**BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Plaintiff,

PAULETTE MATTHEWS, GRETA FULLER,
C.A.R.E., et. al

Defendant,

v.

DISTRICT OF COLUMBIA ZONING
COMMISSION, DISTRICT OF COLUMBIA
HOUSING AUTHORITY, DISTRICT OF
COLUMBIA OFFICE OF PLANNING,
OFFICE OF THE DEPUTY MAYOR FOR
PLANNING AND ECONOMIC
DEVELOPMENT, DISTRICT OF
COLUMBIA DEPARTMENT OF HOUSING
AND COMMUNITY DEVELOPMENT, et al

Defendants.

Civil Action No.
1:18-cv870

Class Action
Civil Rights Complaint

Jury Trial Requested

**COMPLAINT**

**INTRODUCTION**

1. Over the past 12 years , and still continuing today, the District of Columbia has implemented

   policy to attract the Creative Class. City Planning agencies have used land use policy as a

primary tool to implement this agenda. These Land use policies leverage amenities to attract the targeted demographic groups. Moreover, the policies are determinative of unit types that overwhelmingly do not include family units or true affordable housing. These policies discriminate explicitly by age and source of income. Further, this agenda disparately impacts other protected classes such as race, family, religion, and matriculation. Such was the drive to implement these high density land use coveting policies, that over the past 12 years the Zoning Commission has not done its statutory duties as regards assessing the adverse impacts of Planned Unit Developments. Adverse impacts noted in the Comprehensive plan such as displacement and gentrification have gone ignored or been subject to arbitrary findings. Even fundamental administrative functions such as assignment of party status and ANC great weight have been sandbagged to facilitate a new, "world-class" District of Columbia. Further, either no studies, or inadequate studies, were conducted for land use changes that invariably impact housing.    These written policies, and unwritten policies and practices, have perpetuated segregation in the District of Columbia.

## PARTIES

2. CARE members are all African-American's living East of the River.  Many members meet informally on a daily and weekly basis on the streets of the neighborhood, raising awareness among those who are not able or are not inclined to attend civic meetings.  These happenings primarily occur around 15th and 16th St SE and U, W, and V St SE. As gentrification takes hold they are increasingly subjected to incommoding laws and "jump outs".  Their ways of life, which include gathering and holding court outside during day time hours, are

increasingly being challenged by over policing and gentrifiers who have weaponized group listservs and apps like "Nextdoor".  While some C.A.R.E. members are employed, and often work non-traditional hours, many are not and have suffered by city policy to attract the creative class.  C.A.R.E. members also meet formally and have testified before various bodies concerning the affects of gentrification and displacement.  C.A.R.E members are committed to the cause of staying in their neighborhood. They are highly offended by current plans that are underway to actively racially integrate their neighborhoods, as if something is wrong with African-Americans living together in tight knit communities, in East of the River particularly. They are aware their being split apart is intentional and based on their race and culture.  None of them will benefit from any of the projects being built because none of them can afford to live in any of the mixed income developments that are part of this suit and planned for the neighborhood.   In fact, there will be a substantial increase in likelihood that they will priced out of their neighborhoods via gentrification and tax and rent increases as a result of these projects. App.Ex.A.p0001-0003.

3. Paulette Matthews is an original BFTAA and CARE member.  Ms. Matthews wishes to stay on the Barry Farm site during redevelopment and does not wish to be moved out of her neighborhood.   If she is forced to relocate during the construction of the new Barry Farm development she wishes to stay in the surrounding area.   She is African-American.   Ms. Matthews is currently unemployed. Her last job was as a groundskeeper at the National Zoo. She never attended college. She has been living in the Barry Farm neighborhood for 20 years. She is 52 years old and attends church weekly.   She lives in subsidized housing and cannot

afford market rate rental in the District of Columbia.   The housing she is able to afford is

mostly in segregated parts of the city that lack comprehensively planned development.

App.Ex.A.0001-0003.

4. Shanifinne Ball lives in the Union Market area.   She is black, a non-millennial, and lives on

fixed income.   There is currently a 6,000 unit multiple PUD development underway that is

located 1 and a half blocks from her home. Shani is not currently employed.   Her job is to care

for her elderly uncle who has lived in his home for over 45 years.   His home is paid off.   She

will inherit the home after her uncle dies, but she is also worried about rent increases that

increase the substantial likelihood of her being displaced from the area.   It is an area she is

attached to.   She knows many neighbors.   She does not like the new flow of her neighborhood

which no longer has the same residential character as before with the glut of high density 11

story buildings that have been built with even more remaining to be built. Shani is angered that

they have replaced her community with another one she largely does not know because the

buildings are self-sustaining and residents stay in them. As well, the businesses they frequent

are different from the ones she would frequent and in fact some of her relied upon businesses

have closed. App.Ex.A0004-0005.

5. Greta Fuller is a Historic Anacostia resident and also the ANC 8A commissioner.  Ms. Fuller is

suing in her capacity as a resident.   Ms. Fuller is a black entrepreneur who is a non millenial.

Additionally, her business, is not considered a "creative business" by the  DCOP.  Ms. Fuller's

ANC is the same ANC where the Poplar Point development is being built.   Ms. Fuller has

endured  many engagements testifying as a resident and ANC commissioner before the Zoning Commission.  She was among the commissioners able to get the DCZC to delay initial Poplar Point proceedings in order for the developer and various agencies to present more information to the  commission prior to moving forward with the hearing so that the information could be held up to public scrutiny.    DHCD never produced a report for review.   Ms. Fuller is concerned that the zoning process is a sham and that all her efforts as an ANC and resident to help bring the community she is a part of real benefits are for naught.   Ms. Fuller is not opposed to development, but believes it should be thoughtful, fore planned, and appropriate for the community of which she is a part.

6. The District of Columbia Housing Authority (hereinafter DCHA) is a named defendant.  They are located at 1133 North Capitol Street N.E., Washington, DC 20002.  The agency's mission is to "provide quality affordable housing to extremely low- through moderate-income households…" and to provide "sustainable communities, and…opportunities for residents to improve their lives." (http://www.dchousing.org/topic.aspx?topid=21 (follow "About DCHA" hyperlink; then follow "Mission and Vision" hyperlink") (last visited 9/8/2017).

7. The District of Columbia Office of Planning (hereinafter DCOP) is a named defendant.  DCOP is located at 1100 4th Street, S.W., Suite 650 East, Washington, DC 20024.  The DCOP's "mission is to guide development of the District of Columbia, including the preservation and revitalization of our distinctive neighborhoods, by informing decisions, advancing strategic goals, encouraging the highest quality outcomes, and engaging all communities." (https://

planning.dc.gov/page/about-dc-office-planning (follow "About OP" hyperlink) (last visited 9/8/2017).

8. The District of Columbia Zoning Commission (hereinafter DCZC) is a named defendant. They are located at 441 4th Street, N.W., Suite 200S, Washington, DC 20001.  The agency's mission is to "…provide oversight and adjudication of zoning matters in the District of Columbia." https://dcoz.dc.gov/ (follow "About DCZC" hyperlink; then follow "Office of Zoning" hyperlink) (last visited 9/8/2017).

9. The Department of Housing and Community Development (hereinafter DHCD) is located at 1800 Martin Luther King Avenue SE, Washington, DC 20020. The mission of the DHCD is to "produce and preserve opportunities for affordable housing and economic development and to revitalize underserved communities in the District of Columbia." https://dhcd.dc.gov/ (follow "About" hyperlink; then follow "Mission and Vision" hyperlink).

10. The Deputy Mayor for Economic Development and Planning (hereinafter DMPED) is a named defendant. DMPED is located in the John A. Wilson Building, 1350 Pennsylvania Avenue, NW, Suite 317, Washington, DC 20004.

11. Mayor Bowser is a named defendant.  Mayor Bowser is being sued in her official capacity.

12. Mayor Grey is a named defendant.  Ex-Mayor Grey is being sued in his official capacity.

13. Adrian Fenty is a named defendant.  Adrian Fenty is being sued in his official capacity.

14. Harriet Tregoning is a named defendant. Harriet Tregoning is being sued in her official capacity.

15. Eric Shaw is a named defendant.  Eric Shaw is being sued in his official capacity.

16. Anthony Hood is a named defendant.  Anthony Hood is being sued in his official capacity.

17. Neil Albert is a named defendant.  Neil Albert is being sued in his official capacity.

## JURISDICTION

18. This action arises under the Fifth Amendment to the Constitution of the United States; DC Human Rights Act §§ 2-1402.2(a) (5), (b) 42 U.S.C. Code §3604(b); 42 U.S.C. §1983; 42 U.S.C. §1985; and Title VI.

19. This court has original jurisdiction over Plaintiffs' constitutional claims pursuant to 28 U.S.C. §1331 and 28 U.S.C. §§§1343(a)(1), (a)(2), and (a)(4).

20. This court has supplemental jurisdiction over Plaintiff's District of Columbia law claims pursuant to 28 U.S.C. §1367(a) because they are part of the same case and controversy described in Plaintiffs' federal claims.

21. Venue is proper in the District Court of the District of Columbia pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1)(B).


## BACKGROUND

22. Historically, urban renewal projects have involved widespread community destruction and large scale African-American exoduses across the District. This, from the time of the early freedmen who were removed from the "shanties and shacks" they built seeking solace in the Capital immediately after the Civil War. All the way up to these former slaves subsequent placement at Barry Farm freedman's colony (Barbary Y Newsom, <u>The Art Museum as Educator: A Collection of Studies as Guides to Practice Policy</u> 187 (1978). Through and all the way up to the Barry Farm freedman's colony's razing and removal.   App.Ex.B.p0006. To the razing and removal of Reno City in Tenleytown.   **App.Ex.B.p0068**. And the Alley homes and dwellings razing and removal (App.Ex.B0022), to the Southwest Neighborhood's razing and removal (*Berman v. Parker*, 384 U.S. 26 (1954) and the Hope VI projects and Arthur Capper Carrollsburg public housing project razing and removal.   *Compare* App.Ex.B.p0008-0009 *with* App.Ex.B.p0058; *accord with* App.Ex.H *see generally*.   Up to today's current New Communities programming, still not ensuring African American communities can stay intact through "revitalization."  App.Ex.H.p0723-0725.

23. Countless neighborhoods broken up by intentional policy such has been currently enacted by DCOP, DMPED, DHCD, DCHA and the executive office of the mayor and various mayors. That being the case, the latest community up for destruction— Barry Farm—is not aided by a continuation of these repackaged urban renewal[1] policies happening in the same areas for the third time. *See* Newsome and App.Ex.B.p0006.

24. Really these are just ways for private speculators to buy or lease low and sell or lease high with government assistance, i.e. tax incremental financing, government grants, and undervalued land sales, while further weakening a discrete, easily identified oppressed racial group. The resulting diminution in community cohesion primes vulnerable groups of African-Americans for even more economic exploitation to be repeated generationally.  The reason for these policies is solely to upwardly agitate local economies on the backs of the most vulnerable and to do so in a way that's predicated on race.

25. Low income black residents are moved around as easily as "potted plants or flowers"[2] aided by the hands-off approach of the Zoning Commission that seems very unbothered by the past decade of African-Americans being forced out of the city, to the tune of 39,000 between 2000-2010 while gaining 50,000 white residents during that time Ex.J.App.0755-0757.

---

[1] Infamously called negro removal by James Baldwin.

[2] Paulette Matthews

26.It bears repeating, it is under these circumstances that the city is intentionally trying to lighten

black neighborhoods and the way they have primarily been doing it is through construction of

high density, luxury buildings, that primarily only offer studios and one bedrooms.


27.In Barry Farm planning agencies have conspired to demolish 440 units and build nearly 300%

more whitening integrating units, but in whiter areas of the city the "integrating" units are

capped at 8% of the proposed total number of units built and priced above what is affordable

for African-American DC residents. As Barry Farm residents are dislocated or displaced it

tears apart the social fabric of communities and rends support networks. The chance to

*possibly* return to a site with 1000 new, richer, whiter neighbors is not worth the destruction

of relationships and community even if it opens the poor door to more "opportunity".


28.Further, there is no model for *potential* economic integration that is worth the destruction of

communities against a community's will; the disruption of interconnected relationships and the

destruction of stores of goodwill and continuity of reputation for members of a community

within a community. These repeatedly failed policies for economic integration are not worth

how urban renewal uproots lives and changes routines, friendships, and life outcomes.   Not

only in the present, but in ways that reverberate for generations.


29.This type of removal and relocation is cyclical in the District's black communities.   Any

distress or morbidity in the black community today is just as likely the result of 150 years of

government policy executing the removal, dispersal, and displacement of black people in order

to replace them with whites. Since the time of slavery the District's black communities and neighborhoods were rarely given a chance to gain steady footing, grow synergistically, and build successful momentum for extended periods before disruption. There were Barry Farm residents who moved there directly after being displaced in Southwest's urban renewal project of the 1960's. That generational instability, combined with no statehood or 14th Amendment rights leads to a special kind of degradation not experienced elsewhere in the U.S..

30. Barry Farm residents now look forward to another round  or few of displacement as many of the housing servicing residents during the construction time frame is also slated for re-development so it is likely at least some people will be beginning their lives anew more than twice by the time they make it back to a redeveloped Barry Farm site, if they ever do return.

31. Outside of Barry Farm, and by enacting policy that leads to construction of self-sustaining and isolated, high-density, luxury, studio and 1 bedroom PUD's, often numbering into the thousands of units, the District of Columbia planning agencies have intentionally re-segregated neighborhoods.  This has been compounded by the Zoning Commission's repeated failure to ascertain appropriate agency reports from the DHCD, which when combined with the Zoning Commissions propensity to increase density to maximum levels – even in Neighborhood Conservation areas – causes disastrous results for communities, as Comprehensive Plan and FLUM planners never fathomed the types of projects being proposed, which makes the lack of written DHCD reports all the more appalling and

damaging. Combined with patterns and practices of arbitrary rulings on gentrification/ displacement, density, ANC Great weight, party status, and even the environment, it is very clear all city planning agencies, DCZC and OP in particular, have a great deal of animus for close-knit black communities.   Black communities, of which, city planning agencies have sought to break apart and replace with white communities, harmfully perpetuating segregation under the guise of integration.

## STATEMENT OF THE CASE

**Decision to make the District of Columbia a World Class City**

32. September 19, 2006, the Washington DC Economic Partnership announced Richard Florida would present the keynote address at the Washington DC Economic Partnership Annual Meeting on October 17, 2006.   The announcement quotes from Florida directly, "'human creativity is the engine of economic growth. The dynamic nature of creative class workers seeks not only fulfilling jobs, but also tolerant and vibrant communities and cities." App.Ex.C.p0098-0099.

33. Five months later, March 6, 2007, DC Council approved former Mayor Adrian Fenty's nomination of Harriet Tregoning to serve as director of the DC Office of Planning. App.Ex.C.p102.

34. At her confirmation hearing Tregoning stated,

**"This city is on the verge of greatness… But to truly be a globally competitive city in the 21st century, we also need to substantially reduce the disparities that divide the city -- the haves from the have-nots. An inclusive city -- one city -- is a goal I intend to vigorously pursue, especially in terms of health, environment, housing, transportation and economic prosperity outcomes.".**

35. In the press release, Fenty stated "I can't think of a more qualified person to lead the necessary planning to transform the District into a world-class city." *Id*.

36. In fact, prior to her nomination Tregoning never had a leadership role enacting urban planning for a major city; primarily having worked on the environment, and as a state level planner. App.Ex.D.p0110.

37. September 5th, 2007 Fenty and former Deputy Mayor for Planning and Economic Development Neil Albert and other high ranking DC government officials joined more than 200 civic, arts, and business leaders from across the country to discuss ways to grow the city's creative economy at the city's first ever Creative Economy Summit. App.Ex.C.p0104-0105.

38. Experts from various fields convened at Shakespeare Theatre Company's Lansburgh Theatre and "shared their stories in helping other cities transform their economies and offered insights into how DC can expand its creative economy" *Id*.

39. With no less than 6 months experience planning for a major urban city, and not more than one day after DC's first ever "Creative Economy Summit",   on September 6, 2007, the Office of Planning was named as a collaborator in implementing the "Creative Action Agenda". *Id*.

**Office of Planning Overreach**

40. The September 6, 2007 press release from the Deputy Mayor for Planning and Economic Development called for inter-agency cooperation between the Deputy Mayor's Office, DC Commission on the Arts and the Humanities, and the Washington DC Economic Partnership. *Id*.

41. The resulting plan would ultimately also require cooperation between the District of Columbia Office of Planning and the District of Columbia Office of Tax and Revenue, the District of Columbia Board of Zoning Commissioners, the District of Columbia Board of Zoning Adjustments, the District of Columbia Department of Housing and Community Development, and the District of Columbia Housing Authority.

42. And in a more indirect manner nearly every other agency in District government cooperated with the District of Columbia Office of Planning to implement The Plan to become a world class city.

43. The far-reaching plan also called for the advent of new agencies, and new tax, land use, and zoning policies.

44. The title of the press release, "District Launches Creative Economy Initiative DC's Focus on Idea People Can Transform Neighborhoods" underscores the motivations of the Plan. App.Ex.C.p0104-0105.

45. Within the release is an express desire from DMPED to create "appealing neighborhoods that attract more creative people." *Id*.

46. The Plan included a future study which would be called the "Creative DC Action Agenda". App.Ex.E.0419-498.

47. An action plan for "strengthening" the District's "creative economy". App.Ex.C.0104-0105.

48. Among other things the "Creative DC Action Agenda would:

> **"develop an inventory of the District's creative assets, assess the District's competitive position, and identify the industries that the District should target.   It also will assess the effectiveness of *land use, development, and planning strategies* in promoting creative uses throughout the District"**

(emphasis ours).  App.Ex.C.0104-0105.

49. The Plan introduced a paradigm shift, whereby the Office of Planning and DMPED began framing policy around what constitutes the highest and best use of a person's personhood, rather than land. (Predicating land use policy on the predilections of a certain class of individual) *Id*.

50. As part of this overreach, a person's chosen profession, status as a Millennial, familial status, religious beliefs, and educational attainment all became important considerations in determining land use policy and affecting who has best access to quality housing, public amenities, natural amenities, and public transit.

**Richard Florida's Preeminence and the Creative Class City-Growth Engine.**

51. Between Tregoning's confirmation hearing March 6, 2007 and the launch of the "Creative Economy Initiative" September 6, 2007, Tregoning did not pioneer any of the widely cited theorems about the "Creative Economy" or the "Creative Class".

52. However, in 2002, urban planner Richard Florida did first identify the Creative Class in his seminal novel "Rise of the Creative Class". (Richard Florida, The Rise of the Creative Class : And How it's Transforming Work, Leisure, Community, and Everyday Life (HarperBusiness 2005) (2002)

53. "Rise of the Creative Class" has been cited 18,130 times. App.Ex.G.p0589.

54. The theories it propounds are ubiquitous in the urban planning field.

55. Arguably, the book is alternatively the most heralded and criticized book in modern urban planning.

56. In 2004 Florida received the Harvard Business Review, "Breakthrough Idea of the Year" based on his identification and study of the creative class.  In his career Florida has also won Esquire Magazine's "Best and Brightest Award" and was named the "World's Most Influential Thought Leader" by MIT Analysis. App.Ex.D.p0114.

57. Since 2002, Florida has written 9 books on the "Creative Class" and the "Creative Economy" in urban centers. *Id*. at 0117.

58. Florida has written 25 academic journal articles on the "Creative Class" and the "Creative Economy" in urban centers.  Some of the titles include "Human Capital in Cities and Suburbs", "The Happiness of Cities", "There goes the Metro: How and Why Artists, Bohemians, and Gays Effect Housing Values", "Innovation, Human Capital, and Creativity", "Human Capital, the Creative Class, and Tolerance", "Bohemia and Economic Geography". *Id*. at 0117-0122.

**Richard Florida's Influence on District of Columbia Office of Planning Policy**

59. In DCOP's early pursuit towards fulfilling Fenty's world class city goals, DCOP and Director Tregoning relied on Florida's theories.

60. In May of 2010, a team of consultants published a report commissioned by the DC Office of Planning (DCOP) and the Washington, DC Economic Partnership.

61. This report, the Creative DC Action Agenda, was created to "quantify and put into context the creative economy of the District" (App.Ex.E.pp0425) and was to be a blueprint to increase connectivity between the public, private, and nonprofit sectors to the District's existing assets and support systems. *Id.* at 432. These enhanced connections would promote revitalization, livelier streets and neighborhoods, a greater impact for planning, the generation of new work opportunities, and the furtherance of a "sense of place" for residents and visitors in communities such as Anacostia. *Id.*

62. DCOP used Florida's theories to make District of Columbia neighborhoods, particularly the neighborhoods surrounding the green-line spine "vibrant", "rejuvenated", and places where people "want to live".   Harriet Tregoning, YouTube, TEDxWDC Harriet Tregoning at 4:40-7:25 (TedxTalks posted Jul 5, 2012) (available at https://www.youtube.com/watch?v=6Tg_nIlXJFE).

63. With the "The Creative DC Action Agenda" the District set forth concrete plans to attract the creative class and noted that one of the positive effects of a creative economy was that as businesses within that economy gained higher profiles they helped make the District a more attractive destination for "high-value" future residents.  App.Ex.E.p 0445.

64. The report quotes article, "The Young and Restless in a Knowledge Economy" and states "25-34 year olds…" comprise an important part of the creative class and therefore cities "must be magnets for these highly coveted workers." *Id*.

65. Under the subsection "Attracting Talent", "The Creative Action Agenda" borrows heavily from Florida alleging that "knowledge workers make decisions about where to live based on their values, desired amenities, and community sensibilities" *Id. accord* with Richard Florida, The Rise of the Creative Class : And How it's Transforming Work, Leisure, Community, and Everyday Life (HarperBusiness 2005) (2002)

66. Since then the District of Columbia's Planning policy has centered on attracting and retaining the Creative Class, releasing two policy documents in the following decade, named the Creative Economy Strategy (2014) and the Creative Plan DC (2016).

67. The Creative Economy Strategy states, "[B]y changing zoning regulations in industrial areas and allowing residential use, the District will increase affordable space for creative businesses…and creative uses, including make/live space.   In executing this initiative, the District government will analyze the costs and benefits of modifying its zoning regulation.   If viable, the District will work to update zoning regulations to reflect the recommendations that come out of this report."  App.Ex.E.p0548.

68. It also states in order for a business to be a Creative business the business must "either (1) produce innovative goods or services or (2) use innovative processes to produce goods and services." *Id*. at 0518.

69. This is an admission directly from DMPED that DC resident's access to rental property or real property will be predicated at least in part on membership in an invented discrete class which directly discriminates based on source of income. For instance, providers of traditional goods and services with traditional processes would be hindered from space in the creative use re-zoned development. *Id*

**Director Tregoning was Richard Florida's brain child**

70. On July 11th 2011 Tregoning gave a TedTALK elaborating on   the "Creative DC Action Agenda", stating:

> **"People are really flooding into the city.  And the people coming are making the city more diverse.  A lot of what they are attracted to is uh you know is the creative part of the city and the creative occupations.  The idea that you can come here…and be innovative. It makes us a growing city: our cool neighborhoods, our social media, our transportation choices…This is why people tell us that they are coming here… The fact that you can come here and create something no one has created before… we now have dozens of …fascinating… neighborhoods where people are dying to live…and the people that we are attracting here are often very highly educated.  We are a region that is more highly educated than any in the country and the people that are moving here are even more highly educated."**
> **71.**

72. Harriet Tregoning, YouTube, TEDxWDC Harriet Tregoning at 4:40-7:25 (TedxTalks posted Jul 5, 2012) (available at https://www.youtube.com/watch?v=6Tg_nIlXJFE).

73. In the TEDTalk, Tregoning posits it is "cool neighborhoods" that are "fascinating" and "diverse" and provide the opportunity for creatives to affirm their identity as "innovators" {*Id.*} that draw the sort of "18-34  year old high value knowledge workers" the District publishes the "Creative DC Action Agenda" to assert it must attract like "magnets" and is "key" to growing the city's economy.  App.Ex.E.p0445.

74. Of course, this closely mirrors Florida's data, which reveals what creative class members "look for in communities are abundant high quality experiences, an openness to diversity of all kinds, and, above all else, the opportunity to validate their identities as creative people". *Id*. at

75. On November 15, 2013 Tregoning interviewed with the Washington Project for the Arts along with artist Gabriel Mellan.  She explained that an initiative to utilize building lobbies for "the layering of art exhibits, interior design, vending, and a speaker series" was "grounded in efforts that OP (Office of Planning) has been undertaking for several years, which seeks to strengthen neighborhoods through creative place-making approaches". App.Ex.F.p0563.

76. These "Creative Place Making" approaches activate building lobbies with light shows and other visual art and is one of several approaches taken by the Office of Planning in collaboration with DC Office of Arts and Humanities to attract "high-value" workers or "18-34 year old 'millenials'", including, but not limited to, food trucks, temporary art installations, parties, ethnic events, festivals, food markets, generation appropriate outdoor

movies, and performance art etc., supplemented with targeted ad campaigns aimed at preferred

DC residents or preferred potential DC residents.

77. After Tregoning left the District's office of planning, she reflected on the multilayered

experiences millennials are drawn to: "thing about millennials is that they really want to have

experiences."  App.Ex.F.p0568.

78. In the interview, Tregoning provides further insight into what goes into attracting favorited

prospective residents,

> **"Millennials don't like to be yelled at, so they come once and they're out of there.
> But what if you make part of your planning process painting a road tattoo to show
> what a plaza would look like in the future, or doing a festival that occupies empty
> storefronts to show what it would look like if the plan was fully implemented, or
> building street furniture? You could demonstrate the market potential of their
> residence by bringing in food trucks …"**

*Id*. at 2.

79. Of course, Florida's observations are nearly identical.   In one of Florida's early academic

articles, and based on surveys of creative class members, Florida theorized,

> **"Creatives …prefer indigenous street level culture—a teeming blend of cafes
> sidewalk musicians and small galleries and bistros, where it is hard to draw the line
> between performers and spectators. They crave simulation, not escape.  They want
> to pack their time full of dense high quality, multidimensional experiences. Seldom
> has one of my subjects expressed a desire to get away from it all, and do it with eyes
> wide open."**

App.Ex.G.p0609.

80. Early on Tregoning staked much of her planning legacy in the District on the ideas of Florida. In 2009, the District started tracking the results of that strategy.

**Millennial Demographics**

81. In 2015 DCOP released a report named "Millennials' Demographic Characteristics DC vs US", which tracked, inter alia, the "key" "25-34 year old demographic." App.Ex.H.p0613-0626.

82. Between 2009-2013, and only two years after DC launched the "Creative Economy Initiative" and began to actively "attract" "high knowledge" "high value" "creatives" the amount of 18-34 year olds in the city was at its highest levels in over 30 years of tracking the statistic despite the overall amount of 18-34 year olds in the United States being at its lowest since tracking began. *Id*. at 0616.

83. In the year 2000 the number of 18-34 year olds made up 30.5% of the DC population and 23.7% of the US population yet by 2009-2013 the 18-34 population within DC had risen to 35.0% despite the overall numbers of 18-34 year olds in the country dropping by .3% to 23.4% and being on a steady decline since 1980 when the 18-34 year old population of the country was 29.6%. *Id*.

84. Between 2009-2013 the gap between the percentage of 18-34 year olds living in the District versus the rest of the country was +11.6%. However, historically, from 1980 until 2009, the 18-34 year old population in the District versus the rest of the country had hovered between +5-7%. *Id*.

**Tregoning at The District of Columbia Office of Planning**

85. Tregoning was so successful in drawing the "key" "Millennial" "high value worker" she survived Mayor Fenty.

86. Tregoning was reappointed and the "Creative Economy" was further institutionalized into the new Mayor Grey administration with the introduction of the "The Creative Economy Strategy", which outlined Office of Planning accomplishments involving the "Creative DC Action Agenda" and also included updated strategies with all that had been learned over the past 4 years implementing the "Creative DC Action Agenda". App.Ex.E.p0143.

87. The "Creative Economy Strategy" served as a policy document for city development moving forward. *Id*. and *See generally*.

88. Under a subsection named "Changing Demographics", the policy document institutionalizes Richard Florida's contributions to Office of Planning policy and asserts how important attracting "Millennials" are to the city's economic resurgence:

> **The research of social scientist Richard Florida has served as the trigger for much of the thinking nationally and internationally around the Creative Economy. Best known as an authority on the concept of the creative class and its implications for urban regeneration, Florida argues that cities garner longer-term prosperity if they attract and retain high-quality talent within creative industries, the so-called creative class.**

> **As Millennials move to the District, they bring disposable income to support a vibrant arts scene, openness to diversity and support for the creation of social and professional networks. These qualities, among others, make this demographic the basis for the robust creative class Florida describes, one that supports the labor demands of the District's growing Creative Economy.**

*Id.* at 0155-0156.

89. The Creative Economy Strategy further states "To maintain its positive trajectory for economic expansion, the District must nurture and enlarge its significant Creative Economy and leverage its notable creative assets, including its…Reputation as a magnet for young talent." *Id.*

90. This is another admission directly from DMPED that there are favored DC residents. DMPED explicitly states its intent to is to enlarge the creative economy by "leveraging" its reputation as a "magnet for young talent" {*Id.*} by altering land use and city planning.

91. "Florida argues that cities garner longer-term prosperity if they attract and retain high-quality talent within creative industries, the so-called creative class…" and that the millennial

demographic is "the basis for…" a "robust creative class" acknowledging that "Millennials are the most highly educated… generation in U.S. history." *Id*. at 0156.

92.44. This belies an elevation of millennials and "young talent" over other kinds of people or talent, having labeled the reputation of having them in the city as a "notable asset" of which to take advantage, compared to what must be a non-notable asset or maybe even a liability. District Government has a clear preference for millennial creatives, making it somewhat harder for those residents that aren't notable assets. *Id*. at 0152.

93. By the time of the "Creative Economy Strategy" publication in 2014, and even before that in 2010 when the "Creative Action Agenda" was published, Florida was a full-fledged economic development guru collecting fees nationally and internationally in excess of $35,000 per speaking engagement to consult municipalities on how to grow their creative economies by attracting creative individuals. App.Ex.G.0591.

94. When the "Creative Economy Strategy" was released in Spring of 2014, Tregoning was a thought leader in her own right and was beginning to be seen as an urban planning star. The Atlantic Magazine would eventually dub her "The Futurist". App.Ex.F.p0571.

95. Few knew that before "The Futurist" became a popular nickname for Tregoning that it was a name she used to describe *herself* in a 2010 Washington Examiner, cute, slice of life piece about house hunting. App.Ex.F.p0575.

96. In the Atlantic article, Tregoning was noted as having brought "a certain energy and intolerance for bureaucracy from the city government…" when she first began as director of the DCOP.  App.Ex.F.p572.

97. Between 2009-2013, Tregoning had put her stamp on the "Creative Economy", emphasizing Transit Oriented Development and high density, walkable, public transit accessible communities with a high dose of creative place making. (Tregoning was Co-founder of Smart Growth America).  *Id.* at 572-573; *see also* App.Ex.F.p0581-0582.

98. When 2014 approached, Tregoning had outgrown the DC Office of Planning.

99. In February, Tregoning left the DC Office of Planning for the Obama administration to oversee the "Office of Sustainable Housing and Communities" at HUD.  App.Ex.F.p0581.

**Florida Changes Course and Tregoning's Legacy**

100. By 2014 Florida was headed a new direction too.  After spending several years post 2008 recession peddling hope to hard hit places and "new economy winners" alike, Florida was now expressing some reservations about the "Creative Economy."

101. His research showed there was a direct correlation between segregation and concentrations of the creative class. App.Ex.H.p0702; *see also* App.Ex.H.p0661-0663.

102. In fact, Florida found creative class clusters perpetuated and worsened segregation patterns and that he has known this since at least 2014. *Id.*; *see also* Richard Florida, The New Urban Crises: How Our Cities Are Increasing Inequality, Deepening Segregation, and Failing the Middle Class—And what we can Do About it (Basic Books 2017).

103. Place-making for creatives, especially when done in dense areas with public transportation, led to segregation between creative class and non-creative class members which also correlated along racial segregation lines. (Negative correlation between blacks in creative class and large black population.  Also large negative correlation for presence in creative class when workers drive to work alone. DC has a large black population that also disproportionately drives to work thus increasing segregation and inequality as non-presence in the creative class in areas that primarily have creative economies contributes to segregation and inequality.) App.Ex.H.p0700-0701; *see also* App.Ex.M.p1429

104. Between Tregoning's high density, TOD, and Florida's Creative Place making, the District possessed all the factors for a perfect racially segregative storm piqued for inequality.

105. On September 14, 2014, Florida, through the Martin Prosperity Institute, released the "Divided City : And the Shape of the New Metropolis.".  Florida wrote

**"While all classes of workers receive higher wages in knowledge metros, they found, housing prices are higher too—and the wage premiums that the service class and the**

blue-collar working class receive are not large enough to make up for the difference. Another study found that inequality was compounded by differentials in access to services and amenities. *Skilled knowledge workers derive distinct advantages from living in safer neighborhoods with better schools, better heath care, and a wide range of services and amenities*, a gap in well-being that is 20 percent higher than the simple wage gap between skilled and unskilled workers can account for." (emphasis ours)

App.Ex.H.p0642.

106.61.9% of DC metro area white workers are creative class members.  App.Ex.H.p0697.

107.40.9% of DC metro area black workers are creative class members.  *Id*. at 0695.

108.White DC metro area residents are 34% more likely to be creative class members. *Id*. at 0699.

109.There are .66 black creative class members living in the DC metro area for every 1 white creative class member.  *Id*. at 0693.

110.Nationally blacks make up 12% of the US population but only 8.5% of the creative class jobs. *Id*.

111.Nationally whites make up 64% of the US population but comprise 73.8% of the creative class jobs. *Id*.

112.Hyper-locally, "Seven of the ten top service class tracts are located in historically black neighborhoods within DC city limits."  App.Ex.H.0662.

113.In a 2011 study Florida found that nationally Women comprise 52.3% of the creative class but after controlling for "hours worked and education in a regression analysis, creative class men out earn creative class women by a sizable $23,700, or 49.2%." App.Ex.H.p0712.

114.Between 2000 and 2014 the District of Columbia creative class population grew from 38.8% to 44.6% of the worker population.   App.Ex.H.p0706, 0707.

115.The Creative Class skews white.  App.Ex.H.p0696,0697.

116.The Creative Class skews highly educated.   Harriet Tregoning, YouTube, TEDxWDC Harriet Tregoning at 4:40-7:25 (TedxTalks posted Jul 5, 2012) (available at https://www.youtube.com/watch?v=6Tg_nIlXJFE)

**By Implementing Florida's Theories The District of Columbia Incentivized High Value Residents to Live in the City to the Detriment of Existing Non Favored Residents.**

117.From 2007 to present, long standing, tight knit, civically active, and historically stable African-American communities form the base of a disproportionate share of the community

opposition to PUD approvals leading to party status.   This was already baked into Florida's

theories as early as 2003. App.Ex.L.p14.


118.In an article titled, "Cities and the Creative Class" Florida waded into dangerous territory for

a government but something perhaps inevitably explored as an academic.  *Id*.


119.Beyond what a government can do to "Creative Place-Make" and attract Creatives is to

discover what is inimical to the Creative. *Id*.

120.    As it were, in the article, Florida applies the field research and empirical data gathered by

University of Texas sociologist Robert Cushing to his own theories about driving creative

class growth.  Cushing found,

> **"…that regions that ranked high on the Milken Tech pole Innovation
> index and Innovation index ranked low 11 of Putnam's 13 measures of
> social capital.  High tech had less trust, less reliance on faith based
> institutions, fewer clubs, less reliance on faith based institutions ,
> fewer clubs, less volunteering less interest in traditional politics , and
> less civic leadership. The two measures of social capital where these
> regions excelled were protest politics and diversity of friendship.
> Regions low on the Tech Pole index and the innovation index were
> exactly the opposite . They scored high on 11 of the 13 Putnam
> measures but below average on protest politics and diversity. Cushing
> then threw into the mix individual wages , income distribution,
> population growth, numbers of college educated residents, and
> scientists and engineers.   He found that the high tech regions had
> higher incomes, more growth, more income inequality, and more
> scientists engineers and professions than their low tech, but higher
> capital counterparts.    When Cushing compared the gay and
> bohemian indexes to Putnam's measures of social capital of the 40
> regions surveyed in 2000 , the same basic pattern emerged:  Regions
> high on these two diversity indexes were low on 11 of 13 of Putnam's
> categories   of social capital. In Cushing's words, "conventional
> political involvement and social capital seem to relate negatively to**

> **technological development and higher economic growth" . "The low social capital communities had the highest rates [of] diversity and population growth" "The high social capital communities showed a strong preference for "social isolation" and "security" and "stability" and grew the least—their defining attribute being a "close the gates mentality"**

*Id*.

121. This led Florida to conclude that:

> **"Creatives prefer "quasi anonymity. In terms of modern sociology these people prefer weak ties to strong. This leads me to an even more basic observation. The kinds of communities that we both desire and that generate economic prosperity are very different from those of the past."  . Social structures that were important in earlier years now work against prosperity. Traditional notions of what it means to be a close, cohesive community and society tend to inhibit economic growth and innovation. Where strong ties among people were once important, weak ties are now more effective.  Those social structures that historically embraced closeness may now appear restricting and invasive. These older communities are being exchanged for more inclusive and socially diverse arrangements."**

122. *Id*. at 16; *See also Id*. at 5.

123. In the same 2003 article, Florida put it even more succinctly, stating "The same strong ties that help members of a group often enable it to exclude outsiders." *Id*. at 6.

124. Communities East of the River and other historically African-American neighborhoods provide a strong contrast to the "plug and play" communities for creatives who are looking to find a "facsimile of a life" within a week. App.Ex.G.p0608.

125.Indeed, inequality has always been a topic of discussion in Florida's theories about the Creative Economy. From his earliest publications to the present, Florida has acknowledged that shifts in relations of production lead to increased inequality. David Harvey (1990) termed this Post-Fordist mode of production    Flexible Accumulation, a mode of production "characterized by the emergence of entirely new sectors of production, new ways of providing financial services, new markets, and, above all, greatly intensified rates of commercial, technological, and organizational innovation" (Harvey 1990:147).

126.The significant aspect of this mode of production is the relationship to finance capital, which coupled with a regressive tax code is accepted as heightening inequality (Piketty 2014) and increasing the use of previously obscure instruments like Tax Increment Financing in urban redevelopment policy (Weber 2010:251).

127.But upon information and belief, neither Tregoning nor the Office of Planning has ever made explicit public pronouncements proclaiming a desire to destabilize African American neighborhoods nor increase inequality among them in order to disperse legacy residents with "strong ties" so creatives can "plug and play" to more easily justify the Office of Planning's millions in infrastructure investments, institutional buy-in, public/private partnerships, and opportunity costs sunk into attracting creatives.

128.Upon information and belief, The District of Columbia Office of Planning and the Office of the Deputy Mayor for Economic Planning and Development both understood what was

inimical to the Creative and advised the Zoning Commission to ignore its statutory duties when Creative Place-Making projects faced community opposition or when neighborhoods inimical to the creative class posed opposition.

129. After gentrification set out across the country, leaving many fragmented communities in its wake, and Florida made a full throated mea culpa by way of his latest book named the "New Urban Crises" which, coincidentally, was mostly caused by his own snake oil. *See generally* Richard Florida, The New Urban Crises (2017).

130. The District of Columbia, for its own part, doubled down by implementing the Creative Plan DC in 2016. In fact, 202Creates celebrated the entire month of September 2017 and the current Mayor held its launch party at a night club. App.Ex.C.p0107-0108.

131. For his part, Florida has teamed with the International Development Bank (and is taking his reverse blockbusting schemes to the indigenous and immigrant communities in Latin America, currently speaking with mayors across the South America. https://www.eventbrite.com/e/richard-florida-at-the-idb-the-new-urban-crisis-tickets-33346902483#

132. Both the Creative Plan DC, which was issued in 2016 (hereafter "CP DC") and 2016's Consolidated plan issued the same year (hereafter "CP 16") states it is a policy goal using mixed income communities to racially "integrate" neighborhoods despite knowing such efforts

were "re-segregating them". It is to the point now where zoning decisions are regularly held up in the court of appeals and many are awaiting adjudication.

**Creative Class Policy was bolstered by explicit policy to break apart historically black communities by re-segregating them through wholesale approval of high density projects meant for creative class millennials**.

133.In 2012 DHCD released the 2006-2011 Analysis to Impediments to Fair Housing Choice. When describing EoTR it notes African-Americans were "over 98 percent in but a...handful of...neighborhood clusters." App.Ex.E.p0217. The document goes on to state, "*This extreme degree of segregation is the District's greatest fair housing challenge* [emphasis not ours]." *Id*. Maybe somewhat naively, it goes on to state   "The District's goal should be to achieve the racial and ethnic composition throughout the city that would exist in a genuinely free housing market not distorted by racial discrimination." *Id*.

134.That same year, in 2012,  as a "local response to neighborhood redevelopment in the wake of federal budget cuts", (http://dcnewcommunities.org/, follow "About NCI" hyperlink)(last visited 9/8/2017)  DC Council adopted New Communities.

135.In 2012's AI the District acknowledged gentrification.  App.Ex.E.p0217. The AI stated areas they had sought to integrate were becoming segregated again, this time segregated with white people. App.Ex.E.p0388.

136.New Communities and the Creative Economy were given the green light by overtly racial government policy and even when DCOP, DMPED, DCZC, and DCHA knew the destruction it was causing to black communities, they continued.

137.In a subsection of the District of Columbia FY16- FY20 Consolidated Plan titled, "Are there other strategic opportunities in any of these areas?" The Plan states, "It is vital to create affordable housing that integrates neighborhoods racially and economically... To this end, strategic opportunities include...development of mixed-income housing, particularly in areas of the city where market rate housing could subsidize affordable income targets." Department of Housing and Community Development, FY 2016-FY 2020 Consolidated Plan, p. 137.App.Ex.J.p0944 available at https://dhcd.dc.gov/service/consolidated-plan-housing-and-community-development). The District's Consolidated Plan explicitly states race is a factor in carrying out the development of mixed income communities. *Id*.  DMPED and the DHCD formed the Consolidated Plan in 2016, but the DHCD has advocated for racially integrating communities since 2012's AI... That notwithstanding, in the very same document, DHCD warns that "[T]he in-migration by wealthier whites is producing gentrification that is reducing the Districts supply of housing affordable to households with modest incomes and threatens to resegregate these gentrifying neighborhoods as virtually all-white." App.Ex.E.p0216, 0388.

138.The 2016 Consolidated Plan is an active DC government policy to create mixed income neighborhoods in order to racially integrate them in a manner where the market rate housing

pays for the affordable housing when in 2011 the District Government knew their plans to integrate neighborhoods were turning them "virtually all" white. *Id*.

139.The timing of the AI report coincides with the public scaling up of the Creative Economy and DMPED's release of the "Creative Economy Strategy".  New Communities was another way to carry out the non-race neutral goals of the AI, and after 9 years of inactivity New Communities was relaunched the same year DMPED released the Creative Economy Strategy. App.Ex.M.p1426-1428.

140.Today the Creative Economy is the driving force of District of Columbia urban planning. It relies on densely packed apartment buildings near to metro.  But not just anybody can crowd near metro if the Creative Economy is to be viable, it has to be a class of resident with high education levels, earning income from "innovation", and preferably be a millennial. If people are the fuel for the Creative Economy large mixed income buildings are the vehicle.  Even though "Mixed Income" is a misnomer of sorts, as 8% affordable Inclusionary Zoning Units at 80AMI technically is mixed income.

141.The Creative Economy requires density   New Communities also requires density. In 2006, the Creative Economy, New Communities, and The Analysis to Impediments to Fair Housing Choice gave reasoning for the boosts in density the city would be requiring to successfully implement the Creative Economy. In 2012, DHCD was of the position too many black people

living together EoTR was problematic and city planning apparatus set to break apart those neighborhoods.

142. In 2016, the District of Columbia was warned by HUD for its "entrenched dual housing market" and "High cost of housing leading to displacement of low to middle income residents".  App.Ex.E.p0412.   The District of Columbia was also warned by HUD that there was a "lack of clear goals and objectives to achieve stable, racially-integrated neighborhoods."*Id.*

143. The lack of clear goals and objectives to achieve stable, racially integrated neighborhoods is evident in the Zoning Commission's failure to gather DHCD written reports as required by statute.  App.Ex.E.p0412.; *see also* ZC Nos. 14-02, 16-13, 16-09, 15-27, 15-24, 16-02, 16-07, 15-29, 15-28, 15-16, 15-22.

144. On more than one occasion, in the Zoning Commission's rush to achieve high density, the Commission has introduced high density, luxury, studio and one bedroom, very predominately market race housing, into neighborhood conservation areas with low lying homes and moderate density without an analysis from the DHCD as to adverse impacts on the stability of the neighborhood despite the huge differences in the proposed PUD and the Future Land Use Map.

145. The commission is often satisfied by architectural "step backs"  that helps the physical structures blend into the neighborhood but refuses to consider any substantive adverse impact to the community.

146. Often the Commission attempts to head off any dissent at all by denying party status.

147. Ostensibly New Communities and the Creative Economy are meant to "economically integrate" and "revitalize". (Office of the Deputy Mayor for Planning and Economic Development, New Communities Initiative, https://dmped.dc.gov/page/new-communities-initiative-nci) (last visited 9/7/2017).

148. In reality and in practice they are classist, racist, and ageist policies that lead to widespread gentrification and displacement when implemented with no clear plan for stable neighborhoods. Every city planning agency: OP, DMPED, DHCD  and DCHA conspired to make DC very welcoming for preferred residents and sought to displace residents inimical to the creative economy.

**New Communities Is The Vanguard Government Policy To Eliminate Low Income, Non-College Educated, Larger Family'd, Close-Knit, African-American Communities.**

149. The New Communities program, which began in 2006 but has been given ongoing allegiance from the District government over the years of repeated implementation attempts and questionable successes, is an active policy program that states it is

**"designed to revitalize severely distressed subsidized housing and redevelop communities plagued with concentrated poverty, high crime, and economic segregation. The initiative targets four neighborhoods in the District of Columbia, including Barry Farm in Ward 8, Lincoln Heights/Richardson Dwellings in Ward 7, Northwest One in Ward 6 and Park Morton in Ward 1."**

*Id.*

150. The stated goals of the New Communities program do not hold up to scrutiny and has largely been a failure.  App.Ex.H.p0715-0752.

151. The New Communities program perhaps more than any other exemplifies Florida's pondering about what is inimical to the Creative Class and is the underside of using the Creative Class as a city-growth engine. Each Public Housing project is a close-knit community inhabited by people largely without formal education. The situation presents as less innovative producers and processes being recognized with job offers and venture capital, and more babysitter, barber, dental assistant, fast food, and security guard jobs sustaining people. App.Ex.H.p0662.

152. Neil Albert, the District's Deputy Mayor for Planning and Economic Development  was the person who first announced the Creative Economy in the District of Columbia and is currently the board of the District of Columbia Housing Authority. Albert has overseen votes to disallow

development in place for Barry Farm residents contrary to statute but in furtherance of city planners' goals to turn DC into a world class city.

153. New Communities targeted neighborhoods are the anti-creative class and they have been overtly targeted for elimination through the combined use of the Consolidated Plan, New Communities, Creative Action Agenda, Creative Economy Strategy and Creative Plan DC and implemented through patterns and practices of discrimination at the Zoning Commission.

**The New Communities Program Is Steered By Overtly Discriminatory Policies But The Program Itself Disparately Impacts Black People and So Does the Creative Economy.**

154. In Zoning Hearings the DCHA touted the mixed income, economic integration aspects of the Barry Farm project. *See generally* ZC Tr. 14 *and* ZCO 14-02. Also, mentioning communities "plagued" with high crime and the presence of concentrated poverty. The creation of a mixed income community at the Barry Farm site was ostensibly one of the reasons for re-development.

155. Targeting low income District of Columbia public housing communities to become mixed income ones at expense of potentially decades long dislocation and permanent displacement disparately impacts black people compared to other races.

156. On top of overt discrimination in government disseminated policy documents followed by every city planning agency somehow even including the Office of Arts and Humanities, and

on top of a nearly perfect 1 for 1 disparate impact implicating the New Communities program, the Zoning Commission seems to have a real axe to grind against long standing, close knit, mainly African American communities.   As the regulatory authority, DCZC, consistently smooths over OP, DMPED, DHCD, and DCHA plans with arbitrary rulings and bizarre hearings where directly impacted residents' party status receives irrational scrutiny but developer adverse effects go ignored.

157. This is because both the Creative Economy and New Communities require high density development. The Creative Economy "clusters" highly educated young people together in order to "creative place make" and create experiences.  New Communities allegedly requires high density in order to support the cost of the public housing replacement units. App.Ex.B. In a way, the Zoning Commission has come to exist as a body that simply okays density increases through the PUD process.

158. Predictably, the neighborhood's with the most dense development have undergone the most demographic change from 2005-2009 to 2010-2016:

159. American Community Survey estimates Navy Yard (Census Tract 72) had 625 total residents between the years 2005-2009.  Of those 625 residents, 138 were white and 459 were black.  So 73.44% of Navy Yard residents were black compared to 22.08% of residents being white.   After implementation of the city planning apparatus policy, and by the time of 2010-2016, Navy Yard  had 4,664 total residents.  Among them 3,085 were white and 1,294 of

them were black.  The percentages virtually flipped, with 66.1% of the population being white

and only 27.7% being black.

160. Navy Yard has the most dense development in the city.  App.Ex.O.p4; *see also Id.* at 1-6.

161. This trend begins as Northward as Petworth, continuing along the greenline and trekking

east to Bloomingdale, and H. St., continuing south and eastward to Anacostia.

162. Bloomingdale has seen some of the most intense re-segregating.   From 2005-2009

American Community Survey estimates Bloomingdale had a total 5,107 residents.  3,439 were

black, or 67.3%; while 1,126, or 22% were white.  By the 2010-2016 survey, there were 6,135

total residents and despite gaining over a thousand total residents, the area lost 770 black

residents for a total 2,669 black residents living in the Bloomingdale neighborhood consisting

of census tracts 33.01 and 33.02.   Black residents went from 67.3% of the population to 43%

of the population.  White residents grew to make up nearly 46% from 22% of the population.

163.Likewise, U St. gained 2,674 residents, going from 6,795 in total residents in the surveys

collected from 2005-2009, to 9,469 residents in 2010-2016.  Despite U St. gaining 2,674 total

residents black residents were displaced.   From 2005-2009 there were 2,355 black residents

but by the time of 2010-2016 there were only1,984 black residents.   The U St neighborhood

lost 371 black residents and gained 1,306 white residents during the same time period. During

that time period black residents went from 34.65% of the population to 20.95% of population

while white residents experienced population growth going from 58.01% of the population to

65.98%.

**To exacerbate matters the Zoning Commission has a Pattern and Practice of Ignoring its Statutory Duties in Order to Carry Out District of Columbia Office of Planning Creative Class policy and practice to re-segregate neighborhoods by wholesale approval of increased density despite community reported adverse impacts and overall community sentiment.**

164. The Office of Planning generally, and the Zoning Commission more specifically, has routinely undermined the ability of a certain and predictable variety of DC resident to have an individual say and to associate with others to exert influence on government decisions on how they live and organize their communities.

165. Between 2014 and the Present the Zoning Commission made a series of arbitrary decisions where gentrification, displacement, tax increases, dislocation, or, any concern, really, that might displace primarily non college educated, mostly black, service and working class, lower income individuals from their communities, was essentially ignored and brushed off by the Commission.

166. Such disregard for current residents' concerns was calculated to re-segregate black communities into white upper class and creative class communities. Among the concerns raised by "high social value" residents are gentrification, displacement, tax rate increases, and displacement. In every instance the Commission made outrageous findings which require impossible suspensions of disbelief to ignore the adverse impact of projects.

167. The Zoning Commission has in concert with the Office of Planning repeatedly made arbitrary findings on matters as fundamental as party status ZC No.14-02 (FFCL.FF.8.P1,2; FFCL FF.9,10,12,13.P2.)(App.Ex.J.p0771-0772) (Prejudiced by initial denial of party status for not being "uniquely" impacted despite being Barry Farm residents); ZC No.15-24 (Ex. 27A.p1-17.App.Ex.J.p0791-808; *see also* ZCO.FF.9.P3.App.Ex.K.p1086.) (Denying party status due to not being impacted despite UMN having membership living one block and a half from 1000 unit luxury development); ZC No.15-28 (Ex.22.App.Ex.J.p0822-0825; ZTr. 6/20/2016.P6-8.App.Ex.J.p0851-0853; *see also* ZCO.FF.7,8.P2.App.Ex.K.p1200) (Denying party status due to not appearing at hearing however facilitator has sworn affidavit they appeared and were denied so left the hearing in frustration.)

168. The Zoning Commission has in concert with the Office of Planning routinely made arbitrary findings or made no findings at all on gentrification/displacement despite it being within its clear statutory authority and despite having provisions protecting against displacement/ gentrification in the comprehensive plan: ZC No. 14-02 (The ZC finds displacement is outside its purview despite )(ZCO.FF.P53.App.Ex.K.p0962, 1003; *see also* FFCL.FF.31.P5; FFCL.FF. 53-55.P7;  FFCL.FF.59,60,65.P8;  FFCL.FF.66.P9;  FFCL.CL.86,87.P11;  FFCL.CL.90.P12; FFCL.CL.126.P17; FFCL.CL.127.P18. App.Ex.J.p0775,0777-0779, 0781-0782, 0787-0788); 15-28 (Ex.22A.p2-4,6-13.App.Ex.J.p0830-0832,0834-0841; ZC No. 15-27 (Arbitrary findings not based on substantial evidence on the record because no DHCD report)(ZCO.FF.112(f).P. 32;  FF.120(b)(c)(d).P.38;  ZCO.CL.151(e).P.48.App.Ex.K.p1164,1170,1180);  ZC  No.15-24

(arbitrary finding that there would be no displacement to surrounding area because current construction site is empty despite no DHCD report per statute and despite the McMillan case which remanded so Commission could conduct a gentrification study on surrounding area when construction site was empty)(Ex.27.p2-3.App.Ex.J.p0810-0811; Ex. 27A.p7-18.App.Ex.J.p0797-0808; *see also* ZCO.FF.29.P6; ZCO.FF.74(a).P18-19; ZCO.FF. 74(b).P.20.App.; ZCO.FF.100.P31.App.Ex.K.p1089,1101-1103,1114)

169. The Zoning Commission has in concert with the Office of Planning routinely made arbitrary findings or made no findings at all on Density/Building Height: ZC No. 14-02 (Finding a moderate density site was consistent with a development plan including clusters of high density and medium density buildings based on conclusory statements from developers not based on substantial evidence (any evidence) on the record) (Ex. 83A2.p21,22.App.Ex.J.p0766-0767) (ZCO.FF.13.p4; ZCO.FF.18(a).p5;ZCO.FF. 30.p10;ZCO.FF.39.p11;ZCO.FF.80-82.p26;) (FFCL.FF.7.P1; FFCL.FF.22.P3; FFCL.FF.29.P4; FFCL.FF.71,73.P9; FFCL.CL.111,112.P15; FFCL.CL. 131.P18.App.Ex.J.p0771,0773-0774,0779,0785,0788; ZC No. 15-28 (Arbitrary findings changing from Production, Distribution, Repair in FLUM to residential without DHCD report and also granting public benefit with no set proposal for residential units, leaving option open for office space contrary to statute)(Ex.22.p2,3;Ex.22A.p5.App.Ex.J.p0824-0825, 0834-0835; *see also* ZCO.FF.23.p3-4; ZCO.CL.12.p24.App.Ex.K.p1201-1202,1222; *See also* ZC No. 15-24 (Ex.39.p.1-3.App.Ex.J.p0817-0819.)(ZCO.FF.82-84.p. 25-26.App.Ex.K.p1108-1109; ZCO.CL.96-97.P27-29.App.Ex.K.p1108-1112); ZC No. 16-07

(Finding a 9 story building fit medium density when regulations clearly state medium density tops out at 7 stories)(ZCO.ff.60-62.p15.App.Ex.K.p1341); *see also* ZC No. 16-20 (Finding the descriptions for land use zones located in the zoning regulations is not binding because it is in the pre-amble and thus finding a building type noted as "appropriate" for arterial streets is not inconsistent with the comprehensive plan despite the building in question fronting a street much smaller than an arterial street. App.Ex.M.p1852 *and* App.Ex.N.p1921, 1966-1967, 2002-2003, 2051-2052 ; *see also* Commission shutting down testimony by arguing the increased density for the site is appropriate because of a setback despite court rulings in *Durant* explicating a necessity for deeper analysis into adverse impacts and despite there not being any DHCD report on the record to consider the adverse impacts of increased density. App.Ex.M.p1853-1854; *see also* App.Ex.N.p.1905.

170. ZC No 16-07 (Ex.34) The Zoning Commission has in concert with the Office of Planning routinely made arbitrary findings on ANC Great Weight: ZC No.14-02 (Commission gives great weight to an ANC resolution that did not have quorum and ignores the recommendations of the ANC with quorum) (FFCL.FF.123.P16.App.Ex.J.p0786; ZCO.CL. 11,12.P57.App.Ex.J.p1006; *see also* ZC No. 16-20 (ANC commissioner testifies project does not qualify as a community benefit but rather will have adverse impacts given circumstances of community but no findings are made in ZC Order addressing the ANC's concerns re: whether the project qualifies as a "community benefit", despite the Commissioner explaining she represents the will of the community, despite the ZC being required to give the ANC great weight, and despite there being no report from the DHCD on the record that may address the

ANC's concerns, with the ZC merely writing in its order the PUD process is not a "popularity

contest") App.Ex.N.p2021-2022; ZCO.FF.87.App.Ex.M.p1857)

171. The Zoning Commission has in concert with the Office of Planning routinely made arbitrary

findings on the Environment.  ZC No. 16-02 (Finding adverse impacts to noted environmental

contaminates were "mitigated" by efforts at least one Commissioner acknowledged could not

possibly be adequate, then the ZC making no findings in the ZC Order as to that particular

concern. ZCTr…App.Ex..p.; *see also* ZC No. 15-29 (Abused discretion finding it was

"unusual" to accept a motion to reconsider from a non party that participated heavily in the

hearing when the non party lived next door, participated heavily in the hearings, and

discovered documented evidence of site contamination) ZCTr…App.Ex..p.; *see also* (Appeals

court finding adverse impacts must be considered per enabling statute and comprehensive plan

policies when the ZC failed to consider same for the very large McMillan project) *Friends of*

*McMillan v Zoning Commission*, 149 A.3d 1027, 1036-1038 (2016).

172. The Zoning Commission in concert with the Office of Planning has engaged in contract

zoning.  The city has invested millions into the DC United project in order to gain site control

before the project has even gone to the Zoning Commission, further calling to question the

impartiality of the Zoning process. App.Ex.M.p1891-1892.

**Specific Instances of Egregious Arbitrary Findings, Rulings, and Conflicts of Interest**

A. **The Barry Farm Tenants and Allies Assassins**

173. Initially BFTAA was denied party status even though testifying members lived in Barry Farm. People testifying were told dislocation and displacement was "not in our purview" even though it clearly was by way of organic statute and the Comprehensive plan. The Commission found that displacement was outside its purview because the URA was a federal statute concerned with the relocation of public housing residents and thus conferred no jurisdiction on the Zoning Commission. Alternatively, the Commission found that even if displacement or dislocation was in its purview Applicant met its burden to "avoid displacement" by mitigating the effects of dislocation with wrap-around services. In the order, the Zoning Commission did not include any citation for their legal reasoning besides a general cite to the URA explaining it took precedence over local law. However, the URA has an explicit provision for local agencies to work with and cooperate with HUD pursuant to local policy regarding relocation procedures. This provision was analyzed in the Findings of Fact and Conclusions of law submitted by BFTAA but the provision was ignored entirely in the Commission's order. Moreover, the commission's confusing the words "avoid displacement" with "help deal with the impacts of displacement" is irregular. It is a significant departure from foundational administrative law for the Commission to make findings on contested facts without at least referencing the specific statutory provision opposing parties raise in support of their arguments.

174. Moreover, the Commission made a nonsensical finding about the ANC where the sole ANC vote approving the project was revealed to be done without quorum but the ANC Commission

that held the improper vote would still be given great weight because the previous ANC disapproval vote, the one with quorum, requested as pre-requisite for project approval matters the Commission deemed outside its purview.  To be clear, the Commission gave great weight to a publicly elected body that by law could not act on behalf of the people; and, in doing so, denied "great weight" to the convening of ANCs that had democratic support.

175. At zoning, government development partner A&R Development alleged with conclusory statements that in order to provide the required public housing replacement units they needed to build roughly 1,423 units of mixed income housing as opposed to the small area plan specified 1,100 units of mixed income housing. That, in order to increase revenue. (Exhibit : ZC 14-02 Applicant's Materials in Support of the Limited Scope Hearing on September 18, 2014 pp. 4, 5) A&R development made more conclusory statements about the exorbitant costs of redoing the street grid and utility infrastructure. *Id*. at 5. According to A&R Development they cannot do "development in place" during construction of the 1423 unit site because of the massive infrastructure upgrades the site will need due to the intensified land use. *Id*.

176. At the Barry Farm site, it is the introduction of roughly 1,000 new economically integrating units on top of the 344 replacement units which is the direct cause of residents' removal from the site during construction and which causes increased risk of permanent displacement. (Cf. *Id*. at 5)(Developer stating it will need to build 9 internal roads and new underground utility infrastructure in order to accommodate the site layout for a 1423 unit project and to provide adequate utility services for the increased demand.)

177. Yet the developer has presented no evidence the policy goals of the New Communities Program can only be carried out by moving residents off the site, only conclusory statements. Even if the revitalization of dilapidated housing and the economic integration of communities and the racial integration of communities were important government concerns, causing widespread, long term and indeterminate dislocation with great risk of permanent displacement is far from the least imposing of methods to accomplish the aforementioned and alleged government interests.

## B. **McMillan**

178. In 2015, the Zoning Commission held that Friends of McMillan's concerns about gentrification were unfounded because community members in opposition did not prove the project would lead to gentrification.  By finding that community members were responsible for proving the project would lead to gentrification the commission departed from foundational administrative law norms and shifted the burden of proof from the Applicant to community members.  In Friends of McMillan v. DC Zoning Commission (2016) the DC Court of Appeals held that the Comprehensive plan required that the Commission weigh the effects of gentrification, both through the lens of relevant Comprehensive plan provisions, and through the lens of the adverse impact statute.  The court also found that the Commission could not shift the burden from Applicant to community members when it came to assessing the impact of gentrification such as dislocation, displacement, and increased property taxes.

C. **Buzzard Point**

179. In 2016 the Zoning Commission issued an order on the Buzzard Point project, or soccer stadium deal. Almost a dozen community members testified as to the project likely gentrifying their community. Even after the McMillan ruling and court provided guidance, specifically on the impacts of gentrification, the Zoning Commission issued yet another ruling on the matter, finding: since the homes adjacent to the soccer stadium would not be demolished that there was no risk of displacement. There was no study conducted to determine if the Zoning Commission's conclusion was correct. It is a significant departure from foundational administrative law for the Commission to make findings without basing it on substantial evidence on the record. Moreover, asserting displacement only happens when the homes the people are living in gets demolished is beyond absurd. For the third time, the Zoning Commission failed to adequately weigh community concerns about development projects that are accused of weakening and destroying communities via gentrification and displacement. Moreover,

D. **River Terrace**

180. In the River Terrace/ St. Eads St development the Zoning Commission was asked to consider the impacts of disinvestment when it sought to approve warehousing of elderly low income residents in an area devoid of economic development.    Instead of weighing the ANC commission's concerns and giving them great weight, the Zoning Commission found the

ANC's statements were conclusory and engaged in a similar burden shifting that occurred in the McMillan case and was overturned by the court.

### E.  **Union Market**

181.In the Union Market cases the Zoning Commission improved high density projects contrary to the FLUM and comprehensive plan be approving 6000 units of studio and one bedroom apartments as part of a plan to resegregate the area by introducing massive amounts of a different racial and economic development without considering any of the UMN's concerns about gentrification.  In the UMN cases the Zoning Commission went so far as to deny party status when members lived within 200 feet of a 1000 unit development because they were not "uniquely effected", much the same as they denied party status in the Barry Farm case when residents actually lived in the public housing.

### F.  **Post World Class City Declaration**

182.In fact, the Office of Planning, since 2007 has not once weighed the benefits of a proposed PUD against opposition arguments brought forth concerning the destabilization of a neighborhood or "well-being" of its residents regarding adverse effects.

183.Despite adamant pleas from community members who often, tearfully, give testimony out of concern for their home and neighborhood.

184. African-Americans, families, East of the River residents, working class and service class neighborhoods, the elderly and the young, were rend from control over their communities' destinies by the District of Columbia Zoning Commission.

185. The District of Columbia Zoning Commission routinely ignored any representation of what is important to non-preferred resident's culture, well-being, and neighborhood stability in favor of an invisible 3rd party, and yet to spend one day as a DC resident, archetyped, "creative", who is white, receives a 2 to 1 wage premium for being male, is college educated, is from a select grouping of intellectual property based professions, and is overwhelmingly single, childless, and millennial.

186. Compounding matters, in all of the cases aforementioned DHCD has refused to produce an agency report as required by statute.   Such reports are due 10 days before the hearing so ANC's may have the chance to review them and bring issues before the zoning commission so that they may mitigate the issues before approval of a PUD.   Other agencies that routinely do not produce reports but by statute must include the Department of the Environment and DC Water.   *See Generally (No* DHCD Reports - ZC Nos. 14-02, 16-13, 16-09, 15-27, 15-24, 16-02, 16-07, 15-29, 15-28, 15-16, 15-22, 16-20, 13-14, 16-29; *and* No DDOE Reports - 14-02, 16- 16-13, 16-09, 15-27, 15-24, 16-02, 16-07, 15-29, 15-28, 15-16, 15-22, 16-29, 13-14

187.DMPED, DHCD, DCHA, and DCOP utilized openly racist, ageist policy, and, illegally implemented classist policy favoring the college educated and favoring professionals which share a particular notion of innovation, to attack segments of the population.

188.Then DCZC misused procedure to squelch dissent, silencing ANC Commissions and prospective parties in opposition, ignoring objections from the community by turning away from statutes and regulations that provide protections against gentrification and displacement.

189.No matter what came up the Commission was going to move full speed ahead, such is the unspoken disdain for "non- notable" DC residents and having to engage their "close the gates mentality" in contested zoning hearings.

G.  **Specific Instances of Animus**

190.Specific instances of animus include recommendations from the Office of Planning  for DC Council to create economic policy inimical to non-favored residents, unbelievable Zoning Commission ignorance about its own statutory duties, egregious zoning commission incompetence, and  public statements from DCOP directors.

H.  **Economic Policy-Parking Ticket Schematic**

191.The District of Columbia City Council in concert with the Office of Planning developed a pilot parking ticket schematic where the people with the most to lose from transit oriented

development as a means to drive creative class growth were burdened with paying for the infrastructure hastening their displacement. DC Code §50-2534.

192. 97% African American East of the River residents are disproportionately likely to drive for their commute thus that much more likely to be ticketed parking in the Performance Zones. App.Ex.M.p1429.

193. East of the River residents feed a design where revenue from parking tickets goes towards developing transit oriented infrastructure such as bike lanes in the zone where that parking ticket was issued in order to drive creative class growth and clustering. *Id*.

194. Since 2013 the DC government has known such TOD clustering leads to increased inequality and racial segregation.

195. The parking ticket schematic leads to outcomes where the people mostly paying for the infrastructure, which statistically harms them and leads to segregation and inequality, also inure no benefit from it.

196. Revenue from the geographic location of ticket issuance only goes towards transit oriented infrastructure in that zone.

197. Parking tickets generated East of the River do not generate near the same revenue stream, creating a scenario where East of the River residents have >5 miles of bike lanes and the L'Enfant plan for DC has <300 miles of bike lanes despite East of the River residents being regressively taxed for and being disproportionately burdened with paying for TOD construction.

198. Further, the constant ticketing compounds economic inequality.

199. At every turn, the Office of Planning intentionally creates a descending vortex of economic oppression.

I.   **Unbelievable Zoning Commission Ignorance**

200. Chairman Hood has been on the Zoning Commission for 18 years and at his recent re-confirmation hearing March 26, 2018 Chairman Hood gave testimony about his reasoning for the real-time denial of Barry Farm residents party status request when they sought to engage the Zoning process for a project that would lead to the removal from their homes and community.

201. In the public roundtable, Hood seems to argue that since opposition to the Barry Farm community being split apart and demolished was widespread across the city that actual residents bringing the issue of being displaced from their homes was not worthy of Party Status because it was not unique to other claims:

**Council Chairman Mendolson: "Let me ask you about party status…"**

**Zoning Commission Chairman Hood: "Particularly in the Barry Farm case, and nobody re-prompted us[3]…you have to be uniquely affected so if everybody is saying the same thing there is no uniqueness…"**

DC Council, Committee of the Whole, Public Roundtable, 3/26/2018, 1:14:22-1:17:00.   http://

dccouncil.us/videos/archive/

202.However, in cite Hood lucidly argued against a projects progression because he could not

understand how the proposed use was not just a "restaurant" instead of an eligible taker space,

which, "can be a restaurant" as long as it is secondary to another primary use and provides the

multi-layered experiences appropriate ate for creatives.

203. Hoods feigned ignorance about what constitutes party status after 18 years as Chairman of a

commission that routinely engages the public compared to Hood's spot-on knowledge about

what constitutes a maker space reflects the policies of DMPED, OP, and the Mayors agendas

to create a low social value city to the detriment of blacks, non-millennials, and legacy

residents, among other protected classes.

J.  **Zoning Commission Incompetence**

---

[3] Chairman Hood and the Zoning Commission eventually granted party status but only after a motion to reconsider was submitted by pro-se public housing residents.  Hood denied that zoning commission was "re-prompted" twice during his committee of the whole testimony but the record is very clear here. *See* App.Ex.J.p0772; *see also* App.Ex.M.p1893. The real-time denial of party status prejudiced members by affecting the availability of expert witnesses as well as the ability to bring contemporaneous cross examination.

204. In ZC 10-28, captioned 901 Monroe Street LLC, the Zoning Commission incorporated Holland & Knights findings of fact and conclusions of law word for word, including typos, into the commission's order.

### K. In Director Tregoning's Own Words

205. In a February 25, 2016 interview for the website "The Planning Report: Insider's Guide to Planning and Infrastructure", featuring Tregoning and the chair of the Center for Real Estate and Urban Analysis at the George Washington University School of Business, Chris Leinberger.   In the interview, Leinberger discusses transit oriented development and DC in particular, concluding,

> **"The bad news is that there's no such thing as a free lunch: We have a massive affordable-housing, social-equity challenge that we in the TOD movement have to take responsibility for. If we don't, we're going to be shut down or government's going to tell us how to solve it. I don't think we're going to be happy about it."**

App.Ex.F.p0568.

206. For her part, Tregoning boasts "I don't know if there's any place in the country that went from having a Murr[a]y's Meats to a Whole Foods on that same site." *Id*.

207. Murray's being a regional, family friendly, supermarket historically providing low cost, bulk food items for African American communities when other food retailers would not locate there.

208. Whole Foods being a national, known to be high priced, artisan and organic food seller that primarily serves better heeled patrons than those at Murray.

209. There, Tregoning expresses a clear preference for one business over another. *Id*.

210. It appears that after leaving the Office of Planning Tregoning cannot hide her excitement that one mostly white and well off community will have their needs served.

211. On the other hand, Tregoning can't veil her clear aversion towards another community which once lived and shopped at the same coordinates, mostly comprised of low-income African-American's and families, that, by negative implication, will no longer have their needs served, and probably, really, will no longer have a place to live there either.

L. **Eric Shaw's own words**

212. In 2017 Eric Shaw interviewed with developer trade rag Bisnow and stated part of the push for altering the comprehensive plan was to make it more difficult for residents to file appeals by giving zoning more flexibility even as the Zoning Commission has had carte blanche to arbitrarily address most adverse impacts. App.Ex.M.p1431.

**The Office of Planning and the Zoning Commission Intentionally Changed the Demographics of the City**

213. The Office of Planning and the Zoning Commission has shown utter disregard, distaste, and outright disdain and animosity for African-Americans, families, East of the River residents, and service class neighborhoods, as well as the elderly and the young.

214. The Office of Planning and the Zoning Commission have enacted policies hostile to non-favored individuals continued existence in this city.

215. The Zoning Commission has intentionally gentrified communities with enmity.

216. Repeatedly, very clear comprehensive plan language and empowering statutes don't say what they say  and laymen giving testimony are gas-lighted into believing their concerns are not valid ones brought before the proper administrative body when they are and rather it is the Zoning Commission and Office of Planning that has surreptitiously pursued policies that are outside the purview of zoning and city planning.

217. The Office of Planning has propounded a covert and far-reaching programmatic mission to tear the fabric of close knit communities.

218. The Office of Planning and the Zoning Commission do this by dispersing the residents of stable communities so creatives can take root and thrive, quickly seeking experiences and spending money, increasing the tax base, while the Office of Planning develops a creative abiding "low social value" city. App.Ex.L.p15.

219. City Planners have created an Orwellian Capitol city where culture is not born but planned by "rock star" land use experts like Tregoning and Florida.

220. In one hearing, at 84 years old," an elderly community member testified, "it's getting harder for me to suffer...spirit depressing approval...of...harmful...proposals." ZC 16-02 Tr. 54:2-6. At 84 the person testifying was old enough to have experienced forced segregation.

221. Now what is transpiring is government policy and practice to re-segregate neighborhoods under the pretense of integration, better known as gentrification. The mechanism by which the DC Office of Planning, DMPED, and the DC Zoning Commission affected such demographic change is by introduction of high density almost exclusively studio and one bedroom luxury residential development requiring incomes higher than surrounding census tracts. This creates racially segregated enclaves that shift communities' political power by introducing concentrated wealth in low income neighborhoods.

222. New residents have exigencies completely different from legacy residents. The process is repeated up and down city blocks until a neighborhood is re-segregated into "almost all white" communities. This process has been repeated across the city over objections repeatedly raised by legacy residents. The zoning commission has a pattern and practice of routinely ignoring its statutory duties to achieve their policies of racial segregation.

223. By taking this tact, the Commission has caused deleterious injury to communities. Since the commission routinely makes arbitrary rulings on matters such as gentrification, displacement, dislocation, density and over crowdedness, rent and property tax increases, community character, and environment, always in a way that inures to developers, the zoning process, which should be a place where community members gain some leverage in making developers abide by regulations, is not that, but rather provides a sense of arrogance and entitlement to developers. Who, with little blame, believe it is not necessary to genuinely engage community concerns, leading to such outcomes as at Buzzard Point where the Community Benefits agreement for the Soccer Stadium yielded the neighborhood $35,000 and some free DC United Summer Camp days for community kids compared to the Soccer Stadium in St. Louis which yielded 5 million dollars and similar side offerings to sweeten the pot. Without any regulatory hurdles there is no incentive for developers to engage the community in good faith.

224. That is the best news the court will hear, the intentional destruction of low income black communities has a deep and long lasting impact on collective progress negatively influencing the ability to maintain or build businesses and interpersonal relationships, the ability to keep stable work, to grow culture and support systems and reputations and goodwill, to have familiarity, peace and non-violence, and to pass on shared heritage.  Black DC residents have remained in a constant state of dis-ease and flux, since slavery, repeatedly having their communities uprooted, compounding injury and quite insidiously contributing to the conditions used as justification for the racist policies.

225. DC Planning Agencies have missions and vision statements purporting to promote economic and racial integration, but are knowingly causing economic inequality and racial segregation in order to present private businesses with what are historically once in a generation financing opportunities to profit off the low market values caused by years of  government disinvestment or environmental neglect and concomitant land banking, allowing the government to exchange, intentionally kept unused land, for private funding and management of traditional government functions like public and subsidized housing.

226. It is black neighborhoods targeted for this speculation under the auspice of integration, then further disadvantaged by implementation of economic systems that lead to their disparate and explicit exclusion, resulting in widespread low income, non-college educated, larger families, and mostly black DC residents' waning of opportunities, displacement, and hardship forming a historical pattern and a depressing multiplication of indignities over the generations.

**The newest close knit black community slated for destruction through intentional Office of Planning policy is further east, green line community, Historic Anacostia.**

227. In Historic Anacostia plans are under way to develop the entire Martin Luther King corridor with 1000's of high density residential housing that requires incomes higher than the surrounding three census tracts in order to live in the proposed development.   Housing that is primarily for singles in an area that has a great need for family housing not kept in slum conditions. Such development will also bring retail out of step with the vast majority of local

residents, displacing local, non-creative businesses.  This will be done in synergy with the 11th

St. Bridge Project, Busboys and Poets, Starbucks, and the Frederick Douglass Bridge.  These

plans will predictably re-segregate the census tracts which have already seen an increase in

home values based solely on speculation.

228.In fact, the Department of Justice has already warned the District of Columbia about its

policies, patterns, and practices re: lack of planning surrounding their efforts to "integrate"

neighborhoods warning that those efforts were actually re-segregating them.  The DOJ asked

for explanations and an accounting for those policies once before and was ignored. By

refusing to gather written agency reports from DHCD, the only mechanism by which such

explanations could be gathered, DCOP and DCZC continue to flout the DOJ.  For instance, in

Poplar Point, the Zoning Commissions first incursion into EoTR, the DCZC failed to gather

written reports from the DHCD over resident objection.  Ex.App.J.p0943, 0945, 0946.

## COUNT ONE
## FIFTH AMENDMENT VIOLATIONS
## PATTERN AND PRACTICE
### Geographic Discrimination - DC Human Rights Act
(*Village of Arling'n Heights et al. v. Metropolitan Hous'g Develop't Corp et. al,* 429 U.S. 252)
42 U.S.C. §1983; 42 U.S.C. §1985; Title VI
### Defendants -  DCZC, DCOP, DMPED, DHCD

229. Plaintiffs incorporate and re-allege herein paragraphs 1-228

230.The Zoning Commission has an unspoken policy promoted by DMPED and DCOP to

increase density whenever possible.

231. To accomplish this the Zoning Commission has previously sought to silence community dissent.

232. In the Barry Farm case, during a public hearing, the zoning commission denied party status to Barry Farm residents who sought party status as BFTAA.

233. The Zoning Commission later granted party status to BFTAA members, which included Paulette Matthews.

234. Party status was granted the day of the second day of hearings, three days later, with no forward notice to BFTAA or Paulette Matthews or any member of the general public.

235. This prejudiced the Barry Farm residents that were seeking party status.

236. During the hearings for ZC No. 15-24 and 15-28 (Union Market hereinafter) the Zoning Commission reasoned that people living in low lying row homes 200ft from a high density project would not be uniquely affected by 9-11 story, high density development.

237. Shanifinne Bell is a UMN member that fears displacement from her home as result of the projects being proposed.

238. The Zoning Commission has also sought to squelch dissent by not giving great weight to ANC's.

239. In the Barry Farm case the Zoning Commission disregarded the entirety of the ANC resolution with quorum because the resolution called for consideration of items that were not in the ZC's purview, such as "displacement".

240. Provisions for displacement are in the comprehensive plan.

241. Provisions calling for avoiding the displacement of Barry Farm residents, specifically, were in the Barry Farm Small Area Plan.

242. Among BFTAA members' complaints was displacement from their homes.

243. Paulette Matthews still faces removal from her home and community.

244. Paulette Matthews is grievously injured by the ZC wrongly applying great weight in ZC No. 14-02.

245. During hearings in ZC No. 16-20, ANC members openly questioned how the community would benefit from developer proffers.

246. ANC members complained about the redundancy of homes for the elderly in the community.

247. ANC members argued the "community benefit" would not benefit the community.

248. The ANC argued that combined with other factors the project would be a detriment to the community.

249. The Zoning Commission ignored the ANC's complaints about redundancy and any detriment to the community beyond home values.

250. Instead the Zoning Commission found that "income" data provided by the census and shared by Applicant showed the community would not be harmed.

251. The Zoning Commission has made multiple arbitrary rulings to approve increased density.

252. Density is a noted aspect necessary to achieve a millennial based creative class.

253. Jemal's Gateway abuts a neighborhood conservation area and Applicant was granted increased density.

254. The zoning commission found the zoning designation Applicant requested in JG is not inconsistent with the Comprehensive Plan.

255. The commission relied on architectural features, such as a step back, to justify building a mid rise building adjacent to a neighborhood conservation area.

256. The commission did not explain how the generalized policy map designation of a main street mixed use corridor characterized by "traditional storefronts" can be consistent with one large grocery store, and six stories of "neighborhood serving" residential use taking up over 90% of the site's small, irregularly shaped lot, is consistent with the adjacent neighborhood conservation area.

257. The zoning commission necessarily found granting Applicant's requested flexibility through the PUD process was not inconsistent with the FLUM designation as a Neighborhood conservation area.

258. In Barry Farm the zoning commission allowed a density increase from 1100 units to over 1400 units.

259. The developer wrote a letter to the commission explaining the density increase was necessary due to the cost of infrastructure upgrades and replacement public housing units.

260. The developer did not include any line items in their letter or reference any consulting firm.

261. The letter the developer sent to the zoning commission indicated the requested density increase was the only way to make the project feasible.

262. The zoning commission incorporated that understanding into their order.

263. Other than the letter and the developer's word, there is no corroborative information that density above and beyond what's specified in the small area plan is necessary to complete the project.

264. Nor is their any corroborative information located in the rest of the administrative record.

265. In the Benning Rd. project residents complained the land use designation requested by Applicant was inappropriate because the project was not on an arterial street.

266. According to zoning regulations the requested site designation is characterized as "appropriate" for arterial streets.

267. The Benning rd. Project fronts Eads St.

268. Eads St. is not an arterial street.

269. The ZC found that preambles in the zoning regulations are not binding.

270. The zoning designation requested by applicant was described as appropriate for arterial streets in the zoning regulation's preamble.

271. Proposed land use changes must be consistent with the intent of the zoning regulations.

272. The intent of the zoning regulations is for the building type proposed by applicant to be located on arterial streets.

273. The Benning Rd. ZC decision is another case where density is increased erroneously.

274. In ZC No.15-28 the Applicant requested a production, distribution, repair zoning designation.

275. Applicant requested flexibility to provide either residential or office uses.

276. When Applicants propose office uses there must be a commiserate affordable housing proffer.

277. Flexibility to build any amount of office space more than allowed by right, without an affordable housing proffer, is contrary to the intent of the zoning regulations.

278. The Zoning Commission on more than one occasion has found displacement out of its purview.

279. In ZC No. 14-02 the Zoning commission repeatedly stated displacement is outside of its purview.

280. The city wide comprehensive plan includes displacement as an adverse impact.

281. The area comprehensive plan said, specifically, any development plan for the Barry Farm site must encourage development that takes steps to avoid dislocation.

282. In ZC Order No 14-02 the Zoning Commission found displacement is outside of its purview.

283. This is literally a case of the zoning commission stating the sky is not blue.

284. In ZC Order No. 15-27 it was noted UMN members lived 200 feet from the project site.

285. The Zoning Commission found UMN members were not at risk of displacement because the project was being built on empty land.

286. The zoning commission has found proposed high density development abutting low lying row homes a block and a half away did not pose risk of displacement for residents living less than 200 feet from the PUD site.

287. Zoning regulations and case law require the ZC to make findings based on substantial evidence on the record.

288. There was no evidence on the record documenting displacement as an adverse impact to proposed high density development abutting low lying row homes.

289. DHCD did not submit written reports for the Zoning Commission to evaluate as regards the proposed PUD's adverse impacts to displacement.

290. DMPED and Mayor Bowser approved land purchases amounting to millions of dollars in order to complete the DC United deal before the project even went to zoning.

291. At Jemals Gateway the an alley that had yet to gain council approval for closure was calculated into the FAR of the project over objection.

292. The Zoning Commission routinely engages in contract Zoning,

293. There is no firewall between the commands of the Mayor and the Zoning Commission leading to routine sham hearings, put on just for show.

294. In both Jemals Gateway and DC United there were environmental issues.

295. Both projects occurred in long standing black communities and are evidence of policies that harm all Plaintiffs.

296. The zoning commission on more than one occasion made erroneous decisions when considering the adverse impacts of displacement.

297. In each of these instances members of the community were denied their due process rights, at least in part, because they lived within proximity of the proposed projects and could slow down the projects if their opposition was considered according to regulation, statute, and common law.

298. In each of these cases no written report on the adverse impacts of land use development projects was submitted by DHCD.

299. The lack of written reports for made available for public scrutiny and DCZC consideration exacerbated the arbitrary rulings.

300. These actions have been the direct cause of the wholesale destruction of tight knit long standing African-American communities.

301. All plaintiffs are grievously injured by the ZC's refusal to consider adverse impacts to projects and by issuing arbitrary rulings.

302. CARE members who have testified before the Zoning Commission, as well as individual residents such as Paulette Matthews who have repeatedly testified before zoning are particularly aggrieved.

**COUNT TWO**
**DC HUMAN RIGHTS ACT OF 1977**
**DC Code §2-1402.21 (a)(1)(2)(3)(4)(5)(6)**
**TITLE VI**
**AGE OR SOURCE OF INCOME EXPLICIT GOVERNMENTAL POLICY**
**PREFERENCE**
**CREATIVE ACTION AGENDA, CREATIVE ECONOMY STRATEGY &**
**CREATIVE PLAN DC**
**Defendants –MAYORS' FENTI, GREY, AND BOWSER, DMPED, OP, DHCD, DCZC**

303. Plaintiffs incorporate and re-allege herein paragraphs 1-302

304. The Creative DC Action Agenda, Creative Economy Strategy, and Creative Plan DC were created in part to guide the Office of Planning on the city's residential development.

305. The Creative DC Action Agenda, Creative Economy Strategy, and Creative Plan DC note specific Planned Unit Development projects (PUDs) and highlight specific neighborhoods targeted for "revitalization" and highlight others already made "vibrant".

306. The Creative DC Action Agenda, Creative Economy Strategy, and Creative Plan DC guide the city's residential development in a way that indicates a preference for millennials, college educated people, and people of certain professions.

307. The stated purpose of the preferences indicated in The Creative DC Action Agenda, Creative Economy Strategy, and Creative Plan DC is to pursue the cause of increasing the population of creative class members living in the city.

308. The stated purpose of the preferences indicated in The Creative DC Action Agenda, Creative Economy Strategy, and Creative Plan DC is to pursue the cause of increasing the population of creative class members living in certain neighborhoods.

309. The stated purpose of the preferences indicated in The Creative DC Action Agenda, Creative Economy Strategy, and Creative Plan DC is to pursue the cause of increasing the population of creative class members living near to amenities, natural amenities, and transportation options as well as other public facilities.

310. The land use policies implemented by DCZC,DMPED,DCOP, DCZC and the various mayors include:

311. The concentrated development of high density housing.

312. The development of overwhelmingly one bedroom and studio housing.

313. Undervalue government owned land sales promulgated by DMPED, DCOP, and each of the Mayors over the relevant time periods.

314. Overvalue land buys of privately owned land promulgated by DMPED, DCOP, and each of the Mayors over the relevant time period.

315. Financing of projects through TIFs and LIHTC grants promulgated by DMPED, DCOP, and each of the Mayors over the relevant time period.

316. Not to pursuing development opportunities that did not primarily service the creative class and millennials.

317. Leveraging public amenities and facilities specifically for millennial and the creative class.

318. By implementing these policies Defendants necessarily discriminated geographically.

**COUNT THREE**
**FAIR HOUSING ACT**

**DISPARATE IMPACT**
**(Texas Department of Housing and Community Affairs v. Inclusive Communities Project,**
**Inc., 135 S. Ct. 46 (2014))**
**42 U.S.C. 3604 (a)(b)(c)(e)(DISCRIMINATION)**
**42 U.S.C. 3605 (a)((b)(1)(2))(DISCRIMATION RELATED TRANS)**
**DC Code §2-1402.21 (a)(1)(2)(3)(4)(5)(6)**
**IN VIOLATION OF**
**42 U.S.C. § 1983; TITLE VI; 42 U.S.C. § 1985**
**(Against DMPED, DCZC, DCOP and Mayoral Defendants)**

319. Plaintiffs incorporate and re-allege herein paragraphs 1-318

320. Creatives skew white by over 20% nationally

321. Creatives skew white by over 20% in the DMV

322. In Washington DC land use policy to attract the creative class disproportionately

impact black residents.

323. Land use policy to attract the creative class as enacted by DMPED, DCOP, DCZC,

DHCD, and the offices of each of the Mayors perpetuate segregation in the District of

Columbia.

324. In Washington DC land use policy to attract creative class disproportionately impact

those that do not hold college degrees.

325. Upon information and belief land use policy to attract creatives disproportionately

impact families

326. Upon information and belief, land use policy to attract creatives disproportionately

impact the religious.

## COUNT FOUR
### FIRST AMENDMENT RIGHT OF ASSOCIATION & ESTABLISHMENT CLAUSE IN VIOLATION OF
### 42 U.S.C. § 1983; TITLE VI
### (*Healy v. James*, 408 US 169, 181)
Defendants: DMPED, DCZC, DHCD, Mayors,

327. Plaintiffs incorporate and re-allege herein paragraphs 1-326

328. By attracting and retaining people primarily employed in specific synergistic fields , grouped by age range and college matriculation, which significantly skewed white, non-black, and financially well off, the city pre-selected inhabitants proned to viewpoints , opinions, and normative and cultural values that were often contrary to those of existing residents, who tended to be black, non-college educated, family oriented, religious, less well off financially, and not a part of the preferred creative class.

329. At all times relevant to this complaint the District of Columbia was aware and in fact pre-selected and incentivized the attraction of inhabitants at least partially for their viewpoints, opinions, and normative and cultural values.

330. The scope and length of the District of Columbia's human experiment changed the cultural and normative landscape of its neighborhoods.

331. DCZC, DMPED, DCOP, DHCD, and each of the Mayor's offices during the relevant time period took a non-neutral position on the kinds of viewpoints, opinions, and normative and cultural values its residents should have and should not have by undermining the zoning process through sandbagging of its statutory duties.

332. District of Columbia residents who embodied the antithesis of the non-neutral, morally repugnant government views that propounded the growth of, and superiority of, the creative class, were forced out of the city with intentional government policy.

333. Promulgation of the plan negatively influenced the ability of non creative class members to effectively petition their government by limiting their numbers and influence.

334. Promulgation of The Plan constitutes a prior restraint on speech marking people who hold viewpoints, opinions, and cultural and normative values different from those supported by government for removal from their neighborhood and mandated lack in businesses that serve them.

335. Promulgation of the plan interfered with DC residents right to associate by forcing individuals not apart of the governments creative class messaging to have to identify with the message as a member of the neighborhood.

336. It is morally repugnant to be forced to listen to government spread racist and classist ideas spread through urban planning code words like "vibrancy" and "rejuvenation".

337. It is morally repugnant to be forced to listen to government messages about how persons within the creative class are superior and more worthy of District of Columbia residence than other members of society.

**COUNT FIVE**
**ANIMUS**
**42 U.S.C. §1983; 42 U.S.C. §1985**
**TITLE VI**
**Defendants-DCZC, DHCD, DCOP, Muriel Bowser, and Harriet Tregoning**

338. Plaintiffs incorporate and re-allege herein paragraphs 1-337

339. The District knew implementing the Creative Economy would lead to income inequality even though all District planning agencies have in their mission some form of economic equality   whether in affordability or economic integration.

340. The DCZC commissioners saw the impact of New Communities and the Creative Economy up close and personal.

341. DCZC commissioners have heard people testify about their homelessness, disability, susceptibility to pollutants; have watched people cry, storm out the room, scream, and do protest theatre.

342. But DCZC commissioners have never seen a PUD they have turned down.

343. DCZC watched the city change and watched how it affected the citizenry at every hearing.

344. For over ten years the DCZC ultimately approved every single project brought before them unless the Applicant chose not to complete the process.

345. The DCZC callously did their AI, Consolidated Plan, and Creative Economy mandated jobs and intentionally worked to destroy blacks, high social value communities to replace them with low social value communities of an entirely different make up predicated on race, age, matriculation, source of income, and familial status.

346. The DCZC acted with animus in enduring over ten years of purposefully erasing black communities with legacy DC residents.

347. DCZC in some instances requested agency reports from DHCD.

348. DHCD has conducted no study or data analysis on the adverse impacts of the Creative Economy despite knowing about its adverse impacts since, upon information and belief, 2006.

349. DHCD definitely knew the adverse impacts since 2014.

350. Nonetheless DHCD has refused to conduct any data analysis or adverse impact study via written report to DCZC on a single development project that was not overturned by appeal.

351. The Director of the Office of Planning from 2006 to 2014 Harriet Tregonig brags about transforming a family serving, discount, bulk grocer named Murrys into a Whole Foods displaying a preference for the type of residents she wanted living in the city under her tenure.

352. Muriel Bowser has named the legal challenges brought by residents as a nuisance.

353. Current director of the Office of Planning, Eric Shaw, has stated efforts to amend the Comprehensive Plan were at least partly driven by a desire to end resident legal challenges against the Zoning Commission.


### COUNT SIX
### CONSPIRACY
### 42 U.S.C. §1985
### TITLE VI

**Defendants – DCZC, OP, DHCD, DCHA,  DMPED and the Various Mayors**

354. At all times relevant to this complaint DCZC, OP, DHCD, DCHA, and DMPED worked together to implement the Creative Economy and New Communities programs.

355. OP, DHCD, DCHA, and DMPED and the various Mayor's hid their conspiracy through sham hearings at the DCZC.

**RELIEF REQUESTED**

    **WHEREFORE**, Plaintiffs request the following relief:

356. That this Court determines that Plaintiffs prevail on all counts of the Complaint

357. Or that in the alternative this court issue an immediate injunction against the DCZC enjoining it from further activity regarding phase one PUD approvals.

358. An immediate emergency injunction against the DC Office of Planning, DMPED, and Muriel Bowser from interacting with the DC Council to amend the Comprehensive Plan.

359. That Barry Farm be awarded special performance:

    A.  DCHA to develop in place so residents do not have to leave the neighborhood.

    B.  DCHA to cease all pre-construction activity at Barry Farm.

    C.  DCHA to make every resident current on their rent and utility bills due DCHAs years of neglecting the site.

    D.  DCHA to make timely and necessary repairs on every unit.

    E.  Provide adequately funded pre-paid phones to permissively track residents if they ever are required to leave the Barry Farm site.

    F.  DCHA to regularly maintain the grounds.

360. That a consent decree be issued.

361. That the Office of Planning be operate independently and managed separately from DMPED and the Executive office of the Mayor.

362. That all outstanding Requests for Proposals be halted and investigated for Creative Class preferences.

363. That DC residents receive a fully staffed independent People's Counsel before the Zoning Commission and the DC Appeals Court

364. That this Court grant Plaintiffs class certification.

365. That this Court determine that Defendants have damaged Plaintiff continuously since 2006 through the Creative Economy and New Communities Program;

366. That damages are as of yet unknown but exceed 1 billion dollars.

367. That Plaintiffs be awarded attorneys' fees and court costs

368. That Plaintiffs be awarded such additional relief as the Court deems just.

369. That Plaintiffs be granted a jury trial on the Complaint.


s/Aristotle Theresa, Esq
Stoop Law
DC Bar : 1014041
1604 V St SE
Washington DC, 20020

**Certificate of Service**

I, Aristotle Theresa, hereby certify a true and correct copy of the foregoing COMPLAINT was served to the following defendants.  This, the 17th day of April 2018.


s/Aristotle Theresa, Esq
Stoop Law
DC Bar : 1014041
1604 V St SE
Washington DC, 20020

Julia Wiley
DHCD
1133 North Capitol St. NE
Washington DC, 20002

David Lieb
DCOP
1100 4th St, SW Suite 650 East
Washington DC 20024

Susan Longstreet
DMPED
John A. Wilson Building
1350 Pennsylvania Ave, NW Suite 317
Washington DC 20004

Karl Racine
Office of the Attorney General
441 4th St NW
Washington DC 20001

Jessie K. Liu
Office of the US Attorney General DC
555 4th St NW
Washington DC, 20001

Mayor Muriel Bowser
Executive Office of the Mayor
John A. Wilson Building
1350 Pennsylvania Avenue, NW, Washington, DC 20004

**<u>Certificate of Service</u>**

I, Aristotle Theresa, hereby certify a true and correct copy of the foregoing COMPLAINT was served to the following defendants.  This, the 17th day of April 2018.


Councilman Vince Gray
1350 Pennsylvania Ave, Suite 406
Washington DC, 20004