1        GOVERNMENT OF THE DISTRICT OF COLUMBIA

2                Zoning Commission

3

4

5

6

7

8

9                    Public Hearing

10   Case No. 16-20 [3443 Benning, LLC - Consolidated PUD

11   Application and Related Map Amendment at Square 5017,

12   Lots 839, 840, 841, 842, and a portion of the public

13            alley abutting Lots 839 and 840.]

14

15

16

17            6:31 p.m. to 10:32 p.m.

18            Thursday, May 4, 2017

19

20

21

22   Jerrily R. Kress Memorial Hearing Room

23    441 4th Street, N.W., Suite 220 South

24            Washington, D.C. 20001

25

Exhibit N  1892

1   Board Members:

2     ANTHONY HOOD, Chairman

3     ROBERT MILLER, Vice Chair

4     PETER MAY, Commissioner

5     PETER SHAPIRO, Commissioner

6

7   Office of Zoning:

8     SHARON SCHELLIN, Secretary

9

10  Office of Planning:

11    JOEL LAWSON

12    KAREN THOMAS

13

14  Department of Transportation:

15    EVELYN ISRAEL

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2        CHAIRPERSON HOOD:  This is the public hearing

3  of the Zoning Commission of District of Columbia.

4  Today's date is May the 4th, 2017, and it's

5  approximate 6:30 p.m.  We're located in the Jerrily

6  R. Kress Memorial Hearing room.

7        My name is Anthony Hood.  Joining me this

8  evening are Vice Chair Miller, Commissioner Shapiro,

9  and Commissioner May.  Also, we are joined by the

10  Office of Zoning Staff, Ms. Sharon Schellin, Office

11  of Planning staff, Mr. Lawson, Ms. Thomas, as well as

12  the District Department of Transportation, Ms.

13  Israel.

14        This proceeding is being recorded by a court

15  reporter and is being recorded by a court reporter

16  and is also webcast live.  Accordingly, we must ask

17  you, excuse me, refrain from any disruptive noises or

18  actions in the hearing room, including the display of

19  any signs or objects.

20        Notice of today's hearing was published in

21  the D.C. Register and copies of that announcement are

22  available to my left on the wall near the door.  The

23  hearing will be conducted in accordance with

24  provisions of 11Z DCMR Chapter 4 as follows;

25  preliminary matters, applicant's case, report of the

1    Office of Planning, report of other government

2    agencies, report of the ANC, organizations and

3    persons in support, organizations and persons in

4    opposition, rebuttal and closing by the applicant.

5         The following time constraints will be

6    maintained in this meeting.  The applicant has up to

7    60 minutes.  I see they've requested 45.

8    Organizations, five minutes.  Individuals, three

9    minutes.

10        All persons wishing to testify before the

11   Commission in this evening's hearing are asked to

12   register at the witness kiosk to my left and fill out

13   two witness cards.  These cards are located to my

14   left on the table near the door.

15        Upon coming forward to speak to the

16   Commission, please give both cards to the reporter

17   sitting to my right before taking a seat at the

18   table.  When presenting information to the

19   Commission, please turn on and speak into the

20   microphone, first stating your name and home address.

21   When you are finished speaking, please turn your

22   microphone off so that your microphone is no longer

23   picking up sound or background noise.

24        The decision of the Commission in this case

25   must be based exclusively on the public record.  To

1  avoid any appearance to the contrary the Commission

2  requests that persons present not engage the members

3  of the Commission in conversation during any recess

4  or at any time.  The staff will be available

5  throughout the hearing to discuss procedural

6  questions.  Please turn off all electronic devices at

7  this time so as not to disrupt these proceedings.

8          Would all individuals wishing to testify

9  please rise to take the oath?

10          Ms. Schellin, would you please administer the

11  oath?

12          MS. SCHELLIN:  Yes.  Please raise your right

13  hand.

14          [Oath administered to the participants.]

15          Okay, Ms. Schellin, do we have any

16  preliminary matters?

17          MS. SCHELLIN:  Yes, sir.  Just the proffered

18  expert witnesses of the applicant.  We have Mel

19  Thompson from Grim and Parker, who has previously

20  been approved by the Commission.  And then we have

21  either Irwin Andreas, which I don't see him, James

22  Watson.  He's also previously been approved by the

23  Commission as an expert in traffic engineering and

24  design.  And so, I would ask the Commission to also

25  accept them in this evening's case as experts.

1    CHAIRPERSON HOOD:  Okay.  I don't see any
2  objections.  I think we will continue their status.
3  All right.  Anything else?
4    MS. SCHELLIN:  No, sir.
5    CHAIRPERSON HOOD:  Okay, Mr. Avitabile.
6    MS. SCHELLIN:  Oh, I'm sorry.  Just for the
7  Office of Planning report, they submitted it one day
8  late and would just ask for -- they did ask for a
9  waiver and just ask the Commission by consensus to
10  accept the late filing of their report.
11    CHAIRPERSON HOOD:  Okay.  Any objections?
12  Not hearing any.  Okay.  Mr. Avitabile, you all may
13  begin.
14    MR. AVITABILE:  Thank you very much.  Good
15  evening, Chairman Hood and members of the Commission.
16  My name is David Avitabile with the land use firm of
17  Goulston and Storrs.  We're land use counsel for the
18  applicant tonight.  With me tonight is Dave Lewis,
19  also from Goulston.
20    We are here tonight to present a Planned Unit
21  Development and related zoning map amendment for
22  property located along the Benning Road corridor and
23  in the River Terrace neighborhood of Ward 7.  The
24  project is an all-affordable apartment building
25  reserved for seniors that will meet a critical need

1    for affordable senior housing which is specifically

2    called for in the Comprehensive Plan.

3            It is a four to five-story building that is

4    not inconsistent with the site's land-use

5    designations under the Comprehensive Plan,

6    particularly when viewed through the lens of the

7    Benning Road Corridor Small Area Plan.

8            We will begin our presentation with an

9    overview of the project, the community outreach

10   process, and the proposed benefits and amenities from

11   the applicant, followed by a design presentation from

12   the architect, and then an overview of the

13   transportation study by the traffic consultant.  I'll

14   then conclude with a summary of the project.

15           And so, with that, I will turn it to Michael

16   Giulioni from Neighborhood Development Company.

17           MR. GIULIONI:  Good evening.  So, I guess we

18   wanted to start our presentation by providing you

19   with a high-level overview of what it is we're

20   proposing.  David did mention some of these elements.

21   It is a 70-unit building.  It is now 100 percent

22   senior serving, which is 55 years of age, based on

23   our proposed financing for the project.  We're

24   proposing, for the most part, one-bedroom units,

25   although there will be two studios based on our most

1    recent design iteration.

2         Again, the project will be affordable to

3    those making 50 percent or below of area median

4    income, and you know, based on the household size,

5    whether it's one or two people, we're looking at a

6    range of between 38 to $44,000 a year would be their

7    gross income of the persons who would be eligible.

8         I think an important element that we've

9    worked on with both the neighborhood association and

10   the ANC is the neighborhood serving community room,

11   which we'll talk about more as we move through the

12   presentation.  I think a big element that we've

13   worked on, as a result of the set down hearing is

14   high quality exterior which we hope you recognize in

15   the drawings and Mel will take you through those in

16   more detail.

17        And important to note is the project does

18   include an alley closure as a part of the overall

19   proposal.

20        NDC is a D.C. based company founded here in

21   1999 by Adriane Washington.  To date we've done over

22   600 units and 700,000 square feet of real estate.

23   Important to note is we work across all, I guess,

24   ranges of real estate.  We do affordable.  We also do

25   a lot of tree condominium, and we think both of those

1  are the entire spectrum of housing types adds to the

2  value of the city.

3         We also do some retail around the city as a

4  part of other projects, which we're going to

5  highlight.

6         Historically, our projects have, in our

7  opinion, been catalysts for change in neighborhoods.

8  I think a great example, first example is 4100

9  Georgia Avenue, where we took a vacant lot and turned

10 it into this moderate-income housing project.  This

11 was delivered in 2008 in Petworth.  And one of the

12 things we're really proud about with respect to this

13 project was we were able to incorporate a Yes Organic

14 Market in the ground floor and it was an important

15 food -- it addressed a food desert issue at that

16 time.

17        Another project is 3232 Georgia Avenue.

18 Again, you can see we took another vacant lot.

19 Beforehand I think it was a pawn shop there, on most

20 of the site.  This was also serving moderate income

21 households, delivered in 2015 in the Parkview

22 neighborhood.  And it also incorporates ground floor

23 retail, which includes both our -- our head offices,

24 both local small businesses, and we do have a few

25 national brands, chain retailers that are in this

1   building.

2          Important to note, which we're going to deal

3   with a little bit more is that I think this project,

4   and this happened during the operations phase,

5   represents a great example of how we've worked with

6   local neighborhood groups and MPD to put together a

7   community policing plan when there was issues

8   surrounding our building.  Not so much in our

9   building.  We think it's important that our assets

10  are valuable over the long haul in the neighborhoods

11  they're located.

12         So, in terms of this site, you know, we think

13  it's another great opportunity to bring about

14  positive change to a neighborhood.  As Dave

15  mentioned, you know, in terms of land-use policy, we

16  think we're doing a lot by putting underutilized land

17  to use.  We're doing our part to address a lot of

18  variety of planning guidance that is in the

19  Comprehensive Plan and more local plans.  I think as

20  I'll get into a little bit more detail in a moment,

21  we think this neighborhood has great assets and we're

22  building on those, and our affordable strategy is,

23  you know, it's a long-term -- our delivery of

24  affordable housing in this neighborhood, it's a long-

25  term investment.  It's a 40-year investment for the

1  company.

2          I may be here, but I don't know if our CEO

3  will be.  I hope he is.

4          So, I guess, I think also important is that,

5  you know, where we are in terms of timing is we see

6  this as a great opportunity to secure affordable

7  housing for the future for the demograph that we are

8  serving.  So, you know, the window, I guess we see it

9  as maybe closing, to be able to do this.  And so, now

10 is a great time to do it.

11          So, to dive into more detail on the actual

12 site, I want to sort of walk you through the local

13 context and then talk about really why did we choose

14 to invest in this property.  And then, what we've

15 done to date to work with the community and where we

16 stand.

17          So, as you'll see, I guess our site is one

18 block south of Benning Road.  It's actually on -- I

19 guess Eads Street itself is actually -- it's right

20 here.  You'll see that.  I guess why, you know, why

21 would we choose here?  You can see the Metro lines

22 which are not -- we're not right close to, but we are

23 just outside of the half mile radius.  As well,

24 though, we have the various bus lines that run along

25 Benning Road, which Jim will tell you more about.

1      It is close to existing assets such as the
2  River East shopping center, which the Comp Plan
3  designates as a regional center.  So, it's not
4  convenient, it does require to go over the 295
5  bridge, but there is access to a pretty diverse
6  retail base there.
7      And then I think another facet is, you know,
8  local neighborhood assets like Anacostia Park, which
9  I'll mention again in a moment.  And I think an
10  important reason why we chose this site was also the
11  decommissioned PEPCO plan.  The work of River Terrace
12  to advocate for its decommissioning has definitely
13  made this an area worth pursuing investment from our
14  point of view.
15      So, you know, I think one asset that was
16  particularly intriguing to us is Anacostia Park,
17  which is, I guess, two to three blocks to the west of
18  our site.  Right now, I guess I see this as an
19  underutilized asset and it's getting better all the
20  time.  I think they've been adding bike trails and
21  things like that through it.  So, we see that as a
22  great asset to build around.
23      So, the site itself -- so we are, it's pretty
24  clear, on the north side of the street, between 34th
25  and 36th Streets.  I think I wanted to highlight, you

1  know, we're on a 20-foot alley to the north, 20-foot
2  alley to the west, and we will be -- this is the
3  alley we're proposing to close.  We actually own this
4  parcel here and these three parcels, which will be
5  ultimately subdivided.

6          A key factor early on in the discussions
7  about the site, including with the Office of
8  Planning, are the existing building restriction
9  lines.  And as Mel takes you through the architecture
10  of the project, I think you'll see, we've done what
11  we can to adhere to the spirit of that control.

12          I think important to note, which is that we
13  also, investing in this site, we also purchased this
14  property to the north.  You know, we are hoping to do
15  more in this neighborhood.  And as well, this may
16  come up in discussions.  So, I wanted to -- there is
17  a Department of General Services lot that's here
18  right next to our site.

19          So, a little bit about the existing character
20  of this neighborhood.  This is on the south side of
21  Eads, west of our site.  You know, what you'll find
22  is we have these lovely two-and-a-half story
23  rowhomes.  The bit of the character, which is nice,
24  is created by the pent roofs, which give a little bit
25  more articulation to the roof pattern.

1            As you'll see better in the next slide, as
2    you move along the street, the elevation changes.
3    So, in some instances we have the plinths at the
4    sidewalk level that lift the houses up a little bit.
5            Also, you know, the thing of interest to us
6    as developers is there is -- the public realm was
7    recently improved and we think we're going to be
8    adding to that with our project.
9            So, this is pretty much the same household --
10   or housing type on the north side.  Again, as you may
11   have noted on the site plan, the buildings are set
12   back from the building restriction line, but there is
13   this existing I guess, fairly deep front yard
14   setback, and then the buildings are set up on these
15   land plinths.
16           The general pattern as you'll see, we have a
17   mixture of brick with some siding and again, the
18   varied roof patterns.
19           In terms of, you know, we wanted to just
20   highlight, you know, this is the site at the west
21   end.  You'll see here, this is the alley that we're
22   proposing to close, which splits our very parcels.
23   What's going on around us, this is the to the
24   northeast.  As you can see there's a relatively high
25   proportion of vacant land that also shows up on the

1  local context map.  And this just is intended to
2  highlight the property that we actually own, between
3  Benning Liquors and the Chateau Remix.  The two
4  current operating businesses.
5      So, I guess why would we build here?  A big
6  reason was the Future Land-Use Map guidance, which is
7  residential, moderate density, and commercial, medium
8  density/residential moderate density.  As we've
9  discussed with the community, a big part of our
10  investment strategy was looking to the map and seeing
11  this designation and wanting to build a project
12  that's consistent with it.
13      Building on this, we also feel that there's
14  very strong small area plan guidance through the
15  Benning Corridor plan.  Our property, properties I
16  guess, are actually called out within the plan,
17  within the part of a larger opportunity site.  So,
18  it's actually the yellow boundary here that defines
19  where our property is within the plans, boundaries of
20  opportunity site 2C.
21      So, I guess in addition to the geographic
22  guidance, you know, we did look to the Comprehensive
23  Plan, and here we've tried to highlight I guess not
24  all of them, but a lot of the ones that run the gamut
25  of the different elements of the plan, including

1   land-use, environment, urban design, and housing.

2   So.

3        So now I'm going to, I guess, talk a little

4   bit about our community outreach process to date.

5   I'm going to try to orient you to the overall

6   approach, and then sort of walk you through the

7   timeline of what's happened.  And I think what's most

8   important is where we are right now.

9        What's depicted on this slide, it's really

10  just intended to reflect what we've submitted into

11  the record, which is our cataloging of what we've

12  done and the different conversations we had.  And

13  some of that is from us.  Or most of it is from us,

14  but actually a lot of it is what we heard back from

15  the community, which has been great.

16       So, overall, I guess you know, how would I

17  characterize the process to date?  Well, it's been

18  very iterative, and we've tried to be as responsive

19  as we can with, you know, with I guess the nature of

20  time.  You know, there's only so much time.  We've

21  really tried to engage locally with local citizens,

22  as well as the Advisory Neighborhood Commission.  I

23  feel you know, it's been very collaborative.  There

24  has been people in the community who have been active

25  partners in helping us create a dialog about the

1    project.

2          And from my point of view, I've really tried

3    to do our part in helping inform and educate the

4    people we've been working with by providing them

5    resources about the zoning regulations and procedures

6    so that we can all have a constructive dialog.

7          And I think it's also fair to say we've tried

8    to be very transparent in our processes.  Early on we

9    were asked --

10          [Interruption by service announcement.]

11          CHAIRPERSON HOOD:  Okay.  We can continue.

12          MR. GIULIONI:  Thank you.  Oh, where did I

13    leave off?  Oh, yeah, transparency.  Sorry.

14          Early on in the process, you know, through

15    dialog with one -- actually, at the time, President

16    of River Terrace Community Organization, we were

17    asked for, you know, information about our financial

18    model.  We shared that.  You know, we wanted to help

19    people understand how our projects work.

20          So, again, not going to go through all these

21    slides.  You have it in front of you, but I think

22    some of the key things we did, I guess the process

23    started over a year ago in terms of initial

24    conversations with, at the time, the single-member

25    district commissioner, and then shortly thereafter

1    with the ANC.  We introduced, I guess -- I guess a
2    big part of the ANC meeting was wanting to identify
3    stakeholders who we could work with and we think that
4    was very successful.

5         We talked with them about how community
6    interaction could occur.  We worked with MPD as a
7    result of you know, going to a meeting.  They
8    contacted us and they helped inform certain elements
9    of the project's design.

10        I think a key aspect that was very helpful is
11   through one of the meetings with the ANC is that, you
12   know, they advocated a different approach to how we
13   would conduct interaction that led to two open
14   houses, which were very helpful in raising awareness
15   and getting input about the project.

16        At their request, you know, we notified over
17   1,000 households by UPS within the boundaries of
18   River Terrace.  Those events ultimately were held by
19   -- or attended by just over 60 people, signed in.
20   And that was all before we actually filed our
21   application.

22        Subsequent to that, we did work with again
23   the SMD Commissioner at the time, and who is now the
24   current RTCO president, to work on the community
25   benefits together.  So, we talked about, you know,

1    our time constraints and to the point of being

2    collaborative they were very helpful in basically

3    taking the helm on that and you know, through some

4    dialog back and forth, we were able to, I think,

5    resolve a lot of issues and definitely get a lot of

6    issues out on the table.

7        I guess, key to that was they actually did

8    prepare a survey that they gave to us which was also

9    submitted into the record.  And I think that was very

10   helpful in that they did establish a clear list of

11   needs for the community that was vetted by them.  So.

12       So, ultimately as a result of the survey, we

13   did respond to that and we're going to highlight some

14   of the changes that came about as a result of that.

15   This March, between March and April, we actually had,

16   both through the Executive session of the ANC, and a

17   regular ANC meeting and special meeting, we had

18   ongoing dialog and I guess which I will highlight,

19   you know, where we currently stand with the

20   outstanding issues.

21       So, you know, to sort of summate where we are

22   now, and sort of how things have changed, these three

23   bullets, I think is -- it's important.  They actually

24   are sequential.  You know, as a result of the

25   community open houses, we received design feedback

1  which ultimately has changed the design.  At that

2  time, we agreed that yeah, the community room we felt

3  was something we could you know, offer up as a public

4  benefit.  And we also got a clear list of issues, not

5  just about the PUD, but how we should deal with

6  things were the PUD to be approved, and we would have

7  to go to the construction phase of the project.

8        As a result of the survey, at that time we as

9  a function if it, we committed to set aside 60

10  percent of the project as senior housing, to provide

11  the cash disbursement to River Terrace Community

12  organization, and as a part of overall design

13  changes, we removed the underground level to mitigate

14  negative impacts associated with the future

15  construction.  And a lot of issues were raised about

16  the impacts of construction in general, and so we

17  committed to doing monitoring around the site, and

18  you know, should it happen, if we monitor it

19  shouldn't.  But we would, you know, we would correct.

20        And then as a result of the more recent ANC

21  discussions, we came to the conclusion that, you

22  know, 100 percent senior housing is the right program

23  for the site; that there is a need and we should

24  provide a passenger pick-up and drop-off area in

25  front of the building on Eads Street.  And we did do

1  what we could at that time to address questions and
2  concerns that had come up as a result of the ANC's
3  discussions with the ANC.

4         So, I guess just to sort of close out my part
5  before I pass it on to Mel, you know, I think the
6  record will show that there are some outstanding
7  issues that we need to work on.  But when I look at
8  this process, you know, I obviously have my way of
9  looking at it and in my view, really we engage with
10  the community to make better projects.  And I think
11  we have a better project now than we did when we
12  started, because we had that dialog with them, with
13  the Office of Planning, with all the parties who are
14  involved, including the Zoning Commission.

15         So, we may have some work to do, but we think
16  that we've got a great point we're at, and we're
17  looking forward to continuing to work with the
18  neighborhood on the outstanding issues.  So, thank
19  you.

20         MR. THOMPSON:  Good evening, Commission,
21  commissioners.  My name is Mel Thompson with Grimm
22  and Parker Architects.  Thanks for having us back.

23         The -- hold on.  The project we're bringing
24  to you today is a four five-story senior apartment
25  building.  Again, there are 70 apartments in the

1    building.  We have rear loaded parking off of the

2    alley for the required parking we have for the

3    building.  The loading dock and trash pick-up will be

4    on the west side of the site on the west alley

5    portion.  We'll have units on the -- this is a slab

6    on grade building for the most part.  We'll have

7    units on the first floor, community space and leasing

8    on the first floor as well.

9         The typical floors, the second floor is, you

10    know, all apartment units to meet the needs of

11    providing as many units as we could for the senior

12    building.  The upper floor, four -- fifth floor, I'm

13    sorry, is a green roof and the building steps back to

14    the west to soften the height of the building and

15    elevation as well.

16         The main portion of the building's roof will

17    have a mechanical systems and a green roof on the

18    majority of the roof itself.

19         This is an Eads Street elevation of the

20    project.  We are proposing an all-brick building with

21    metal and glass canopies as entryways.  The material

22    and the facades address some of the materials that we

23    have in the community today.

24         The rear elevation, you will see the loading

25    berth off of the west alley and the rear parking

1    garage bays off of the alley parallel to Eads Street.

2        We're planning to do -- address the street

3    scape correctly, so the pedestrian experiences is a

4    very good one.  That's very important to us as we

5    make the connection down from the top of the block,

6    down to the community center at the end of the block.

7        The Eads Street elevation again, is all brick

8    and we're proposing to do that on the entire all four

9    sides of the building.

10        And next I'll hand it over to transportation.

11    Thank you.

12        MR. WATSON:  Good evening, Commissioners.

13    And for the record, my name is Jim Watson with Gorove

14    Slade Associates.  We performed the transportation

15    review for this project, working with the applicant,

16    and have been coordinating with DDOT along the way.

17    I'll briefly touch on the transportation related

18    highlights of the 3450 Eads Street PUD.

19        As been mentioned, the sites located on Eads

20    Street between 34th and 36th Streets just south of

21    Benning Road, there's access to a number of

22    transportation options and services that are

23    available on all modes.  There are several metro bus

24    lines nearby, including the X-2 line that runs along

25    Benning Road from Minnesota Avenue Metro Station,

1    terminating at the Farragut West Metro Station in

2    downtown D.C.

3         This route provides service every six to 20

4    minutes at the covered bus shelters that are on

5    either side of Benning Road at 34th Street, as well,

6    the Minnesota Avenue Metro rail station is within a

7    half a mile, but it's just under a mile walk from the

8    site on accessible sidewalks via Kenilworth Avenue to

9    a pedestrian bridge at Hayes Street.  And that

10   provides access to the Orange Line.

11        There's a Capital Bikeshare station also

12   located less than two blocks away, and there are car

13   sharing options provided near the neighborhood with

14   three Zip cars located on the opposite side of

15   Minnesota Avenue.

16        In addition, the PUD's transportation plan

17   also takes advantage of the transportation amenities

18   of the nearby area, as well as a transportation

19   demand management plan that I'll talk about a little

20   bit later, to incentivize residents to use the

21   nonauto modes available.

22        A comprehensive transportation review, or

23   CTR, was scoped with DDOT and performed for this PUD

24   in accordance with DDOT and national industry

25   standards.

1     As it was reviewed by DDOT, census data for
2  the area tells us that the overall River Terrace
3  neighborhood, in the overall River Terrace
4  neighborhood, just over a third of people commuting
5  use nonauto means to do so.  This isn't surprising
6  given the number of transportation options afforded
7  the site as I just discussed.
8     In addition, census data also tells us that
9  less than half of senior residents in the River
10  Terrace neighborhood currently commute on a daily
11  basis.  And of those that do, only about a quarter do
12  so by auto.
13     In order to provide a conservative analysis,
14  the CTR was actually examined assuming standard
15  residential housing on the site, and standard River
16  Terrace commuting patterns with about 65 percent of
17  the residents commuting by auto, as I discussed a
18  moment ago.
19     Overall, these assumptions would generate
20  much more traffic than the proposed senior housing
21  development, which provides us with a conservative
22  basis for review of the roadway networks.  Even with
23  this conservative analysis, the intersection
24  surrounding the site would operate well within
25  acceptable levels of delay, and the very small number

1    of new vehicular trips that would be attributed to

2    the site during commuter hours.

3         There is also a capacity on the other modes

4    of the network to accommodate the nonauto trips that

5    would be generated.  As I mentioned, we scoped the

6    CTR with DDOT and are pleased to have DDOT's support

7    for the project.  The DDOT staff report stated no

8    objections and very few conditions from their review,

9    all of which the applicant has agreed to implement.

10        From a parking standpoint, zoning regulations

11   require that the project provide 12 parking spaces,

12   and the development has planned to provide 17.  The

13   parking provided for the site is appropriate given

14   the local zoning standards, ITE parking and trip

15   generation studies, and census data all indicate that

16   senior vehicular needs are less than those of

17   standard residential users.  Similar to the vehicular

18   trip patterns that I mentioned before.

19        Also, the nonauto modes available nearby

20   further support the parking supply as proposed.  The

21   vehicular parking will be accessed via the public

22   alley on the north side of the site, with the 17

23   parking spaces individually accessed from the alley.

24   The parking will also meet the zoning requirements

25   for long-term and short-term bicycle parking.  Long-

1    term bicycle parking will be provided in a secure

2    area adjacent to the parking spaces that can be

3    accessed either by the alley or from the -- inside of

4    the building, and that area.

5         The bike parking area is in that area right

6    there.  Thanks, Michael.

7         Short-term bicycle parking will be provided

8    at street level along Eads Street, with the applicant

9    working with DDOT to select the location of these

10   bicycle racks in public space.

11        While zoning requires that the project

12   provide one 20-foot service space, and one 30-foot

13   loading berth, the plan -- the PUD plans to provide

14   just one 30-foot loading berth, which will be

15   serviced from the western alley.

16        Given the nature of the project is a senior

17   residential building, and based on coordination with

18   DDOT, it was determined that a single loading berth

19   would be enough to accommodate the loading service

20   and trash needs of the project.

21        However, in order to address any concerns

22   regarding usage of the loading facilities, a loading

23   management plan was developed and reviewed by DDOT.

24   It will limit trucks to 30 foot in length or less,

25   and in 12 feet in height or less.  Deliveries will be

1  scheduled via the loading coordinator to minimize any

2  impacts to neighbors, and with this the loading

3  provided in associated management plan will

4  adequately accommodate the needs of the project.

5       Finally, the PUD will also incorporate a

6  transportation management, or TDM plan.  This TDM

7  plan was also developed in consultation with DDOT and

8  tailored in a way to best suit the residential

9  tenants to take advantage of the nonauto options

10  afforded the location.  That includes many of the

11  typical elements, but will also include credit toward

12  commuter shuttle services, an annual reporting to Go

13  D.C. Go, as requested by DDOT as a part of their

14  conditions outlined in their review.

15       I appreciate you listening and I turn it over

16  to Dave.

17       MR. AVITABILE:  Yes.  Thank you, Jim.  Before

18  I conclude, I'd like to do three things.  First, I'd

19  like to review the status of the agency reports in

20  the record, then review our areas of flexibility, and

21  then finally review the public benefits and project

22  amenities.

23       We are pleased to be here tonight with

24  support from the Department of Transportation and the

25  Office of Planning as well.  And I think the reports

1  speak for themselves.

2       As you have heard, we have worked hard for
3  over a year to address the issues and concerns that
4  have been raised by the ANC and community
5  stakeholders.  I thought it would be helpful for me
6  to run through the issues that are laid out in the
7  ANC report, which largely mirror the same issues that
8  were raised in the letters in opposition to lay out
9  where we are.

10       The first issue raised is the appropriateness
11  of the proposed rezoning.  I think it's important to
12  reiterate that the identification of the appropriate
13  zone category, we start first, as we all know, and
14  we've been reminded recently, with the Comprehensive
15  Plan.  And here, the Future Land-Use Map specifically
16  calls for a mix of medium and moderate density
17  development on the property as a whole.  And the
18  small area plan then further clarifies that the
19  entire site should be considered part of that
20  opportunity for redevelopment, with, among other
21  uses, mixed income housing.

22       The proposed MU-7 Zone, which was formerly
23  the C-3-A Zone under the old regulations, is
24  specifically listed as a zone that is consistent with
25  the medium density commercial land-use category.  And

1   for what's it's worth, it is also listed as a zone

2   that is consistent with the moderate density

3   commercial land-use category.

4           It is true that the description of the MU-7

5   Zone references its location along arterial streets,

6   and this is exactly the location that's contemplated

7   for such zoning.  This is a square that fronts on

8   Benning Road, which is clearly an arterial street.

9   And the Comprehensive Plan and the small area plan

10  both tell us that here, it's appropriate to look not

11  just to the portion of the square that fronts on

12  Benning Road, but to the entire depth of the square

13  for that medium to moderate density redevelopment.

14          Constraining that MU-7 Zone to just the

15  properties that literally front on Benning Road is, I

16  think, a too literal reading of what the zoning

17  regulations intend, particularly when the

18  Comprehensive Plan is telling us, look at the whole

19  square.

20          And there are situations throughout the

21  regulations where the land-use plan will draw the

22  line down the center of the alley and say, okay, one

23  side of the alley should be a mixed-use density, the

24  other side should be a lower density.  And that's not

25  the case here for the majority of the site, and the

1    majority of this eastern half of the square, where

2    we're located.

3            And then finally, this is a PUD related

4    rezoning, which means that the permitted height and

5    density here is limited to only what is approved by

6    the Zoning Commission, and only what we're seeking,

7    which is a building with a height of 58 feet, and a

8    density of 3.8 FAR.  And that's under not only the

9    PUD guidelines, but also the matter-of-right limits

10   for the MU-7 Zone.

11           The second issue raised in the ANC letter is

12   site design.  The opponents have challenged the

13   compatibility of the proposed project with the

14   height, scale, context, and zoning of the surrounding

15   properties.

16           The surrounding houses to the west and south

17   are all two, two-and-a-half story rowhouses.  But it

18   is important to note that these surrounding

19   properties are in the R-3 Zone, and the R-3 Zone does

20   permit a height of 40 feet, or three stories.  Our

21   building most adjacent to them, at the alley, is 46

22   feet tall and four stories.  And then steps off to a

23   height of 58 feet and five stories, as it moves to

24   the east, creating a transition from those houses to

25   the densities and heights that are contemplated and

1   called for in the Comprehensive Plan.

2          Similarly, we've sited the building on the

3   property in a manner that really does respect the

4   context.  As Michael mentioned, the surrounding

5   houses along Eads Street are all subject to a 15-foot

6   building restriction line that doesn't apply to our

7   portion of the street.  However, we have pulled

8   ourselves back to kind of create, again -- continue

9   that transition.  It also allows us to create a

10  better sidewalk streetscape condition along the front

11  of the project.  And we've also pulled ourselves

12  west, from the alley, so that we're not hard up

13  against the edge of that alley.  There is again, some

14  area to have some transition.

15         The third issue raised by the ANC is one of

16  security.  There's a specific concern about the use

17  of the alley, which I think maybe just routed in

18  misunderstanding or miscommunication.  The front door

19  of this building is on Eads Street.  That will be the

20  primary location for pick-up and drop-off activity.

21  That will be the primary entrance for the residents

22  to enter and exit the building.

23         We do have service and delivery activity on

24  the side alley, but that's where loading should be

25  located, and that's what, you know, District policy

Exhibit N  1923

1    has consistently told us, alleys are for loading

2    activity of goods and trash and such.

3         And I think more broadly, in terms of

4    security, the redevelopment of the site will lead to

5    improvement over existing conditions where you have

6    existing surface parking lots and paved areas.  You

7    know, this is Jane Jacobs telling us that buildings

8    like these improve conditions when it comes to

9    security and safety, because they create activity and

10   eyes on the street.

11        The remaining issues in the ANC report

12   revolve around transportation and parking and I think

13   Jim has adequately addressed those in his testimony.

14   So, I won't repeat them in detail.  I just did want

15   to reiterate again, we're providing 17 parking

16   spaces.  This does not just meet but exceed the

17   minimum requirement for the zone, and this is based

18   on the regulations that have just been recently

19   adopted by this Commission and reflect the fact that

20   the city is changing.  There is a changing trend

21   towards, you know, multiple modes of transportation

22   and expectations that people use them.

23        And I think Jim also cited to objective data

24   that supports -- that further supports these parking

25   requirements, as well as the right numbers, given the

1    use and mix of the project.

2           We are located proximate to Benning Road, and
3    the various X bus lines, and these are not just bus
4    lines, this is a priority corridor network for Metro
5    bus.  So, this is significant bus service.  Again, I
6    mean, this is true transit oriented development here.
7    There's a bus stop on the other side of the square,
8    right on Benning Road.  And so, there is access to
9    that transportation.  Yes, the Metro is a little bit
10   further away, but you've got great bus access right
11   here.

12          And as Jim indicated, and DDOT concurred, the
13   transportation analysis concludes that this won't
14   generate adverse traffic impacts.  Those conclusions
15   are sound, and they are supported by accepted
16   methodology, and any impacts that are potentially
17   generated are being addressed through both the
18   transportation demand management plan, and the
19   loading management plan.

20          So now I'd like to go to the areas of
21   flexibility.  We did summarize these in our
22   prehearing statement that we filed a couple of weeks
23   ago, but I thought it might be helpful to go through
24   them again one more time with some images.  So, the
25   requests are really -- they tend to be minor.

1  They're all driven by desire to reduce the impacts of

2  this building, versus where we would be with

3  following the matter of right regulations.

4         The first two areas of relief are the rear

5  yard and the side yard requirements.  And you can see

6  here along the rear of the building, there are

7  portions where we are arguably closer in compliance

8  and then portions where we're really right up against

9  the lot line in not providing the rear yard.

10        And similarly, there's also a portion here,

11 where we're not complying with the side yard

12 requirements.

13        In both cases, this is drive by the fact that

14 we moved the building off of the property line Eads

15 Street to create this additional widened sidewalk,

16 and pulled ourselves back up towards the alley.  And

17 it's seen here with the side yard -- I guess if I do

18 this there it comes up.

19        With the side yard, you're not actually

20 required to have a side yard in this zone.  But when

21 you provide one you have the minimum requirement.

22 So, you know, we've pulled off of the alley to create

23 this you know, little bit of relief in space and

24 transition, and you know, that's what's creating this

25 area of relief.

1        And since we're next to an alley, it's not
2   like there's a concern about adequate light and air.
3        The next area of relief is on the roof.  The
4   building has a relatively limited amount of equipment
5   and structures on its rooftop.  There is the elevator
6   pop-up, there is a stairway pop-up, there are two
7   larger rooftop units, and then some smaller units on
8   top.
9        The smaller condenser units are all below the
10  four-foot height limit, so they aren't subject to the
11  requirements.  So, really what we're left with is
12  just the elevator and the stairway, which are
13  separated.  And they're allowed to be separated under
14  the recently adopted penthouse regulations.  And then
15  these two rooftop units.
16        Ordinarily, under the regulations these
17  rooftop units that are a little bit taller would need
18  to be not only enclosed and screened, which they are,
19  but also in the same screen wall that is connected to
20  that main elevator penthouse.  And we just felt that
21  that was adding a lot of unnecessary wall and
22  structure on top of the building, and so that's what
23  we're proposing for them to just be screened
24  independently.  We have positioned them next to the
25  elevator and to the stairway penthouses, so there is,

1  you know, a synergy there.  But, you know, I think a

2  deviation from the strict requirements is

3  appropriate.

4         The final areas of relief are from parking

5  and loading.  Again, it's not -- our relief from

6  parking is not from the minimum requirement of

7  parking spaces.  This is a new requirement to, I

8  think all of us under the new zoning regulations.

9  When you have parking entrances off of an alley, the

10 entrance itself needs to be stepped back a minimum of

11 12 feet from the centerline of the alley.  Generally

12 speaking, our entrances do meet that 12-foot minimum

13 requirement because we're pulled off of our property

14 line by more than two feet, and the alley itself is

15 20 feet wide.  But there are a couple of points where

16 the angle of the lot and the way our rectangular or

17 rectilinear building meets it that we are just a

18 little bit closer.

19        One of these places, we're about 10 feet

20 away.  At one of these places we're about 11 feet

21 away.  So, these two areas, the doors are technically

22 not 12 feet back and that's what's triggering a

23 little bit of relief here, given this is just a

24 single door for a single car.  I don't think there

25 should be any significant impact here.

1     And then, the last couple of areas of relief

2   are loading, as Jim outlined.  If we asked for relief

3   to only have a loading berth, not a loading berth and

4   a service delivery space, and Jim articulated why.

5   The other area of relief is that this loading berth,

6   under the regulations, is supposed to have a 14-foot

7   clear height requirement.  We have a 12-foot high

8   clear requirement.  That's because we wanted to match

9   the height of the rest of the first floor.  It seemed

10  to us unnecessary to increase the entirety of this

11  floor by an additional two feet, and increase the

12  entire height of the building by two feet just to

13  accommodate the requirement for the height of the

14  loading berth when, when we looked at the actual

15  needs of our loading activity, it could be met within

16  that height of 12 feet.

17     And finally, I did want to summarize the

18  benefits and amenities.  I may not be able to do that

19  in the 27 seconds that are left, but I'll do it

20  quickly.

21     First and foremost, this project does provide

22  housing and affordable housing well in excess of the

23  minimum requirements.  Housing for seniors is

24  identified as a specific benefit in the zoning

25  regulations, as is housing that exceeds the minimum

1  set aside requirements, and the minimum --

2         [Interruption by service announcement.]

3         MR. AVITABILE:  Okay.  The second amenity I

4  wanted to focus on is our site planning and

5  streetscape improvements, which again are

6  specifically enumerated as public benefits.  The

7  third is promoting employment and training

8  opportunities, which we'll do through a first-source

9  employment agreement.

10        The fourth amenity is the community room in

11  the ground floor of the building, and this was

12  provided as a direct response to the feedback we did

13  receive from the community as articulated at the open

14  house and in the survey.

15        And then fifth and finally, we have proposed

16  to make a contribution to the River Terrace Community

17  organization.  This would be to support their ongoing

18  community beautification and community gathering

19  activities, and other community events.  And this was

20  again, proposed in direct response to their request.

21        Given the Comprehensive Plan guidance for

22  this property, and the public benefits that are

23  created by this project, we believe we have met the

24  requirements of Subtitle X, Chapter 3, for approval

25  of this PUD and related zoning map amendment.

1        The Comprehensive Plan generally calls for
2  affordable housing, particularly for seniors, as a
3  critical city-wide goal, and the city's planning
4  documents specifically identify this site as a site
5  for redevelopment with, among other things, mixed
6  income housing.
7        The zoning regulations reiterate the
8  importance of affordable housing and senior housing
9  as public benefits, and the recently adopted changes
10  to the zoning regulations do emphasize the importance
11  of balancing the desire for vehicular parking with
12  the similar desire to promote multiple alternative
13  forms of transportation to meet the city's changing
14  needs.
15        The PUD does include several areas of
16  flexibility, but each request is minor and it's
17  largely driven by a responsive design that was
18  intended to produce the height, scale, and impact of
19  the project.
20        And finally, we recognize the concerns raised
21  by the ANC in the opposition and I think we've
22  addressed them, you know, through our testimony
23  tonight.
24        This PUD will create 70 units of affordable
25  housing for seniors, and that benefit really more

1   than balances the zoning flexibility and the
2   potential impacts of this PUD.
3          So, with that, we are available to answer
4   questions, and I did want to note, joining us at the
5   table is CR Crowder, who is with Residential One, who
6   will be the operator of the project, and Melody was
7   very helpful when we've been at the ANC and community
8   meetings to address questions about marketing of the
9   affordable program, the operation of the building,
10  the operation of the senior program.  And so, we
11  thought it might be helpful for you all to have her
12  available tonight as well.  Thank you very much.
13         CHAIRPERSON HOOD:  Okay.  Thank you all for
14  your presentation and let's see if we have any
15  comments or questions up here.
16         Okay.  Vice Chair Miller.
17         MR. MILLER:  Thank you, Mr. Chairman, and
18  thank you very much for your presentation.  And I
19  appreciate all of the responsiveness that you have
20  done thus far to community concerns, Office of
21  Planning and DDOT concerns, concerns of the -- that
22  the Zoning Commission expressed at set down last
23  November, I think it was.
24         I mean, this is a -- I mean, this is a great
25  all affordable, all senior project.  You've gone from

1   -- I think it was 60 percent senior to 80 percent

2   senior, now you're at 100 percent senior.  And the

3   deeper -- it's all affordable mostly at the 50

4   percent AMI, and I think 80 percent of the units are

5   at 50 percent AMI or lower.

6            MR. AVITABILE:  That's correct.

7            MR. MILLER:  Twenty percent are at 30 percent

8   AMI or lower.

9            MR. AVITABILE:  That's correct.

10           MR. MILLER:  For the life of that

11  financing --

12           MR. AVITABILE:  Right.

13           MR. MILLER:  -- that you're obtaining, the 40

14  years.  And then it would revert to, at worst, to the

15  minimum IZ zoning.

16           MR. AVITABILE:  That's correct.

17           MR. MILLER:  So, that's all a huge public

18  benefit and a civic priority as outlined in the

19  Comprehensive Plan.

20           And the design changes that you've made, I

21  think are definite improvement.  The all brick and

22  especially on that fifth floor, and the way that

23  you've treated the roofline, I think was responsive

24  to some of our concerns here, getting rid of that

25  Hardy Plank.  It's a lot more cohesive and I think it

1  does fit into the fabric of the neighborhood much
2  better.  Although, our chairman probably will want to
3  see a context view, which I might want to see too.
4  But I'll let him go into that.
5       So, DDOT asked for an alternative TDM
6  measure.  You may have addressed this in your
7  testimony, but I just want to -- instead of the one-
8  time smart-trip car and car share, bikeshare credits
9  for -- they wanted you to do three years after the
10 building opening, provide the equivalent of an annual
11 Capital Bikeshare membership or credit for a commuter
12 service equal to the value of an annual Bikeshare
13 membership to all new residents.
14      Have you agreed to that?
15      MR. WATSON:  Yes, we have.
16      MR. MILLER:  And you mentioned tonight the
17 pick-up and drop-off area for residents on Eads
18 Street.  Has that been discussed with DDOT, and has
19 that been worked out yet?
20      MR. WATSON:  That is something that will
21 ultimately be decided at Public Space.  However, we
22 have brought it up to DDOT.  Ultimately there
23 shouldn't be any reduction of on-street parking due
24 to that since we're closing one alley and that space
25 should be available for pick-up/drop-off.

1        MR. MILLER:  And what is the status of the

2   alley closing application?

3        MR. AVITABILE:  We filed the alley closing,

4   actually even before we filed the PUD.  We have all

5   of the agency reports in, in support with the

6   exception of DDOT and NCPC, both of which were

7   holding their alley closing reports so they could do

8   them at the same time as the PUD, which I think makes

9   sense.  So, we're waiting on DDOT and NCPC, and we

10  are also waiting on the Advisory Neighborhood

11  Commission.  But those are the only three outstanding

12  reports.  Everyone else has commented, everyone else

13  has been in support.

14       MR. MILLER:  And then subsequent to that it

15  will be submitted to the Council by the Mayor.

16       MR. AVITABILE:  That's right.  That's exactly

17  right.

18       MR. MILLER:  So, there will be an opportunity

19  for public input there as well, I guess.

20       The community room that you're providing on

21  that first lobby, off the lobby level, what are the

22  details or in terms of the hours of operation and who

23  has access to it?  I assume the ANC and the River

24  Terrace community organization residents --

25       MR. AVITABILE:  That's right.  I mean, I'll

1   start out -- I mean, broadly it's been designed so

2   that you can access it directly from the lobby.  And

3   so, there's no need to come through -- from the main

4   entrance.  So, there's no need to go through the

5   residential lobby to get there.  You can come in

6   really almost directly from the street.

7          You know, beyond that, Michael, I don't know

8   if you have additional thoughts on the operation of

9   it and who will have access, and who can use it and

10  when.

11         MR. GIULIONI:  So, we have nothing firm, but

12  what we envisioned happening in line with how the

13  space has been physically configured is that there

14  would be delegated representatives from the community

15  -- well, from the community organization and the ANC

16  who would basically be point persons to facilitate

17  the use of the space by anyone for any community

18  event.  I think the only things we probably want to

19  restrict are things that are incompatible with the

20  building code.  You know, you couldn't have an event

21  that would be inconsistent with code requirements,

22  and no commercial oriented things would be allowed in

23  the space.

24         MR. MILLER:  And they'd have access through a

25  key card or --

1    MR. GIULIONI:  Yes.  So I guess, you know,
2  down the road when we work on our low voltage wiring
3  plan, we would basically integrate, as you would not
4  with like a key fob.  And those key fobs could be
5  provided to the delegated representatives.  So, we
6  would, you know, set up a scheduling system with our
7  management company, Res One, where you know, people
8  would reserve the time they needed.  And then they
9  would be able to just directly enter the space.
10    I can actually -- let me just highlight on
11  the drawing sheet to make it clear.
12    CHAIRPERSON HOOD:  Let me just ask, let me
13  interrupt.  Is there a narrative in here?  I didn't
14  see it if -- what you're talking about.  Or are you
15  still just thinking about -- are you still working
16  through it?
17    MR. GIULIONI:  I think the goal would be, I
18  mean, that's a conversation we would like to have
19  with the ANC and with the River Terrance folks, you
20  know, in terms of --
21    CHAIRPERSON HOOD:  Okay.  We need to have
22  that conversation sooner than later, because I've
23  seen this all over the city.  And when we start
24  putting rooms and stuff in, we start having problems.
25  So, we need to make sure everybody knows what the

1    parameters are, what the rules are going in, so it
2    won't be any problems later on down the line after
3    you've -- if this is approved, after you've built and
4    gone.  So, we need to do that sooner than later.
5    Thank you.
6            MR. GIULIONI:  Sure.  So, on drawing sheet A-
7    12 from the actual submission package, the drawing
8    submission package, you know, what you'll see --
9    thanks, David.  Actually, it's evident here, is there
10   is -- you know, you can enter the vestibule and then
11   from the vestibule where you'd normally, you know,
12   use your security fob if you lived in the building,
13   you'd also be able to get into the community room and
14   the I guess doors serving the hallway, those would be
15   one-way doors going into the space.  They may end up
16   forming part of the egress path.  And then we have to
17   have a second door on the, I guess it would be the
18   east side, on the east side of the room, south side
19   of the building, for egress, emergency egress.
20           So, we think to the Chair's point, part of
21   what will help this space be a community space is
22   this flexibility of access.  You know, if you have to
23   go up to the 5th Floor, well, that's a lot more
24   difficult.  There's a lot more security issues.  But
25   by creating a compartment, we're hoping that it will

1  be the asset that it should be to both the residents

2  and the neighborhood.

3        MR. MILLER:  And on a different subject, one

4  of the concerns that you've tried to be responsive to

5  is the concerns about the construction, which -- and

6  you said that you're going to have an assessment of

7  surrounding homes beforehand, I think, and a

8  monitoring plan during construction and you

9  eliminated the underground parking garage because of

10 the concern that excavation might cause to

11 surrounding neighborhood.  Is that correct?

12       MR. GIULIONI:  Yes.

13       MR. MILLER:  Is there anything in -- I mean,

14 this construction management plan isn't enforceable

15 by us, but if one exists and been agreed to between

16 the applicant and the ANC, for example, or a

17 neighborhood organization, we sometimes at least

18 reference it in our zoning order.  Is there a written

19 version of this, just like the Chairman --

20       MR. AVITABILE:  No, not yet.  I think the

21 principles were outlined and addressed as part of

22 really I think it was in response to what we heard in

23 the open house and in the survey.  But beyond

24 articulating it, we'll do that.  We haven't yet put

25 pen to paper on that.

Exhibit N  1939

1        MR. MILLER:  Okay.  There are written

2   principles or no?

3        MR. AVITABILE:  Well, I mean, I think, you

4   know, other than what we've outlined in our filing

5   where we said this is something we do, we haven't put

6   together an actual formal plan yet.  It's certainly

7   something that could happen through the continued

8   discussions with the neighborhood.

9        MR. MILLER:  Well, it might be helpful before

10  we get to final if we get to that point, before we

11  get to a final approval, to have a narrative on that

12  so we can reference it in a zoning order, and a

13  narrative on the community room access and hours of

14  operation.  Even though you want to make it a -- have

15  it be a flexibility document that will be a living

16  document going forward so others in the community can

17  use it.

18       My only final other question is, one of the

19  changes you made was -- no, it's not one.  I think I

20  have two questions.  On the rooftop, there had been

21  recreational outdoor recreational access by the

22  residents.  So, you eliminated that.  What was the

23  reason for eliminating that?

24       You still have a green roof up there and all

25  the mechanical stuff.  But --

1          MR. THOMPSON:  Correct.

2          MR. MILLER:  But then no access for the

3     residents.

4          MR. THOMPSON:  Correct.  On the west side of

5     the building there is the green roof access patio

6     that we had up there earlier was eliminated.  One,

7     because seniors really don't like outdoor space that

8     on the west side of the building that's going to end

9     up being a cooler space, mostly.

10          MR. MILLER:  A what space?

11          MR. THOMPSON:  It's going to end up being a

12     cooler space, mostly.  They are temperature

13     sensitive.

14          So, we felt a lot of use wouldn't have been

15     done for the rooftop terrace, as if it was -- in

16     exchange for if it was a multifamily building where

17     we had different age groups and such.  So, that was

18     the logic, and so we thought to make it more of a

19     green roof.

20          MR. MILLER:  Okay.  Well, I can tell you that

21     I'm eligible to be a senior at this building.  I

22     don't know if I quite qualify for the income levels,

23     but -- and I like outdoor space.  I think other

24     seniors do too.

25          MR. THOMPSON:  Yeah.

1          MR. MILLER:  You like to get out, especially

2      since there aren't any balconies on this particular

3      apartment building, which is something that I also

4      like.  So, I don't know if you wanted to reconsider

5      that.  I don't know if you've got feedback from the

6      community.  Was there a concern about noise from up

7      there to the neighbors, or --

8          MR. THOMPSON:  We've been addressing some of

9      the issues, and sometimes noise is an issue.  But we

10     also thought that the park was nearby, and so the

11     public park nearby would --

12         MR. MILLER:  How close is that?

13         MR. THOMPSON:  Three blocks.

14         MR. MILLER:  Again, I can tell you as a

15     senior eligible person, it would be easier just to go

16     up on the roof than to walk three blocks to a park.

17     But that's because my knees are deteriorating.  But

18     that's just a gratuitous comment.

19         MR. GIULIONI:  So, this would be 34th Street,

20     and then this would be I guess 35th Street.  And not

21     -- that's the park.  So, two blocks.

22         MR. THOMPSON:  Yeah.

23         MR. MILLER:  So, on the green roof, on the

24     green -- on the environmental stuff, I think in OP's

25     report they didn't give you any credit.

1          MR. AVITABILE:  Nor were we looking for it.

2          MR. MILLER:  Asking.  But did you have

3     discussions with DOEE about ways to try to maybe

4     increase some of the sustainable items so that you

5     could get some credit?

6          MR. AVITABILE:  Well, the first thing to note

7     is we're in the Anacostia Waterfront development

8     zone, so we're already subject to kind of a higher

9     standard, where not only do we do green communities

10    but we also have to -- Michael, maybe you remember, I

11    think our energy savings needs to be -- there's an

12    additional energy efficiency requirement that we have

13    to hit on top of that so we're kind of already

14    subject to an advance standard.  With GAR our

15    requirement would be a .25.  We're actually at a .3,

16    so we're actually exceeding the requirements there.

17    Storm water, I think similarly, we're at or above the

18    requirements.

19         But you know, I think given the other

20    budgetary constraints of the building, you know, the

21    other types of things that one might look at were not

22    in the cards.  I think the other thing that is

23    somewhat limiting here is probably the construction

24    type, which maybe limits things that one might be

25    able to put on the roof.

1        Michael, I don't know if you want to go in
2   greater detail.
3        MR. GIULIONI:  So, just to that element, I
4   think the District is doing what they should do in
5   terms of addressing -- mitigating storm water
6   impacts.  But right now, based on the type of
7   structure, I think we'd be limited to what, you know,
8   an extensive green roof as opposed to like an
9   intensive thick one, you know, with the -- it will be
10  -- right now we're forecasting a concrete podium.
11  But then above that it will be stick frame.  So, we
12  don't have a huge amount of capacity to add weight
13  there.  And although we're doing a lot in the public
14  right of -- or on the space between the public right
15  of way and our building, you know, I think that --
16  we've done the most we can at this time.
17        In terms of the, you know, changing the green
18  roof, the only challenge I see there to usable space
19  is the tension between the storm water regulations.
20  Is it, you know, it's a good but hard standard, you
21  know, to achieve.
22        MR. MILLER:  So, just one last question.  I'm
23  sorry, I forgot your name.
24        MS. CROWDER:  Melody.
25        MR. MILLER:  Melody.  Can -- so, it was

1  represented that you were providing some information
2  to the community about how the building will be
3  marketed to seniors and those who meet the income.
4  Can you just briefly provide information on that?  Is
5  it existing residents at River Terrace, or is it a
6  city-wide marketing?  Or how are you going to -- how
7  will people know about this --
8          MS. CROWDER:  Well, marketing strategies are
9  done based on affirmative fair housing market and
10  plan established between management, ownership, and
11  DHCD.
12          What I have agreed to, which I think we can
13  work it out with DHCD, is to go to the ANC meeting
14  that will be presented right before this building
15  opens, and provide them with the marketing materials
16  that -- to give them like a more of an intuitive of
17  knowing that this is happening.  This is the day
18  we're selecting to accept applications.  This is the
19  process, this is what we're doing.  And also market
20  the area so they know in their area, this is
21  happening.  This is the day this is happening but we
22  were not able to provide them with like a holding.
23  We couldn't hold apartments specifically for the
24  residents of River Terrace.
25          So, I wanted to provide them with information

1   to make them aware, on this day we're accepting

2   applications, please come out for our open house, or

3   this is the location where we'll be starting to

4   accept applications.

5           MR. MILLER:  Thank you for that information

6   and thank you for your presentation.

7           MS. CROWDER:  You're welcome.

8           CHAIRPERSON HOOD:  Commissioner Shapiro.

9           MR. SHAPIRO:  Thank you, Mr. Chair.  I just

10  have a few questions.  I first of all I would support

11  the comments of my colleague, the Vice Chair.

12  Especially in terms of the process that you've gone

13  through with the community, which I appreciate.  And

14  also, specifically around your commitment to do the

15  geotechnical studies and establish the

16  preconstruction conditions.

17          And as part of the process, to be clear with

18  the community about who the point of contact is

19  during the construction process.  I'm assuming you'll

20  do that, but it's good for us to hear that that's

21  something that you're being attentive to.

22          MR. AVITABILE:  Yeah.  If and when we get to

23  the point, or I should say, when we get to the point

24  of putting together a construction management plan,

25  that's one of the key provisions up front is

1  identifying that point of contact, and that's really

2  the most important.  That's actually the most

3  important thing that happens in the CMP.

4          MR. SHAPIRO:  Great.  Thank you.  Also,

5  related to the green building and the standards that

6  you're talking about and that you're meeting, and

7  OP's point about these, these are not actually

8  considered project, benefits, or amenities.  This is

9  something that you are -- it's a standard you need to

10 be held to.

11         But I'm -- the one further amenity that I

12 want you to look at to explore, you may have answered

13 it relating to what the roof can sustain, but I would

14 encourage you to look at solar panels on the roof.

15 If your plan is not to have this be usable in that

16 way, there are lots of ways and there's lots of

17 benefits from that.  I don't know if you've explored

18 this, if you're working with DOEE at all --

19         MR. AVITABILE:  We haven't explored it but we

20 can certainly look at it.

21         MR. SHAPIRO:  You know, it can save you and

22 the residents money.  I actually don't know how that

23 works with the long-term housing tax credit deal.

24 This is a four percent deal, a nine percent deal.

25 What are you looking at?

1        MR. GIULIONI:  I can't answer that question.

2        MR. SHAPIRO:  But I mean, there's all sorts

3    of issues around building type that you will have to

4    address related to that.  But I'd like to see you

5    explore that because --

6        MR. GIULIONI:  What I can say from the

7    ownership point of view is, in terms of solar, is you

8    know, we'd like to understand everything, you know,

9    that we can, but you know, there's complexity there

10   to understand how solar works in integrating in terms

11   of financing.  But we're right now working on a

12   partnership with the National Housing Trust

13   Enterprise Preservation Corporation who are

14   specialists in this.  And so, you know, we're

15   hopefully going to be able to go to them and they're

16   going to help us understand this.  At this time, this

17   is a, I guess something that NEC desires to

18   incorporate into our development projects, but we

19   need to get up to speed on how the procedures work.

20   So, we're starting down that path and ideally, it

21   will line up with when the project is getting closer

22   to delivery.

23       MR. SHAPIRO:  And I mean, you have tremendous

24   resources here in D.C., even with in the government.

25   And I would encourage you to take advantage of that.

1          MR. GIULIONI:  We've also been exploring,
2    what is it, property assessed clean energy financing.
3          MR. SHAPIRO:  Right.
4          MR. GIULIONI:  So, that's something that is
5    relatively new as well, so part of that is educating
6    our financiers on how that works and how to get it
7    integrated into our projects.  But we're currently
8    working on a matter-of-right project where we have
9    been, I guess, getting familiar with how that process
10   works so we can use it as a future financing source.
11         MR. SHAPIRO:  Okay.  Thank you.  Couple of
12   other quick ones.  Related to the alley, I mean, I
13   think I know the answer to this, but who's
14   responsibility is it to maintain the alley directly
15   behind you and to the side of you, the one that
16   you're not taking?
17         I assume it's D.C. Government, but I don't
18   know this.
19         MR. AVITABILE:  It's DDOT's responsibility to
20   maintain the alleys and you know, pave them when they
21   need to be paved.
22         MR. SHAPIRO:  Right.
23         MR. AVITABILE:  And I think sometimes in
24   connection with a redevelopment, if there's work that
25   needs to be done there will be a discussion about

1  what we may or may not do.  I don't think we've had

2  any discussions about any changes to the alley to

3  date, but it is, it's DDOT normally.

4       MR. SHAPIRO:  Yeah.  But I think based upon

5  the use of this alley and that you may want to have -

6  - that covers it.  It may be in your interest to do

7  this --

8       MR. AVITABILE:  Right.

9       MR. SHAPIRO:  -- in addition to saving you

10  know, D.C. Government some money.  So, I'd encourage

11  you to explore that with them.

12       And the other thing is, I assume that the

13  access to the garage spaces, not driving into them,

14  but walking out of them is from inside the building.

15       MR. GIULIONI:  Correct.  It's internal.

16       MR. SHAPIRO:  Okay.  And do I have any other

17  -- oh, do you know if the neighboring community is

18  parking restricted?  Is it residential permit

19  parking?

20       MR. WATSON:  Eads Street itself is RPP

21  restricted, and there's some RPP restriction on 34th

22  Street to the west of the site.

23       MR. SHAPIRO:  So, has the community brought

24  this up as an option to restrict residents of this

25  building from having permits?

1      MR. GIULIONI:  It's something that NDC Is

2 open to doing.

3      MR. SHAPIRO:  I imagine you still have some -

4 - little bits of conversations ahead of you with the

5 community in some way, shape, or form, so I would

6 like to see that on the table.

7      I agree -- by the way, I agree with you and

8 the transit study that you've done.

9      I think my chair isn't such a big fan of

10 this.  And I mean, it seems like pretty thorough, and

11 I recognize that you're actually holding yourselves

12 to a higher standard than you probably need to in

13 terms of parking demand.  But this might address

14 community concerns.

15      And from your own analysis it would probably

16 practically not have much of an impact on the

17 residents.  But, you could give reassurance to the

18 community in that way.

19      And I believe, Mr. Chair, that is all the

20 questions that I had.  Thank you.

21      CHAIRPERSON HOOD:  Thank you.  Commissioner

22 May.

23      MR. MAY:  Thanks.  So, I have a handful of

24 questions.  First of all, I agree with Commissioner

25 Miller on trying to bring back the rooftop recreation

1  space or patio, or whatever it is, whatever can be

2  put up there, because I do think that would be a nice

3  amenity and it's a very safe place for people to get

4  outside if they want to get outside.  And I don't

5  know whether the entirety of the streetscape has been

6  -- is the entire neighborhood streetscape been fixed

7  the way you showed it on that photo, or is that just

8  one block?

9      MR. GIULIONI:  I can't speak -- I can say the

10  block itself.  That's all.

11      MR. MAY:  Yeah.  Yeah, I mean, I honestly

12  don't recall much about it.  I know that when you get

13  up to Benning Road the sidewalk is not very good.

14  And, you know, walking two or three blocks away to be

15  able to get outside, and just to be in a public park,

16  I mean, that's a good experience in and of itself,

17  but it's a very different experience from being able

18  to go out onto your, you know, a rooftop patio.  And

19  it seems like a pretty easy thing to do when you have

20  that section of the building dropped down, right?  It

21  just, you know, is a matter of having a door at the

22  exterior.  So, I would encourage that.

23      I do have a bit of a concern about the

24  sidewalk conditions, kind of all around it because

25  you know, even though it theoretically has a -- the

1  walk score is something like 64, I forget what the
2  exact number was.  It's really not practical to think
3  that people are going to walk up and over the bridge
4  to get to the shopping area, or even walking to the
5  Metro is problematic because of the crossing -- I
6  mean, crossing Benning Road is not a great
7  experience.  Walking along Benning Road is not a
8  great experience given with the sidewalk.  And
9  frankly, the way it's maintained.  I mean, the last
10 time I was in around that area, the sidewalk was just
11 -- it was not in good shape physically, and it wasn't
12 very clean.  So, it just, it feels like you're
13 walking through an uncomfortable place.
14        Now, maybe -- I mean, I wasn't walking that
15 same segment.  It was a different -- it was a more
16 western segment of Benning Road, but it's not great
17 walking when you're getting out to Benning Road,
18 which will bring up a question for DDOT, which is
19 like, what is the future of Benning Road because
20 right now it's like a super highway in that segment
21 between Kenilworth and when it hits Oklahoma Avenue.
22 And I want to know what the future holds for that
23 area, because it seems like there's a lot more
24 asphalt there than there probably needs to be.
25        Anyway, so I appreciate the changes that you

1  made to the design.  Going all brick, I think is an
2  improvement.  I think that the way you've done it is
3  a little bit odd.  I mean, first of all there's a
4  disconnect between the colors, the way they are
5  named.  I mean, you call it a gray brick.  It
6  actually looks like a brown brick.  Some of the
7  drawings it shows up as like a black brick.  Some of
8  the drawings it shows up as a brown brick.  And it's
9  highly -- you know, there's a lot of variation in the
10  individual bricks, which was sort of a rendering
11  thing, and it doesn't really help you.  I think that
12  just showing the renderings with the color of the
13  brick more consistent -- I mean, I'm looking at the
14  brick over here and there is no variation between the
15  brick there.  But when you look at -- I'll borrow
16  yours since it's handy -- this, it's sort of a muddy
17  brown, and there's a lot of variation in the bricks.
18  Right?

19          So, it's not showing up as sort of clean and
20  crisp the way it should.  That's largely a rendering
21  thing.  You might want to look at fixing that because
22  it will make the building look better.  But it's also
23  very strange that the projecting bays are the dark
24  color, the dark brown or gray, and the rest of the
25  building is red brick.  I mean, you made the right

1    move where -- yeah, bring up the elevation.

2         So, you made the right move by having the

3    elevated section being a different color.  I mean,

4    it's not my favorite color, but the fact that you

5    have that color and then the entry portion, you know,

6    continues that color down, I think that's a good move

7    in terms of the coloration.  But it just seems rather

8    odd to have the projecting bays, which really say you

9    know, kind of rowhouse.  And yet, they're

10   differentiated in color.  And so, they look like

11   they're kind of added on and not, you know,

12   integrated with the rest of it.

13        Using you know, if it were all red brick it

14   might look better.  I mean, these are just things to

15   look at, right?  If it were all red brick, it might

16   look better.  If you were to do red brick and then

17   use the brown or the gray as more of an accent,

18   access -- sorry, accent, sort of between the windows

19   as you go up, and maybe it's slightly recessed, you

20   know, just something to give you a little bit more

21   detail and variety.  But it would feel like a more

22   cohesive whole.

23        So, these are just things to look at and you

24   have to decide what you really like and, you know,

25   I'll be fine with what you really like.  But I just

1  think it's, these are things that I would look at

2  again.  But again, generally speaking, I think a

3  significant improvement.

4          The rooftop relief, I do find a little bit

5  puzzling.  First of all, I mean, you're skinning the

6  stair and elevator enclosures with thin brick, I

7  assume.

8          MR. THOMPSON:  Correct.

9          MR. MAY:  Okay.  So, I'm not sure that it's

10  worth doing the thin brick.  I mean, it's really not

11  going to be that visible.

12          MR. THOMPSON:  Correct, it's not.

13          MR. MAY:  Yeah.  So, I mean, you know, having

14  the thin brick on the fifth floor of the apartment

15  space itself, you know, that, what you can see from

16  the front, that makes perfect sense.  But doing it

17  there, I mean, you might as well use Hardy panel or

18  metal panel or something like that, that might be a

19  little bit less expensive.  And I would also

20  encourage a dark color rather than a light color.

21  Not that it's going to be highly visible because

22  they're very low, and you know, you can't see them

23  that much.

24          But, I also don't see what you gain by not

25  just sort of wrapping that enclosure around those

1   rooftop units. I mean, they're just, they're right

2   next to it. And you've got something that's, you

3   know, 10 feet tall here, and something that's six

4   feet tall here, and they're like I don't know, three

5   feet away from each other. It just doesn't seem to

6   make a whole lot of sense. Maybe I'm not getting

7   what's really going on. I mean, is there a big

8   distance between them? I'm not talking about the

9   little units. I'm talking about the six-foot tall

10   rooftop unit separate enclosures.

11        MR. THOMPSON: Yes, there's probably 50, 60

12   feet between them.

13        MR. MAY: No, no, no, I'm not talking about

14   the two separate ones. I'm talking about you have on

15   the left the elevator and stair enclosure. Yeah,

16   that cluster. Why can't you join that together?

17        MR. THOMPSON: As far as screening?

18        MR. MAY: Yeah.

19        MR. THOMPSON: We could.

20        MR. MAY: Yeah, that's all I'm talking about.

21   I don't have any problem with having the two separate

22   ones. That's allowed by code. I mean, by the zoning

23   code now, right?

24        MR. AVITABILE: Actually, I think, at least

25   it's been an open question as to whether we need to

1  have a separate one.

2         MR. MAY:  We have to have a separate stair.

3         MR. AVITABILE:  If you have a separate stair,

4  whether you can glom on mechanical to it or not.  You

5  know, it seems like we have --

6         MR. MAY:  All right.  Well, if we had to

7  grant relief for that in order for you to have two

8  separate but small rooftop enclosures of --

9         MR. AVITABILE:  Right.

10         MR. MAY:  -- mechanical and -- I mean, if

11  that is an issue with the zoning regulations, maybe

12  we should look at it because it makes perfect sense

13  that you would take the skin of the stairway and just

14  wrap it around that rooftop unit.

15         MR. AVITABILE:  And that, I think, was what

16  was primarily driving us in this, was that second RTU

17  was not in the same enclosure as the first.  But, we

18  can also make sure that each one is within the same

19  enclosure as what it's next to.  So, you've got two

20  separate enclosed areas.

21         MR. MAY:  Yeah.  Yeah, I mean, that just

22  makes a whole lot more sense because otherwise it

23  really kind of junks up the roof.  And not that it's

24  really going to be highly visible, but we don't know

25  what the future holds in the rest of the block and

1  across the street, and things like that, and you

2  know, there -- as you may be aware, you know, rooftop

3  uses are becoming more and more important under the

4  new zoning regulations as well.  And so, you know, on

5  the -- even the site that you're going to develop in

6  the future that's on Benning Road, you know, you may

7  wind up with a taller building and you've got a

8  rooftop deck, and they're going to be looking out

9  over this building, and you want it to look good.

10      So, all right.  Enough about that.

11      I had the same questions about parking in the

12  neighborhood and RPP.  It may make sense to go to a

13  RPP restriction for the residents of the building,

14  but I think what I'm really curious about is did you

15  actually survey the parking at all in the area to

16  know what kind of usage there is?

17      MR. WATSON:  We have not done a parking

18  survey.

19      MR. MAY:  Is that a really difficult thing to

20  do, because I think it might help to you know, for us

21  to understand whether the issue that was raised in

22  the you know, the 50 plus letters that we got, or 50

23  or so letters that we got, about how much of an

24  impact we really would potentially have on the

25  parking.

1          MR. WATSON:  It is something that we could do

2    and we could coordinate with DDOT on the overall

3    scope of that and --

4          MR. MAY:  Yeah.

5          Washington:  -- pull it together.

6          MR. MAY:  Yeah.  Is that a terrifically

7    complicated thing?

8          MR. AVITABILE:  No, I mean, I think it's time

9    and expense beyond that.  It certainly can be done.

10          Truthfully, it wasn't until the last few

11    weeks that parking was really identified in the

12    volume that we've received as a major issue.  So,

13    it's not something that we had thought to do earlier.

14          MR. MAY:  Right.  I appreciate that.

15          MR. AVITABILE:  But it could be done.

16          MR. MAY:  Yeah.  And I'm not trying to just

17    run up the cost of the project, and I was not

18    expecting you to have it here.  I can understand

19    completely because up until two days ago we didn't

20    know there was any real issue with the neighborhood

21    concerns about the project.  So, now that we know

22    there is one with parking, that's one way to try to

23    address it.

24          And then one last question.  In the traffic

25    study, this is one of those rare circumstances where

Exhibit N  1960

1    when you look at the intersections that you've
2    studied and so many of them have a grade of A, and
3    you just don't see that very often.  But then there
4    is like one that's an E.  Can you explain where that
5    is the why that's happening, because that may help us
6    understand whether in fact there is a potential for
7    some change to the traffic circumstance.
8          MR. WATSON:  Right.  So what you're seeing
9    there is, overall the intersections all do operate
10   within acceptable levels.  The E that you're seeing
11   is actually the southbound approach at 34th Street
12   and Benning Road.  So, coming out of actually PEPCO,
13   across the street here.  And that is purely a
14   function of the timing of the signal, and the signal
15   is timed to allow most of the --
16         MR. MAY:  So, when you're coming out of the
17   PEPCO site, is what it is?
18         MR. WATSON:  Correct.  And it's such a small
19   amount of traffic.
20         MR. MAY:  No, no, I understand.  And, yeah.
21         MR. WATSON:  Typically it --
22         MR. MAY:  Yeah, well, and it's only like
23   three seconds over, you know, another one that gets
24   a --
25         MR. WATSON:  right.

Exhibit N  1961

1      MR. MAY:  -- you know, a D, and D is like --

2      MR. WATSON:  right.

3      MR. MAY:  -- is perfectly acceptable,

4  although I know that, you know, Chairman Hood never

5  really understood why a D is acceptable.  But, it

6  never was when he was in school.

7      No, I understand why.  I mean, I understand

8  why you actually, you know, you want to have -- you

9  don't want everything running at A because that means

10  that you have excess capacity.  Right?  So, having a

11  C or D is perfectly fine.

12      MR. WATSON:  Right.  And what you see along

13  Benning Road there, like I said, a lot of those

14  signals are timed to really --

15      MR. MAY:  Yeah.

16      MR. WATSON:  -- move the traffic along

17  Benning Road.

18      MR. MAY:  Right.

19      MR. WATSON:  And that's the vast majority of

20  the traffic that's moving through the study area.

21      MR. MAY:  Yeah.  Yeah.  Yeah.  And if it

22  wasn't for the speed cameras they'd all be going 60

23  miles an hour.

24      MR. WATSON:  Possibly.

25      MR. MAY:  Because the road says, go 60, go

1   60.

2           MR. WATSON:  Right.  Right.

3           MR. MAY:  So, anyway.  All right.  Well,

4   thank you.

5           CHAIRPERSON HOOD:  I Just Wanted to Remind

6   Commissioner May that I have the mic last.  Let me

7   see, where can I start?  There were a lot of good

8   questions, I think asked, mentioned.  But I want to

9   go to -- I'm sorry, I forgot your name also.  It's

10  been a while.

11          MS. CROWDER:  Melody.

12          CHAIRPERSON HOOD:  What's your first name?

13          MS. CROWDER:  Melody.

14          CHAIRPERSON HOOD:  Your last name?

15          MS. CROWDER:  Crowder.

16          CHAIRPERSON HOOD:  Ms. Crowder, I want to --

17  we call people with handles and last names, but I'm

18  going to call you Melody.

19          MS. CROWDER:  Okay.

20          CHAIRPERSON HOOD:  Ms. Crowder, you mentioned

21  about the marketing.  You said just before, like just

22  before you get ready to open you're going to go to

23  the ANC meeting.

24          MS. CROWDER:  Uh-huh.

25          CHAIRPERSON HOOD:  I'm a proponent of trying

1  to do this sooner than later.  And even if you have

2  to go multiple times, because people may have to get

3  their money ready.  You know, it's a lot of things

4  that need to may happen.  There are some things that

5  need to be taken care of.  And that's why we miss out

6  on opportunities because we go to District residents

7  late and other jurisdictions have already beat us to

8  the punch.

9        So, as soon as you can go, even if you have

10  to go multiple times to the ANC meeting and do that

11  marketing piece, I think that would be great.

12        MS. CROWDER:  Okay.  Marketing generally

13  starts roughly 90 to 120 days before the building is

14  set to open.  So, the day we have all of our

15  marketing materials is when we actually will start.

16        CHAIRPERSON HOOD:  Okay.

17        MS. CROWDER:  So, that will be the first

18  stop.

19        CHAIRPERSON HOOD:  Okay.  Great.  Let's go to

20  the RPP.  I don't usually like to talk about RPP, I

21  don't usually like to talk about traffic no more,

22  because I hear how great traffic is on Benning Road,

23  New York Avenue, and when I'm there I think about the

24  traffic consultants.  I always do.

25        Let me just go to -- and it's not that what

1  Commissioner Schapiro mentioned was not a great idea.

2  What I don't want the community to do is to think RPP

3  works and put the community on promised land, and

4  then I go attend and ANC meeting last Saturday and

5  get beat up on.  So, I want to make sure that it's

6  equivocally known that I don't believe RPP works.

7  Not for the intention --

8      MR. MAY:  Can I ask you a question?  Are you

9  saying that RPP doesn't work, or RPP restrictions

10 don't work?

11     CHAIRPERSON HOOD:  I don't believe none of it

12 works.

13     MR. MAY:  Okay.

14     CHAIRPERSON HOOD:  Okay?  When I say works,

15 and forced.  So, we don't want to put people on

16 promised land.

17     MR. MAY:  Right.

18     CHAIRPERSON HOOD:  Thinking that --

19     MR. MAY:  But RPP works great in my

20 neighborhood but the restrictions, I can understand

21 the question.  That's why am asking.

22     CHAIRPERSON HOOD:  Okay.  Well, as a whole,

23 okay?  And I think, this is not the first -- is this

24 the first time you've heard me mention it?

25     MR. MAY:  You have talked many times about

1  RPP, your skepticism about RPP restrictions.  This is

2  the first time I really understood you to be

3  complaining about the RPP system in general.

4          CHAIRPERSON HOOD:  Yeah, I'm talking about --

5          MR. SHAPIRO:  He warned me not to bring it

6  up.

7          CHAIRPERSON HOOD:  Okay.  So, since you

8  brought it up I'm going to talk about it.  And the

9  only thing, the only reason is, is because -- and I'm

10 not saying let's not try it, because if that's going

11 to help the community, relieve them of issues in

12 their neighborhood or parking, I think it's great.

13 But I don't think it's tracked.  I have evidence.

14 I've seen many cases down here it doesn't work.

15          But I want to make sure the residence who are

16 here from Ward 7, well, the Zoning Commission said

17 this.  I don't want to put anybody, as I always say,

18 on promised land.  So, if you're in tune to doing it,

19 let's do it, see how it works.  I'm just not a fan of

20 it.

21          Mr. Watson, let's put up a rendering.  Just

22 show me how I can go around that area.  Around the

23 whole site.

24          And, Mr. Avitabile, I don't know if I'm with

25 you about the arterial.  I don't think I'm with you

1    there.  I don't think that was the intention of the
2    Commission, but I have to go back and look at that.
3    I don't think I'm -- I think it needs to be right
4    abutting to an arterial.  I'm not sure that we said a
5    setback on another street.
6            So, I think that the community actually has a
7    very valid point.
8            MR. AVITABILE:  Well, you know, to that
9    point, two things.  One, I could look at examples
10   where the C-3-A or the MU-7 Zoning does extend beyond
11   the frontage of the street to the other side of the
12   block.  But you know, we could look at other zone
13   categories that might work for this project.  We
14   picked that because we thought that was the zone that
15   best fit the Comprehensive Plan.  Comprehensive Plan
16   says, medium density commercial.  That's a medium
17   density commercial zone.  And it's the lowest of the
18   medium density commercial zones.  It's the highest of
19   the moderate density, but lowest to medium.  So, it
20   seemed like it was the right fit and that was why we
21   selected it at the time.
22           You know, MU-5 Zone would, I believe work for
23   this project.  We have to double check it.  But, it
24   gives us the height in the density that we otherwise
25   need.  It would come with a higher GAR requirement,

1  but we are meeting that.  And I think it otherwise

2  would work.  So, we could certainly look at a

3  different zone category.

4          CHAIRPERSON HOOD:  Let's look at it because

5  we have been dealing with moderate and medium, and

6  that whole argument.  Let's look at it and make sure

7  that we're intact with the right zone.

8          MR. AVITABILE:  We'll certainly do that.

9          CHAIRPERSON HOOD:  And let me ask another

10  question before I go to my transportation run around.

11  I noticed that we have a lot of bicycle parking.  I

12  don't know, I mean, how many seniors -- I mean, I've

13  had seniors tell me, Anthony Hood, are you crazy?

14  I'm not riding no bicycle nowhere.

15          So, if this is going to be for seniors what

16  audience are we trying to get?  The seniors to ride?

17  I mean, explain that to me.

18          MR. WATSON:  Well, the bicycle parking that's

19  proposed really meets what Zoning requires.  You

20  know, ultimately, I think we would expect that some

21  of the younger seniors may use the bicycle parking.

22  But obviously, I think as people get a little older

23  it's probably a little more difficult.

24          CHAIRPERSON HOOD:  You know, I appreciate

25  that answer because I've had some people to tell me

1   that that is not the case.  That everybody's riding
2   bicycles.  And then when I'm in the street, as others
3   know, I'm out in the community and I hear something
4   totally different.  Seniors, have you lost your mind?
5   I'm not taking Uber, I'm not taking Lyft, and I'm not
6   riding a bicycle.  I'm taking my car to my doctor's
7   appointment.  And that's the reality of it.
8        See, I try to be a realist.  I don't try to
9   come down here and paint a glossy picture and look
10  good and go out the door, and then it's over with,
11  because at the end of the day while you develop this,
12  the people who are going to be impacted are going to
13  be the ones who live there.  So, that's why am glad
14  to hear that you all are still having some
15  discussions, because we didn't know until recently
16  that there were some issues.  So, I'm glad to see
17  that you all are going to continue to have those
18  discussions.  And I would like for you to continue
19  having those discussions before, at least, I take a
20  final vote.  Okay?  Or any vote actually.
21       MR. AVITABILE:  Yes, sir.
22       CHAIRPERSON HOOD:  Okay.  All right.  Let's
23  ride around the -- what is the parking lot used for
24  now?  Is there a club nearby there or something?  Is
25  there a place, a club or something nearby there?

1        MR. WATSON:  There are new operators of what
2   used to be the Chateau.  It's now the Chateau Remix.
3   So, yes, in this building.
4        CHAIRPERSON HOOD:  So, when the Château remix
5   is open, do they use your parking lot?
6        MR. WATSON:  They do have leases with us for
7   the lot that is located both on Benning Road and the
8   current lot that is the subject of the application.
9        CHAIRPERSON HOOD:  So, if this moves forward
10  have you worked with them on some additional parking?
11  Can you park on Benning Road after a certain time at
12  night?
13       MR. AVITABILE:  Yes, you can.
14       CHAIRPERSON HOOD:  What time about, after
15  9:00?  10:00?
16       MR. AVITABILE:  I believe it's 6:30.
17       MR. WATSON:  6:30.
18       CHAIRPERSON HOOD:  6:30?  All right.  I don't
19  know if that's going to do it for me, Mr. Watson.  I
20  need something that's going to take me around the
21  whole project.  I just want you to show me -- I don't
22  even know if I saw it.
23       MR. WATSON:  Oh, the -- okay.  Sorry, I'm
24  not --
25       CHAIRPERSON HOOD:  I guess that's going to

1    have to do.

2              MR. WATSON:  Okay.

3              CHAIRPERSON HOOD:  What I need you to do is

4    kind of show me the -- I have my own.  I need you to

5    show me the turns.  I want you to show me how all

6    that's going to work.  How am I going to work it if

7    I'm in a -- not a bicycle, but if I'm in a car?  Show

8    me how it's going to work.

9              MR. WATSON:  In terms of how you would access

10   the site?

11             CHAIRPERSON HOOD:  Turn, what I'm going to do

12   to go around the back, what I'm going to do in the

13   alley.  Are we talking about -- is the alley -- we

14   didn't propose the alley is one-way, did you?

15             MR. WATSON:  No.

16             CHAIRPERSON HOOD:  Okay.  Show me that

17   whole --

18             MR. WATSON:  It's a 20-foot alley.  So,

19   coming in from Benning Road, if you're coming from H

20   Street, you would take a right and you can either

21   come down 34th and Eads and enter this way and come

22   in, or you to come down and actually come all the way

23   down the alley and access your parking space.

24             If you were coming from the east on Benning

25   Road, you could not turn 35th Street.  You'd have to

1   come down to 34th Street and come in one of the same

2   two ways.

3          If you're leaving you can either come out of

4   your parking space and come out, and you could only

5   take a right turn here out of 35th Street.  Or 36th

6   Street, excuse me.

7          CHAIRPERSON HOOD:  Is 36th one-way?

8          MR. WATSON:  No, it is two-way, but it's

9   right in/right out at Benning Road.

10          CHAIRPERSON HOOD:  Right in/right out.

11          MR. WATSON:  So, you can only make a right

12   turn in or only make a right turn out.

13          CHAIRPERSON HOOD:  Okay.  Now, is there an

14   alley or something in the middle of Benning Road

15   right there?

16          MR. WATSON:  Is there a --

17          CHAIRPERSON HOOD:  A alley?

18          MR. WATSON:  Oh, yes.  Yes, yes.

19          Otherwise, if you do want to exit and go back

20   to the west, you could either come out onto Eads and

21   come back out.  There's a signal here.  Come back

22   out.  Or, come back all the way down the alley and

23   come out to the signal.

24          CHAIRPERSON HOOD:  Okay.  What is the width

25   of 34th Street?

1      MR. WATSON:  34th Street itself?

2      CHAIRPERSON HOOD:  Yeah.

3      MR. WATSON:  I do not know off the top of my

4  head but it is two-way with parking on either side.

5      CHAIRPERSON HOOD:  Okay.  And 36th?

6      MR. WATSON:  36th is very similar.

7      CHAIRPERSON HOOD:  Okay.

8      MR. WATSON:  Eads is a little bit narrower,

9  but all of those streets are two-way with parking on

10  either side.

11      CHAIRPERSON HOOD:  And let me ask you, the

12  numbered streets, is it easier for cars to go both

13  ways on them?  I mean, in professional opinion.  I

14  know what it really is.  Actually, let me just

15  explain something to you.  I know the area, okay?

16      MR. WATSON:  Right.

17      CHAIRPERSON HOOD:  I'm asking these

18  questions, so put them on the record.  I do know how

19  tight it is over there.

20      MR. WATSON:  Understood.

21      CHAIRPERSON HOOD:  Okay.

22      MR. WATSON:  On --

23      CHAIRPERSON HOOD:  So, your professional

24  opinion.

25      MR. WATSON:  On 34th and 36th are fairly

Exhibit N  1973

1    comfortable.  Eads is a little tight if both sides

2    are fully parked.  There are much tighter areas in

3    the District, but Eads can be a little bit tighter if

4    it's fully parked on both sides.

5          CHAIRPERSON HOOD:  Mr. Avitabile, why do we

6    have so many form letters in here with the same

7    concern?  Why did we get that, I guess, the last few

8    days?

9          MR. AVITABILE:  Well, I suppose you probably

10   should ask the folks behind me as well.

11         CHAIRPERSON HOOD:  You know, I'm going to do

12   that too.

13         MR. AVITABILE:  I know, but you're going to

14   put me on the spot first --

15         CHAIRPERSON HOOD:  Right.

16         MR. AVITABILE:  -- and make me put my foot in

17   my mouth.  That's fine.

18         So, I think the history of this project, and

19   Michael laid it out, you know, there had been

20   continuing communication for over a year.  We most

21   recently, as we were leading up to the vote for this

22   project on the PUD, there was an executive session of

23   the ANC.  I think it was a phone call with some of

24   the ANC commissioners where questions were outlined

25   and answered.

1      We then went to the ANC the Tuesday or
2  Wednesday before Easter, to their formal meeting.
3  And at that meeting the ANC, you know, decided that
4  they wanted to take a little more time to I think,
5  further get the opinion of the neighborhood on the
6  project before they took a position.  And so, they
7  decided to delay their vote and hold a special
8  meeting the following week.  It was kind of a joint
9  meeting with the River Terrace Community
10  Organization.  River Terrace was already having their
11  regular meeting.  And so, the ANC joined them and
12  discussed this project.
13      So, our project was the first thing discussed
14  at the full community meeting and so there were a lot
15  of people present there for other items on the
16  agenda, and I think it raised consciousness of the
17  project.  I do think that probably there has been
18  some discussion of getting people to write letters to
19  articulate the concerns.  And I think the letter
20  that's there does layout concerns very consistently
21  with the ANC letter.  I think it's pretty clear what
22  the concerns are.
23      I think we struggle a little bit with kind
24  of, where do we go here, because we were -- and this
25  is something we've been asking for for really the

1    last month.  Kind of, what can we do?  You know, a
2    lot of these concerns were, the building is too big.
3    And that's the first time we're hearing it, one.  And
4    it's kind of just a general, we don't think this
5    building should be here.  And that's not really
6    something that we can concretely address.  Things
7    like, we'd like you to do something specifically to
8    address parking impacts, we'd like -- those are
9    things that we can work with.
10         So, I think you know, to the extent the
11   letters and the ANC resolution do that, that's
12   something that we can work with.  Beyond that I mean,
13   I think that's where the letters came from was kind
14   of this, this recent consciousness about the project
15   and kind of using that ground support to get people
16   to kind of make it clear that there are people that
17   are interested in this project.
18         I mean, there's a disconnect, for me at
19   least, and Michael has been leading, you know, a lot
20   of the discussions with the neighborhood, you know
21   from what I've seen, you know, there was, you know, a
22   survey that River Terrace itself conducted and it
23   outlined a series of issues.  And I think we did a
24   really good job of addressing many of those issues.
25   The survey is in the recent material that we filed

1    today that kind of summarizes the community outreach.
2    It's Tab N.
3            but you know, it laid out, you know, we'd
4    like to see senior housing.  We are concerned about
5    construction impacts.  And so, there were a lot of
6    things there that I think we did.  There were issues
7    raised at the open house.  Again, I think we were
8    tracking those issues and doing what we could to
9    address them.
10            I'm not going to lie, we've been a little
11   caught off guard by the last few weeks.  Doesn't mean
12   that it's not something that we can work on
13   addressing, and I think -- I think I'm correct in
14   saying we are all committed to continue to work on
15   it.
16            CHAIRPERSON HOOD:  Yeah, I believe you can,
17   because I was wondering, because typically when we
18   see this I usually get an email from Ms. Schellin,
19   and the applicant usually says, we need to postpone
20   the hearing.  And I was just wondering why we're
21   going forward.  I guess when it's these kind of
22   issues, and I know they were kind of late coming in,
23   typically we will -- I usually will tell her, let's
24   do it so you can work out those issues.
25            But I'm hearing a commitment from you all

1  now, that you know specifically that you can work out

2  those issues with the ANC and the community.

3       MR. AVITABILE:  Well, and I do think

4  sometimes -- there are sometimes when it's worth

5  postponing because we're going to -- we know what we

6  have to work on, we just need more time to work it

7  out.

8       There are some cases where there are some

9  issues that we can work on, but there are some issues

10  that are kind of fundamental.  It works or doesn't.

11  You know, like the building -- the four to five story

12  building with 70 units, you know, whether that's good

13  or not good, and I think sometimes we all need, I

14  think a little bit of direction from you all to

15  signal to us, those issues, like everyone is, your

16  good, these issues are the ones that we all should

17  work on because we're hearing real issues, and you,

18  you know, and the applicant need to work on them.

19  So, I think that's partly what we're hoping.  But we

20  clearly have got a long to-do list already and I

21  suspect over the next hour we'll have more added to

22  it.

23       CHAIRPERSON HOOD:  For me the direction is,

24  go back and have those conversations with the

25  community.

1          MR. AVITABILE:  Uh-huh.

2          CHAIRPERSON HOOD:  I've seen it done.  It

3  works.  And I think this -- while I do kind of like

4  the design, but I want to make sure that the folks

5  who are impacted are the ones who you all can have

6  those conversations.

7          Now, apparently, the supporters didn't come

8  down here tonight, because I'm looking at my list

9  here and we have opponents.  Were there any

10  supporters at the open house?  Or did you -- what did

11  you all do?  Did you serve food?  I mean, what

12  happened at the open house?

13          MR. GIULIONI:  I guess like to be as brief as

14  possible, it was a station format, so people were

15  able to come in.  We did provide food for

16  participants.  And so, there was stations where we

17  had representatives from the development team, from

18  Grimm and Parker, and from Res One to speak to the

19  operations.

20          You know, I guess resulting from that we did

21  feel we identified a series of issues that we did

22  address in terms of preferred public benefits and

23  some of the concerns that were raised.  But, you

24  know, I think what we, you know, as a developer, we

25  feel we have a project that's, from the developer's

1  point of view, consistent with the planning guide.

2  And so, you know, the nature of how the

3  project comes together, it's -- we didn't sort of --

4  we don't have the flexibility to fundamentally adjust

5  our development program because of the land

6  transaction tossed that we initially incurred is

7  predicated on planning guidance.  So, that has been

8  there for a while and we feel that we have done our

9  best to follow that guidance.

10  CHAIRPERSON HOOD:  And I want to make a --

11  and I hear it more on this tonight than I've heard

12  it.  The Comp Plan and the planning guidance or

13  whatever you want to call it, that comes from the

14  community.  The community -- and I have the author if

15  the Comprehensive Plan, I like to say, up here with

16  me.  So, if I'm wrong he will straighten me out.

17  But let me just say, the Comprehensive Plan,

18  a lot of times comes from -- the stuff that's in the

19  Comp Plan comes from community.  Okay?  So, community

20  had a lot to do with the policy of the Comp Plan, the

21  planning guidance, or whatever you want to call it.

22  So, let's make sure we always keep that in mind.  The

23  community had a lot to do with that.  And they are

24  the ones who planned, for the most part, their

25  community.

1       And you know, I didn't see you hit the
2  button, so I must be all right.  Okay.
3       So, my last question, this is a question I'm
4  starting to ask at every hearing.  Who on your
5  development team is from the community?
6       MR. AVITABILE:  No one.
7       CHAIRPERSON HOOD:  Okay.  All right.  Any
8  other questions up here?
9       [No audible response.]
10      CHAIRPERSON HOOD:  All right.  Does the ANC
11 have any cross-examination?
12      MS. MUHAMMAD:  Good evening, Commissioners,
13 applicants.  My name is Sherice Muhammad.  I'm the
14 ANC 7D Commission Commissioner Chair, and I'm here to
15 as briefly as possible talk about what we've heard
16 tonight.
17      I think the ANC plan that was submitted to
18 the Board of Zoning, or the Zoning Commission, was
19 very clear.  And I like the fact that a lot of what
20 we brought up was questioned, and the applicants were
21 able to answer.
22      However, there are some variance of answers
23 that -- well, answers that were given but we know
24 that there are other realities that could be also
25 included in the answers.  We'll begin with

1    transportation.

2         The transportation area I don't think was

3    consistently captured in this project.  Benning Road

4    -- the language that was used, I'll begin there.  The

5    language that was used to describe this project had

6    consistently this evening said or stated that this

7    project, 3450 Eads Street, runs along Benning Road.

8    That's incorrect.

9         The project is on Eads Street.  It is

10   parallel to Benning Road.

11        CHAIRPERSON HOOD:  Chairperson Muhammad.

12        MS. MUHAMMAD:  Yes.

13        CHAIRPERSON HOOD:  Cross-examination is just

14   when you ask a question of what they heard.  Now,

15   what you're refuting now is what you can bring up in

16   your testimony.

17        MS. MUHAMMAD:  Not a problem.  So, you just

18   want me to --

19        CHAIRPERSON HOOD:  Formulate it in a question

20   if you know, or formulate it to --

21        MS. MUHAMMAD:  I thought that cross-

22   examination --

23        CHAIRPERSON HOOD:  -- a question.

24        MS. MUHAMMAD:  I'm sorry.  My understanding

25   was cross-examination was actual questions.  I wanted

Exhibit N  1982

1    to lay a base for what I'm saying in terms of -- I
2    did not want to reiterate the report because the
3    report was clear.  What I wanted to also just state
4    for the record in terms of our statement or
5    testimony, is the fact that information that we heard
6    tonight is not all correct.
7              CHAIRPERSON HOOD:  Okay.
8              MS. MUHAMMAD:  And we wanted to make that
9    record on, you know -- make that statement on the
10   record.
11             CHAIRPERSON HOOD:  What I would just ask, I
12   think you're asking about what street is it on.  Just
13   ask them what street is it on.
14             MS. MUHAMMAD:  No, no, no, I wasn't asking
15   because we know this is factual.  According to their
16   report, or to the application, the project is on Eads
17   Street, and I wanted to make the distinction for the
18   record that this is not a project that's on along
19   Benning Road.  It's along Eads Street.
20             CHAIRPERSON HOOD:  Okay.  I understand it,
21   but what I'm trying to get you to do for me in cross,
22   because the courts look at everything that we say.
23             MS. MUHAMMAD:  Of course.
24             CHAIRPERSON HOOD:  I would like for you to
25   just ask a question in cross and when you come up for

1  your presentation to us, because you don't have a
2  time limit, you can convey that to us.
3          MS. MUHAMMAD:  That's fine.
4          CHAIRPERSON HOOD:  Okay.
5          MS. MUHAMMAD:  So, hold that for cross-
6  examination?
7          CHAIRPERSON HOOD:  Hold that for -- no.  Hold
8  that for when you come to do your presentation.  You
9  can get that in there when you come to do your piece.
10          MS. MUHAMMAD:  Okay.
11          CHAIRPERSON HOOD:  Your presentation.  But
12  right now, anything that they said that you want to
13  clarify, you can ask those questions.  And then if
14  you want to refute it, when you come up and do your
15  presentation you can put all that in there.
16          MS. MUHAMMAD:  Understood.
17          CHAIRPERSON HOOD:  Okay.  All right.
18          MS. MUHAMMAD:  So, is there anything specific
19  that you want me to say at this present time?
20          CHAIRPERSON HOOD:  Do you have any cross?  I
21  mean, anything you've heard -- I think the line of
22  what you were saying, if you could put that in a
23  question, because I think you were going somewhere.
24          MS. MUHAMMAD:  Yes, I was.
25          CHAIRPERSON HOOD:  I just -- yeah.  But if

1   you could just put that in a question?

2         MS. MUHAMMAD:  Okay.

3         CHAIRPERSON HOOD:  Because we're doing cross.

4   And then you can come back up and give us the full

5   piece of it.

6         MS. MUHAMMAD:  I'm now unclear.  You're

7   saying that I'm coming back to cross-examine?

8         CHAIRPERSON HOOD:  No, you --

9         MS. MUHAMMAD:  Or, is this cross-examination?

10        CHAIRPERSON HOOD:  This is cross-examination

11  right now.

12        MS. MUHAMMAD:  Thank you.  I'm sorry.  That

13  was my error.  Okay.  I'm thinking that the next time

14  I come back up is cross-examination.

15        CHAIRPERSON HOOD:  No, you're doing cross

16  now.

17        MS. MUHAMMAD:  That is not a problem.

18        CHAIRPERSON HOOD:  Okay.

19        MS. MUHAMMAD:  Okay.  With regards to -- it's

20  a couple of things.  I'll ask my first question to

21  Mr. Giulioni.  Earlier in your testimony you

22  mentioned that there was a window to affordable

23  housing and that the fact that affordable housing was

24  closing in the Ward and I'd like to get some more

25  clarification on that.

1    MR. GIULIONI:  Sure.  You know, I guess the
2  way to further explain that statement, what I meant
3  by it is, this you know, this area is predominantly
4  ownership housing.  That's what we've been told by
5  the community.  There are some apartment buildings at
6  the southern end.  So, I guess southeast end of River
7  Terrace.  I guess sort of along 295.  Not actually on
8  295, but on the adjacent road.

9    But as we've also heard at public meetings,
10  the sales price of these buildings is going up.  One
11  of the concerns we heard was that you know, this
12  project could devalue these sales prices continuing
13  to increase.  So, I think in general what we see is
14  the city as it grows, rents and costs of housing are
15  going up.  And right now, this area doesn't have
16  housing that serves the need it's intended to.

17    And so, if we get it there now, it's 40 years
18  of that housing because you know, I'm theorizing, but
19  in theory, what will happen on Benning Road on the
20  next phase will not be affordable housing, it will
21  just be market rate housing.  But what we'll have, at
22  least on our site, is an area that is preserved for
23  the demograph that we are now targeting.
24    MS. MUHAMMAD:  And exactly your demographic,
25  if you'll clarify that as well?

1         MR. GIULIONI:  Sure.  So, I guess under the -

2   - excuse me.  Under the DHCD requirements, a senior

3   qualifies as one who is 55 years of age or older.

4         MS. MUHAMMAD:  Okay.  With that said, in our

5   special meeting that came up in April, we have a

6   number -- the majority of our River Terrace residents

7   are homeowners who are retirees.  So, the target for

8   seniors, according to the marketing plan, Ms.

9   Crowder, our question at the special meeting, and I

10  wanted to reiterate this before the Zoning

11  Commission.  If, if our residents in River Terrace

12  who are aging in place, in homes that are much larger

13  than 500, 600, 700 square feet, are able to age in

14  place in their homes that they've paid for, what

15  would be the incentive, or what would be the

16  marketability for said housing?  This project.

17        MR. GIULIONI:  Sorry.  Are you addressing

18  that to myself?

19        MS. MUHAMMAD:  Yes.

20        MR. GIULIONI:  Sure.  Sure.

21        MS. MUHAMMAD:  And I'd like to get input or

22  weigh in from Ms. Crowder as well.

23        MR. GIULIONI:  Sure.  If you'd just give me a

24  moment?

25        MS. MUHAMMAD:  Sure.

Exhibit N  1987

1         MS. CROWDER:  Can you repeat the question,

2   please?

3         MS. MUHAMMAD:  Certainly.  A number of our

4   residents in River Terrace are seniors who are

5   retirees, who are living in their homes, paid for,

6   for the most part, and they're aging in their homes,

7   aging in place.  What would be the marketability for

8   said housing project if you're looking at marketing

9   to people in the River Terrace community?

10        And by your own testimony, Ms. Crowder, you

11  said that you're going to use the ANC meeting to

12  attract potential buyers.

13        MS. CROWDER:  When I said that I will use the

14  ANC meeting, it's to allow anyone that you know to

15  pass that information on.  I don't know exactly who

16  in your community would be willing to move.  So, it

17  would be to give you first-hand information.

18        To give you first-hand information on someone

19  that you know that may live two blocks from this

20  community that will be considering to sell their

21  home.  We don't know what their circumstances are,

22  but you as the ANC may know of several individuals,

23  and which that's why I would like to present you with

24  the marketing tools to let you know, this is what's

25  happening, this is how far along we are.  In the next

1    three or four months, this building is planning to
2    open.  But I don't know who don't have that
3    information, so I wanted to start with you.
4           MS. MUHAMMAD:  Okay.  Can you be a little
5    more specific, Ms. Crowder, with regards to ANC
6    outreach?  Are you speaking of east of the river
7    ANCs, or are you opening this up to ANCs throughout
8    the city?
9           MS. CROWDER:  Well, this would be Ward 7,
10   particularly for this building.
11          MS. MUHAMMAD:  Just a rule of thumb, your
12   residents, your seniors in Ward 7, many of which the
13   larger percentage, I can't quote it at a this present
14   time, but I am familiar with a number of civic
15   associations throughout Ward 7, which is a vast area,
16   many are aging in their homes, aging in place.  So,
17   if seniors are your target you might want to consider
18   opening it up to the city, to the broader community,
19   and not just people east of the river.  Just a
20   suggestion.
21          However, the ANC 7D is opposed to this
22   project, and we wanted to continue with questions
23   relative to the building itself and how it is -- it
24   just seems like somebody is coming in and dropping
25   this building in the midst of rowhouses.

1          I don't want to be shallow and say, it looks
2     terrible, but I'm wondering -- I always like to put
3     the shoe on, you know, try the shoe on yourself.  In
4     your community, a building of this magnitude, with
5     the housing surrounding it, is as it is.  Would you,
6     yourself, want to see a building dropped in on that
7     lot land?
8          Now, like I said, in our report the land use
9     to me, after reading the applicant's information, I
10    don't necessarily see this as the best use of that
11    land.  And I'm saying that we can't just arbitrarily
12    use the land just because it's there and it's
13    available if it doesn't fit, if it's not suitable.
14    And I just don't see in this application, I mean,
15    I've heard consistently that, you know, we're meeting
16    the zoning regulations.  We're meeting the DDOT
17    regulations.  But this is not serving the community
18    to the degree that this is something that the
19    community would want, have a buy-in.  And that was
20    clearly stated in the special meeting.
21         CHAIRPERSON HOOD:  Is there a question?
22         MS. MUHAMMAD:  There is a question.  So, my
23    point is, based upon the building itself, the
24    surrounding transportation, how do you think that
25    people will be able to access, ingress/egress, into

1  River Terrace, on to Eads Street, with the ease that

2  was -- with the ease that this applicant is stating

3  that it will be?  How can you prove that?  Or can you

4  prove that?  And I'm addressing this to the

5  transportation expert.

6        MR. WATSON:  So, when we look at

7  transportation impacts, typically we look at how the

8  development will impact the network during peak

9  times.  So, when the peak traffic times are.  And

10  what sort of additional traffic would be added during

11  those peak times.

12        Obviously, most buildings are going to

13  generate traffic throughout the day.  But in order to

14  kind of get a handle on how the development would

15  impact the transportation network during those peak

16  times, that's how we look at it for most every

17  development.

18        For this one, because it's a senior building

19  and most seniors are not commuting during peak times,

20  and the fact that there is a low number of parking

21  spaces, the general impact associated with those

22  trips during that peak time is relatively low.

23        MS. MUHAMMAD:  So, would you say that this

24  application and considering the transportation

25  aspects, how do you think the seniors that are

1    currently living in River Terrace, how are they doing

2    their shopping?  How are they getting to their

3    doctor's appointments?  How are they getting to

4    visits?  Whatever they do through the day, what

5    traffic, or how do you think they are getting to

6    their obligations?

7            MR. WATSON:  Well, generally speaking, if

8    they have a vehicle at their house, they likely will

9    use their vehicle.  Or if they do not, they'd be

10   using transit.  We have not specifically studied what

11   the existing neighborhood, how the seniors in the

12   existing neighborhood do their day to day errands or

13   whatever they need to do.

14           That being said, you know, as I mentioned

15   when we examine just the general impacts of a

16   development we typically look at how the development

17   is going to impact the streets when they're at their

18   most congested at the peak times.

19           MS. MUHAMMAD:  Okay.  Also, another question

20   with regards to transportation.  When we are saying

21   peak times, currently WMATA offers five bus transit

22   services.  We have the X1, the X2 -- no, I'm sorry.

23   X1, X3, X9, who only function rush hour in the

24   morning, rush hour in the evenings.  So, that leaves

25   two other options, the X2 that runs pretty much into

1   the evenings and on weekends, and the U4 which is a

2   circular route.  So, if we're talking about

3   alternatives for transportation, with those two

4   buses, and then of course you all had mentioned the

5   bikes, do you think those are feasible, realistic

6   alternatives for transportation easement?

7          MR. WATSON:  We would expect that the most

8   likely mode that they would use would be the X2, just

9   given the amount of service that it provides, that it

10  goes both to the Metro station at Minnesota Avenue as

11  well as further to the west, into the heart of the

12  city, and that there are relatively new bus shelters

13  provided there on Benning Road.  Yes, Benning Road

14  does carry a lot of traffic, but there is a clearly

15  marked site, a crosswalk there, to get people between

16  the two bus stops.

17          And Benning Road is, you know, really just

18  half a block on the other side of the development

19  there.

20          MS. MUHAMMAD:  Could you also be more

21  specific, you had mentioned in your testimony that

22  the traffic is coming in and out of the PEPCO.  You

23  had mentioned something about the in and out,

24  ingress/egress to the PEPCO, and that was the cause

25  of the traffic?

1         MR. WATSON:  So, no, there was a --

2         MS. MUHAMMAD:  On Benning Road.

3         MR. WATSON:  There was a general question on

4 the delay, the calculated delay at that 34th Street

5 and Benning Road intersection.  Because the traffic

6 signal itself is really designed to accommodate

7 through traffic on Benning Road, the delays on the

8 side street can really be compounded.  Particularly

9 for the north side where there really isn't a whole

10 lot of traffic and there's not a lot of demand for

11 time on that side of the traffic signal.

12         As a result, the signal itself is not

13 designed to accommodate traffic on the north side.

14 So, it compounds the delay on that side.  There

15 really, at this time, is not much demand on that

16 side, so it really is not something that really is

17 impacted one way or the other by the development.

18         MS. MUHAMMAD:  Okay.  And I guess my last

19 question, and if we have others that are going to be

20 testifying, with regards to the parking, our

21 constituents have informed us that the parking issue

22 with regards to Eads Street is already a strained and

23 very -- it's already a shortage, insufficient for the

24 current residents that are living there.

25         So, I wanted to ask for more creative

1  brainstorm.  I'm not sure how much that is, but
2  that's already an issue and it's already stressed for
3  the current residents that are on Eads Street.  And
4  so, we are hoping that this would be mitigated as
5  well.
6      MS. CROWDER:  Commissioner, before you leave
7  can I clarify a statement you made for the record?
8      MS. MUHAMMAD:  Sure.
9      MS. CROWDER:  You made a statement that asked
10  that we expand our marketing outside of Ward 7.  I
11  want to make it clear that you asked for a preference
12  in our last -- in your last ANC meeting, your special
13  meeting, if we would provide a preference to River
14  Terrace residents.
15      Our marketing efforts are through social
16  media, Trulia, Hotpads, the internet, express.  We
17  have a wide range marketing campaign.  We have
18  several websites including our own, Residential One's
19  website.  The fact that I wanted to bring this
20  information to your ANC meeting was to allow River
21  Terrace the opportunity to know about this property
22  and the opening first-hand.  But our efforts are
23  state wide.
24      So, we will get a lot of volume regarding the
25  application process for this building, so I wanted to

1  make it clear that we do have several sources of

2  marketing.  But by me providing you this information

3  months ahead of time, while as soon as we start our

4  marketing campaign, it will at least let you guys

5  know that this is happening, this is coming up, and

6  the dates that we're set to have an open house to

7  accept applications.  Okay?

8      MS. MUHAMMAD:  Point taken, but I wanted to

9  clarify as well, there was one individual from the

10  River Terrace community that said she'd prefer a

11  preference but she was only speaking for herself.

12      MS. CROWDER:  Okay.

13      MS. MUHAMMAD:  That issue was not brought up

14  by the ANC, nor was it endorsed by the ANC.  We're of

15  the thinking that, and we know our constituents in

16  that area, and of course Commissioner Prue will also

17  be testifying this evening that, that was a request

18  from one of the residents of River Terrace, not from

19  the ANC.

20      MS. CROWDER:  Okay.

21      MS. MUHAMMAD:  Thank you.

22      MS. CROWDER:  Thank you.

23      CHAIRPERSON HOOD:  Any other questions?

24  Okay.  Let's go to the Office of Planning and

25  District Department of Transportation.  Ms. Thomas

1    and then Ms. Israel.

2            MS. MUHAMMAD:  Chairman Hood, am I remaining?

3            CHAIRPERSON HOOD:  You can stay there because

4    we might have some cross for you.

5            MS. MUHAMMAD:  Sure.  Okay.

6            MS. THOMAS:  Good evening, Mr. Chair and

7    members of the Commission.  OP is recommending

8    approval of the applicant's request for the 70

9    affordable housing units for seniors proposed on this

10   vacant lot.

11           While the proposed map amendment would allow

12   additional density on the site, that density would be

13   well within the limits of the proposed zone and under

14   its matter-of-right limits.

15           OP is satisfied that the applicant addressed

16   the concerns outlined in our set down report, and in

17   particular with the reduction in the material types

18   for the facades and the minimal flexibility

19   requested.  We support the development as not

20   inconsistent with the Comprehensive Plan's guiding

21   principles and area elements where new affordable

22   housing is encouraged in the vacant lots in proximity

23   to Metro stations.  And particularly when the level

24   of affordable proposed is deeper than would be

25   offered under IZ.

1       Affordable housing is a desired commodity in
2   the District, particularly for seniors who wish to
3   remain in the city and partake of city life.  The
4   proposed density and design of this small apartment
5   building, dedicated in large part to senior living,
6   would have minimal impact on traffic where the
7   potential for adverse impacts would be mitigated
8   through proposed TDM measures which was agreed to by
9   DDOT.

10      OP commends the applicant.  Applicants worked
11  with the community and supports continued dialog with
12  them to address their concerns.  And at this time, I
13  will stand on the record of the report and take any
14  questions you may have.  Thank you.

15      CHAIRPERSON HOOD:  Okay, thank you.  Ms.
16  Israel.

17      MS. ISRAEL:  Good evening, Chairman Hood and
18  Commissioners.  DDOT would like to thank the
19  applicant for addressing our concerns regarding the
20  TDM plan.

21      With regard to Commissioner May's concern
22  about Benning Road, specifically the Benning Road
23  streetcar extension environment assessment is being
24  conducted right now.  It's, I believe, in its final
25  phases and one aspect, from my understanding, is

1    actually looking at street conditions along Benning

2    Road, and the extension is planned to go from H

3    Street, where it currently ends, all the way the way

4    through to the Benning Road Metro station.

5           Also, with regard to the parking issues, DDOT

6    is happy to work with the applicant to scope a

7    parking study.  We did not look at a parking study

8    initially because typically we look at parking

9    studies when there's either zoning relief for

10   parking, which was not the case in this as part of

11   this application, or when we see that there is

12   considerable concerns as a result of that parking

13   relief.  And we didn't anticipate any problems at

14   that time.  But as I said, DDOT would be happy to

15   work with the applicant if the Zoning Commission

16   chooses to request a parking study.

17          Any other -- otherwise, we stand on the

18   record, and if you have any other questions, I'm

19   available.

20          CHAIRPERSON HOOD:  Okay.  Thank you both.

21   Let's see if we have any questions or comments for

22   either one.  Vice Chair Miller?

23          MR. MILLER:  Thank you, Mr. Chairman.  Thank

24   you both for your reports.

25          Ms. Israel, did you have any comment on, or

1  look at yet the pick-up/drop-off area on Eads Street

2  for the project?

3       MS. ISRAEL:  Yes.  I did look at the -- or

4  DDOT looked at pick-up/drop-off that's technically a

5  separate process.  That doesn't go through Public

6  Space Committee.  It's a separate permit, but typical

7  -- I can't remember the exact terminology, but it's

8  essentially a building entrance zone which any

9  multifamily building ultimately is eligible for

10  receiving.  And through initial conversations with

11  those who do permitting, they indicated that they

12  don't see a problem at this time, although it would

13  still need to be permitted and subject to change.

14       MR. MILLER:  Okay.  Thank you.  And for

15  Office of Planning, I just wanted to -- I appreciate

16  all the information that you provided, both in this

17  report and verbally today in the set down report.  I

18  think there's one correction that needs to be made in

19  the April 25th report on page 14, when you were

20  discussing the Comp Plan policy map and the

21  neighborhood.  It says enhancement area, but I

22  believe that it's a conservation area, which is what

23  your set down report said, what the applicant said.

24  The text under it is consistent with the conservation

25  area text, which in those conservation areas in-fill

1    development on vacant -- on the small amount of

2    vacant land is encouraged.

3            But I just wanted to note that correction for

4    the record.  I don't know if you need to submit

5    anything, but maybe just acknowledge that that was

6    meant -- that that was meant to say neighborhood

7    conservation area.

8            MS. THOMAS:  Sure.  I'd be happy to take a

9    look and make the correction.

10           MR. MILLER:  Okay.  Thank you very much.

11           MS. THOMAS:  Thank you.

12           CHAIRPERSON HOOD:  Okay, any other questions?

13   Commissioner May?

14           MR. MAY:  Yeah.  Just a couple quick ones.

15   So, for OP, the issue of this building being on Eads

16   Street rather than Benning Road, and the applicant's

17   position that what matters is that the square is on

18   Benning Road as opposed to the specific building

19   front, and I mean, do you agree with that

20   interpretation or do you have an opinion about that?

21   I mean, I assume you're more or less in agreement

22   because you support the application.  But I'll let

23   you speak.

24           MR. LAWSON:  Sure.  Oh, sorry.  Joel Lawson

25   with the Office of Planning.

1    Our opinion is certainly that the zone that's
2  being requested is consistent with the Comprehensive
3  Plan, and that the zone is an appropriate one at this
4  location.  MU-7 -- I think it's important to
5  distinguish between what is kind of a preliminary
6  intention statement in the zone, and what's a
7  regulation within the zone.
8    The zoning doesn't include a lot of kind of
9  intention statements.  Mostly it includes, you know,
10  regulations.  You know, you shall do this, you must
11  do this, you can only do that.
12    The intention statement at the beginning is
13  just to provide some basic parameters of what the
14  zone is generally considered to be.  It's to provide
15  a little bit of direction for how you should consider
16  this zone.
17    And I just took a very, very quick look at
18  this today, but the MU-4 Zone exists kind of in spots
19  throughout the city.  It's not one of the more common
20  zones, but it exists in spots throughout the city on
21  various streets.  It's certainly not confined in the
22  current zoning to major arterials.
23    And it's also been used through PUDs and
24  included on portions of property that don't, as a PUD
25  zone, in the past, on portions of property that don't

1   front on to arterials.

2        So, we just feel that it's probably a

3   somewhat more literal interpretation of the zoning,

4   of a section of the zoning that's not intended to be

5   a regulation.  I think that if it was intended to be

6   a regulation we would have stated it that way.  We

7   would have said, this zone shall only be permitted on

8   an arterial zone, and that's not what it says.

9        So, we think it's an appropriate zone.  We're

10  comfortable working with the applicant if the Zoning

11  Commission would want us to look at alternatives.

12  There's certainly a number of other alternatives I

13  think.  Oddly enough, some of them would actually be

14  higher density zones, but they would still be

15  consistent with the Comprehensive Plan, but might

16  also be appropriate on this site and I think the

17  applicant mentioned MU-5, and I agree, that's one

18  that -- that's another zone that would probably

19  accommodate their development, still be considered

20  not inconsistent with the Comprehensive Plan, even

21  though technically it would allow actually more

22  density than the zone that they chose.

23       So, we're comfortable with it.  We're

24  comfortable that it meets the intent and with the

25  relief that they're asking for, the regulations with

1    the MU-7 Zone.

2            MR. MAY:  Okay.  So, earlier in your talking,

3    when you said you looked for other MU -- you said MU-

4    4 Zones.  I think --

5            MR. LAWSON:  Oh, I'm sorry.

6            MR. MAY:  I assume you meant MU-7, right?

7            MR. LAWSON:  Sorry, I meant MU-7.  I'm sorry.

8            MR. MAY:  Okay.  Just wanted to make sure

9    that was clear.

10           MR. LAWSON:  Yeah.

11           MR. MAY:  Okay.  Thanks.  I'm not

12   particularly driven to see what other zones would

13   fit.  I mean, if there is something that truly is

14   more appropriate, maybe that makes sense, but that's

15   not really -- that isn't going to change the design

16   of the building, the density, or any of that sort of

17   stuff.  So, for Ms. Israel, I just had one follow-up

18   question on what the future holds for Benning Road.

19           So, if streetcar comes in, is that going to

20   wind up being in a dedicated lane, or a shared lane,

21   like it is on the rest of Benning Road?  Or do you

22   know yet?

23           MS. ISRAEL:  I'm not sure yet at this time.

24           MR. MAY:  Yeah.  Okay.

25           MS. ISRAEL:  I can certainly find out, and if

Exhibit N  2004

1  that's determined at this point I can follow up with

2  the Commission.

3      MR. MAY:  Yeah.  I mean, if there is

4  information about that it might be helpful to know.

5      Do you know whether there is an intention to

6  significantly improve the streetscape and maybe widen

7  the sidewalks and give you some buffer or reduce the

8  number of car lanes, because it really is just -- I

9  mean, there are so many lanes there.

10      MS. ISRAEL:  I know that was a part of

11  obviously the process as far as Eads Street, although

12  that did not go through an EA process --

13      MR. MAY:  Right.

14      MS. ISRAEL:  -- nor did it have the same sort

15  of funding mechanisms.

16      MR. MAY:  Right.

17      MS. ISRAEL:  But I'm not sure at this point.

18  I would assume so, but I'm not positive.

19      MR. MAY:  So, where are they in the EA

20  process, did you say?

21      MS. ISRAEL:  I know that at middle of this

22  month, I believe it's May 19th, they are having a

23  public hearing, or at least meeting.

24      MR. MAY:  Uh-huh.

25      MS. ISRAEL:  To discuss the various

Exhibit N  2005

1  alternatives.

2       MR. MAY:  So, we're still in the alternatives

3  stage.  They haven't released a final EA?

4       MS. ISRAEL:  You know, what?  Let me check.

5  I had just looked it up and I'm not sure if it's

6  actually alternatives.  I can get back to you in a

7  moment.

8       MR. MAY:  Okay.  Well, I'm just going to ask

9  questions while you look that up and you can chime in

10  toward the end.

11       MR. SHAPIRO:  Thank you, Mr. Chair.  Just one

12  quick question.  In the DDOT report it says that the

13  zoning requires 16 vehicle parking spaces, and I

14  believe the applicant said that your interpretation

15  was that it requires 12?

16       MR. AVITABILE:  I'm sorry, that's --

17       MR. SHAPIRO:  And maybe I'm --

18       MR. AVITABILE:  If you want me to answer the

19  question, we originally had a mix of non-senior and

20  senior housing, and at the time that DDOT reviewed

21  the report it was still a mix of senior and non-

22  senior.  So, if it was non-senior housing the

23  requirement is one for three units, senior housing

24  it's one for six units.  Since DDOT conducted their

25  report we've now switched to all senior housing, so

1    it's 70 divided by 6, and that's how you end up with

2    12.

3         MR. SHAPIRO:  Okay.  Thank you.  Thank you,

4    Mr. Chair.

5         CHAIRPERSON HOOD:  Any other questions or

6    comments of DDOT or OP?  Vice Chair?

7         MR. MILLER:  Yeah, sorry.  Thank you, Mr.

8    Chairman.  I meant to ask Mr. Lawson if you happen to

9    know of a status of the District's vacant lot that's

10   adjacent to this site.  It's, I think there was some

11   reference that it's controlled by DGS.  Is there an

12   RFP that's going to be put on that?  Or maybe the

13   applicant knows because it's --

14        MR. LAWSON:  Not that I'm aware of.

15        MR. MILLER:  Okay.  All right.  Thank you.

16        CHAIRPERSON HOOD:  Okay.  Now it's time for

17   the ANC report.  Chairperson Muhammed if you want to

18   -- you said you had a group coming up?  Oh, I'm

19   sorry.

20        MS. ISRAEL:  I have an answer to the hearing,

21   if that's okay.

22        It says on May 19th, it's actually a review

23   of the findings of the EA.  So, you're right, it is

24   earlier on in the process.  And that will be held May

25   19th from 6:00 to 8:00 p.m. at the Department of

1    Employment Services Building on Minnesota Avenue.

2            MR. MAY:  Okay.  Thank you.

3            CHAIRPERSON HOOD:  Let's see if we have any

4    cross.  Does the applicant have any cross of either

5    Office of Planning or DDOT?

6            [No audible response.]

7            CHAIRPERSON HOOD:  Okay.  Chairperson --

8            MS. MUHAMMAD:  Just one question.

9            CHAIRPERSON HOOD:  Either Office of Planning

10    or DDOT.

11            MS. MUHAMMAD:  For Ms. Israel.

12            CHAIRPERSON HOOD:  Okay.

13            MS. MUHAMMAD:  And that's regarding, you said

14    the street car would be traveling from the Oklahoma

15    or Benning Road to the Benning Road train station,

16    correct?

17            MS. ISRAEL:  No, it would be an extension of

18    the current H Street line that would extend from H

19    Street -- well, technically it's already on a portion

20    of Benning Road.  And -- sorry, am I -- and it would

21    extend to the Benning Road Metro station.

22            MS. MUHAMMAD:  Okay.  Thank you.  My question

23    is, will there be any preliminary work on the Loraine

24    Whitlock Bridge prior to bringing that street car in?

25    Is there any plan to redress the condition of the

1    Loraine Whitlock Bridge?

2         MS. ISRAEL:  I am not aware of that at this

3    time, but I can certainly find out.

4         MS. MUHAMMAD:  Thank you.

5         CHAIRPERSON HOOD:  Okay.  Thank you.  Let's

6    go to the ANC report.

7         MS. MUHAMMAD:  I have with me Commissioner

8    Joanne Prue, who is commissioner for the River

9    Terrace area, and opposite Benning Road is

10   Commissioner Justin Lini, 7D-07, and he's

11   commissioner of the Parkside.  Parkside/Mayfair area.

12        CHAIRPERSON HOOD:  Okay.  So, you all can

13   come up and do your presentation.

14        MS. MUHAMMAD:  And if we may, Chairman Hood,

15   we'd like to begin with Commissioner Lini and then

16   Commissioner Prue.  Or Commissioner Prue,

17   Commissioner Lini.  I'll leave that to them.

18        MS. PRUE:  My testimony is fairly ancillary

19   to --

20        CHAIRPERSON HOOD:  Okay.  So, we'll have you

21   all do it.  We don't want that on the record.

22        MS. PRUE:  Good evening, and please forgive

23   me.  I've been having problems with my voice.

24        Good evening, Chairman Hood.

25        CHAIRPERSON HOOD:  Let me just ask you, is

1  the green light on, on her mic?  It is?

2        MS. PRUE:  It is.  Oh, now it is.

3        CHAIRPERSON HOOD:  Just pull it a little

4  closer.  There you go.

5        MS. PRUE:  MY apologies.  Good evening,

6  Chairman Hood and the Commissioners.  My name is

7  Joanne Prue of the ANC 7D-04.  I live in the River

8  Terrace Community and have been a resident throughout

9  my lifetime, over a period of 40 years.

10        Prior to my retirement, I was employed by the

11  U.S. Postal Service of 43 years, three months, and 17

12  days.

13        River Terrace has a rich legacy and culture.

14  Let me share with you the prominent leaders that came

15  out of the River Terrace community.

16        Dr. Floretta McKenzie (phonetic), the

17  superintendent of D.C. Public Schools; her brother,

18  Dr. Martin Dukes, gynecologist of Columbia Hospital

19  for the Women, here in Washington, D.C.; the first

20  female sergeant; the first female captain; the first

21  female commander; and the first female deputy chief

22  of police for the Metropolitan Police Department,

23  Joyce Leiland (phonetic); Alvin Carter, deputy fire

24  chief; James Shorts, deputy fire chief, who is now a

25  current board member of the Alcohol Beverage

1  Regulation Board; Major Anderson, that we hold dear
2  to our heart, who is a Tuskegee Airman, who is now 92
3  years old and live on Anacostia Avenue, across from
4  the River Terrace Park, and not as earlier stated,
5  the Anacostia Park.  There is a difference.  River
6  Terrace had their own park.
7           Austin Carr, professional MBA basketball
8  player of the Cleveland Cavaliers; former fire chief,
9  T.R. Coleman (phonetic); Mr. Stanley Forshay
10  (phonetic), attorney and his son, Chris, followed in
11  his father's footstep.
12          River Terrace was the number one civic
13  association of the Federal Civic Association back in
14  the days.  Their leaders were Mrs. Suzy Forshay
15  (phonetic), the wife of the late Stanley Forshay, and
16  Mrs. Mary Rough (phonetic), which I have the
17  privilege of being my neighbor, directly across the
18  street where I grew up from, and where I am now
19  residing in the family home, that lived to be 100
20  years old on July the 11th, 2016, that passed away on
21  September the 25th, 2016.
22          As a commissioner, my approach has been grass
23  roots.  Going door to door, talking with block
24  captains, attending River Terrace community
25  organization, and PSA meetings with the Metropolitan

1  Police Department.  I've had many walkthroughs in the

2  River Terrace community with the outreach liaisons

3  for the mayor, and project managers to point out

4  repairs, maintenance issues, street lights, sidewalk

5  repairs, and et cetera.  I know what it is when it

6  comes down to the duties and responsibilities of a

7  ANC commissioner.  I was elected in 2008, and I

8  served six years, until 2014, and ran again in 2016.

9       I am honored to be serving as ANC

10 commissioner in the River Terrace community that I

11 grew up in from -- I mean, from 1949, was when my

12 parents bought in the River Terrace community.

13      I walked my community weekly to engage with

14 the constituents and request for assistance wherever

15 needed if they felt there was a need.  I'm out in the

16 community, not just for a set few, but the young

17 generation that are standing on the corners, that are

18 smoking weed, that are selling drugs, right there on

19 Eads Street.

20      And when I speak, I speak with passion,

21 because I love serving and I love helping people.  My

22 reputation is such that I am responsive, I am very

23 caring, and very efficient in addressing my

24 constituent's concerns for those that reach out to

25 me.

1      My initial thoughts and concerns to Mr.

2  Michael Giulioni, after being sworn in as the new

3  elected ANC commissioner, being briefed on a project

4  by the former ANC commissioner, I was not pleased at

5  all about this project.

6      The projects we grew from the previous ANC

7  commissioner, Mr. Cloyd McKay (phonetic).  I have

8  also captured the raw feelings, the raw feelings of

9  the residents, and the response to this project.  Mr.

10  Giulioni, to me, was not reassuring at some point, of

11  my concerns.  And I'm going to give some specifics.

12      Number one, safety.  Mr. Giulioni was on a

13  telephone conference call at our executive meeting.

14  And my concern was about the location, and keeping in

15  mind, seniors, 55 to 65, that was quoted.  First, it

16  was 50, because I questioned 50.  And then it went to

17  55 to 65, because as I know, and as Commissioner

18  Chairwoman Muhammad stated, that in the River Terrace

19  community the senior citizens, the seasoned senior

20  citizens, age into their homes so that they are not

21  going to sell their homes and give up over 1,000

22  square feet to move in a senior unit of only five to

23  600 square feet.

24      Number two, the question that was raised to

25  Mr. Giulioni on the telephone conference call, my

1   concern was, how are you going to, when the seniors
2   that have a disability and need Metro access to use
3   as their means of transportation, and the Seabird bus
4   connection, how are you going to address these
5   connections?
6          And Mr. Giulioni told me that they will pick
7   them up from the alley.  I was disturbed about this.
8   The alley.  It just took me back to Rosa Parks going
9   to the back of the bus.
10          Transportation services.  I raised a question
11  dealing with the Eads Street being the main entrance.
12  I asked about the circular driveway, where if this
13  type of service is to be used for Metro access or the
14  Seabird connection, then why not put in a circular
15  driveway, because if you're having -- and I heard
16  earlier with the testimony, if they're going to be
17  picked up on Eads Street, they're going to be picked
18  up at the curbside.  And this will impact that
19  traffic flow on Eads Street.
20          Now you will encounter the transportation
21  service sitting there with their engines idling until
22  someone comes out to gain access to that
23  transportation.  This, I am not in agreement with.
24          The high density, as earlier mentioned, the
25  parking, and most of all the location.  I walked 30

Exhibit N  2014

1    Eads Street last night, I walked 36th Street, and I

2    walked Dix Street.  And when I walked, I was out door

3    to door yesterday evening gaining more signatures for

4    the letter that was typed up to the residents to

5    oppose this project.  And I've asked many times, if I

6    lived in Eads Street, I would have a problem.

7            And with the new homeowners that had just

8    bought on Eads Street, and the highest home that sold

9    was $369,000, and then the high 200s, if I just

10    bought in Eads Street, and we already have a problem

11    with the element that's on Eads Street, because we

12    have one particular home on there, homeowner, that

13    draws all kind of elements.  And this has been a big

14    concern and a problem of ours for years, and the

15    problem still has not been corrected.

16            MPD has been brought in on the problem for a

17    long time.  Our crime rate has increased.  I can't

18    give you the stats.  The liquor store parking lot is

19    a problem.  A young man that I held dear to my heart

20    had came and sat in his car, and he was murdered.  He

21    tried to leave the -- he left the scene, and I was

22    coming in from South Dakota Avenue, traveling

23    Kenilworth Avenue to Benning Road, and 295 was just

24    blocked off, and I usually take that exit to go into

25    the backway River Terrace.  But because I saw the

Exhibit N  2015

lights and the police and -- just everything.  I
didn't know what was wrong, but I did see this car
that had ran into the fence there, off of 295.  And
later I found out it was a young man I been knowing
all his life, where he had been shot and he was
trying to get away to get to the hospital.

ANC, the special meeting we had on April the
19th of this year, at the Chateau Remix Club, and I
had talked with the commissioners, my colleagues
here, and asked, let's bring the meeting to the
community, because I know in our community you have
seniors, but they will walk to a meeting in the
community.  But to come out of their community to
come to the Dorothy Heights Library, the attendance
is not as great.

But I'll tell you, when we had it at the
Chateau, we had 93 attendees.  And I was really
impressed about that.  And when they stood up, when
the time came for those that wanted to speak, it
blessed my heart to hear their concerns.  And
especially for the developers that listen to what the
people had to say, because I'm a firm believer, one
or two people cannot make a decision for the whole
community.

Parking, Eads Street, and not just Eads

1   Street, throughout River Terrace, I was -- I came up
2   Eads Street about a month ago on a Friday night, and
3   the Chateau was having their fair.  The parking was
4   horrible.  It was horrible.  I've never been on Eads
5   Street Friday night with the Chateau open.  But the
6   parking lot where this project is going to be built,
7   was packed.  Eads Street, people with special
8   permits, and seniors, and you were here for one of
9   them later on, that if you're not in your house by a
10  certain time you're going to forget it because you're
11  going to either have to walk a block or two in order
12  to get a parking space.  And then it becomes a
13  problem for the other streets, because now when they
14  come home, they can't get a parking, because someone
15  else from another street is parking on their street.
16          The drop-off -- let me back up.  I'm sorry,
17  I've already addressed that.
18          The River Terrace community residents feels
19  that we have been overlooked on so many things.  We
20  We've been fighting and protesting for so long.  We
21  protest against the Shell station bringing the
22  hydrogen fuel into the River Terrace community within
23  100 feet of the River Terrace School.  We fought, we
24  fought, we protest, and it went away after five
25  years.  They weren't concerned about our needs.  They

Exhibit N  2017

1    were based on what they wanted.

2            And I'll be done shortly.  Another project,

3    the fire station, a temporary fire station from

4    Engine 27 off of Minnesota Avenue, DGS has a lot

5    there on Eads Street, right behind the old Gino's, or

6    KFC, which is vacant property through there.  And

7    when I was former commissioner I had that lot fenced

8    in up to eight feet of fencing because it was used,

9    back in the days it was used as a tot lot for the

10   little children in the community.  Then it became a

11   drug infested area, and drinking and liquor bottles

12   all into a government park.

13           So, I had asked that this be put in the

14   budget to put this fence up.  And then at one point

15   they were cutting holes and cutting the locks off and

16   everything.  Police had been called numerous times,

17   but now they're not doing this.  They were throwing

18   furniture.  They were angry because their space of

19   recreation was taken away from them.

20           With that being said, to bring this 70-unit

21   apartment building here in the River Terrace

22   community, it's going to create bigger problems than

23   what you all can imagine.  Fifty-five years old is

24   young for senior citizens.  And to 65.  And in this

25   city, an if you were raised in this city, everybody

Exhibit N  2018

1    knows somebody.

2            What my concern is, with senior citizen, a

3    seasoned senior citizen, such as myself, that if I

4    was to live in that building, and I have

5    grandchildren, my grandchildren are going to come and

6    stay with me.  And some senior buildings you have

7    grown children that are coming in, living with their

8    mothers.  And my concern is, once that senior citizen

9    has expired, if management do not do their due

10   diligence, a lot of them remain in those units that

11   should not remain there because they never wanted a

12   lease in the first place.

13           I'm just passionate, and I represent the

14   River Terrace community.  But on yesterday when I was

15   out passing flyers, the street stays filthy.  When I

16   was former commissioner I used to get out there among

17   the guys.  I'd say, oh you all are going to get this

18   cleaned up because I'm not tolerating it.  I'm not

19   going to keep coming around here cleaning up your

20   mess, you know.

21           And then they started bringing bags out and

22   setting up trash cans or whatever.  You know, they

23   were taking it a little interest in there because

24   they don't live on Eads Street, they just congregate

25   there.  You know, that's their place where they hang

Exhibit N  2019

1    out.

2            With that being said, I wish you'd take it to

3    heart, and I want to go back to April the 19th.  The

4    gentleman, he identified himself when he came down to

5    questioning, he said -- he called himself Mr. Wolf.

6            Mr. Wolf was very passionate because he grew

7    up in the River Terrace community.  And he was my

8    twin.  And he is my twin brother.

9            He was very passionate about why I should not

10   be there.  I was kind of taken back in the behavior

11   and the manner that he was delivering his message.

12   And I'm not ashamed to say, he was under the

13   influence of alcohol.  And I'm sure it's in some of

14   our families one time or another.

15           But, when I really thought about this, I kind

16   of felt shame about his behavior, but I understood it

17   because I understood his passion.  But what I didn't

18   like was his behavior that he displayed before the

19   developers.  And I stand here because -- I sit here

20   and talk because I have to clean my soul here when it

21   comes down to my family member.  For those that know

22   him, know him well in the community.

23           But when he approached the developers, and my

24   colleagues here at the table, I just looked at him,

25   and he started pointing in people's faces, and to me

Exhibit N  2020

1    that's very disrespectful.  But they understood the
2    behavior so they knew how to address it.
3            And then he came back and said, this is my
4    twin sister.  And, I just looked at him.  But I
5    engaged with conversation with him after that.  But I
6    understand his passion.  He has the same passion as I
7    have.  He has the same passion as the constituents
8    and life-long residents of the River Terrace
9    community.  They have stressed to me, many, they do
10   not want this project because it does not help the
11   community.  We need something.  We have apartments,
12   buildings, back in the back of River Terrace off of
13   East Capitol Street.  We don't need an apartment
14   building there.  We have children that are playing in
15   the street because their parents do not allow them to
16   go down to the River Terrace park because it's too
17   far for them to go.
18           We need something that's going to benefit our
19   young youth.  They're playing footballs in the
20   street, they're on my street all the time, I'm out
21   there engaging with them.  You even have adults
22   throwing football with them.  And the neighbors are
23   complaining because they paid too much money for
24   their vehicles.
25           What we need in the River Terrace community,

1    and I've heard recreation center.  That came up.  But
2    recreation center, we know we're not going to get
3    because of the parcel of land.  I've heard wellness
4    center.  Seniors are asking for a wellness center.
5    We need something that our seniors and our children
6    can benefit from.  And a senior high-rise building,
7    or a MU-7 high-rise building is not the place.  It's
8    just not the place.
9          And my prayer is, and I solicit to you all,
10   to listen to what we are saying here, that you --
11   regardless of how many times these developers have to
12   go back to the table, and when they come to me, I'm
13   still going to be in opposition of it, because I'm
14   sitting here to represent the people.  And I'm
15   speaking for them.  And please, please, please,
16   please take in consideration before you make your
17   final decision about this project, because trust me,
18   you all don't live in River Terrace.  I grew up in
19   River Terrace.  I know the history of River Terrace.
20         And with that being said, I thank you for
21   your time.
22         MR. LINI:  Good evening, Commissioners and
23   Chairman Hood.  Thank you for the opportunity to
24   testify here.  I'm Commissioner Justin Lini,
25   representing Paradise and Parkside, and I'm here to

1    support my colleague, Commissioner Prue, and my
2    neighbors in River Terrace.
3            I'm going to echo a little bit of what
4    they're going to say here later, and ask the
5    Commission to please refrain from rezoning this lot.
6    It would change the character of the surrounding
7    community.  As a larger principle, in-fill
8    development is going to play a very important role
9    for the future of our ward.  We've got a lot of empty
10   lots, and there's a lot of demand for growth.  And I
11   ask the Commission to please set good precedence that
12   will be put to use to grow our communities, to take a
13   strategic approach, to encourage economic
14   development, because right now all we have in this
15   community is a rickety grocery store, a rickety drug
16   store, and -- which if you've been following the
17   community, has been quite controversial lately.
18           Unfortunately, this project seems to have
19   consistently been moving away from a missing middle-
20   style in-fill project.  Under the last couple
21   revisions of it I've seen, the number of units has
22   moved up from 58 to 70.  The number of parking spaces
23   appears to have been decreased because of the
24   elimination of underground parking.  The massing
25   seems to have become bulkier, and the project appears

Exhibit N  2023

1  to be less friendly to the surrounding areas.  As

2  Commissioner May noted, the mixture of bricks creates

3  a fairly institutional feel.

4       As I stated at the ANC 7D's April meetings,

5  I'm very concerned about what precedent this project

6  sets for the surrounding community.

7       Page 53 of the applicant's materials indicate

8  the potential for construction of an adjacent

9  building of a similar scale, a five-story tall

10  building, wall to wall.

11       The applicant also owns other lots in the

12  neighborhood, and other lots are also owned by

13  institutional, or owned by commercial actors.  So,

14  there is potential for this neighborhood, parcel by

15  parcel, lot by lot, to be -- to, in an ad hoc manner,

16  be rezoned.  And that is something that concerns me,

17  and I believe concerns the community.

18       The applicant, in their materials, noted that

19  M-7 districts adjacent to R-3 Zones and elsewhere in

20  the ward.  And while that's true, these zones are

21  contiguous coherent centers of commercial activity,

22  when there's a mix of activities that -- activities

23  already occur, areas such as downtown Ward 7 Eads

24  Street.  Doesn't really -- Eads Street is a townhouse

25  street.  It's hard to see how these two things, in

Exhibit N  2024

1  terms of the personality and character of the

2  neighborhood reflect the precedent of downtown Ward

3  7.  So, those are my contributions.

4        MS. MUHAMMAD:  Thank you, Chairman Hood.

5        CHAIRPERSON HOOD:  Thank you all for your

6  presentation.  Let's see if any questions up here,

7  the ANC panel.

8        Okay.  Does the applicant have any cross?

9        [No audible response.]

10       CHAIRPERSON HOOD:  Okay.  All right.  Well,

11  thank you all very much, we appreciate your

12  testimony.

13       MS. MUHAMMAD:  Thank you.

14       MS. PRUE:  Thank you.

15       CHAIRPERSON HOOD:  Hold on, before you leave,

16  the young lady, yeah.  Commissioner Prue, I'm sorry.

17  One quick question, I want a quick answer.  I'm going

18  to give you -- yeah, you can turn your mic on.

19       MS. PRUE:  Oh, okay.

20       CHAIRPERSON HOOD:  Quick question for a quick

21  answer.

22       MS. PRUE:  Okay.

23       CHAIRPERSON HOOD:  You said a lot of your

24  constituents don't care for this project.  Is this --

25  there's still room in your mind, because you're the

Exhibit N  2025

1    single-member district commissioner, correct?

2            MS. PRUE:  Yes, I am.

3            CHAIRPERSON HOOD:  So it's still room to work

4    some things out, as I've heard earlier.  Am I

5    correct?

6            MS. PRUE:  Well, I'm not concerned about

7    that, you know, because more against it than are for

8    it.  And I'm listening to what you're saying --

9            CHAIRPERSON HOOD:  Okay.  Well, let me --

10    let's hold off because I want to get straight to the

11    point.

12            What are they against?  Against -- tell me

13    some of the things they're against.

14            MS. PRUE:  They're against the location,

15    they're against the high-density, the safety issue,

16    the parking issue is a very big problem there.  You

17    know.  This is what they are against.

18            CHAIRPERSON HOOD:  So, I'm confused, because,

19    and Chairperson Muhammad, you can help me with this.

20    I thought that we still could have some discussions

21    to try to get to where we needed to be, but I'm

22    hearing something different from the single-member

23    district commissioner.

24            MS. MUHAMMAD:  Inherently, as ANC

25    commissioners, we --

1        CHAIRPERSON HOOD:  You want to turn your mic

2   on.

3        MS. MUHAMMAD:  It's on.

4        CHAIRPERSON HOOD:  It is?

5        MS. MUHAMMAD:  It's on.  I'll push it closer.

6   Can you hear me?

7        CHAIRPERSON HOOD:  Yeah.

8        MS. MUHAMMAD:  Okay.  Inherently, as ANC

9   commissioners, we can't approach a project dead-set.

10  We have to hear the application.  That's statute.

11       However, we do reflect as Commissioner Prue

12  has already done, and quite well because she captured

13  what was stated in the April 19th special meeting.

14  Now, according to our ANC report, we can continue the

15  discussion.  I spoke with Mr. Giulioni this afternoon

16  prior to the hearing.  However, this is not the best

17  land use for this project.  Clearly.

18       There has been statements on the part of the

19  applicants that they have met the zoning regulations,

20  but when it comes down to the nuts and bolts of what

21  makes a project thrive and sustainable, they have not

22  shown that.  At least to the ANCs.  They have not, to

23  us, ANC 7D.  They have not shown where this project

24  is sustainable.

25       So therefore, we can continue to discuss.

1    They can try and make changes and come back.  I think

2    you, yourself had mentioned there were some items on

3    this project that they would have to show better due

4    diligence.  So, we can look at the project, we can

5    discuss, but I don't want to give the impression that

6    we are dead set against, and we cannot continue in

7    the conversation.  But we just don't feel or agree

8    with this project that it's thrive, that it's going

9    to thrive, and it's sustainable, and it benefits the

10   community.

11       CHAIRPERSON HOOD:  And I think you answered

12   my question.  Before I start pushing something I want

13   to make sure, because there are some things that we

14   have to do in doing our due diligence, so we have to

15   make sure that what's correct, that we're doing

16   things within what's allowed by law, by the title.

17           And I just wanted to make sure that, you

18   know, I'm not going to sit here and hammer on the

19   applicant if it's a no-starter to start with.  If you

20   come back to the community and try to work some

21   things out, because that's what I heard all in their

22   presentation, and that's what I even heard in the

23   cross-examination, I thought, that there was still

24   room for negotiations, still room -- because, at the

25   end of the day, I'm sure that Mr. Avitabile wouldn't

1   do this, but I don't know if you're watching the

2   news, you'll see that -- and I'll put it out there,

3   the Zoning Commission, we're taking the task.  Our

4   decisions, they go to court and the court sometimes

5   will remand it back to us.

6           So, we have laws that we have to go by, and

7   the court is holding our feet to the fire.

8           MS. MUHAMMAD:  Yes, I'm aware of that.

9           CHAIRPERSON HOOD:  Okay.  So, one of the

10  things we have to look at is we have to have

11  something justifiable.  And that's why I'm asking.

12  Justifiable, if we were to turn this down for adverse

13  impacts, if we were to prove or something, we have to

14  make sure that we have a justifiable.

15          So, that's why I asked Commissioner Prue.

16  Yeah, Commissioner Prue, is this a no-started for me

17  to push Mr. Avitabile?

18          MS. MUHAMMAD:  Well, let me just answer that

19  in addition, and then of course Commissioner Prue can

20  answer for herself.

21          As ANC commissioners, we have our own

22  personal insights and feelings and opinions, and then

23  we have the function of being the ANC commissioners.

24  So, we have to do due diligence by both.  I would not

25  stand -- I wouldn't sit here and say that personally

1    speaking, I don't like this project.  Nothing about
2    it states sustainable.  From the parking and all of
3    the other points of review on the part of DDOT, on
4    the part of Office of Planning, on the part of the
5    Zoning Commission, this project for me, I felt, was
6    an overreach in what much of it has been presented.
7         However, I can't say as an ANC commissioner
8    that I will stop dialoging with the developers.  I
9    just feel like they should show more competence in
10   the transportation mitigations.  They should show
11   more competence in the site design and the analysis
12   because I see a huge slant of this project to the
13   progression of the project itself.  But it has not
14   adequately taken into consideration the adverse
15   effects, and the impacts of this project to the River
16   Terrace community.
17        CHAIRPERSON HOOD:  And I appreciate your
18   comments because I actually -- I appreciate your
19   comments.  Okay.  Commissioner Shapiro.
20        MS. PRUE:  Thank you.  May I --
21        CHAIRPERSON HOOD:  Oh, I'm sorry.  Ms. Prue.
22        MS. PRUE:  Yes.  And I wanted to address the
23   adverse effects.
24        Being such as it is, with 295 traveling north
25   and south, with that traffic flow, it's very

1  congested.  Coming south and coming into the back
2  entrance of the River Terrace community, a lot of
3  that traffic makes that right to come through the
4  community.  Sometimes they might turn left at that
5  stop sign, thinking they can get out, but it's a
6  dead-end.
7          CHAIRPERSON HOOD:  They make a U-turn.
8          MS. PRUE:  And they turn around and make a U-
9  turn and come back.  And when I was the previous
10  commissioner, back in 2010, I had these barriers put
11  there, these poles put there, because I stood there
12  and I took pictures, and I called DDOT.  And an
13  inspector came out and looked at the -- and he even
14  took pictures.  The traffic thought they could get
15  out because they didn't want to get back on 295.  So,
16  now they're caught in a jam.  Now they're backing
17  down 36th Street to come out Eads Street, to go up to
18  34th Street, to hit Benning Road and travel, you
19  know, going Minnesota Avenue or downtown Washington.
20          With that being said, with that traffic
21  pattern right there, it's already an accident about
22  ready to happen because with the traffic coming from
23  Benning Road to 295, to go south or north, and during
24  rush hour, if we have an emergency, if we have an
25  emergency in that community so far, you know, the

1  ambulance and the fire trucks coming in there --

2      CHAIRPERSON HOOD:  Commissioner Prue, let me

3  just say this to you.

4      MS. PRUE:  It's just --

5      CHAIRPERSON HOOD:  If you were the one who

6  did that, you have done an excellent job because you

7  have accomplished what you have tried to do.  But let

8  me go to Commissioner Shapiro.

9      MS. PRUE:  Okay.  Thank you.

10      MR. SHAPIRO:  Thank you, Mr. Chair.  Just a

11  quick question for you, Chairman Muhammad.  I just

12  want to make sure I understood correctly.  You're

13  saying that one of your concerns is that you feel

14  that the -- when you say the project isn't

15  sustainable, you're saying that you think there may

16  not be a market for the product that they're

17  developing?

18      MS. MUHAMMAD:  I don't think that

19  logistically, there's sustainability.

20      MR. SHAPIRO:  So, it's not about whether or

21  not there are enough seniors who want to move in.

22  It's more about the design of the project.

23      MS. MUHAMMAD:  I think it's a combination of

24  both.  I think moving forward -- right now,

25  currently, there was a constituent, one person that

1  asked for, you know, carte -- I won't say carte

2  blanche, but she wanted to have preferential --

3        MR. SHAPIRO:  She wanted to get in.

4        MS. MUHAMMAD:  Most likely.

5        MR. SHAPIRO:  Right.

6        MS. MUHAMMAD:  But she wasn't a senior.

7        MR. SHAPIRO:  Right.

8        MS. MUHAMMAD:  And so, so she doesn't fit the

9  criteria.  But my point being that the seniors of

10  River Terrace, if that's the purview of Ms.

11  Crowder --

12        MR. SHAPIRO:  Got you.

13        MS. MUHAMMAD:  -- I'm not sure if there is a

14  market.

15        MR. SHAPIRO:  Okay.

16        MS. MUHAMMAD:  Because most of the seniors in

17  River Terrace are --

18        MR. SHAPIRO:  And so, if I'm understanding

19  you correctly, the concern you're expressing is that

20  in that way, this building -- you don't see this

21  building serving the residents of River Terrace.

22        MS. MUHAMMAD:  Not at all.

23        MR. SHAPIRO:  No.  Okay.  Thank you.

24        MS. MUHAMMAD:  Not at all.

25        MR. SHAPIRO:  Thank you, Mr. Chair.

1          CHAIRPERSON HOOD:  Okay.  Thank you.  Any
2     other questions up here?
3          Does the applicant have any cross?  Did I do
4     that?  I didn't do that.  Does the applicant have any
5     cross?  Okay.  Thank you all very much.  Appreciate
6     it.
7          Let's go to the -- I don't see on my list any
8     persons who are here in support, but let me call for
9     it.  Any persons who are here in support?  Besides
10    you guys.
11         [No audible response.]
12         CHAIRPERSON HOOD:  Let's go to the persons in
13    opposition.  You know what I've noticed, and I'm
14    going to say this tonight, but I noticed this the
15    other night.  It seems like whatever side you're on,
16    have you noticed they sit on the same sides at every
17    hearing?
18         MS. SCHELLIN:  Yes.
19         CHAIRPERSON HOOD:  I'm going to start saying
20    that, because the people who are in opposition, I
21    noticed the other night at another hearing.  This is
22    a friendlier group, I can say that.  But I've noticed
23    that.
24         Okay, let's go to the persons in opposition.
25    Chairperson Muhammad has already spoke.  Let's go to

1   Barbara Garnett, Malissa Freese, Jessica Jones

2   Capparell. Okay. Justin -- oh, okay. He was

3   already on the panel. Lacarry Lewis (sic). What is

4   it? Okay, is that you, number 8? Larry Lewis.

5   Okay. Olivia Payton. Coliece Rice. This screen

6   pops back and forth. Sarah Weis. Mr. Colver.

7        Let me ask, do we have enough seats? Yeah,

8   we have enough seats. Do we have enough seats?

9   Yeah, we have enough seats.

10       Is there anyone else who is here who would

11   like to testify in opposition?

12       [No audible response.]

13       CHAIRPERSON HOOD: Okay. So, this is our

14   opposition panel. But let's do this. Who has not

15   been sworn in? Not that we don't believe you, but

16   that's our policy. I know we may have one or two

17   that hadn't sworn in. So, if you haven't sworn in,

18   could you rise to take the oath right quick, please?

19       Anyone else who is here in opposition? Okay,

20   so this is the panel.

21       MS. SCHELLIN: I think the lady with the red

22   scarf, did you -- were you here when --

23       UNIDENTIFIED SPEAKER: [Speaking off

24   microphone.]

25       MS. SCHELLIN: Okay. All right. Those who

1  are going to testify this evening, please raise your

2  right hand.

3          [Oath administered to the participants.]

4          MS. SCHELLIN:  Thank you.

5          UNIDENTIFIED SPEAKER:  [Speaking off

6  microphone.]

7          CHAIRPERSON HOOD:  Could you turn your

8  microphone on?

9          UNIDENTIFIED SPEAKER:  How about that?  Okay.

10  Could we testify as we're seated here?  Just, we sort

11  of have an order, if that's okay with you.

12          CHAIRPERSON HOOD:  Okay.  So, what you mean,

13  you want to go first?

14          UNIDENTIFIED SPEAKER:  No, Ms. Garnett is

15  going to go first.

16          CHAIRPERSON HOOD:  Oh, you all have an order?

17          UNIDENTIFIED SPEAKER:  Yes.

18          CHAIRPERSON HOOD:  Oh, you're all organized.

19  Go right ahead.

20          UNIDENTIFIED SPEAKER:  Thank you.

21          MS. GARNETT:  We push the -- okay.  Good

22  evening, Chairman Anthony Hood, and the D.C. Zoning

23  Commission.

24          My name is Barbara S. Garnett, and I'm a

25  resident of the River Terrace community.  I've lived

1  in this community for 37 years.  In fact, my home is
2  located on Eads Street, within 200 feet of this
3  proposed building.  I am a former Ward 7 committee
4  woman with the Democratic State Committee, and a
5  former Treasury of the D.C. Lottery and Control
6  Board.
7          I am testifying to address my concerns with
8  the rezoning and potential development.  Firstly, I
9  am very concerned about the proposed impact the
10 project will have on parking.  They're calling it the
11 3443 Benning project, to the community and state.
12 There will be 17 parking spaces for 70 apartments.
13 It's suggested that seniors don't drive vehicles and
14 therefore don't need parking.
15         I am 84 years young, and I'm still driving my
16 vehicle, which I park outside of my home.  We have to
17 pay for priority, that zone sticker parking, on this
18 block.  And the street is only one block long.  And I
19 still have difficulty parking at times.
20         Furthermore, even if seniors don't drive,
21 their guests do.  Secondly, I am concerned about the
22 potential structure damage to my home caused by
23 digging and heavy construction equipment.  I am not
24 in a position to repair damage done to my home
25 resulting from the building of this potential

Exhibit N  2037

1    skyscraper up the street.

2           I could go on with my concerns about the

3    proposed rezoning, but I know time is limited.  The

4    MU-7 Zoning allows heights up to 90 feet, and this is

5    entirely too tall for the existing neighborhood.  And

6    totally unacceptable.

7           In conclusion, if rezoning is allowed, the

8    zoning should be restrict -- the zoning should

9    restrict the building height forever, to no more than

10   five stories.  It would be devastating if after

11   rezoning the developer decides to increase the height

12   of the maximum allowed by MU-7.  Thank you.

13          CHAIRPERSON HOOD:  Okay, thank you.  Next.

14          MR. LEWIS:  My name is Larry Lewis.  I was

15   renting in River Terrace.

16          First and foremost, I've been in opposition

17   from this project from the first day it was snuck

18   into our community.  This was a project that was not

19   actually brought to the community's forefront.  They

20   snuck in, had little secret clandestine meetings

21   about what was to become that particular property.

22   But we found out what was happening, and from the

23   onset we've been against this project.

24          The project is too small.  I mean, the

25   project is too large, when you think about it.  First

1    of all, we've just had infrastructure improvements
2    inside of River Terrace.  And with the new
3    infrastructure, the upgraded infrastructure in River
4    Terrace, we've had a lot of cave-ins and things like
5    that due to us being so close to the river bed.
6         That was not -- to me, there hasn't been an
7    environmental study done to show what you know, what
8    potentially what could happen to the homes in River
9    Terrace, or could we sink into the ground, or
10   anything else.
11        Secondly, with the environment, I don't think
12   there has been an environmental impact study based on
13   the fact that last year PEPCO itself said that the
14   pollution level on that particular site, which was
15   adjacent to River Terrace, also that the levels were
16   too high, that they can't even build on that PEPCO
17   property as of yet.
18        But yet, they wanted to start digging into
19   the ground inside River Terrace.  And we're talking
20   about hundreds of years of pollution from PEPCO.
21        Even PEPCO has been closed for a number of
22   years and the levels are still high.  They claim that
23   it's from another plume, not theirs.  But we think
24   the numbers are still too high to go forward with
25   this project without an environmental study.

1          As far as the traffic study goes, there
2    hasn't been any traffic study.  Benning Road is an
3    evacuation route.  And if you've traveled up and down
4    Benning Road in the a.m., it's bumper to bumper
5    traffic in the a.m., bumper to bumper traffic in the
6    evening.  To get from Anacostia Avenue to Minnesota
7    Avenue, takes at least 15 to 17 minutes, from just
8    one block.  Like I say, from Anacostia Avenue to
9    Minnesota Avenue.  It may take a little longer,
10   depending what's going on, on Minnesota Avenue.
11         Plus, also we've looked into other projects
12   that this particular developer has built, and it's
13   been the same thing that these projects were snuck
14   into these communities.  They're claiming that, you
15   know, that they're in affiliation with other
16   buildings with inside the Anacostia area, but this is
17   not Anacostia.  This is River Terrace, and River
18   Terrace has always been a community that's been
19   defined on the zone, it's been a family community for
20   years.  And I don't think this project is for the
21   seniors.  It's just about a dollar.  It's another way
22   to get another dollar into -- another dollar for the
23   developer to come into our city.
24         We don't want this to be another Georgetown,
25   or another extended Capitol Hill.  I mean, let's be

1  for real, man.  I mean, you know, they come to our

2  community and they see the seniors was first, and

3  they want to do is take advantage of the seniors, get

4  them out of their homes.  And then they start selling

5  out the homes.

6         I mean, we see it every day, and we just

7  don't want this to be another Georgetown forgotten.

8  Thank you.

9         CHAIRPERSON HOOD:  Thank you.  Next.

10        MS. WEIS:  Good evening.  My name is Sarah

11  Weis.  I am a resident of Eads Street.  My front

12  view, I guess, is the alley in question.

13        I have many, I guess, points of view on

14  opposition, but tonight I'm going to talk about

15  safety.  Ms. Prue kind of brought up a lot of these

16  issues, but I'll delve into these a little bit

17  deeper.  I've been a resident for three and half

18  years, so I live this day in, day out.  There is a

19  lot of crime on the street.  The drug problem is out

20  of control.  Loitering is out of control.

21        When I go home this evening, I'll be lucky to

22  find a parking space in front of my home, because

23  there will be cars from Maryland, Virginia,

24  everywhere.  I've seen Delaware, New Jersey.  It's

25  drug dealers coming in and out of our neighborhood,

1   hanging out on our street, loitering, playing their

2   music, smoking marijuana, drinking in the street.

3   There's a lot of problems on Eads Street, and I don't

4   think that the applicants have taken that into

5   consideration.

6           I invite you to come over on a Friday night

7   when the Chateau is really going.  See if you can

8   find a place to park, feel safe.  I don't think

9   you'll be able to.

10          And I'm a 36-year-old female.  How is a 55

11  plus year old senior going to be feeling safe on this

12  block?

13          Been deep in contact with the Metro Police

14  Department.  Nothing is being done.  I've been on

15  ride-alongs with them, getting complaints, seeing

16  what they do.  What could we do to address this?

17  Nothing is being done.  I just don't think that this

18  is the right solution for that -- for this area of

19  Eads Street.

20          Also, some of the other -- let me see here.

21  Oh, I wanted to talk about X2 as we're talking about

22  transportation.

23          X2 is a very dangerous bus.  There have been

24  stabbings on this bus.  I've been called racial slurs

25  on that bus.  There has been -- there's all sorts of

1    problems.  I don't see seniors wanting to ride up and

2    down Benning Road corridor on X2.

3        And then also we have, like I said, some of

4    the problems over parking too, we also have street

5    cleaning on that block, on our block, twice a week

6    from March to October.  Where are all these cars

7    going to go for three hours twice a week, while they

8    do the street cleaning?

9        So, that's all I have.  Thank you.

10        CHAIRPERSON HOOD:  Thank you.  Next.

11        MS. RICE:  Hi.  My name is Coliece Rice.  I

12    also live on the 3400 block of Eads Street.  I'm

13    opposed of this because I've been on that block for

14    15 years, and that block has been a nuisance for 15

15    years.

16        When they first came to present this to the

17    River Terrace community, I was an opponent, because

18    all they were concerned about is getting money from

19    the city for PMI.  They wanted it to be low-income.

20    And I was like, well, what happened to

21    gentrification?  Well, we want money from the city to

22    fund this project.  That's why they're rushing to get

23    this project done, to get the money, because their

24    time is running out.  It's not about the community.

25        So, with that being said, I have been against

1  this project from the beginning because a lot of
2  older people in our community don't understand PMI.
3  And if they understood the -- I mean, I'm sorry, AMI.
4  If they understood the AMI a lot of them would have
5  been against it from the beginning.
6        So why, if you went into the census and found
7  that the revenue or the income of people was
8  moderate, why would you put more moderate people and
9  not try to thrive this community, because everybody
10  is not moderate anymore in that community.  But they
11  took old census data and said, hey, we're going to
12  put more poor people with poor people.
13        And to me, I don't want to live with a whole
14  bunch of trash, because I'm living with it now, with
15  my street.  And again, they only did the citizens,
16  probably because the residents were against low-
17  income, because I know I did not vote for low-income.
18  I grew up poor.  I got out of 37th Street, if you
19  know where that is, and moved on.  Who wants to live
20  in impoverished communities?  These people do not
21  live where we live.  They don't live what we endure
22  on our street every day.  And to bring seniors on to
23  that block as, this is my neighbor.
24        So, to bring seniors on to that block they
25  are -- I mean, just recently, a girl got raped,

1    stabbed.  We started getting all these logs -- e-

2    mails about things that are happening.  So, you want

3    to bring seniors into that?  I'm scared for my own

4    safety, and I'm a single woman living by myself.

5           So, I don't care who you bring in there.

6    Until the city actually clean that up, the zoning,

7    that monstrosity that they're trying to build, we

8    live in two-story houses.  When the subway goes past,

9    our houses shake, so them building that would cause

10   more damage to our houses, because I can actually

11   hear my windows tremble when the subway come past.

12          When they did the streets, my windows

13   tremble, my house shaked.  When the trucks, ton

14   trucks are not supposed to come down the street.

15   When they come, my house shakes.  We told them all of

16   this.  So, maybe that's why they're not building an

17   underground parking, but still, they will be digging

18   for water, you know, the power, and all of that

19   stuff.  Thank you.

20          CHAIRPERSON HOOD:  Thank you.  Next?

21          MS. CAPPERELL:  Good evening, Mr. Chairman

22   and members of the Commission.  My name is Jessica

23   Jones Capparell.  I am a resident of Eads of Street

24   Northeast in the River Terrace neighborhood of Ward

25   7.  I moved to River Terrace in March of 2016 after

1  purchasing my first home, a little over a year ago.
2  And just last Friday I got married in my backyard.
3       Tonight, I stand with my neighbors and
4  respectfully asking for no zoning changes from R-3 to
5  MU-7 on the parcels designated by 3443 Benning, LLC
6  Neighbor Development Company for its 3450 Eads Street
7  project.
8       Since our first River Terrace meeting that we
9  attended, I've watched my neighbors lose trust in the
10 developer and the project over the course of the last
11 year.  And some of the reasons that we oppose this
12 building include the following.
13      First, the size and story level of the
14 building has changed over the course of the
15 proposal's presentation.  As proposed currently, a
16 five-level, 70-unit building does not fit within the
17 character of the two-story townhomes that comprise 90
18 percent of the neighborhood.
19      Second, parking along Eads Street and the
20 surrounding streets is already in high demand.  It is
21 estimated that an additional 20 to 50 cars would be
22 added to the block, essentially doubling the vehicles
23 that need to park.  With only 17 available parking
24 spots planned for the building, this would create a
25 serious issue for residents that own their homes

1    along the street.

2         The comprehensive transportation analysis

3    conducted by the developers for the project strongly

4    favors the developer over the existing neighborhood.

5    The analysis finds a Metro station, bike share, and

6    bus lines within a mile from the building, but fails

7    to recognize the difficulty that the targeted age

8    group of the building may have in using these

9    options.

10        How many seniors do you know that will walk

11   on a narrow pedestrian bridge over a major highway,

12   cross a four-lane major thoroughfare, then travel

13   down a busy sidewalk to get to a Metro stop?  How

14   many seniors do you know that feel comfortable enough

15   to walk .3 miles to a bike share station, then bike a

16   mile to the Metro?

17        Finally, I understand that there is a

18   comprehensive plan for the growth of the City of

19   D.C., but I fail to see how this building fulfills

20   that growth.  There are over 2,000 units within two

21   miles of River Terrace that are affordable housing

22   units.  This does not include ongoing construction or

23   other projects currently being planned.  While market

24   rate and luxury apartments are going up all around

25   the city, including in the neighborhoods of Petworth,

1    Columbia Heights, and Shaw, some of which NDC itself
2    has built, none of them are being planned for Ward 7.
3            Statistics show that concentrated poverty
4    does not help a city or its people grow, and
5    according to the D.C. Fiscal Policy Institute, Ward 7
6    has the second highest poverty level in this city,
7    and yet corporations like NDC continue to use our
8    neighborhoods for subsidized apartments that only pad
9    their bottom line.
10            I would ask that the Zoning Commission vote
11    against the zoning changes proposed for this project,
12    as this project has not been properly researched and
13    does not demonstrate any value to the community
14    around it.  I stand with my neighbors, the River
15    Terrace Community Organization, and the ANC 7D
16    Commission in opposing this project, and I ask you to
17    decline the zoning request.
18            CHAIRPERSON HOOD:  Okay.  Thank you.  Next.
19            MS. PAYTON:  Good evening, everyone.  My name
20    is Olivia Payton.  I am one of the co-operators of
21    the Chateau, the newly Chateau Remix, 3439 Benning
22    Road.
23            I signed the lease June 30th, 2016.  I guess
24    my timing was off because I see that there is a
25    problem as far as the parking for the Chateau Remix.

Exhibit N  2048

1        On Sundays, we allow the church to park on
2   the lot that we're leasing now for -- with no cost of
3   course, that we're renting with the help of Mike
4   Giulioni.
5        On Tuesdays, we have our special needs folks.
6   We have close to 200 folks from neighboring group
7   homes to come in.  We supply music or them, dinner,
8   and dancing for them.  They come in wheelchairs,
9   walkers, with oxygen, or any means necessary to come
10  out and have a good time.
11       The parking lot is very important for us,
12  because that's where they unload, in front of the
13  building, and they use the parking area in the back,
14  in the rear of the Chateau Remix for their wheelchair
15  accessible vans.
16       It's very dangerous for them to park in the
17  street.  We cannot use the parking lot that is
18  adjacent to our building that's in front of the
19  church, HVAC training center, and the market.
20       On Fridays, we have the Oldie but Goodies
21  night.  That has been a tradition for over 40 years
22  in that area.  We used the parking lot.  We have to
23  use the parking lot.  We do not want our seniors --
24  because I am 62 years old.  The capacity at the
25  Chateau Remix is 350.  Most of the time we reach at

1  least 300.  We do not want our patrons to walk across

2  five lanes to get across the street to enter into the

3  building.

4          I am just asking that things like this will

5  be taken into consideration.  Again, I have a five-

6  year lease.  If anything happens, I hope it happens

7  after that, and not before.

8          Respectfully, we love the area.  We are so

9  glad we were able to beat out 10 different men to get

10  this project.  My partner is also a young black

11  female.  And that's very rare in this area.  So, we

12  would like to keep as it is, with some consideration,

13  at least from everyone concerned.  Thank you.

14          CHAIRPERSON HOOD:  Thank you.  Next?

15          MR. CALVER:  Good day Commissioner Members

16  Hood, Miller, Shapiro, and May.  My name is Cinque

17  Claver, and I'm a fourth-generation resident of the

18  River Terrace neighborhood, living about two blocks

19  from 3450 Eads Street Northeast.

20          Much of the applicant's current project

21  proposal has left myself and other residents of our

22  community confused and uncertain.  The applicant's

23  subsidiary name is 3443 Benning, LLC, but each time

24  residents have been contacted, Neighborhood

25  Development Company wanted to discuss the proposed

1   development of 3450 Eads Street Northeast.

2           While Benning Road is an arterial road

3   bounding the River Terrace community, Eads Street

4   barely sustains two-way traffic and is within the

5   River Terrace community.

6           But this is just the surface of the

7   inconsistencies our residents have experienced as we

8   considered this proposal.  While the applicant

9   purports to serve the public good by developing a

10  vacant lot, 3450 Eads Street Northeast is not now,

11  nor has it ever been a vacant lot, but a regularly

12  utilized parking lot, which has doubled its space for

13  any number of celebrations and events, including

14  River Terrace Community Market Day.

15          The usage of the term, vacant lot through the

16  applicant's zoning map amendment application is

17  inconsistent with the actual and current utility of

18  the parcel.  Actually, the proposed development of

19  the parking lot will decrease capacities for the

20  commercial area and force overflow onto residential

21  streets deep within River Terrace community.

22          Further, the applicant's request for MU-7

23  amendment, for the development in the interior of the

24  River Terrace neighborhood, on a nonarterial two-

25  story residential street is not consistent with the

1  current development practices as no other MU-7 or C-

2  3-A zone district developments are faced on

3  nonarterial thoroughfares throughout the District.

4         And president for such random developments

5  would eventually undermine the defining aesthetic

6  characteristics and cultural fabric, and

7  comprehensive planning in the District.

8         I think I'm actually going to skip ahead, but

9  can I turn in my testimony for submission?  Couple

10  different points.  You know, while the applicant

11  writes that this request is not inconsistent with the

12  inclusionary principles of the D.C. Comprehensive

13  Plan, their proposed development is certainly not

14  consistent with either the intent of the inclusionary

15  planning, or mixed-use development.  The Department

16  of Housing and Urban Development defines their 30

17  percent AMI marker as extremely low income, and to

18  concentrate over 70 units on about 1,800 square feet

19  of property is the definition of concentrated poverty

20  in a ward that has, as my neighbor just attested, the

21  second highest poverty levels in the city.  That's

22  not what the Inclusionary Zoning reads when I read

23  the -- read the Comprehensive Plan over the last

24  couple of weeks.

25         Currently, the project is not necessary, nor

1  welcome, to the moderate density residential zoning

2  of our neighborhood.  It's not helpful, and very

3  possibly harmful to the public good.  It's very high

4  density, and extremely low-income residences will

5  drive down our property values.  Also, our likelihood

6  of retail offerings to offset the lack of public

7  service amenities now.  So, we actually need the

8  reverse of the rest of the city in Ward 7, and around

9  River Terrace.  Especially when we're trying to work

10  with the Great Streets and Main Streets in order to

11  implement amenities that we don't currently enjoy in

12  our part of the city.

13          A proposal undermines the intention, purpose,

14  and the available -- and the integrity of our zoning

15  regulations and is not comprehensive with my

16  understanding of the Comprehensive Plan as I've read

17  it several times.

18          And further, lastly, there is no undue

19  hardship for the owner to experience as the

20  subsidiary has no revenues, employees, or occupancy

21  needs and can define alternative utilizations to

22  realize profit.  Basically, I'm asking that you deny

23  the current proposal for the current request for

24  amendment of the zoning code on these basis.  Thank

25  you very much.  And I have six copies of my testimony

1    submitted to the Commission.

2        MS. FREESE:  Hello.  Good evening, Chairman

3    Hood and Commissioners.  My name is Malissa Freese.

4    I'm sorry, I'm new to the -- to cheaters here.  My

5    name is Malissa Freese, and I am the current

6    President of the River Terrace Community

7    Organization.

8        I'm an 11-year resident of River Terrace,

9    which sort of makes me a newbie, compared to many of

10   my other neighbors.  But though I haven't gone

11   through the trials and tribulations they have, I will

12   argue with them every day, that I love it just as

13   much as they do.

14       On my first ride over the Key Bridge, I knew

15   I had found my city, and in 2005, I found my home in

16   River Terrace.

17       I am a New York City girl.  I mean, I am a

18   New York girl, but became a D.C. woman.

19       As a concerned resident of River Terrace, I

20   respectfully ask for no zoning changes for NDC.  Not

21   because I and River Terrace are antigrowth.  We, like

22   all of Ward 7 are aching for development and growth

23   in our corner of the city.  We ask for no zoning

24   change because we are enthusiastic supporters of

25   smart planned urban development.  We want to work

1  with NDC, but have decided not to succumb to just

2  anything in the name of development.  Here are some

3  of our reasons.

4      The inappropriate use of a larger scale

5  development than prudent for the street and the

6  neighborhood.  The proposed rezoning change is

7  incongruous with the neighborhood.  A five-story MU-7

8  designation building is too large for the location.

9  The houses zoned R-3 across the street, and next to

10 the building, as well as the retail buildings which

11 are two-story on Benning Road, will be dwarfed.

12     Oh, sorry.  Thank you.  The increased

13 population density to a low-density area.  If

14 approved, this planned unit development would

15 increase a low-density area of R-3 to a moderate

16 density area, adding 70 to upwards of 140 people to

17 the population of Eads Street alone.  This magnitude

18 of change is impacting density dramatically within

19 the area, and the existing neighborhood must be

20 considered.

21     The increase in parking and traffic, and

22 you've heard about parking and traffic, there is a

23 potential of 20 to 50, to 70 cars coming to Eads

24 Street.  That would make an already tenuous parking

25 situation absolutely a DPW parking enforcement

1    nightmare.

2           River Terrace will witness a dramatic

3    increase in traffic in an already congested area.

4    Although this project is branded as a senior

5    development, due to the high number of seniors in

6    River Terrace, now driving in their 50s, 60s, 70s,

7    and 80s, we are aware that age or income does not

8    guarantee the use of public transportation.

9           Eads Street Northeast, and River Terrace can

10   simply not handle the dramatic increase in traffic

11   that will occur if the rezoning is permitted and this

12   building is built.

13          The River Terrace community essentially has

14   three entrances and two and a half egresses.  36th

15   Street Northeast is a right/turn entrance egress

16   only.  34th Street is the Metro Bus route entrance

17   and exit for River Terrace and his heavily used.

18          The last entrance and exit in River Terrace

19   is Anacostia Avenue, and it's on the other side of

20   the neighborhood, and not easily accessible to Eads

21   Street Northeast.

22          I will not cover the congestion on Benning

23   Road, the only road into or out of River Terrace

24   itself.

25          My two last reason are the most compelling.

1  The neighbors on Eads Street are against this

2  project.  They are the most impacted.  Eads Street,

3  again, 36th, the 500 block of 34th, and even the back

4  of Benning Road.  Almost every neighbor who lives

5  within 200 feet of the property is against the

6  project and have been since it was first introduced

7  to River Terrace in April of 2016.

8          They are worried about crime increasing with

9  a vulnerable population taking residents in the

10  project, construction damage to buildings, and the

11  loss of the community history and culture of River

12  Terrace.

13          At one point, many felt they had no say in

14  stopping this building, and asked for the structural

15  monitoring to watch for damage to area homes.  We can

16  thank the ANC 7D for informing us that we did have a

17  say if this building would and could be built.

18          The neighborhood does not support this

19  project.  And this is my last reason.  Spot zoning

20  for this development on this parcel is not only

21  inappropriate, but also circumvents a true

22  neighborhood plan.  With the building of this project

23  there would be one project that fits into the

24  Comprehensive Plan, but did not take into

25  consideration, the rest of the neighborhood.

1    So, at this point, we have this one five-foot
2    building, and two-story or a five-story building, and
3    a two-story buildings surrounding it.  For these
4    reasons, I urge you to vote against this proposed
5    rezoning.  We understand the D.C. Comprehensive Plan
6    gives tacit approval to a development in Ward 7, but
7    current unplanned growth should not justify more of
8    just any kind of development.  It should underscore
9    that more direction and planning of these
10   developments is needed.  Thank you.
11        CHAIRPERSON HOOD:  Thank you.  And thank you
12   all.  Let's see if we have any questions up here of
13   this panel.  Any questions?
14        Okay, not seeing any.  Does the applicant
15   have any cross?  Does the ANC have any cross?
16        [No audible response.]
17        CHAIRPERSON HOOD:  Okay.  Thank you all very
18   much, we appreciate your testimony.
19        Okay.  Mr. Avitabile, you have any rebuttal?
20        MR. AVITABILE:  We may have a couple of
21   points.  Would it be possible to take a two-minute
22   break for us to talk --
23        CHAIRPERSON HOOD:  Okay.  We'll take a two-
24   minute break and we'll come back and do rebuttal and
25   any cross on rebuttal, and that will be it.

1      [Off the record from 10:00 a.m. to 10:07
2  a.m.]
3      CHAIRPERSON HOOD:  Okay.  Let's go back on
4  the record.
5      MR. AVITABILE:  We thank you very much,
6  Chairman Hood.  I know that took a little bit of
7  time, but it helps us to present, I think, a more
8  cogent response.
9      So, we're going to address a couple of points
10  now.  I'd like to start.  Melody, if you could start
11  with the points we talked about, about the market and
12  demand for senior housing, and also how it operates?
13      MS. CROWDER:  One second.  Let me find my
14  spot.
15      MR. AVITABILE:  These will be brief points.
16      MS. CROWDER:  Okay.  Residential One manage
17  11 senior properties within the District of Columbia
18  Metropolitan area.  Of those 11 properties, they are
19  all 55 age -- for seniors 55 of age or older, or 62
20  years of age or older.
21      The demand is very high throughout
22  Washington, D.C.  Every property that we manage in
23  D.C. has an active wait list for senior living.
24      Our portfolio -- Residential One has a
25  portfolio of over 7,100 units, of which 20 percent

1   are dedicated to seniors.  Seniors, for this
2   community -- I'm sorry.  Seniors for the Eads Street
3   location will be marketing again, the market is not
4   just for the Ward 7.  Our Affirmative Fair Housing
5   Marketing plan, we have to market areas that are for
6   residents or prospective residents that would not
7   likely apply to this property.  So, our marketing
8   efforts are wide range.
9         And I feel that this senior property will
10  have the volume that it needs to fill the occupancy
11  in a very short amount of time.
12        MR. AVITABILE:  And then the other point to
13  talk about, how the senior housing program operates
14  where people come in and, you know, whether they can
15  have, you know, grown children or grandchildren, you
16  know --
17        MS. CROWDER:  As far as the lease.
18        MR. AVITABILE:  Yeah.  Yeah.
19        MS. CROWDER:  So, the way the lease -- the
20  leases are set up where you're -- we have
21  housekeeping inspections of course.  Our housekeeping
22  inspections we have general annual inspections,
23  preventive maintenance inspections.  During these
24  inspections, we're looking for overoccupancy,
25  underoccupancy, or unauthorized occupants.  These

Exhibit N  2060

1  inspections happen four times a year, and under no

2  circumstances would if a tenant was to pass away or

3  move out, well, any other occupants or anyone staying

4  with them for the weekend, be able to reside in that

5  unit.

6         The unit are turned within five business days

7  of the occupant moving out.  And we closely monitor

8  the activity of every resident in our building.  So,

9  this will eliminate the -- what was said about

10  somebody else, you know, staying there, kids or

11  whatever the case may have bee, with the young lady

12  prior to me.

13         It's our policy to perform these inspections

14  to prevent these exact reasons.

15         MR. AVITABILE:  Great.  Thank you very much.

16  Jim, I think, if you want to talk about the points we

17  discussed?

18         MR. WATSON:   So, there was a little bit of

19  conversation just in terms of the general parking

20  demand for the site itself.  Industry data, so ITE's

21  parking generation, which is based on national

22  studies of parking, tells us that demand for senior

23  housing is 56 percent.  Or parking demand for senior

24  housing is 56 percent of that, that you would see for

25  standard housing.

1        You know, if we were to apply that to what
2   zoning would require, even before reconfiguration of
3   the zoning code, this would suggest that 14 spaces
4   would be appropriate for this site, which we still
5   exceed that by providing 17.
6        You know, I think there's a -- there is some
7   expectation that this is a lower income bracket and
8   that the auto ownership would be less than that of
9   market rate house, so that there is some of that to
10  consider within this as well.
11       Also, you know, if the residents were not
12  able to obtain an RPP zone, they would not be able to
13  park on Eads Street itself overnight.  Or, you know,
14  throughout the day for fear of exceeding the zone,
15  were it policed properly.
16       I think there was another comment as well
17  about just how the drop-off/pick-up zone at the
18  curbside would work.  As Evelyn from DDOT mentioned,
19  this would be a zone that's similar to many other
20  apartment buildings throughout the District.  Likely
21  would be anywhere from 30 to 40 feet and would be on
22  the curb directly in front of the development.  It
23  would be accessed from the west -- approaching from
24  the east when westbound on Eads Street and would
25  allow for some pick-up and drop-off activity curbside

1  for Metro Access or any other shuttle type services.

2       And I guess lastly, the only other thing I

3  wanted to touch on was just the X2 in and of itself.

4  You know, I know that there has been some issues with

5  that bus just, you know, from a crime standpoint.

6  But from an access standpoint the bus does provide

7  very frequent service for residents along that

8  corridor.  And combined with the future Benning Road

9  street car, there will be multiple more options

10  available going forward in the future.  Thank you.

11       MR. AVITABILE:  Okay, Michael next.  What we

12  talked about.

13       MR. GIULIONI:  Thank you.  So, we just wanted

14  to clarify in terms of our lease with the Chateau

15  Remix.  So, we actually have two leases.  One is for

16  the lot that's adjacent to their location, which is

17  here, and that's a one-year lease, and we actually

18  are on a month-to-month lease for this lot.  We just

19  wanted to make that clear because there was

20  discussions about lease terms and I think she was

21  speaking of her lease term.

22       I guess, you know, there's sort of some

23  interrelated issues that have been raised related to

24  crime and economic benefits accruing to the area, and

25  you know, I do have two planning degrees, one in

1  urban design and one as an undergraduate in planning.
2  And I think there's a difference of opinion based on
3  my dialog with the community.  You know, we see this
4  as providing more residents to the area that will
5  both help in terms of advocating for the mitigation
6  of crime, but then further they're an added
7  population that will help support additional
8  commercial uses along Benning Road and other sites
9  which would support commercial uses.

10        And I think you know, we've talked about this
11  at some of the public meetings.  You know, the 50
12  percent AMI level is, number one, we wanted to
13  clarify, it's 80 percent of the building would be
14  delivered at 50 percent.  The 30 to 50 percent AMI
15  band.  So, it's only 20 percent that would be the 30
16  percent level.

17        You know, in many -- I was surprised when I
18  went and looked at the census that you know, 50
19  percent AMI is the current sort of income band of
20  this area.  And so, you know, this is an example of
21  where things are relative, and right now this kind of
22  goes back to my other point is we're delivering
23  housing that, you know, should be affordable to
24  people who live there now, or other people who fit
25  with that -- in that income range.  So, thank you.

Exhibit N  2064

1    MR. AVITABILE: Okay. And then the last

2  couple of items I just wanted to check on. I know

3  that there was a statement brought up about

4  environmental studies.

5    I think as the Commission knows, there are

6  multiple aspects to the environmental analysis of a

7  project. The bulk of it happens through the

8  permitting process through the environmental

9  screening form which, you know, evaluates whether

10  there are impacts and has them addressed.

11    Usually you typically hear in this process,

12  when we talk about environmental issues, we're

13  focused on sustainability and those measures. But

14  we're certainly happy to provide additional

15  information to the Zoning Commission if they feel it

16  would be helpful. You know, I think environmental

17  studies -- assessments you've done to date on the

18  property, you've done a Phase One?

19    MR. GIULIONI: Yes, we've done a Phase One

20  and we wouldn't have purchased the property had it

21  come back with a less than favorable review.

22    MR. AVITABILE: So, I guess if the Commission

23  is inclined, we can provide additional information on

24  that point, but otherwise I think -- I mean, this is

25  one the first issues that came up, one of the first

1  cases I dealt with, and at that time at least the
2  Court said, you know, environmental studies for the
3  most part are a permitting issue, not necessarily a
4  zoning issue.  But to the extent that it's of concern
5  to any of the commissioners, we're happy to continue
6  to address it.
7          One point I wanted to also make, there was a
8  suggestion that this rezoning would allow us to go to
9  the theoretical 90 feet of height that a PUD in the
10 MU-7 zone would allow.  But I think as you all know,
11 PUD related zonings are limited to what the applicant
12 seeks.  So, if the Commission were to approve the
13 proposed we've proposed, we would be limited to five
14 stories.  We could not build a taller building
15 without coming back to you all and asking for more
16 height, and the community having a say and a strong
17 and allowed say in that process.
18         So, this rezoning does not allow us to get
19 more than what we're specifically asking for here.
20 And I think furthermore, and as you all have reminded
21 us time and again, this rezoning does not necessary
22 set a precedent for the other parcels that are around
23 us.  This project is being evaluated on its own
24 merits, based on what we've proposed and the benefits
25 and amenities that we're proposing, and whether it's

1    the DGS site that's right next door, or the sites on

2    Benning Road, they'll be evaluated on their own

3    merits, and what we request doesn't necessarily set

4    the table for that.

5             I think that is everything.  Yes, okay.

6    That's our rebuttal.  I don't think I need to make a

7    closing statement.  I think I addressed that with the

8    close of our direct presentation.  We certainly do

9    feel that this project meets the standards of the

10   zoning regulations.

11            CHAIRPERSON HOOD:  Are you making your

12   closing?

13            MR. AVITABILE:  What I was simply going to

14   say is, yes.

15            CHAIRPERSON HOOD:  Okay.  Before you make

16   your closing, any questions up here?  Vice Chair?

17            MR. MILLER:  Yes, just quickly, following up

18   Mr. Giulioni -- Giulioni.

19            MR. GIULIONI:  Giulioni, like pepperoni.

20            MR. MILLER:  Okay.  Giulioni.  That's a good

21   way to remember it.

22            So, on the 50 percent AMI, I think this would

23   be helpful to put on the record what that household

24   income, the expected household income for the

25   expected tenants would be.  Do you happen to know

1  that?  I think it's in the 50s.  I think it's in

2  the --

3        MR. AVITABILE:  It's approximate 44 to 52,000

4  (simultaneous speech).

5        MR. GIULIONI:  So, well okay.  Let me --

6  yeah, there was a slide we had here.  Where was it?

7  Sorry.

8        [Pause.]

9        MR. AVITABILE:  Sorry.  Thirty-eight to 44.

10        MR. GIULIONI:  Yes.  So, again, okay, there's

11  a lot of variables that go into AMI determinations.

12  I wish it was simpler.  I wish it was simpler to

13  explain to people, I really do.  But one of the

14  factors here that is important is that, you know, as

15  your household size changes it adjusts accordingly.

16  So, that's why there's a multiplicity of numbers.

17        So, this is at the 50 percent range.  For,

18  you know, one person it would be 38,000.  But two

19  people, which would be the maximum allowable in the

20  unit, we're looking at around 44,000.  But, important

21  to note is, you know, income ultimately plays another

22  factor in it.  But let's not get into it.

23        MR. MILLER:  No, I just thought it was

24  important to put on the record because even though 50

25  percent AMI might be called low-income under the

1    Federal HUD standards, it's the area median income
2    that includes all of the region, the richest counties
3    in America.  And for those income levels, that is a
4    lot of our residential population.  I just thought
5    that was -- and that is where the D.C. -- where we've
6    received testimony in our Inclusionary Zoning
7    hearings, where there is a lot of need by existing
8    residents for that level of affordable housing.
9            Can I just ask Melody.  I forgot your last --
10   Crowder?  Crowder?
11           MS. CROWDER:  Crowder.
12           MR. MILLER:  Okay.  The senior's buildings
13   that are in high demand that you manage, or that
14   you're part of helping manage, are they income
15   restricted as well?
16           MS. CROWDER:  Yes, they're affordable.  Yes.
17           MR. MILLER:  Okay.  And the seniors that --
18   and the restrictions on nonseniors, living with the
19   seniors, whether they're a child or a grandchild,
20   what are the typical restrictions that you would
21   expect in this?  I mean, obviously, the grandchild --
22   well, I don't know.  Can a grandchild can come visit
23   for the weekend, I think you mentioned.  Is there a
24   restriction on like, continuous use?
25           MS. CROWDER:  Uh-huh.

Exhibit N  2069

1          MR. MILLER:  Of more than a certain number of
2     days a week, a month, or a year?
3          MS. CROWDER:  Yeah.  So, weekend use, daily
4     use, I mean, there are restrictions that will be
5     identified in what's called the tenant selection
6     criteria plan, which will identify how long an
7     occupant can have a visitor.
8          For senior facilities normally it's, no one
9     is staying longer than a seven-day period without
10    management's permission.  And that includes children.
11         CHAIRPERSON HOOD:  Let me just follow up on
12    that note.  Sometimes seniors have to take care of a
13    child who is autistic.
14         MS. CROWDER:  Uh-huh.
15         CHAIRPERSON HOOD:  And that situation, and
16    the child may be -- not child.  Let's not suggest,
17    sometimes adults, and they can't stay by themselves,
18    and they're autistic, and they're autistic their
19    whole life, are there concessions in that regulation
20    or whatever you all -- is there something out there
21    that they can be able to stay there because they
22    can't really go nowhere else.  And if they have a
23    senior already staying there, are they allowed to be
24    able to stay there?  Let me -- are there concessions
25    for special cases like that?

Exhibit N  2070

1          MS. CROWDER:  Yes.

2          CHAIRPERSON HOOD:  Okay.  All right.  All

3    right.  Commissioner May, you had a follow-up?  I

4    mean, any follow-up on rebuttal?  None?  Oh, okay.

5          All right, does the ANC have any cross on

6    rebuttal?

7          [No audible response.]

8          CHAIRPERSON HOOD:  Okay.  Well, this is the

9    last -- this is it, so -- okay.  It's questions now.

10    On rebuttal.

11          MS. GARNETT:  [Speaking off microphone.]

12          CHAIRPERSON HOOD:  It's on rebuttal.

13          MS. GARNETT:  [Speaking off microphone.]

14          CHAIRPERSON HOOD:  Well, I'm going to help

15    you because it's 10:30.  I'm going to really help

16    you.

17          MS. GARNETT:  This is to Ms. Crowder, is your

18    name?  I listened to your -- your statement that you

19    just made, and my concern is, how are you going to

20    manage and monitor the stay of grandchildren or older

21    sibling that were there -- be there caring for their

22    loved one?  What type of measurements do you have in

23    place to control that, because it just doesn't set

24    right with me, because once they're in, they're in.

25          MS. CROWDER:  We have, they're called lease

Exhibit N  2071

1  violations.  Again, we have other seniors that will
2  be living throughout the community that will actually
3  give us these tips.

4        When doing the inspections, management will
5  be on site.  So, we will see the children.  As we get
6  to know the tenants, you know, these are not things
7  that we will just automatically know or just do
8  surprise inspections.  But as time goes on, these
9  people become comfortable and they're seen often.
10  And that's when the lease holder is questioned and an
11  inspection is performed, and a lease violation is
12  given from our attorneys, and then a 30-day notice to
13  vacate for breach of lease.

14        MS. GARNETT:  Well, I'm going to give you a
15  case.  My aunt lived in a senior building up here off
16  of 6th Street Northwest.  And when she passed, and
17  that's why I raised the concern.  And when she passed
18  -- well, before she passed, she had grandchildren
19  living with her, and even grown sons.

20        And after she passed and moved -- and they
21  transferred her out to her resting place, guess what?
22  Those children and grandchildren removed -- remained
23  in that apartment for over a year.  Because you know
24  why?  I think it was called Gibson Plaza Apartments.
25  And let me tell you, they were living, my cousins and

1  their children were still living in that apartment

2  because you know, why?  Because everybody in that

3  building new each other.  And everybody had the same

4  circumstances at one time or another.  And guess

5  what, if they left there they became homeless.

6          So eventually, after a year or so --

7          CHAIRPERSON HOOD:  Okay.  Commissioner, do

8  you have --

9          MS. GARNETT:  -- the ended up giving up.  So,

10  that's what my concern is to you.

11          CHAIRPERSON HOOD:  Okay, I think we got it.

12          MS. GARNETT:  Thank you.

13          CHAIRPERSON HOOD:  We all got it.

14          MS. GARNETT:  Thank you.

15          CHAIRPERSON HOOD:  You have any other

16  questions?  Thank you very much.

17          MS. GARNETT:  That's it.

18          CHAIRPERSON HOOD:  Okay.

19          MS. GARNETT:  Thank you.

20          CHAIRPERSON HOOD:  All right.  Can we get

21  your closing?

22          MR. AVITABILE:  This project is an all-

23  affordable senior housing project that meets a

24  critical need that the city has identified in not

25  just the Comprehensive Plan, but in other planning

1  documents.  We've identified this as a site that is

2  identified for redevelopment.  It is an in-fill site.

3  These are the sites that need to be redeveloped.

4  When we have to capitalize on the opportunities to

5  create this, this type of housing that we can.

6          I do think that that said, the scale of this

7  building, the way it's been located, the way it's

8  been sited, the way it's been designed, it has been

9  designed in a manner that is compatible with the

10  surrounding neighborhood.  It has been pushed away

11  from the street.  It's pushed away from the alley, it

12  steps down in height.  All of these things contribute

13  to this building, navigating what is admittedly a

14  transition between a two-story rowhouse community,

15  and a planning -- set of planning documents that say

16  there should be bigger, taller development right next

17  door.

18          But that's what happens when you have these

19  sites that are right at, you know, right at the edge.

20  This is a transitional site.  This is an edge site.

21          And so, I think the features that we've

22  included in the building do provide that transition.

23  There have been a number of impacts that have been

24  identified.  I think we've done our best to talk

25  about the ways in which we are trying to address them

1  tonight.  I think we've gotten some feedback from the

2  Zoning Commission, and I think we've also, in

3  listening again tonight, have thought of some other

4  things that we could consider, and we certainly can

5  come back to the Zoning Commission with whatever it

6  is you'd like us to look at, and address that

7  further.  But we do certainly appreciate everyone's

8  time tonight and everyone's participation.  And we

9  look forward to continuing to move this project

10  forward.  Thank you.

11       CHAIRPERSON HOOD:  Here's something that I

12  want that I didn't ask for.  I want a perspective,

13  and I think the Vice Chair mentioned it earlier on.

14  I want a perspective of how it looks with -- how this

15  project is going to look with what exists now.  And I

16  want different sites, one coming from I guess, down

17  in there, the edge of River Terrace, one looking from

18  Benning Road, one looking from the backside where Ms.

19  Prue has made it so I can't turn around no more, and

20  one from 295.  I want to be able to see how it's

21  going look within that whole area, okay?  All the way

22  around.  Okay?

23       MR. AVITABILE:  Yes, sir.

24       CHAIRPERSON HOOD:  And I don't want it to be

25  cartoonish.  I want to see exactly what's there now

1  with the project.

2       MR. AVITABILE:  Drop it into an existing

3  photograph.  Got it.

4       CHAIRPERSON HOOD:  Existing, right.  What

5  else?  I think we have most of the stuff.  Anything

6  else up here?

7       [No audible response.]

8       CHAIRPERSON HOOD:  Okay.  And, also before

9  you come back to us, I know you all are going to be

10  going back to the community, right?

11       MR. AVITABILE:  Yes, sir.

12       CHAIRPERSON HOOD:  All right, and maybe more

13  than once.

14       MR. AVITABILE:  We will do what we can.

15       CHAIRPERSON HOOD:  Okay.  Anything else up

16  here?  Do we need to go over the list?

17       MR. AVITABILE:  I think I'm clear.

18       CHAIRPERSON HOOD:  Okay.  All right.  So, I

19  don't know.  I don't know if we need to set any

20  dates.

21       MR. AVITABILE:  I do think it would probably

22  be helpful to have a date set to keep all of us

23  moving forward and perhaps direct us.

24       CHAIRPERSON HOOD:  Okay.

25       MR. AVITABILE:  We don't necessarily need to

Exhibit N  2076

1   -- I don't think we need to necessarily pick a date

2   that's in, you know, later this month.  You know,

3   there are too -- just, things drag otherwise.

4         CHAIRPERSON HOOD:  Right.  Okay.  So, we're

5   looking at, maybe looking at this, our last meeting

6   in June?

7         MS. SCHELLIN:  So how much time do you think?

8   Maybe four weeks for the submissions?

9         MR. AVITABILE:  Now, this all said, let me

10   think about this because this ANC meets the second

11   week of the month, correct?  So, you all are meeting

12   next --

13         MS. MUHAMMAD:  The second Tuesday of every

14   month with the exception of July and August.

15         MS. SCHELLIN:  Okay.

16         MS. MUHAMMAD:  We're in recess for those two

17   months.  So, after June we'll reconvene in September.

18         MS. SCHELLIN:  Okay.  So, the second Tuesday.

19   So, they meet next week.

20         MR. AVITABILE:  So, we certainly need -- we

21   won't get to --

22         MS. SCHELLIN:  And they'll meet on the 13th.

23         MR. AVITABILE:  -- I mean, we could try to

24   get to the next week, but my guess is we'll need a

25   little more time than next.  So, I think we need to

1  have whatever it is we submit be ideally a week or so

2  after their meeting in June.

3        MS. SCHELLIN:  Okay.  So, it appears, then,

4  they would meet June 13th.

5        MR. AVITABILE:  Yes.

6        MS. SCHELLIN:  Okay.  So --

7        MR. AVITABILE:  And that probably means that

8  we're not going to make the June meeting, the June

9  26th meeting, because we would have to submit

10 something.

11       MS. SCHELLIN:  Correct.  You won't.

12       MR. AVITABILE:  Okay.  That's what it is.

13       MS. SCHELLIN:  So we'll shoot for the July

14 10th meeting.  But they meet on June 10th -- I

15 mean --

16       MR. AVITABILE:  No, no, no.

17       CHAIRPERSON HOOD:  But no, no, he's going to

18 already be out there because one thing I do not want

19 to hear is that we did something in July and August

20 when I know the community groups are on vacation.

21       MS. SCHELLIN:  He's going to come in June.

22       CHAIRPERSON HOOD:  He's going to come in

23 June.  And one thing I do want to assure you, that I

24 served as the president of a civic association for 20

25 years, and we didn't do anything in July and August,

1    and I don't play that down here because people do try

2    to do things in July and August, and everybody knows

3    I don't like doing stuff in July and August, even

4    though we are finishing up our stuff that we have

5    done previously, we're not going to do that to the

6    community.

7              MS. SCHELLIN:  Right.

8              CHAIRPERSON HOOD:  So, they're going to go

9    out in June.

10             MS. SCHELLIN:  Yes, so we need the ANC --

11             CHAIRPERSON HOOD:  And we're going to deal

12   with it in July.

13             MS. SCHELLIN:  Right.  So, we need the ANC to

14   schedule them in June, and then we could have your

15   submission, the applicant to make their submissions a

16   week later by 3:00 p.m. on June 20th.  And then the

17   ANC would have an opportunity to respond to those

18   submissions to submit their report, or follow-up by

19   3:00 p.m. on June 27th, 3:00 p.m.  Draft findings of

20   facts, conclusions of law would be due by 3:00 p.m.

21   also on June 27th, and then we can put this on our

22   July 10th meeting agenda for consideration.

23             Does that work?

24             CHAIRPERSON HOOD:  Okay.  We have anything

25   else?

Exhibit N  2079

1          MS. SCHELLIN:  That's it.

2          CHAIRPERSON HOOD:  All right.  I want to

3    thank everyone for their participation tonight, and

4    this hearing is adjourned.

5          [Whereupon, the public hearing adjourned at

6    10:32 p.m.]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25