# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GRETA FULLER**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>**DISTRICT OF COLUMBIA DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT**, *et al.*,<br><br>    **Defendants.** | **Civil Action No. 18-872 (EGS)** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE DISTRICT OF COLUMBIA DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

# Table of Contents

Tables of Authorities.................................................................................................iii

Introduction............................................................................................................... 1

Background ................................................................................................................ 2

I.      The District's Development Policies Provide High-Quality Housing and Economic
        Opportunity.................................................................................................... 2

        A.      The District's Creative Economy Strategy ........................................... 3

        B.      The New Communities Initiative........................................................... 4

II.     Plaintiffs' Allegations ................................................................................... 5

Standards of Review ................................................................................................. 5

I.      Federal Rule of Civil Procedure 12(b)(1) ..................................................... 5

II.     Federal Rule of Civil Procedure 12(b)(6) ..................................................... 6

Argument .................................................................................................................. 7

I.      Plaintiffs' Claims are Non-Justiciable. .......................................................... 7

        A.      Plaintiffs Lack Standing to Sue Because They Have Not Plausibly Alleged They
                Will Experience an Injury in Fact........................................................... 7

        B.      Plaintiffs' Claims Raise Political Questions Not Fit for Judicial Resolution. ........ 9

        C.      Plaintiffs' Claims Are Not Ripe Because the DCZC Has Yet to Address the Issue
                Plaintiffs' Raise in This Lawsuit Concerning the Barry Farm Redevelopment. .. 12

II.     Plaintiffs Have Failed to Allege Intentional Discrimination So Their Geographic
        Discrimination (Count One), Source of Income Discrimination (Count Two), and
        Discriminatory Animus (Count Five) Claims Fail........................................... 13

        A.      Plaintiffs' Equal Protection and Title VI Claims Lack Merit Because Plaintiffs
                Fail to Plausibly Allege that the District Created the Development Policies with
                the Intent to Discriminate...................................................................... 13

        B.      Plaintiffs Have Failed to Allege a Due Process Violation. ................... 17

        C.      Plaintiffs' DCHRA Claim of Intentional Discrimination Lacks Merit Because
                Plaintiffs Have Not Plausibly Alleged that the District Acted with the Intent to
                Discriminate in Violation of the DCHRA. ........................................... 18

III.     Plaintiffs Fail to State a Disparate Impact Claim Under the DCHRA, the FHA, and Title VI (Count Three)................................................................................................. 18

    A.     Plaintiffs Cannot Assert a Disparate Impact Claim Under Title VI. ................... 19

    B.     Plaintiffs' Disparate Impact Claim Does Not Target Actions Covered by the DCHRA or FHA. ............................................................................................... 19

    C.     Plaintiffs Fail to Plausibly Allege the District's Development Policies Have a Discriminatory Effect on a Protected Group. ..................................................... 20

IV.     Plaintiffs Have Not Plausibly Alleged a First Amendment Violation (Count Four)........ 23

    A.     The Development Policies Do Not Violate Plaintiffs' Right to Freedom of Association.......................................................................................................... 23

    B.     The Development Policies Do Not Violate Plaintiffs' Rights Under the Establishment Clause. ....................................................................................... 24

V.     Plaintiffs Have Not Plausibly Alleged a Conspiracy (Count Six) .................................. 25

    A.     Plaintiffs Have Not Plausibly Alleged an Agreement to Participate in an Unlawful Act....................................................................................................................... 26

    B.     Plaintiffs Have Not Plausibly Alleged an Injury Caused by an Unlawful Act. ..... 27

VI.     All District Defendants Should be Dismissed and the District of Columbia Should be Substituted as the Proper Defendant. .................................................................................. 27

    A.     The District Agencies Should Be Dismissed as Not Suable................................ 27

    B.     The District Should Be Substituted for The Current Official Capacity Defendants. ........................................................................................................................... 28

    C.     The Former Official Capacity Defendants Should Be Dismissed as Moot. ......... 28

Conclusion ..................................................................................................................... 29

## TABLES OF AUTHORITIES

### Cases

*Adair v. England*, 183 F. Supp. 2d 31 (D.D.C. 2002).................................................... 16

*Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963 (D.C. Cir. May 3, 2011).......................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 6, 15

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) ............................................. 28

*Baker v. Carr*, 369 U.S. 186, 210-11 (1962) ...................................................................... 10, 11

*Bank of Am. Corp. v. City of Miami*, 581 U.S. ___, 137 S. Ct. 1296 (2017) ............................. 19

*Barry Farm Tenants and Allies Ass'n v. D.C. Zoning Comm'n*, 2018 D.C. App. LEXIS 161 (D.C.

    April 26, 2018) (*BFTAA I*) ........................................................................................... 4, 27

*Barry Farm Tenants and Allies Association v. Housing Authorities*, 2018 U.S. Dist. LEXIS 71559

    (D.D.C. Apr. 30, 2018) (*BFTAA II*) .............................................................................. 12

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ............................... 24

*BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13 (D.D.C. 2015) .................................................. 14, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................... 6

*Bonham v. District of Columbia Library Admin.*, 989 F.2d 1242 (D.C. Cir. 1993) ..................... 24

*Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) .................................................................. 17

*Boumediene v. Bush*, 551 U.S. 1160 (2007) ............................................................................ 17

*Bowie v. Maddox*, 642 F.3d 1122 (D.C. Cir. 2011) ................................................................. 26

*Boykin v. Fenty (Boykin II)*, 650 Fed. Appx. 42 (D.C. Cir. 2016) ........................................ 20, 21

*Boykin v. Gray (Boykin I)*, 895 F. Supp. 2d 199 (D.D.C. 2013) ............................................. 21

*Bush v. Butler*, 521 F. Supp. 2d 63 (D.D.C. 2007) ............................................................ 25, 26

*Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71 (D.D.C. 2003) ....................................... 19

*China Trade Center, L.L.C. v. China Trade Ctr., L.L.C. v. Washington Metro. Area Transit Auth.*,

    Case No. 99-7029, 1999 U.S. App. LEXIS 19433 (D.C. Cir. 1999) (*per curiam*) .................. 16

*China Trade Center, L.L.C. v. Washington Metro. Area Transit Auth.*, 34 F. Supp. 2d 67 (D.D.C.

    1999) ............................................................................................................................. 16

*City of Dallas v. Stanglin*, 490 U.S. 19 (1989) .......................................................... 23

*Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120 (3d Cir. 2002)....................... 14

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)................................... 26

*DaimlerChrysler v. Cuno*, 547 U.S. 332 (2006) ........................................................... 9

*District of Columbia v. John R. Thompson Co.*, 346 U.S. 100 (1953) ........................ 10

*Doe v. District of Columbia*, 2008 U.S. Dist. LEXIS 110348 (D.D.C. Nov. 12, 2008).............. 28

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)........................ 6

*Estate of Phillips v. Dist. of Columbia*, 257 F. Supp. 2d 69 (D.D.C. 2003) ................ 25

*Estate of Phillips v. Dist. of Columbia,* 455 F.3d 397 (D.C. Cir. 2006) ...................... 25

*Flast v. Cohen*, 392 U.S. 83, 94-95 (1968) .................................................................. 7

*Friends of McMillan Park v. D.C. Zoning Comm'n*, 149 A.3d 1027 (D.C. 2016) ................ 17, 27

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 185 (U.S. 2000).............. 8

*Galveston Open Gov't Project v. United States HUD*, 17 F. Supp. 3d 599 (S.D. Tex. 2014) ... 8, 9

*Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1 (D.C. 1987) (*en banc*)........................................................................ 20

*Ginn v. Tex. Wired Music, Inc.*, No. SA-99-CA-553-FB, 2000 U.S. Dist. LEXIS 22511 (W.D. Tex. Aug. 10, 2000) .................................................................................. 21

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) .............................................................. 14

*Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366 (6th Cir. 2007) .................................................................... 21

*Graves v. United States*, 961 F. Supp. 314 (D.D.C. 1997) .......................................... 25

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) ........................................................ 21

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ................................................. 25

*Hall v. Clinton*, 285 F.3d 74 (D.C. Cir. 2002) ............................................................. 25

*Harris v. City of St. Clairsville*, 330 F. App'x 68 (6th Cir. 2008) ................................. 26

*Harris v. FAA*, 353 F.3d 1006 (D.C. Cir. 2004) .......................................................... 12

*Hessey v. Burden*, 615 A.2d 562 (D.C. 1992) .............................................................. 19

*Hodel v. Indiana*, 452 U.S. 314 (1981) ........................................................................ 16

*Hollingsworth v. Perry*, 570 U.S. __, 133 S.Ct. 2652, 2661 (2013) .......................... 7, 8

*Huddle v. Reagan*, Civil Action No. 88-3130, 1991 U.S. Dist. LEXIS 7070 (D.D.C. May 24, 1991)

............................................................................................................................. 28

*Hunt v. Cromartie*, 526 U.S. 541 (1999) ..................................................................... 14

*Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086 (6th Cir. 1985) ........................... 9

*Kadi v. Geithner*, 42 F. Supp. 3d 1 (D.D.C. 2012) ...................................................... 24

*Kelley v. District of Columbia*, 893 F. Supp. 2d 115 (D.D.C. 2012) ........................... 27

*Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142 (D.D.C. 2014) ...................... 19

*Kundrat v. District of Columbia*, 106 F. Supp. 2d 1 (D.D.C. 2000) ............................ 27

*Laughlin v. Holder*, 923 F.Supp. 2d 204, 209 (D.D.C. 2013) ........................................ 6

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ................................................................... 24

*Lewis v. Casey*, 518 U.S. 343 (1996) .............................................................................. 8

*Lopez v. District of Columbia*, 268 F. Supp. 3d 256 (D.D.C. 2017) ........................... 28

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ....................................... 8

*Marbury v. Madison*, 5 U.S. 1 (Cranch) 137, 170 (1803) .......................................... 10

*McCreary Cty., Ky. v. ACLU of Ky*, 545 U.S. 844 (2005) ........................................... 24

*McCreary v. Heath*, Civil Action No. 04-0623, 2005 U.S. Dist. LEXIS 34082 (D.D.C. Sept. 26,

2005) ..................................................................................................................... 26

*Murphy v. County of Yavapai*, Civil Action No. 04-1861-PCT-DGC, 2006 U.S. Dist. LEXIS 63732
(D. Ariz. Aug. 23, 2006) ...................................................................................... 28

*Mykonos v. United States*, 59 F. Supp. 3d 100, 103 (D.D.C. 2014) ............................................... 5

*Nat'l Cmty. Reinvestment Coalition v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70
(D.D.C. 2008) ...................................................................................... 22

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ................................................ 12

*Proctor v. District of Columbia*, 74 F. Supp. 3d 436 (D.D.C. 2014) ............................................. 28

*Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 4 (D.D.C. 2007) ........................... 5

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ........................................................ 23, 24

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ............................................................... 6

*Schmidt v. Boston Hous. Auth.*, 505 F. Supp. 988 (D. Mass. 1981) ............................................. 9

*Sculimbrene v. Reno*, 158 F. Supp. 2d 8 (D.D.C. 2001) ...................................................... 25

*Sevier v. Lowenthal*, Civil Action No. 17-570, 2018 U.S. Dist. LEXIS 48724 (D.D.C. Mar. 26,
2018) ...................................................................................... 24

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ............................................................... 12

*Smith v. Henderson*, 54 F. Supp. 3d 58 (D.D.C. 2014) (*Smith II*) ........................................ 14, 19

*Smith v. Henderson*, 982 F. Supp. 2d 32 (D.D.C. 2013) (*Smith I*) .......................................... 14

*Tabb v. District of Columbia*, 477 F. Supp. 2d 185 (D.D.C. 2007) ............................................. 27

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, ___ U.S. ___, 135 S. Ct.
2507 (2015) .................................................................................. 11, 19, 20, 21

*Toth v. Wells Fargo Bank, N.A.*, 82 F. Supp. 3d 373, 376 (D.D.C. 2015) ..................................... 6

*United States ex rel. Tudbury v. Pacific Architects & Engineers, Inc.*, 270 F. Supp. 3d 146 (D.D.C.
2017) ...................................................................................... 15

*Vance* v. *Bradley*, 440 U.S. 93, 97 (1979) ................................................................. 11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ............... 14

*Village of Belle Terre v. Boraas*, 416 U.S. 1 (1974) ..................................................... 15

*Village of Bensenville v. FAA*, 376 F.3d 1114 (D.C. Cir. 2004) .................................. 12

*Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117 (D.D.C. 2011) .................. 4, 27

*Warth v. Seldin*, 422 U.S. 490 (1975) ........................................................................... 11

*Watson v. Clark*, 716 F. Sup. 1354 (D. Nev. 1989) ...................................................... 25

## Statutes

42 U.S.C. § 1983 ...................................................................................................... 12, 28

42 U.S.C. § 1985 ...................................................................................................... 25, 26

42 U.S.C. § 3604 ........................................................................................................... 19

42 U.S.C. § 3605 ........................................................................................................... 19

D.C. Code § 1-204 ......................................................................................................... 17

D.C. Code § 2-1402 ....................................................................................................... 18

D.C. Code § 6-202 ......................................................................................................... 26

D.C. Code § 6-215 ......................................................................................................... 26

D.C. Human Rights Act, D.C. Code Title 2, Chapter 14 ...................................... passim

District of Columbia Housing Authority Act of 1999, D.C. Law 13-105, 47 D.C. Reg. 1325 (May 26, 2000) ............................................................................................................... 26

District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93-198, 87 Stat. 774 ........................................................................................................ 11, 17

Fair Housing Act, Title VIII of the Civil Rights Act of 1968, Pub. L. 90-284, Apr. 11, 1968, 82 Stat. 81 ............................................................................................................... passim

Title VI of the Civil Rights Act of 1964, Pub. L. 88-352, July 2, 1964,78 Stat. 241 ............ passim

Zoning Act of 1920, Pub. L. 75-153, 41 Stat. 500....................................................................... 10

### Other Authorities

Bell Clement, *The White Community's Dissent from "Bolling"*, WASHINGTON HIST. SOC. (Fall/Winter, 2004/2005) .......................................................................................................... 2

Richard Florida, *The New Urban Crisis, How Our Cities are Increasing Inequality, Deeping Segregation, and Failing the Middle Class—and What We Can Do About It*, at 78 (Basic Books 2017) ........................................................................................................................................ 23

*The Old Southwest – Historic Resource Documentation and Preservation Plan* at 26, University of Maryland Historic Preservation Studio (Fall 2005) ............................................................. 2

*Unemployment in the Washington Area by County – March 2018*, BUREAU OF LABOR STATISTICS (May 11, 2018)...................................................................................................................... 4

### Constitutional Provisions

Art. III, § 2 ................................................................................................................................. 7

District Clause of the Constitution............................................................................................. 10

Fifth Amendment to the Constitution ......................................................................... 1, 5, 13, 14

First Amendment to the Constitution................................................................................. passim

## INTRODUCTION

Plaintiffs[1] allege that the District of Columbia (the District) has engaged in a conspiracy to implement economic and residential development policies that favor housing for a "creative class" (millennials who are college educated) over "legacy DC residents" (low income African-Americans families). They allege these policies discriminate against them in violation of the First and Fifth Amendments, Title VI of the Civil Rights Act of 1964 (Title VI), the Fair Housing Act (FHA), and the D.C. Human Rights Act (DCHRA).

The District understands plaintiffs' concerns about the changing natures of their communities and the challenges they and others face in securing the homes and neighborhoods they desire. Indeed, the District has invested great time and effort to address such concerns for all of its residents. Unfortunately, the issues of which plaintiffs complain are not ones that are properly before this Court; plaintiffs' claims are non-justiciable because:  plaintiffs lack standing to bring this lawsuit, their claims fall under the political question doctrine, and the issues are not ripe for adjudication. Even if these matters were justiciable, plaintiffs fail to state a claim upon which relief can be granted. In particular, plaintiffs' claims of geographic discrimination under the Fifth Amendment and DCHRA, source of income discrimination under Title VI and the DCHRA, and discriminatory animus under Title VI fail because plaintiffs do not plausibly allege that the District implemented its development policies with the intent to discriminate. Plaintiffs' disparate impact claim under the DCHRA, FHA, or Title VI should not be sustained because plaintiffs' allegations fail to implicate those provisions of law. Even if they did, plaintiffs fail to allege that the District's development policies have a disproportionate effect on a protected group, result in segregation, or

---

[1] Plaintiffs are three District of Columbia residents and C.A.R.E., an organization allegedly comprised of African-American residents living east of the Anacostia River.

that the policies create "artificial, arbitrary, and unnecessary barriers" to housing. And plaintiffs have failed to support any conspiracy claim with plausible allegations of an agreement between two parties to conspire who then committed an illegal act that caused plaintiffs harm. Regardless whether plaintiffs state any claim for relief, their claims against various District agencies should be dismissed because the agencies are not suable entities. If any of plaintiffs' claims survive, the Court should substitute the District of Columbia for those agencies and the official-capacity District Defendants, and dismiss all claims against former official-capacity District Defendants as moot.

## BACKGROUND

### I.   The District's Development Policies Provide High-Quality Housing and Economic Opportunity.

The demographics and economic prosperity of neighborhoods in the District of Columbia have changed over time because of market forces and changes in society.[2] Indeed, there has been a shift in the entire country "from an Industrial Economy to a Creative Economy [that] affects the production and distribution of products and services and presents numerous opportunities for policymakers looking to counter the ill effects of the recession and of deindustrialization through targeted initiatives." Creative Economy Strategy for the District of Columbia at 10, Compl. Ex. E at 0152 [4-3 at 53]. In recent decades, the District has adopted development policies to address these changes and ensure that all residents live in thriving neighborhoods, receive appropriate social services, and can achieve their goals in life.

---

[2] *See, e.g.*, Bell Clement, *The White Community's Dissent from "Bolling,"* WASHINGTON HIST. SOC. (Fall/Winter, 2004/2005), *available at* http://www.jstor.org/stable/40073399 (last accessed June 22, 2018); *The Old Southwest – Historic Resource Documentation and Preservation Plan* at 26, University of Maryland Historic Preservation Studio (Fall 2005), *available at* https://www.swdc.org/wp-content/uploads/2015/08/University-of-Maryland-Old-SW-Report.pdf (last accessed June 22, 2018).

A. **The District's Creative Economy Strategy**

Although the District has not suffered from deindustrialization like other cities, the "District is in a risky economic situation similar to so many industrialized cities" because its "economy [has been historically] based heavily on a single economic driver, the federal government, making the city reliant on the budgeting of an increasingly divided Congress." *Id.* To counteract this dependency, in 2007, the District launched a Creative Economy Strategy "aimed at leveraging the city's creative assets to create new jobs and attract new residents and innovative companies to the District." Compl. Ex. C at 0104 [4-3 at 6]; Creative Economy Strategy for the District of Columbia at 10, Compl. E at 0152 [4-3 at 53]. A September 6, 2007 press release by the Office of the Deputy Mayor for Planning and Economic Development (DMPED) explained that it intended to launch a Creative Action Agenda to "lay out an action plan for strengthening the District's creative economy, expanding employment and business development opportunities and enhancing neighborhoods." *Id.*

The Creative D.C. Action Agenda (Action Agenda), released in 2010, contextualized the District's Creative Economy Strategy. It explained that "[t]he city's 'creative sector'—a phrase referring to enterprises in and for which creative content drives both economic and cultural value, including businesses, individuals, [and] organizations engaged in every stage of the creative process—acts as a local economic driver creating a significant number of jobs, income, and revenues for the city and its residents." Ex. A, Action Agenda at 7. The Action Agenda provided a blueprint for, among other things, (1) revitalization "of underserved neighborhoods through arts and creative uses that generate new business creation, employment for residents, and income for communities"; and (2) generation of new work opportunities "for youth, entrepreneurs in the creative economy, and the underemployed …." *Id.* at 7-8.

In 2014, the District issued a Five-Year Economic Development Strategy that "established an analytical framework that guided the strategic-planning process." Compl. ¶ 66 and Ex. E at 0156 [4-3 at 57]. "The Five-Year Economic Development Strategy is the District's first tactical roadmap for sustained, sector-driven economic development." *Id.* It also reported on economic gains; between 2001 and 2012, the District experienced a 12-percent increase in private sector job growth. Ex. E at 0146 [4-3 at 47]. During the same period, wages increased by 37 percent. *Id.* This has led to "[s]truggling neighborhoods … becom[ing] centers of economic opportunity[,]" and "[t]he unemployed … finding purposeful work[.]" *Id.* at 0151 [52]. The unemployment rate in the District has fallen "from 11.3 percent in September 2011 to 7.5 percent in April 2014" to 5.7 percent in March 2018. *Id.*; *Unemployment in the Washington Area by County – March 2018*, BUREAU OF LABOR STATISTICS (May 11, 2018), *available at* https://www.bls.gov/regions/mid-atlantic/news-release/pdf/unemployment_washingtondc.pdf (last accessed June 25, 2018).

## B. The New Communities Initiative

The District's plan for enhancing neighborhoods includes its New Communities Initiative, "a District program aimed at transforming select public and low-income housing developments into mixed-income, mixed-use communities[,]" *Barry Farm Tenants and Allies Ass'n v. D.C. Zoning Comm'n*, 2018 D.C. App. LEXIS 161, at *7 n.6 (D.C. April 26, 2018) (*BFTAA I*), and intends to provide "One for One Replacement," meaning the overall number of public housing units is not decreased for purposes of development. *New Communities Initiative (NCI)*, DMPED, *available at* https://dmped.dc.gov/page/new-communities-initiative-nci (last visited June 21, 2018). It is "designed to improve the quality of life for families and individuals living in four neighborhoods in Washington, DC:  Northwest One (Ward 6), Barry Farm (Ward 8), Lincoln Heights/Richardson Dwellings (Ward 7), and Park Morton (Ward 1)." *Id.*; Compl. ¶ 147. "The New Communities Initiative will also provide the human services necessary to help prepare

residents [to] take advantage of the new economic opportunities that are coming their way." *Park Morton - New Communities Initiative (NCI)*, DMPED, available at https://dmped.dc.gov/page/ park-morton-new-communities-initiative-nci (last visited June 21, 2018).

## II.     Plaintiffs' Allegations

On April 14, 2018, plaintiffs filed their lawsuit, alleging the District's development policies, including the Creative Economy Strategy and New Communities Initiative, have led to the exodus of economically disadvantaged African-American families from their neighborhoods. Plaintiffs specifically allege:  geographic discrimination in violation of the Fifth Amendment and DCHRA (Count One); age and source of income discrimination in violation of Title VI and the DCHRA (Count Two); disparate impact in violation of the FHA and the DCHRA (Count Three); violation of plaintiffs' First Amendment rights of freedom of association and under the Establishment Clause (Count Four); racial animus in violation of Title VI (Count Five); and conspiracy to violate their Title VI rights (Count Six). *Id.* ¶¶ 229-355. Yet plaintiffs' allegations appear to be in conflict. On the one hand, plaintiffs allege that the District has, in recent years, either failed to combat or "intentionally resegregated neighborhoods." *See*, *e.g.*, Compl. ¶¶ 1, 31. And on the other hand, plaintiffs complain equally about "current plans that are underway to actively racially integrate their neighborhoods." *See*, *e.g.*, *id.* ¶¶ 2, 27, 137.

## STANDARDS OF REVIEW

## I.     Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), "[a] court must dismiss a case when it lacks subject matter jurisdiction." *Mykonos v. United States*, 59 F. Supp. 3d 100, 103 (D.D.C. 2014) (quoting *Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 4 (D.D.C. 2007)). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that can be drawn from them." *Id.* (quoting

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "The court need not, however, accept as true 'a legal conclusion couched as a factual allegation' or make inferences that are unsupported by the facts set out in the complaint." *Id.* (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)) (other citation omitted). "[I]n deciding a 12(b)(1) motion, a court need not limit itself to the complaint; rather, it 'may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction in the case.'" *Toth v. Wells Fargo Bank, N.A.*, 82 F. Supp. 3d 373, 376 (D.D.C. 2015) (citations omitted).

## II.   Federal Rule of Civil Procedure 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.*, at 678 (quoting *Twombly*, 550 U.S. at 557). The Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice," including administrative proceedings and court filings that are a matter of public record. *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp. 2d 204, 209 (D.D.C. 2013).

**ARGUMENT**

**I.**     **Plaintiffs' Claims are Non-Justiciable.**

Plaintiffs' claims are non-justiciable because plaintiffs lack standing to bring this lawsuit, the issues fall under the political question doctrine, and the claims are not ripe for adjudication. "Article III of the Constitution confines the judicial power of federal courts to deciding actual 'Cases' or 'Controversies.'" *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing Art. III, § 2). The words "Cases" and "Controversies" "limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 94-95 (1968). They also "define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." *Id*. at 95. "Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine." *Id*.

The concept of justiciability is "illustrated by the various grounds upon which questions sought to be adjudicated in federal courts have been held not to be justiciable." *Id*. "Thus, no justiciable controversy is presented when the parties seek adjudication of only a political question, … when there is no standing to maintain the action[,]" and when a claim is not ripe for adjudication. *Id*.

**A.**     **Plaintiffs Lack Standing to Sue Because They Have Not Plausibly Alleged They Will Experience an Injury in Fact.**

When a plaintiff's challenge to government policies is based on an alleged injury widely shared in an undifferentiated way with many people, the plaintiff usually lacks standing. To establish standing, the party invoking federal jurisdiction bears the burden of demonstrating three "irreducible constitutional minimum" requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560-61 (1992); *Hollingsworth*, 570 U.S. at 704. A plaintiff must have suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent" and it must be "fairly … traceable to the challenged action of the defendant" and it must be "likely … the injury will be redressed by a favorable decision. These basic requirements—injury-in-fact, causation, and redressability—must be proven separately as to each request for relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 185 (2000) ("a plaintiff must demonstrate standing separately for each form of relief sought"); *Lewis v. Casey*, 518 U.S. 343, 358 n. 6 (1996) ("standing is not dispensed in gross").

In *Warth v. Seldin*, 422 U.S. 490 (1975), the plaintiffs alleged a town's zoning ordinance "effectively excluded persons of low and moderate income from living in the town, in contravention of [the plaintiffs'] First, Ninth, and Fourteenth Amendment rights …." *Id.* at 493. The Supreme Court held the plaintiffs lacked standing to maintain such claims because merely being "a person of low or moderate income and coincidentally, … a member of a minority racial or ethnic group," did not show that they had been injured *personally*. *Id.* , at 502-508. That the plaintiffs "share attributes common to persons who may have been excluded from residence in the town is an insufficient predicate for the conclusion that petitioners themselves have been excluded, or that the respondents' assertedly illegal actions have violated their rights." *Id.* , at 502.

In *Galveston Open Gov't Project v. United States HUD*, 17 F. Supp. 3d 599 (S.D. Tex. 2014), individual plaintiffs sought to change the state and local government's development plan for public housing. *Id.* at 600. Among other things, the individual plaintiffs asserted the government agencies would be "intentionally perpetuat[ing] and refus[ing] to disestablish racial segregation" and made claims for racial and disability discrimination under Titles VI and VIII of the FHA. *Id.* at 602 (alteration original). Plaintiffs' alleged injury was insufficiently "actual or

imminent" to convey standing. *Id.* at 604. The same was true of the organizational plaintiff; its "stated interest in an issue is not enough" and there were "no allegations that [it] engage[d] in the types of activities that often establish standing." *Id.* at 613.

Similarly, here, plaintiffs have not alleged that the District Defendants' actions have or will cause them to experience an "actual or imminent" injury.[3] Plaintiffs essentially contend that the development policies result in high density development that might, some day, force them—or C.A.R.E. members—to leave their neighborhoods. But the "constitutional and statutory claims [plaintiffs] assert provide a right to be free of discrimination, not a right to have public housing in the neighborhood of their choice." *Galveston Open Gov't Project*, 17 F. Supp. 3d at 605 (citing *Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1103 (6th Cir. 1985); *Schmidt v. Boston Hous. Auth.*, 505 F. Supp. 988, 995 (D. Mass. 1981)). Plaintiffs have not alleged that they have been personally injured by the District's development policies. And plaintiffs have not alleged that they were personally discriminated against in attempting to secure housing or that they have taken any of the steps necessary to attain standing. In the absence of plaintiffs establishing they have experienced an injury in fact, they cannot establish that the District Defendants caused them injury, or that the injury is redressable by a favorable court decision. Plaintiffs' difficulties might equally be "the consequence of the economics of the area housing market, rather than of [the District's] assertedly illegal acts." *Warth,* 422 U.S. at 506. Simply put, plaintiffs lack standing.

### B.   Plaintiffs' Claims Raise Political Questions Not Fit for Judicial Resolution.

Plaintiffs appear to ask the Court to overturn the District's development policies, particularly the policies that allegedly permit high-density housing developments with small units.

---

[3] Plaintiffs must "demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler v. Cuno*, 547 U.S. 332, 352 (2006). Plaintiffs' claims all challenge the District's land-use policies. Thus, the District does not conduct a claim-by-claim discussion of plaintiffs' constitutional standing.

*See*, *e.g.*, Compl. ¶ 1, 23, 326. To the extent plaintiffs are challenging these subjective, executive-level decisions about the District's housing development priorities, their claims are nonjusticiable under the political question doctrine.

Long ago, Chief Justice John Marshall articulated the principal behind the political question doctrine: "questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). Over one hundred and fifty years later, the Supreme Court attempted to illuminate the "contours" of the doctrine in *Baker v. Carr*, 369 U.S. 186, 210-11 (1962). Among other things, the Court explained that "[p]rominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion...." *Id*. at 217. Dismissal under the political question doctrine is appropriate because the referenced formulations of the political question doctrine are inextricable from the case. *See id*.

### 1. Formulating Housing Policy is Left to the District of Columbia Government.

Under the District Clause of the Constitution, Congress possesses plenary authority over the District, including the power to delegate that authority. Art. I, sec. 8, cl. 17; *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 109 (1953). Congress created the D.C. Zoning Commission (DCZC) in 1920 and gave it the authority and power "to protect the public health, secure the public safety, and to protect property in the District of Columbia." Zoning Act of 1920, Pub. L. 75-153, 41 Stat. 500. In 1973, Congress declared "[t]he Mayor [to] be the central planning agency for the District" and delegated legislative authority to the D.C. City Council. District of

Columbia Self-Government and Governmental Reorganization Act (the Home Rule Act), Pub. L. 93-198, 87 Stat. 774 (now codified at D.C. Code §§ 1-204.23 and 204.04, respectively, of the D.C. Charter) "[Z]oning laws and their provisions, long considered essential to effective urban planning, are peculiarly within the province of state and local *legislative authorities*." *Warth*, 422 U.S. at 508 n.18 (emphasis added).

> ### 2. This Case Lacks a Manageable Standard for Resolution Without the Kind of Initial Policy Determination Properly Left to the Political Branches of Government.

In addition, absent an initial policy determination about how to choose housing projects, there is no way to determine whether plaintiffs are correct that the District has failed to satisfy its obligations. "[A]n initial policy determination of [this] kind [is] clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. The Court is also not well positioned to weigh the competing "mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture)" that go into setting housing policy. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2523 (2015). "These factors contribute to a community's quality of life and are legitimate concerns for housing authorities." *Id.*

There is, for example, no statute declaring the proper ratio of studio and one-bedroom units to two- or three-bedroom units in a city, a neighborhood, or in any one development. Compl. ¶¶ 26, 181, 221, 312. The Court cannot look to any law or regulation to decide whether increased density in one place will pay for greater services somewhere else, nor whether such a trade is appropriate. *Id.* ¶¶ 68, 157, 173. These are subjective questions of values and may require trade-offs based on uncertain conclusions. The elected branches of government exist to handle such issues. *Vance* v. *Bradley*, 440 U.S. 93, 97 (1979) (footnote omitted) ("The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic

process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.").

**C.** **Plaintiffs' Claims Are Not Ripe Because the DCZC Has Yet to Address the Issue Plaintiffs' Raise in This Lawsuit Concerning the Barry Farm Redevelopment.**

To the extent plaintiffs challenge the effect redevelopment may have on their surrounding neighborhoods, that issue is not ripe for judicial review. Ripeness is an independent requirement for judicial review. *Shays v. FEC*, 414 F.3d 76, 95 (D.C. Cir. 2005). "[R]ipeness 'requires [the Court] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.'" *Id.* (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (other citation omitted). "[T]he fitness analysis requires the court to consider both whether the context in which the issue is presented is sufficiently concrete and conducive to judicial determination, and whether deciding the issue now would violate principles of judicial restraint and efficiency." *Alcoa Power Generating Inc. v. FERC*, 643 F.3d 963 (D.C. Cir. May 3, 2011). The hardship analysis requires the Court to consider "'not whether the parties have suffered any "direct hardship," but rather whether postponing judicial review would impose an undue burden on them or would benefit the court.'" *Village of Bensenville v. FAA*, 376 F.3d 1114, 1120 (D.C. Cir. 2004) (quoting *Harris v. FAA*, 353 F.3d 1006, 1012 (D.C. Cir. 2004)).

Plaintiffs allege the Barry Farm redevelopment may affect one of them. This Court has already dismissed an analogous challenge to that redevelopment plan on ripeness grounds. In *Barry Farm Tenants and Allies Association v. Housing Authorities*, 2018 U.S. Dist. LEXIS 71559 (D.D.C. Apr. 30, 2018) (*BFTAA II*), the plaintiffs brought a putative class action under 42 U.S.C. § 1983, consisting of two proposed classes. *Id.* at *4. One of the classes "consiste[d] of Barry Farm families with children, who allege[d] that the redevelopment plan discriminates against them based

on their familial status." *Id.* That class of plaintiffs alleged that the defendants violated the FHA by adopting a redevelopment plan for Barry Farm that will significantly reduce the number of multiple bedroom apartments, "and thus will have a disparate impact or disproportionate effect on families and children." *Id.* at *13. This Court held that the claim was not ripe for review because "[w]hile the plaintiffs are deservedly anxious about their ability to return to their community, the unit mix is clearly not final; it has neither been proposed to the DCZC, nor adopted by it." *Id.* at *2, *19.

Here, the Court should find that plaintiffs' claims are not fit for judicial review to the extent they are based on the Barry Farm redevelopment or decisions by the DCZC. Plaintiffs' challenge to the redevelopment stems from the relocation process of residents and the perceived housing availability after redevelopment. *See* Compl. ¶¶ 176-77, 200-01, 239, 258-64. The Court, however, cannot evaluate the effect on Barry Farm residents until after the redevelopment plans have been finalized.

## II.    Plaintiffs Have Failed to Allege Intentional Discrimination So Their Geographic Discrimination (Count One), Source of Income Discrimination (Count Two), and Discriminatory Animus (Count Five) Claims Fail.

### A.    Plaintiffs' Equal Protection and Title VI Claims Lack Merit Because Plaintiffs Fail to Plausibly Allege that the District Created the Development Policies with the Intent to Discriminate.

Even if plaintiffs' claims were justiciable, the Court should dismiss the claims on the merits. Plaintiffs assert Counts One, Two, and Five under the Equal Protection Clause of the Fifth Amendment, Title VI, and the DCHRA. Plaintiffs essentially allege in those counts that the District has intentionally given preference to the "creative class" at the cost of displacing the "legacy class" in its development policies and enforcement of zoning regulations, leading to segregated neighborhoods rather than racially integrated neighborhoods. *See* Compl. ¶¶ 1, 155, 165-66, 218, 229, 221-22, 224-28, 306-318, 338-353. This, they allege, constitutes intentional geographical

discrimination in violation of the Equal Protection Clause of the Fifth Amendment and the DCHRA (Count One), intentional age and source of income discrimination in violation of Title VI and the DCHRA (Count Two), and discriminatory animus in violation of Title VI (Count Three). *Id.* ¶¶ 229-30, 295-300, 303, 318, 348-353.

Plaintiffs' claims of geographical discrimination in violation of the Equal Protection Clause and Title VI—Counts One and Two, *see* Compl. ¶¶ 229-30, 295-300, 303, 318, 348-353—"require a showing of <u>intentional</u> discrimination." *Smith v. Henderson*, 54 F. Supp. 3d 58, 68 (D.D.C. 2014) (*Smith II*) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977)) (emphasis in original); *see also BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015) (dismissing Equal Protection and Title VI claims because want of allegations "supporting its assertion of discriminatory intent ... makes the claim of discriminatory treatment less than plausible").

A plaintiff may prove an intentional discrimination claim in one of three ways:  (1) by "proffer[ing] a law or policy that explicitly classifies citizens on the basis of race"; (2) "claim[ing] that a facially neutral law or policy has been applied differently on the basis of race"; or (3) "show[ing] that a facially neutral law or policy that is applied evenhandedly is, in fact, motivated by discriminatory intent and has a racially discriminatory impact." *Smith v. Henderson*, 982 F. Supp. 2d 32, 49-50 (D.D.C. 2013) (*Smith I*) (citing *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Yick Wo. v. Hopkins*, 118 U.S. 356, 373-74 (1886); *Arlington Heights*, 429 U.S. at 265-66; *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)).

Plaintiffs do not specify under which approach they intend to proceed but all would fail. Plaintiffs challenge no law or policy that explicitly classifies anyone based on race. *See Smith I*, 982 F. Supp. at 50; *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 133 (3d Cir. 2002)

("land use ordinances that do not classify by race, alienage, or national origin, will survive an attack based on the Equal Protection Clause if the law is 'reasonable, not arbitrary' and bears 'a rational relationship to a (permissible) state objective.'") (quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8 (1974)). Plaintiffs do not allege a facially discriminatory policy.

Plaintiffs also do not plausibly allege the District promulgated its development policies with discriminatory intent. Plaintiffs' Complaint is filled with bald assertions of discriminatory intent. *See*, *e.g.*, ¶ 148 (alleged conspiracy of making the District "very welcoming for preferred residents" and seeking "to displace residents inimical to the creative economy"); ¶ 339 ("[t]he District knew implementing the Creative Economy would lead to income inequality"); ¶ 348 (the DCZC "acted with animus in enduring over ten years of purposefully erasing black communities with legacy DC residents"). Such "'generalized claims of discrimination cannot survive a motion to dismiss'" because the Court "need not 'accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint.'" *BEG Invs., LLC*, 34 F. Supp. 3d at 85 (quoting *Iqbal*, 556 U.S. at 678); *United States ex rel. Tudbury v. Pacific Architects & Engineers, Inc.*, 270 F. Supp. 3d 146, 157 (D.D.C. 2017).

Here, plaintiffs' allegations and exhibits to the Complaint establish that the New Communities Initiative and the Creative Economy Strategy "are meant to 'economically integrate' and 'revitalize'" communities "plagued with concentrated poverty, high crime, and economic segregation." Compl. ¶¶ 147, 149, 154, 225-26. In addition to providing increased employment opportunities with its Creative Economy Strategy, Compl. Ex. E [4-3 at 52] at 9, the District, through its New Communities Initiative has "generated new housing units and neighborhood facilities, and has provided social support and youth development services to hundreds of residents in its four selected neighborhoods." Compl. Ex. H at 0721 [5-3 at 70].

Plaintiffs also acknowledge that the Office of Planning (OP) has not "made explicit public pronouncements proclaiming a desire to destabilize African American neighborhoods nor increase inequality among them in order to disperse legacy residents …." Compl. ¶ 127. The District's Five Year Consolidated Plan's approach to housing includes the creation of "affordable housing that integrates neighborhoods racially, ethnically, and economically and [to] diversif[y] the District's affordable housing supply to include higher opportunity neighborhoods and Wards." Compl. ¶ 132; Ex. B, Excerpts of *Five Year Consolidated Plan for October 1, 2016 to September 31, 2021* at 138, DMPED (July 31, 2015).[4] In other words, the District "is committed to preserving affordable housing across the District." *Id.*; *see also New Communities Initiative* at 4 above.

In sum, the challenged programs are explicitly designed to improve the lives of all District residents. "Social and economic legislation … carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Hodel v. Indiana*, 452 U.S. 314, 331-32 (1981). Furthermore, "[w]ell-settled case law instructs courts to presume that government officials will conduct themselves properly. … 'government officials are presumed to act in good faith [so a] plaintiff must present "well-nigh irrefragable proof" of bad faith or bias on the part of government officials in order to overcome this presumption.'" *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) (quoting *China Trade Center, L.L.C. v. Washington Metro. Area Transit Auth.*, 34 F. Supp. 2d 67, 70-71 (D.D.C. 1999), *aff'd* Case No. 99-7029, 1999 U.S. App. LEXIS 19433 (D.C. Cir. 1999) (*per curiam*)). Plaintiffs have offered no such proof.

---

[4] The full version of the *Five Year Consolidated Plan for October 1, 2016 to September 31, 2021* is available at: https://dhcd.dc.gov/sites/default/files/dc/sites/dhcd/publication/attachments/FY16%20-%20FY20%20Consolidated%20Plan%20for%20the%20District%20of%20Columbia.pdf (last accessed June 21, 2018).

B.     **Plaintiffs Have Failed to Allege a Due Process Violation.**

To the extent plaintiffs attempt to make a due process challenge, regarding the actions of the DCZC or otherwise, *see* Compl. ¶ 297, their claims also fail because plaintiffs may obtain due process. Section 431 of the Home Rule Act, now codified at D.C. Code § 1-204.31, provides "[t]he [D.C.] Court of Appeals has jurisdiction of appeals … to review orders and decisions of any agency of the District." The Court should not, as plaintiffs suggest, ignore congressionally mandated jurisdiction and review orders of the DCZC "party status," meaning the weight it grants their testimony; the weight granted to ANC opinions; what constitutes "an arterial street;" and whether it acted "callously" or "with animus." Compl. ¶¶ 167, 232-35, 239, 267, 345-46. "When Congress acts pursuant to the powers it derives from the Constitution," it can "deprive a court of jurisdiction," and the District Clause gives Congress "exclusive" authority over the District of Columbia. *Boumediene v. Bush*, 476 F.3d 981, 995 (D.C. Cir. 2007), *vacated on other grounds at* 551 U.S. 1160 (2007); *see* Section I.B.1.

The D.C. Court of Appeals has repeatedly demonstrated its ability to address concerns of the sort plaintiffs raise. For example, in a case in which plaintiffs' counsel was involved, the Court of Appeals recently ordered "the [Zoning] Commission [to] explicitly address [plaintiffs'] arguments concerning issues of gentrification, land values, and displacement." *Friends of McMillan Park v. D.C. Zoning Comm'n*, 149 A.3d 1027, 1038 (D.C. 2016). Plaintiffs appear to concede this. Compl. ¶¶ 132, 178.[5] In response, the DCZC issued an Order on Remand that closely examined "displacement and increasing land values … taking place across the City," and

---

[5] The D.C. Court of Appeals has not found on the merits that the proposed projects would have violated the Constitution or any statute but, rather, that the record on which the case reached the court "failed to adequately address a variety of asserted adverse impacts." *Friends of McMillan Park*, 149 A.3d at 1037.

concluded "that it is important to have 'sound land use policies and development review procedures that mitigate the effects of competing and conflicting uses.'" Ex. C (Excerpts from Z.C. Order No. 13-14(6) (Sept. 14, 2017)) ¶ 221 (quoting District regulations), available at https://app.dcoz.dc.gov/Zdocs/getExhibit.aspx?case_id=13-14&exhibitNumber=960&email=1 (last accessed June 25, 2018).

> **C.**   **Plaintiffs' DCHRA Claim of Intentional Discrimination Lacks Merit Because Plaintiffs Have Not Plausibly Alleged that the District Acted with the Intent to Discriminate in Violation of the DCHRA.**

Counts One and Two also fail under the DCHRA. The DCHRA states, in relevant part, "it shall be an unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: race, … familial status, … source of income, or place of residence …." D.C. Code § 2-1402.73. Plaintiffs, however, have not alleged that the District has refused to "provide any facility, service, program, or benefit" to them. Plaintiffs have not alleged they have been denied access to housing by the District's overall housing policy, so their DCHRA challenge fails.

> **III.**   **Plaintiffs Fail to State a Disparate Impact Claim Under the DCHRA, the FHA, and Title VI (Count Three).**

Count Three seeks to bring claims under the DCHRA, Title VI, and the FHA, but those laws do not provide a private right of action for the types of acts plaintiffs allege. Compl. ¶¶ 322, 324-326. Title VI prohibits discrimination against members of protected classes in federally funded programs, but requires a showing plaintiffs have not made, and the sections of the DCHRA and FHA, under which plaintiffs sue deal with private financing of such projects, not the government's development policy.

18

A.      **Plaintiffs Cannot Assert a Disparate Impact Claim Under Title VI.**

Plaintiffs' disparate impact claim under Title VI fails because "the Supreme Court has held that there is no private right of action for disparate impact discrimination under Title VI." *Colwell v. HHS*, 558 F.3d 1112, 1129 (9th Cir. 2009) (citing *Alexander v. Sandoval*, 532 U.S. 275, 285 (2001)) (other citation omitted); *but see Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2540-41 (Thomas, J., dissenting). As other courts in this Circuit have explained, "the text and structure of Title VI" show disparate impact alone does not provide a private right of action or support a showing of discrimination under Title VI; a plaintiff must plausibly allege discriminatory intent. *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 82 (D.D.C. 2003) (quotation omitted), *Smith II*, 54 F. Supp. 3d at 69 (D.D.C. 2014). *See also Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 168 n.13 (D.D.C. 2014) (same). Because, as discussed in II.A above, plaintiffs have not plausibly alleged such discriminatory intent, the Title VI disparate impact claim should fail.

B.      **Plaintiffs' Disparate Impact Claim Does Not Target Actions Covered by the DCHRA or FHA.**

Plaintiffs assert their DCHRA claim under D.C. Code §§ 2-1402.21(a)(1)-(6) and their FHA disparate impact claim under 42 U.S.C. §§ 3604, 3605. Those provisions, however, apply only to "transactions in real property" or the refusal or restriction of facilities, services, repairs or improvements for a tenant or lessee. *See, e.g.*, 42 U.S.C. §§ 3604(a) ("[t]o refuse to sell or rent"), 3605(b)(1)(A) ("[t]he making or purchasing of loans … for purchasing, constructing, improving, repairing, or maintaining a dwelling"); *Bank of Am. Corp. v. City of Miami*, 581 U.S. ___, 137 S. Ct. 1296, 1301 (2017) (claim bank "intentionally issued riskier mortgages on less favorable terms"); *Hessey v. Burden*, 615 A.2d 562, 579 (D.C. 1992) ("The Human Rights Act defines 'transaction in real property' as 'the exhibiting, listing, advertising, negotiating, agreeing to

19

transfer or transferring, whether by sale, lease, sublease, rent, assignment, or other agreement, any interest in real property or improvements thereon ….'").

Plaintiffs have not alleged that the District has interfered with housing finance or access to facilities, services, repairs or improvements for a tenant or lessee in such forbidden manners. Plaintiffs' allegations simply pertain to how the District exercises its discretion regarding urban development and the placement of public housing. *See*, *e.g.*, Compl. ¶¶ 166, 177, 179, 216. The Supreme Court recently rejected plaintiffs' argument, explaining the FHA—and, thus, the parallel provisions of the DCHRA—do "not decree a particular vision of urban development; and it does not put housing authorities and private developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing …." *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2523. "As [the U.S. Department of Housing and Urban Development] itself recognized in its recent rulemaking, disparate-impact liability 'does not mandate that affordable housing be located in neighborhoods with any particular characteristic.'" *Id.* (quoting 78 Fed. Reg. 11476).

### C.     Plaintiffs Fail to Plausibly Allege the District's Development Policies Have a Discriminatory Effect on a Protected Group.

Even if plaintiffs' disparate impact allegations did implicate the DCHRA and FHA, plaintiffs would still fail to plausibly allege a disparate impact claim. To allege such a claim under both acts, "a plaintiff must allege that a facially neutral practice or policy has a disproportionate impact on [a protected group]." *See Boykin v. Fenty (Boykin II)*, 650 Fed. Appx. 42, 44 (D.C. Cir. 2016) (addressing an FHA, claim); *Gay Rights Coalition of Georgetown Univ. Law Center v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (*en banc*) ("As the legislative history demonstrates, the Council imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*,

401 U.S. 424 (1971)."). Further, a plaintiff must plausibly allege that the challenged government policies are "artificial, arbitrary, and [create] unnecessary barriers" to housing. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. at 2524 (quoting *Griggs*, 401 U. S. at 431. Plaintiffs fail to satisfy either requirement.

### 1.    Plaintiff Have Not Plausibly Alleged a Disproportionate Impact.

Although the D.C. Circuit has not opined on the matter, other circuits "hold that there are 'two types of discriminatory effects which a facially neutral housing decision can have.'" *Boykin v. Gray (Boykin I)*, 895 F. Supp. 2d 199, 213 (D.D.C. 2013) (quoting *Graoch Associates # 33, L.P. v. Louisville/Jefferson County Metro Human Relations Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007)). First, a neutral housing decision can have "'a greater adverse impact on one [protected] group than on another.'" *Id*. Second, a neutral housing decision can "perpetuate[] segregation and thereby prevent[] interracial association ...." *Id*. (other citations omitted).

As for the former, plaintiffs offer no factual support for their assertion that the District's development policies disproportionately affect the access to housing for residents who are African-American, families, or religious. *See Boykin II*, 650 Fed. Appx at 44 (affirming dismissal of a disparate impact claim based on disability for failure to state a claim where allegations do not show challenged action "had a disparate impact on persons with disabilities' access to housing as opposed to persons without disabilities' access to housing").[6] To the contrary, plaintiffs' allegations show generally positive effect. They point, for example, to the high-density development in the Navy Yard as evidence of an adverse impact on African-Americans caused by the District's development policies. Compl. ¶¶ 158-60. But plaintiffs' evidence does not show a

---

[6] Plaintiffs' claims of disability against those without college degrees are immaterial as "discrimination based on level of education has not been held actionable or given protected class status." *Ginn v. Tex. Wired Music, Inc.*, No. SA-99-CA-553-FB, 2000 U.S. Dist. LEXIS 22511, at *35 n.7 (W.D. Tex. Aug. 10, 2000); *see, e.g.*, Compl. ¶¶ 165, 226, 306, 324.

decline but a 182% *increase* in the African-American population, from 459 to 1,294 people. *Id.* Although plaintiffs point to neighborhoods in which the African-American population has declined in recent years, *id.* ¶¶ 162-63, the Census Bureau reports a 4.4% increase in the District's African-American population overall, from 305,125 in 2010 to 318,598 in 2016. Ex. D (Census data) at 1, 4. Plaintiffs also cite what they describe as "research show[ing] a direct correlation between segregation and concentrations of the creative class," which describes how "efforts to boost the black creative class may help to combat inequality and segregation." Compl. ¶ 101; Ex. H [5-3 at 50] at 702.

As for the latter, plaintiffs have not plausibly alleged that the District's development policies perpetuate segregation. To the contrary, plaintiffs acknowledge that the District is attempting to integrate neighborhoods, Compl. ¶¶ 26, 147, the intended purpose of the FHA. *See Nat'l Cmty. Reinvestment Coal. v. Accredited Home Lenders Holding Co.*, 573 F. Supp. 2d 70, 76-77 (D.D.C. 2008) (Sullivan, J.) ("the broad purpose of the FHA, … is to promote integrated housing patterns and to discourage discrimination in access to housing.") (quotation omitted).

### 2.    Plaintiffs Have Not Plausibly Alleged Any Artificial Barriers to Housing.

As explained above, the development policies are intended to provide affordable housing and economic opportunities to low-income individuals. Plaintiffs allege these policies derive from Richard Florida, and that Mr. Florida "made a full throated mea culpa" in his latest book titled "New Urban Crises [*sic*]." Compl. ¶¶ 52-80, 129. A review of the book establishes otherwise.[7] As

---

[7] Mr. Florida concludes his chapter on "Gentrification and its Discontents" by stating:

> Rather than … resistance to change or attacks on new urbanites, the
> more appropriate response is to assist those who are most

plaintiffs concede, the District's development policies are aimed at supporting residents in neighborhoods like Barry Farm so they are not "left behind." Compl. ¶¶ 28, 154, 339. Plaintiffs have therefore failed to plausibly allege that the District's development policies are "artificial, arbitrary, and unnecessary barriers" to housing.

## IV.   Plaintiffs Have Not Plausibly Alleged a First Amendment Violation (Count Four)

In Count Four, plaintiffs allege the Creative Economy Initiative attracts non-African-American and non-religious residents and leads to the removal of African-American religious residents and the businesses that serve them from their neighborhood in violation of the First Amendment. *See* Compl. ¶¶ 327-337. But even if this were true, it would not constitute a violation of the First Amendment.

### A.   The Development Policies Do Not Violate Plaintiffs' Right to Freedom of Association.

The First Amendment does not recognize a "generalized right of 'social association.'" *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). Rather, the right to freedom of association exists in "two distinct senses," "intimate association" and "expressive association." *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). "The intimate relationships to which [the Supreme Court has] accorded constitutional protection include marriage, the begetting and bearing of children, child rearing and education[,] and cohabitation with relatives." *Bd. of Dirs. of Rotary Int'l v. Rotary*

---

vulnerable. It makes little sense to discourage investment in cities and urban neighborhoods, especially in places that desperately need it. Indeed, the real task of urban policy is not to try to stop market forces that are leading to the economic revitalization of certain urban areas, but to improve the housing options, economic opportunities, and neighborhood conditions of those who are being left behind ….

Ex. E,  Excerpts of Richard Florida, *The New Urban Crisis, How Our Cities are Increasing Inequality, Deeping Segregation, and Failing the Middle Class—and What We Can Do About It*, at 78 (Basic Books 2017).

*Club of Duarte*, 481 U.S. 537, 545 (1987) (citations omitted). In other words, it relates to the bonds of the nuclear family and "distinctively personal aspects of one's life." *Id.* Expressive association involves "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618.

Plaintiffs' allegations do not implicate a right to intimate association; the District has not, for example, restricted whom they may marry. Nor do they address the right to expressive association; the development policies do not prevent or punish plaintiffs from joining together to express their views. Instead, the development policies govern the improvement in housing and economic growth. *See Kadi v. Geithner*, 42 F. Supp. 3d 1, 35-36 (D.D.C. 2012) (no First Amendment violation when government action does not penalize mere associational activity).

**B.     The Development Policies Do Not Violate Plaintiffs' Rights Under the Establishment Clause.**

Under the Establishment Clause, "Congress shall make no law respecting an establishment of religion." U.S. CONST., Am. I. Plaintiffs have not alleged the District has acted with "the ostensible and predominant purpose of advancing religion." *McCreary Cty., Ky. v. ACLU of Ky*, 545 U.S. 844, 860 (2005). The Court therefore considers (1) whether the government activity in question has a secular purpose, (2) whether the activity's primary effect advances or inhibits religion, and (3) whether the government activity fosters and excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *Bonham v. District of Columbia Library Admin.*, 989 F.2d 1242, 1244 (D.C. Cir. 1993); *Sevier v. Lowenthal*, Civ. Act. No. 17-570, 2018 U.S. Dist. LEXIS 48724, at *17 (D.D.C. Mar. 26, 2018).

Plaintiffs do not challenge a law respecting the establishment of a religion. Plaintiffs challenge District policies related to economic growth and development. Plaintiffs also have not

alleged how the challenged District policies have impaired the exercise of religion. Thus, they have failed to state a claim under the Establishment Clause of the First Amendment.

## V.     Plaintiffs Have Not Plausibly Alleged a Conspiracy (Count Six)

In Count Six, plaintiffs allege defendants DCZC, OP, the District of Columbia Department of Housing and Community Development (DHCD), the District of Columbia Housing Authority (DCHA), DMPED and the current and former mayoral defendants conspired to implement the Creative Economy and New Communities programs in violation of 42 U.S.C. § 1985. Compl. ¶ 354. "Civil conspiracy, of course, is not actionable in and of itself … [but requires] an overt *tortious* act in furtherance of the agreement that causes injury." *Hall v. Clinton*, 285 F.3d 74, 82-3 (D.C. Cir. 2002). "The elements of civil conspiracy consist of:  (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to and in furtherance of the common scheme." *Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 16 (D.D.C. 2001) (citing *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

"To survive a motion to dismiss a Section 1985 claim, plaintiff must set forth more than conclusory allegations of an agreement." *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) (citing *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004); *Estate of Phillips v. Dist. of Columbia*, 257 F. Supp. 2d 69, 83 (D.D.C. 2003), *rev'd in part on other grounds*, 455 F.3d 397 (D.C. Cir. 2006)). That is, a "plaintiff should allege the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate his rights." *Id.* And "a plaintiff is required to allege a connection between the overt acts, the furtherance of the conspiracy and the plaintiff's injury." *Graves v. United States*, 961 F. Supp. 314, 321 (D.D.C. 1997) (citing *Watson v. Clark*, 716 F. Sup. 1354, 1358 (D. Nev. 1989)). Plaintiffs fail to satisfy all elements of a civil conspiracy claim.

### A.   <u>Plaintiffs Have Not Plausibly Alleged an Agreement to Participate in an Unlawful Act.</u>

First, plaintiffs have not plausibly alleged an agreement to participate in an unlawful act. "Plaintiff[s] merely conclude[ ] that there was an agreement" with no "description of … the nature of the agreement, what particular acts were taken to form the conspiracy, or what overt acts were taken in furtherance of the conspiracy." *Butler*, 521 F. Supp. 2d at 68-69. "The mere repetition of a conclusory statement that a conspiracy exists and that all the alleged events occurred as a result of a conspiracy are insufficient as a matter of law." *Id.* at 69 (citing *McCreary v. Heath*, Civ. Act. No. 04-0623, 2005 U.S. Dist. LEXIS 34082, at *5 (D.D.C. Sept. 26, 2005)).

Indeed, plaintiffs have not alleged an agreement between two or more persons at all. The defendant agencies act through their employees and the agencies are all a part of the District.[8] "There can be no conspiracy between a municipality and its own agents or employees." *Harris v. City of St. Clairsville*, 330 F. App'x 68, 78 (6th Cir. 2008) (quoting the district court below); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise") (cited in *Bowie v. Maddox*, 642 F.3d 1122, 1130 (D.C. Cir. 2011)). Although the D.C. Circuit has not explicitly ruled on the question, it notes the majority rule under which "[a]t least seven circuits have held the intracorporate conspiracy doctrine applies to civil rights conspiracies." *Bowie*, 642 F.3d at 1130 (discussing cases). "District courts within this Circuit have … 'consistently … applied the intracorporate conspiracy doctrine to Section 1985.'" *Kelley v. District of Columbia*, 893 F.

---

[8] Although DCHA employees are not District employees, DCHA itself is "an independent authority *of the District government*." District of Columbia Housing Authority Act of 1999, D.C. Law 13-105, 47 D.C. Reg. 1325 (May 26, 2000), §§ 3(a) and 17(a) (codified at D.C. Code § 6-202(a) and 215(a)) (emphasis added).

Supp. 2d 115, 120 (D.D.C. 2012) (quoting *Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007) (listing cases)). The Court should do the same here.

### B.     Plaintiffs Have Not Plausibly Alleged an Injury Caused by an Unlawful Act.

Second, plaintiffs have not plausibly alleged an injury caused by an unlawful act. They only alleged that "OP, DHCD, DCHA, and DMPED and the various Mayor's [*sic*] hid their conspiracy through sham hearings at the DCZC." Compl. ¶ 355. But all of the District's actions were public and plaintiffs do not dispute the District followed the laws, set forth by Congress and the D.C. Council, and implementing regulations in promulgating the development policies. If a given agency may fail to satisfy a specific regulation, plaintiffs have shown their ability to gain redress from the D.C. Court of Appeals. *See BFTAA I*, 2018 D.C. App. LEXIS 161; *Friends of McMillan Park*, 149 A.3d 1027. Thus, plaintiffs have not shown that they experienced an injury.

### VI.   All District Defendants Should be Dismissed and the District of Columbia Should be Substituted as the Proper Defendant.

### A.     The District Agencies Should Be Dismissed as Not Suable.

If any of plaintiffs' claims survive the District's motion to dismiss, the Court should dismiss defendants DHCD, DMPED, and OP because they are agencies of the District government. *See* D.C. Code §1-603.01(17)(J), (TT), (VV). "[T]he overwhelming weight of precedent in this Circuit … holds that in the absence of explicit statutory authorization, bodies within the District of Columbia government are not suable as separate entities." *Kundrat v. District of Columbia*, 106 F. Supp. 2d 1, 7 (D.D.C. 2000) (internal quotation marks and citations omitted). DHCD, DMPED, and OP therefore are not suable and the District should be substituted for those agencies. *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 120 (D.D.C. 2011) ("When a plaintiff mistakenly names as a defendant a District of Columbia agency instead of the District of Columbia itself, it is appropriate to substitute the District for its agency.").

**B.** **The District Should Be Substituted for The Current Official Capacity Defendants.**

Similarly, the District should be substituted for the individual defendants sued in their official capacities because the District is the real party in interest. *Lopez v. District of Columbia*, 268 F. Supp. 3d 256, 259 (D.D.C. 2017) (quoting *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996)) ("A section 1983 suit for damages against municipal officials in their official capacities is equivalent to a suit against the municipality itself.") (alteration omitted); *Proctor v. District of Columbia*, 74 F. Supp. 3d 436, 445 n.3 (D.D.C. 2014) (substituting the District for the Chancellor of the District of Columbia Public Schools (DCPS), former Chancellor, and DCPS); *Doe v. District of Columbia*, 2008 U.S. Dist. LEXIS 110348, *1 (D.D.C. Nov. 12, 2008) (denying attempt to name mayor "in his official capacity" as "both futile" and "redundant … [as] the District is already a defendant").

**C.** **The Former Official Capacity Defendants Should Be Dismissed as Moot.**

Plaintiffs' claims against Councilmember Gray, brought in his capacity as a former mayor; former Mayor Fenty; Neil Albert, in his official capacity as former-Deputy Mayor for Planning and Economic Development; and Harriet Tregoning, in her official capacity as former-Director of the D.C. Office of Planning, should be dismissed because any claims against them are moot. Plaintiffs' claims against those defendants are based on their actions in official positions none of them now maintain. *See Huddle v. Reagan*, Civ. Act. No. 88-3130, 1991 U.S. Dist. LEXIS 7070, at *1 n.1 (D.D.C. May 24, 1991) ("plaintiffs concede that the case is 'moot as Mr. Reagan is no longer President' …. "Consequently, all claims against former President Reagan shall be dismissed."); *Murphy v. County of Yavapai*, Civ. Act. No. 04-1861-PCT-DGC, 2006 U.S. Dist. LEXIS 63732, at *6-7 (D. Ariz. Aug. 23, 2006) (dismissing an official capacity defendant who is no longer in office).

## CONCLUSION

For the foregoing reasons, the Court should grant the District Defendants' motion and dismiss plaintiffs' Complaint, with prejudice.

Dated:  June 25, 2018.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

/s/ Fernando Amarillas
FERNANDO AMARILLAS [974858]
Chief, Equity Section

/s/ Conrad Z. Risher
CONRAD Z. RISHER [1044678]
MICHAEL A. TILGHMAN II [988441]
Assistant Attorneys General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-5691
(202) 741-8934 (fax)
conrad.risher@dc.gov

*Counsel for the District Defendants*