**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
FULLER, *et al.*                                )
                                                    )
            Plaintiffs,                         )
                                                    )
v.                                                 )
                                                    )        Case No. 1:18-cv-00872 (EGS)
DISTRICT OF COLUMBIA                    )
HOUSING AUTHORITY, *et al.*          )
                                                    )
            Defendants.                        )
                                                    )
_____)

**DEFENDANT DISTRICT OF COLUMBIA HOUSING AUTHORITY'S REPLY IN**
**SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

    I.    None of the Counts against DCHA States a Viable Claim for Relief. .................. 3

        A.    Plaintiffs Matthews and Hamilton Have Conceded that Count
                11 Does Not State a Claim against DCHA and Otherwise Fail
                to Allege Intentional Race Discrimination by Subterfuge
                against DCHA. ........................................................................ 3

        B.    Count 12, Alleging Disparate Impact Based on Race, Makes
                No Claim against DCHA. ......................................................... 6

        C.    Count 15 Does Not State a Claim against DCHA for a
                Substantive Due Process Violation. ........................................ 10

        D.    Plaintiffs Concede that Count 16, Alleging a Violation of 42
                U.S.C. § 1983, Fails to State a Claim. .................................... 14

    II.    The Plaintiffs Who Bring Claims against DCHA Fail to Show that They
        Have Standing to Sue DCHA. ............................................................... 14

        A.    NeRAC and CARE No Longer Have Any Claim against
                DCHA and Would Lack Standing in Any Event. ..................... 14

        B.    No Individual Plaintiff Can Show Standing to Sue DCHA. ..................... 16

    III.    Plaintiffs' Claims Challenging Policy Statements Are Non-Justiciable
        Political Questions. ............................................................................. 19

    IV.    Plaintiffs' Claims Against DCHA Are Barred by the Statute of
        Limitations. ...................................................................................... 19

CONCLUSION ............................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Abigail All. for Better Access to Developmental Drugs v. Von Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ................................................................................................15

*Abigail All. for Better Access to Developmental Drugs v. Von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007) ................................................................................................12

*Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*,
297 F. Supp. 2d 165 (D.D.C. 2003) ..........................................................................................7

*Barry Farm Tenants and Allies Ass'n v. Zoning Comm'n*,
182 A.3d 1214 (D.C. 2018) ....................................................................................................17

*Bolling v. Sharpe*,
347 U.S. 497 (1954) ................................................................................................................11

*Bonaccorsy v. District of Columbia*,
685 F. Supp. 2d 18 (D.D.C. 2010) ............................................................................................3

*Borum v. Brentwood Village, LLC*,
218 F. Supp. 3d 1 (D.D.C. 2016) ..............................................................................................8

*Boykin v. Fenty*,
650 F. App'x 42 (D.C. Cir. 2016) ....................................................................................4, 9, 10

*Boykin v. Gray*,
895 F. Supp. 2d 199 (D.D.C. 2012) ..........................................................................................8

*Boykin v. Gray*,
986 F. Supp. 2d 14 (D.D.C. 2013) ....................................................................................5, 8, 9

*Breithaupt v. Abram*,
352 U.S. 432 (1957) ................................................................................................................13

*Butera v. District of Columbia*,
235 F.3d 637 (D.C. Cir. 2001) ................................................................................................17

*Carey v. Piphus*,
435 U.S. 247 (1978) ................................................................................................................16

*Clinton v. City of New York*,
524 U.S. 417 (1998) ................................................................................................................17

*Collins v. City of Harker Heights, Tex.*,
    503 U.S. 115 (1992) ...........................................................................................13

*Cty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .....................................................................................11, 13

*Doe v. Chao*,
    540 U.S. 614 (2004) ...........................................................................................17

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
    968 F. Supp. 2d 243 (D.D.C. 2013) ...................................................................15

*Florida Audubon Soc. v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) .............................................................................18

*Friends of McMillan v. Zoning Comm'n*,
    149 A.3d 1027 (D.C. 2016) ................................................................................17

*Graham v. Connor*,
    490 U.S. 386 (1989) ...........................................................................................11

*Hobson v. Brennan*,
    646 F. Supp. 884 (D.D.C. 1986) ........................................................................16

*Int'l Acad. of Oral Med. & Toxicology v. United States*,
    195 F. Supp. 3d 243 (D.D.C. 2016) ...................................................................15

*Johnson v. U.S. Office of Personnel Mgmt.*,
    783 F.3d 655 (7th Cir. 2015) ..............................................................................16

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) .............................................................................4

*Kingman Park Civic Ass'n v. Gray*,
    27 F. Supp. 3d 142 (D.D.C. 2014) .......................................................................7

*Lempres v. CBS Inc.*,
    916 F. Supp. 2d 15 (D.D.C. 1996) .....................................................................20

*Lindsey v. Normet*,
    405 U.S. 56 (1972) .............................................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................7

*Memphis Cmty. Sch. Dist. v. Stachura*,
    477 U.S. 299 (1986) ...........................................................................................16

*Obergfell v. Hodges,*
    135 S. Ct. 2071 (2015) ............................................................................................12

*Palmer v. Kelly,*
    17 F.3d 1490 (D.C. Cir. 1994) ................................................................................20

*Paul v. Davis,*
    424 U.S. 693 (1976) ................................................................................................17

*Robbins v. U.S. Dep't of Hous. & Urban Dev.,*
    72 F. Supp. 3d 1 (D.D.C. 2014) ..............................................................................18

*Rochin v. California,*
    342 U.S. 165 (1952) ................................................................................................13

*Rosenblatt v. Fenty,*
    734 F. Supp. 2d 21 (D.D.C. 2010) ......................................................................3, 14

*Shelley v. Kraemer,*
    334 U.S. 1 (1948) ....................................................................................................11

*Siegert v. Gilley,*
    500 U.S. 226 (1991) ................................................................................................17

*Taylor v. Fed. Deposit Ins. Corp.,*
    132 F.3d 753 (D.C. Cir. 1997) ................................................................................21

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,*
    135 S. Ct. 2507 (2015) ..............................................................................................8

*Thompson v. U.S. Dep't of Hous. & Urban Dev.,*
    348 F. Supp. 2d 398 (D. Md. 2005) ........................................................................12

*Tsombanidis v. West Haven Fire Dep't,*
    352 F.3d 565 (2d Cir. 2003) ......................................................................................9

*Turlock Irr. Dist. v. Fed. Energy Reg. Comm'n,*
    786 F.3d 18 (D.C. Cir. 2015) ..................................................................................15

*Valley Forge Christian College v. Am. United for Separation of Church & State,*
    *Inc.,*
    454 U.S. 464 (1982) ................................................................................................16

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ................................................................................................12

**Constitutional Provisions**

U.S. Const. amend V ................................................................................................................2, 10

**Statutes**

42 U.S.C. § 1983 (2012) .........................................................................................................2, 14

D.C. Code § 2-1402.21 (2012) ...................................................................................................3, 6

D.C. Code § 6-202 (2012) .............................................................................................................5

**Rules**

Fed. R. Civ. P 12(b)(6) ..............................................................................................................1, 3

**Other Authorities**

24 C.F.R. § 100.1 *et seq.* (2018) ...............................................................................................10

## INTRODUCTION

Plaintiffs' Opposition to DCHA's Motion to Dismiss underscores both the paucity and the hollowness of Plaintiffs' claims against DCHA. Like the Opposition, the focus of the amended complaint is on the District's purported plan to attract a young, upwardly mobile "creative class" through the policy statements of its agencies and certain decisions of its Zoning Commission. None of these alleged actions are attributable to DCHA, an independent entity whose statutory mission and raison d'être is to house people of limited means, not members of some wealthier creative class. Because of its focus on the "Creative Class Agenda" and Zoning Commission decisions, the amended complaint names DCHA as a defendant in only three of 16 counts (Counts 11, 15 and 16) and, in those three counts, challenges DCHA's actions as to only one housing development—Barry Farm. The rest of the amended complaint—the vast majority of it—has nothing to do with DCHA. Emblematic of how scant the allegations against DCHA are, the Opposition devotes just over two of its 85 pages to responding to DCHA's arguments that the three counts naming DCHA fail to state a claim for relief. *See* Opp. at 75-76, 84-85.

There is a good reason for the Opposition's abbreviated, conclusory responses to DCHA's Rule 12(b)(6) arguments: the allegations against DCHA in Counts 11, 15 and 16 are untenable.

The Opposition does not respond to, and thus concedes, DCHA's arguments that Count 11 fails to state a claim against DCHA for intentional discrimination by subterfuge based on race under the District's Human Rights Act ("DCHRA"). As DCHA's opening brief explains, Count 11 does not plausibly allege that DCHA has deprived either of the Count 11 Plaintiffs, Paulette Matthews and Michelle Hamilton, of housing, much less deprived them of housing based on race through pretextual means.

Count 15, alleging a violation of the substantive due process rights of Plaintiffs Matthews and Hamilton, is equally infirm. Under rudimentary constitutional principles, Plaintiffs may not bring a claim for intentional housing discrimination under the Fifth Amendment's due process clause because there is a more specific constitutional provision—the equal protection component of the Fifth Amendment—that covers that claim. Further, to the extent Count 15 alleges the violation of any right other than intentional housing discrimination, it fails to identify that right with the requisite specificity, let alone assert a right so fundamental as to warrant due process protection. Nor does Count 15 allege conduct that meets the stringent "shocks the conscience" standard for a due process violation.

Finally, Plaintiffs concede that Count 16 fails to state a claim because 42 U.S.C. § 1983 does not create a cause of action independent of the violation of underlying federal rights.

In addition to these fatal defects, there are fatal jurisdictional infirmities. The Plaintiffs who bring claims against DCHA—Matthews (Counts 11, 15 and 16), Hamilton (Counts 11, 15 and 16), Mpulubusi-El (Count 16), NeRAC (Count 16) and CARE (Count 16)—lack standing to sue DCHA. In fact, with Plaintiffs' concession that Count 16 should be dismissed, the latter three Plaintiffs have *no* remaining claim against DCHA. Further, to the extent Counts 11 and 15 challenge an alleged policy of investing in luxury studio condominiums over family homes under the Creative Class Agenda, that challenge not only has no relationship to DCHA—which is not, and is prohibited from, replacing the population at Barry Farm with wealthier people—but presents a non-justiciable political question. Last, by claiming to sue DCHA over the Zoning Commission's approval of the Barry Farm PUD—again, an action that is not even attributable to DCHA—Plaintiffs run afoul of the pertinent statute of limitations, because the approval of the Barry Farm PUD occurred nearly three years before Plaintiffs filed their original complaint.

**ARGUMENT**

I.      **None of the Counts against DCHA States a Viable Claim for Relief.**

     A.     **Plaintiffs Matthews and Hamilton Have Conceded that Count 11 Does Not State a Claim against DCHA and Otherwise Fail to Allege Intentional Race Discrimination by Subterfuge against DCHA.**

In their Opposition, Plaintiffs Matthews and Hamilton make clear that Count 11's claim of intentional race discrimination by subterfuge under DCHRA § 2-1402.21(b) takes issue only with decisions of the Zoning Commission. Opp. at 75-76. The Zoning Commission is a District agency. It is not an agency or an arm of DCHA, and DCHA is not liable for its actions. Therefore, although DCHA is named as a defendant in Count 11, Count 11 does not actually challenge actions attributable to DCHA. *Id.* The failure of the Opposition even to assert that Count 11 challenges a DCHA action, much less rebut DCHA's Rule 12(b)(6) arguments that Count 11 fails to state a viable claim, means that Plaintiffs Hamilton and Matthews concede they are not entitled to relief against DCHA on Count 11. *See Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded . . . ."); *Bonaccorsy v. District of Columbia*, 685 F. Supp. 2d 18, 24 (D.D.C. 2010).

Even apart from Plaintiffs' concession, Count 11 fails to adequately allege intentional discrimination by subterfuge based on race against DCHA for all of the reasons DCHA furnished in its opening brief. *See* Opening Br. at 31-34. Those reasons include the following:

*First*, because Count 11 does not adequately allege that DCHA has deprived Plaintiffs Matthews and Hamilton of housing, it necessarily fails to allege that DCHA has deprived them of housing based on race. Count 11 suggests that DCHA is not complying with "one-for-one" housing replacement provisions at Barry Farm—*i.e.*, that DCHA has sought to force Plaintiffs Matthews and Hamilton from Barry Farm and will not give them the chance to return once redevelopment is completed, favoring "Creative Class" members instead. *See* Am. Compl. ¶¶ 334-45. Yet this

conclusory allegation is contradicted by the very same evidence that Plaintiffs append to their complaint and cite in their Opposition. For instance, contrary to the contentions in Count 11, the Quadel Report states that DCHA will *comply with*, rather than breach, its one-for-one housing replacement obligation: "The [New Communities] Initiative remains committed to One-for-One Replacement and the Initiative is making progress in this regard." Am. Compl., Ex. H at 718. The Quadel Report later reiterates that "[t]he Opportunity to Return/Stay in their neighborhood is another guiding principle of the [New Communities] Initiative," and emphasizes the success DCHA had achieved in adhering to that principle as of the date of the report, noting that returning residents filled 80% of the new replacement units in DCHA properties redeveloped under the Initiative. *Id.* at 727, 744. Consistent with this trend of compliance with the one-for-one replacement requirement, the first-stage PUD for Barry Farm provided for relocation of all current residents, complete replacement of all demolished units, and the guaranteed opportunity to return for all existing residents to Barry Farm after construction is completed. Am. Compl., Ex. K at 981-82. Thus, the allegation in Count 11 that DCHA is displacing Plaintiffs Matthews and Hamilton and will not return them or their neighbors to Barry Farm in the future is both wholly speculative and undermined by their own evidence. *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (stating that although a court must generally accept a complaint's factual allegations as true, it need not accept factual allegations contradicted by the complaint's exhibits or matters subject to judicial notice). No one from Barry Farm is being denied housing, let alone denied housing based on race in violation of the DCHRA. *See Boykin v. Fenty*, 650 F. App'x 42, 45 (D.C. Cir. 2016) ("Appellants contend that the closure of La Casa had an adverse impact on homeless people in the District because it denied them housing. But the undisputed evidence showed that, because of additional housing provided through PSH placements, there was a net *gain* in available housing

for the homeless notwithstanding the closure of La Casa. *Boykin*, 986 F. Supp. 2d at 21. As a result, the evidence did not suggest an adverse impact on the homeless generally, let alone any disproportionate adverse impact on a protected class.").

*Second*, Count 11 includes no support for the allegation that DCHA has engaged in intentional discrimination through subterfuge by allegedly refusing to make repairs to the units of Plaintiffs Hamilton and Matthews. As explained in DCHA's opening brief, Count 11 fails to allege facts sufficient to support the contention that DCHA refused to make repairs for a discriminatory reason. Opening Br. at 33-34. If anything, what Count 11 alleges are housing code violations (free of racial animus). The proper forum for challenging those is the Housing Conditions Calendar in Superior Court. *See* https://www.dccourts.gov/services/civil-matters/housing-conditions-calendar.

*Third,* even though Count 11 is a claim for race discrimination *by "subterfuge,"* it does not adequately allege any subterfuge attributable to DCHA. The claim of subterfuge is that the Creative Class Agenda and related policies favor residents based on age and source of income and that those preferences are a pretext for favoring whites over African Americans. DCHA, however, is not responsible for the Creative Class Agenda or related policies, as Plaintiffs tacitly acknowledge. *See* Am. Compl. ¶ 29. Correspondingly, DCHA does none of the things that Count 11 alleges to be discrimination by subterfuge: it does not make zoning decisions and does not issue statements promoting the Creative Class Agenda. *See* Opp. at 76. Indeed, DCHA is precluded from pursuing policies to *replace* existing and relocated Barry Farm tenants with upwardly mobile millennials because, by law, it is required to provide housing to people of limited means. *See* D.C. Code § 6-202(b); *see also* Government of the District of Columbia, *Five Year Consolidated Plan, October 1, 2016 to September 30, 2021* 54 (2015) ("The work of [DCHA] is guided by its mission to provide quality affordable housing to extremely low- through moderate-income

households . . . .").[1] For that reason, while DCHA plans to add market rate units to Barry Farm to create a mixed income development, it will not reduce the supply of affordable housing; to the contrary, consistent with the one-for-one requirement, it will ensure that every Barry Farm tenant who wants to return to Barry Farm *will* return. Am. Compl., Ex. K at 981-82. The entire premise of the subterfuge claim against DCHA—*i.e.*, that, in furtherance of a Creative Class Agenda, DCHA is *replacing* people of limited means at Barry Farm with young people of greater means— is thus erroneous. Plaintiffs Hamilton and Matthews do not plausibly allege that DCHA is pursuing a Creative Class Agenda that is a pretext for race discrimination.

### B.   Count 12, Alleging Disparate Impact Based on Race, Makes No Claim against DCHA.

Count 12 does not name DCHA as a defendant; it names only the District. Nor does Count 12 include any current or former DCHA tenant as a Plaintiff, identifying only Tamia Wells, Ariyon Wells and "Certified Class." Moreover, Count 12 does not allege any actions attributable to DCHA, challenging only the District's "land use policy," as expressed through the District's Creative Class Agenda and carried out through the decisions of the District's Zoning Commission. *See* Am. Compl., ¶¶ 348-356. By any measure, Count 12 makes no claim *at all* against DCHA.

Because Count 12 does not implicate DCHA, there should be no reason to consider Count 12's allegations further. Nonetheless, in their Opposition, the Plaintiffs identified in Count 12— none of whom has even lived in Barry Farm—belatedly assert that DCHA has violated D.C. Code § 2-1402.21(b) by making "policy choices" that have had the effect of displacing African Americans from Barry Farm "in furtherance of an agenda that will disproportionately benefit the

---

[1] This document was attached as an exhibit to Plaintiffs' original complaint, but does not contain an exhibit letter to which DCHA may refer the Court.

Creative Class, who are disproportionately white." Opp. at 74. For several independent reasons, this tardy assertion fails to rescue Count 12 from dismissal as to DCHA.

*First*, the Count 12 Plaintiffs are prohibited from doing what they appear to be attempting to do, which is use their Opposition to constructively amend Count 12 to conjure a disparate impact claim against DCHA. Count 12 itself does not name DCHA, does not implicate DCHA conduct, and does not say anything at all about Barry Farm. The Count 12 Plaintiffs may not now use the Opposition to lodge Count 12's allegations against DCHA. *See, e.g.*, *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 165 n.10 (D.D.C. 2014) ("It is well settled law that a plaintiff cannot amend his or her complaint by the briefs in opposition to a motion to dismiss."); *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (same).

*Second*, none of the Count 12 Plaintiffs has standing to sue DCHA. Because none alleges ever having lived at Barry Farm, none alleges an injury in fact fairly traceable to DCHA. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (showing injury fairly traceable to defendant's actions is second requirement for establishing Article III standing).

*Third*, the Count 12 Plaintiffs' belated, prohibited effort to insert DCHA as a defendant in Count 12 would not state a claim for disparate impact based on race against DCHA even if such a claim were included in Count 12 and lodged by individuals with standing to sue DCHA.

As an initial matter, there is no disparate impact claim against DCHA because, as explained *supra* and in DCHA's opening brief, Opening Br. at 31-34, the threshold allegation underlying the Count 12 Plaintiffs' disparate impact allegation—namely, that DCHA is displacing Barry Farm residents and will not return them to Barry Farm once redevelopment is completed—is both speculative and contradicted by Plaintiffs' own evidence. For that reason alone, there is no viable claim for disparate impact based on race against DCHA.

Moreover, there is no claim against DCHA because the Count 12 Plaintiffs, by their own admission, fail to allege that DCHA's planned redevelopment of Barry Farm will disproportionately affect African American residents of Barry Farm *as compared to* non-African American residents. Opp. at 74 (arguing that Plaintiffs do not need to allege such disparate impact and that it is enough to allege that DCHA's purported actions affect the predominantly African American resident population at Barry Farm). That failure also dooms Count 12. *See* Opening Br. 35-37 (citing cases).

Citing *Boykin v. Gray*, 895 F. Supp. 2d 199, 208 (D.D.C. 2012), the Count 12 Plaintiffs disagree, saying that all they have to allege is that DCHA has targeted for redevelopment a predominantly African American housing complex. Opp. at 74. But by definition, that is not the law, which requires proof of a robust causal link between a challenged policy and an alleged *disparate* impact on a protected class—or put differently, proof that a challenged policy has a disproportionate effect on a protected class *as compared to* others within the population to which the policy applies. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). In the context of a plan for redevelopment of a specific housing complex like Barry Farm, this means that (i) the universe of potentially affected individuals should consist of existing tenants in the complex and (ii) plaintiffs must allege and prove that redevelopment would have a disparate impact on tenants within a protected class *as compared to* tenants outside that protected class. *See Borum v. Brentwood Village, LLC*, 218 F. Supp. 3d 1, 23 (D.D.C. 2016). Because there is no such allegation as to Barry Farm in Count 12, or even in the Opposition, there is no claim for disparate impact based on race against DCHA.

*Boykin* does not compel a different result. In his opinion granting summary judgment, issued the year after his decision on the District's motion to dismiss, on which the Count 12

Plaintiffs rely, Judge Friedman held that, to sustain a claim of disparate impact race discrimination against the District for a decision to close a homeless shelter with a largely African American and Hispanic resident population, plaintiffs had to show that the decision was part of a broader race-neutral policy that disproportionately affected African Americans and Hispanics within the District's homeless population as compared to non-African Americans and non-Hispanics within that population; proof that the decision simply affected a heavily African American and Hispanic population at the shelter was not sufficient. *See Boykin v. Gray*, 986 F. Supp. 2d 14, 20-23 (D.D.C. 2013) (the "focus" of the "law of disparate impact" is "on facially neutral *policies* that systematically exert discriminatory effects within the population to which they apply") (emphasis in original). *Boykin* is thus different than this case, because the universe of individuals purportedly affected by the challenged race-neutral policy there did not consist of the population of one large housing complex, as Plaintiffs seek to allege in the Opposition, *see* Opp. at 74 (challenging alleged displacement of residents from Barry Farm), but instead consisted of a City's entire homeless population. *Id.* Nonetheless, the overarching analytical framework is the same: those challenging a race-neutral policy must show that the policy has a disparate impact on members of a protected class *as compared to* individuals outside the protected class within the population to which the policy applies. *Id.* at 20-21. On appeal, the D.C. Circuit affirmed both this analytical framework and Judge Friedman's summary judgment ruling in favor of the District, finding that "appellants failed to establish a causal link between the challenged action—the closing of La Casa as part of the PSH program—and any *disparate* impact on a protected population." *Boykin*, 640 F. App'x at 45 (emphasis added).[2] Moreover, the D.C. Circuit affirmed Judge Friedman's pleading-stage

---

[2] Even if the Count 12 Plaintiffs' allegations in the Opposition could somehow be construed as challenging a broader DCHA policy that affected them and other Barry Farm residents, they fail to identify what that policy was (the Creative Class Agenda is the District's purported policy, not

dismissal of plaintiffs' disparate impact disability status claim by making the same point about the need to show a *disparate* impact on individuals with disabilities: "The complaint failed to allege facts suggesting that the closure affected a greater proportion of disabled individuals than non-disabled, as it did not, for instance, include an allegation that disabled homeless individuals are more likely to rely on low-barrier shelters than non-disabled homeless individuals." *Id.* at 44.

Count 12 fails to allege that the planned redevelopment of Barry Farm will have a disproportionate impact on African American residents as compared to non-African American residents. Rather, in the Opposition, the Count 12 Plaintiffs allege only that all Barry Farm residents are affected. Therefore, even if it were lodged against DCHA by plaintiffs who had standing to sue DCHA, Count 12 would not adequately allege a claim of disparate impact based on race against DCHA.

### C.  Count 15 Does Not State a Claim against DCHA for a Substantive Due Process Violation.

Count 15 is titled "Fifth Amendment Violations – Substantive Due Process." Although DCHA presumed in its opening brief that, despite its title, this Count primarily alleges a procedural

---

DCHA's), fail to identify the purportedly wider universe of individuals affected by the policy, *and* fail to allege the requisite evidence (*e.g.*, statistical evidence) showing that, within that broader universe, the policy had a disproportionate effect on African Americans as compared to non-African Americans. Rather than satisfying any of these mandatory prerequisites, they simply allege (again, in the Opposition, not the amended complaint) an adverse effect on the population at Barry Farm. If the Count 12 Plaintiffs intend to allege the redevelopment of Barry Farm as part of a broader DCHA policy that has a disparate impact on African Americans, such a bare bones allegation is wholly insufficient to state a disparate impact claim. *See, e.g.*, *Boykin*, 986 F. Supp. 2d at 20-23 (citing *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003) ("The basis for a successful disparate impact claim involves *a comparison between two groups*—those affected and those unaffected by the facially neutral policy. This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals.") (emphasis added) (internal quotation marks omitted), *superseded on other grounds by* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 24 C.F.R. § 100.1 *et seq.* (2018) (rendering moot the decision's explanation of the burden-shifting framework for disparate impact claims).

due process claim, Opening Br. 38-40, Plaintiffs make clear in their Opposition that, in fact, they wish to allege a substantive due process claim. Opp. at 84-85. Count 15 fares no better as a substantive due process claim than it does as a procedural due process claim.

At its core, Count 15 alleges that DCHA's failure to maintain adequate housing conditions at Barry Farm has "constructively evicted" Plaintiffs Matthews, Hamilton and others "similarly situated" and, consequently, "deprived [them of] their constitutionally or statutorily protected rights, including but not limited to their rights to access housing without discrimination." Am Compl. ¶¶ 400-01; Opp. at 84-85. This allegation fails to state a claim for a substantive due process violation for a host of reasons.

To begin, it is a bedrock principle of constitutional law that if a constitutional claim is "covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). Here, Plaintiffs Matthews and Hamilton allege that DCHA's failure to maintain their units at Barry Farm amounts to intentional housing discrimination based on race—or, as the amended complaint asserts, "the right to access housing without discrimination." Am Compl. ¶ 401. There is, of course, a specific constitutional provision that "covers" this type of claim: the equal protection clause, *see Shelley v. Kraemer*, 334 U.S. 1, 20-23 (1948)—or, in the District of Columbia, the equal protection component of the Fifth Amendment's due process clause. *See Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954). As a result, Plaintiffs' claim may not be brought as a substantive due process claim and must be dismissed. *See Lewis*, 523 U.S. at 843.

To the extent Count 15 can be construed as anything other than a claim of intentional housing discrimination based on race, the purported right it invokes is far too undefined, inchoate

and unrecognizable to qualify for protection under the due process clause. The Opposition asserts that Count 15 alleges a violation of "fundamental rights." Opp. at 85; *see also* Am. Compl. ¶¶ 401 (alleging a deprivation of generic "constitutionally or statutorily protected rights, including but not limited to [the] right of access to housing without discrimination"). But with the exception of the purported "right of access to housing without discrimination," Plaintiffs Matthews and Hamilton never explicitly say what those "fundamental rights" are. That, too, is fatal to Count 15. *See Abigail All. for Better Access to Developmental Drugs v. Von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (*en banc*) (substantive due process claims require a "careful description of the asserted fundamental liberty interest") (citing *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).

Even if Count 15 could be read as "carefully describing the asserted liberty interest"—*e.g.*, as a fundamental right to good housing conditions—it would still fail. The only rights recognized as "fundamental" under the due process clause are the select few that are, "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720-21. All such rights that courts have recognized are intimate and personal—the right "to marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion." *Abigail All. for Better Access to Developmental Drugs*, 495 F.3d at 702 (citing *Glucksberg*, 521 U.S. at 720); *see also Obergefell v. Hodges*, 135 S. Ct. 2071 (2015) (recognizing fundamental right to same sex marriage). The right to quality housing—if that is what Plaintiffs Matthews and Hamilton are claiming—has never been recognized as among these fundamental rights. To the contrary, the Supreme Court has held that it is "unable to perceive in [the Constitution] any constitutional guarantee of access to dwellings of a particular quality . . . ." *Lindsey v. Normet*, 405 U.S. 56, 74 (1972); *see also Thompson v. U.S.*

*Dep't of Hous. & Urban Dev.*, 348 F. Supp. 2d 398, 433-34 (D. Md. 2005) ("Plaintiffs are not contending—nor could they—that under the Fifth and Fourteenth Amendments individuals are entitled to housing, because there is no such right." (citing *Lindsey*)). Plaintiffs have not alleged the violation of any "fundamental right" protected by the due process clause.

The substantive component of the due process clause also protects individuals against the arbitrary abuse of power by executive branch officials that "shocks the conscience." *Lewis*, 523 U.S. at 846; *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (only conduct so "brutal" and "offensive" that it "shocked the conscience" and did not comport with "traditional ideas of fair place and decency" violates substantive due process), *abrogated on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961). Yet substantive due process "does not impose liability whenever someone cloaked with governmental authority causes harm." *Lewis*, 523 U.S. at 848. It is "not a font of tort law to be superimposed upon whatever systems may already be administered by the States . . . ." *Id.* (internal quotation marks omitted). Thus, courts rarely have found conduct so egregious as to shock the conscience, *see Rochin v. California*, 342 U.S. 165, 174 (1952) (police forcibly pumping suspect's stomach to obtain evidence of drug possession), and frequently have ruled that the due process clause provides no refuge. *See, e.g.*, *Lewis*, 523 U.S. at 854-55 (no due process right recognized when police officer accidentally killed passenger on motorcycle by following too closely during high-speed chase); *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126 (1992) (same; failure to provide safe working environment); *Breithaupt*, 352 U.S. at 439 (same; administering unauthorized blood test while suspected drunk driver was unconscious).

The alleged failure to maintain housing conditions is not so conscience-shocking that it violates due process. If it were, federal courts would be deluged with regular housing conditions claims framed as substantive due process claims. No case supports this result, and Plaintiffs

Matthews and Hamilton cite none. The alleged failure to prevent housing from falling into "gross disrepair," Am. Compl. ¶ 393, is an ordinary tort claim, one addressed dozens of times every day on the Housing Conditions calendar in Superior Court. If poor housing conditions are the crux of the Count 15 claims of Plaintiffs Matthews and Hamilton, that is the proper forum for them.

### D.    Plaintiffs Concede that Count 16, Alleging a Violation of 42 U.S.C. § 1983, Fails to State a Claim.

Plaintiffs concede DCHA's argument that 42 U.S.C. § 1983 does not operate as a stand-alone cause of action and is instead a vehicle for enforcing rights secured by the Constitution and other federal laws. Opp. at 85. Accordingly, Count 16 should be dismissed.

## II.    The Plaintiffs Who Bring Claims against DCHA Fail to Show that They Have Standing to Sue DCHA.

The Plaintiffs who bring claims against DCHA—Matthews (Counts 11, 15 and 16), Hamilton (Counts 11, 15 and 16), Mpulubusi-El (Count 16), NeRAC (Count 16) and CARE (Count 16)—do not have standing to bring those claims.

### A.    NeRAC and CARE No Longer Have Any Claim against DCHA and Would Lack Standing in Any Event.

NeRAC and CARE concede that Count 16 should be dismissed. Because Count 16 is the only count those Plaintiffs bring against DCHA, they no longer have any claim against DCHA.

Even assuming Count 16 were not dismissed, NeRAC and CARE would not have organizational standing to sue DCHA.[3] *See* Opening Br. at 19-25. Neither organization has plausibly alleged any injury fairly traceable to conduct by DCHA. *Id.* at 24. NeRAC focuses on "problems occurring in the Buzzard Point community," complaining of a *private* housing

---

[3] NeRAC and CARE do not address DCHA's argument that they do not have associational standing. Opening Br. at 20-21. They argue only for organizational standing. Thus, they concede that they lack associational standing. *See Rosenblatt*, 734 F. Supp. at 22.

development that has no connection to DCHA. Opp. at 9. CARE complains of actions by the Zoning Commission—not DCHA—that will purportedly result in the loss of affordable housing east of the Anacostia River. Opp. at 10. Neither organization claims to have been harmed by anything DCHA did or did not do.

NeRAC and CARE also fail, at the threshold, to allege any injury in fact. *See* Opening Br. at 21-24. A chief reason for this failure is that, although they claim diversion of resources as their injury, they really allege only a frustration of purpose, which is insufficient as a matter of law. *See Turlock Irr. Dist. v. Fed. Energy Reg. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (defendant's alleged conduct must "perceptibly impair" organization's provision of services to establish organization's standing; impairment of advocacy is insufficient). Neither NeRAC nor CARE can establish diversion of resources—that is, a "perceptible impairment" of their ability to provide services—because they were formed for the very purpose of advocating against redevelopment that they believe will either cause environmental harm in Buzzard Point (NeRAC) or diminish the supply of affordable housing east of the river (CARE). *See* Opening Br. at 23. They "cannot convert an ordinary program cost—advocating and educating about [their] interests—into an injury in fact." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 968 F. Supp. 2d 243, 266 (D.D.C. 2013) (citation omitted). "[T]he resources [they] expended on advocacy and education . . . were expended by choice because such activities are at the core of [their] mission[s]." *Id.* at 267; *see also Int'l Acad. of Oral Med. & Toxicology v. United States*, 195 F. Supp. 3d 243, 262 (D.D.C. 2016) ("[E]xpending resources to challenge a regulation constitutes self-inflicted harm that does not constitute injury in fact.") (internal quotation marks omitted) (quoting *Abigail All. for Better Access to Developmental Drugs v. Von Eschenbach*, 469 F.3d 129, 133-34 (D.C. Cir. 2006)).

**B.      No Individual Plaintiff Can Show Standing to Sue DCHA.**

Like NeRAC and CARE, Plaintiff Mpulubusi-El concedes that the only count he brings against DCHA, Count 16, should be dismissed. Thus, he has no remaining claim against DCHA.

That leaves only Plaintiffs Matthews and Hamilton, named in Counts 11 and 15. These Plaintiffs lack standing because most harms they allege do not qualify as injuries to legally protected interests and because they otherwise fail to trace any alleged injury to DCHA. *See* Opening Br. at 25-26. The same would be true of Plaintiff Mpulubusi-El if he had any remaining claim against DCHA. *See id.* In fact, the Opposition acknowledges that Plaintiff Mpulubusi-El never even lived at Barry Farm, *see* Opp. at 14-15, so his argument for standing is even weaker than the others'.

Plaintiffs Matthews and Hamilton (and Mpulubusi-El) first argue that they automatically have standing because they allege violations of their constitutional rights. *See* Opp. at 6-7, 13. But none of the cases upon which Plaintiffs rely supports that argument. Those cases address a different issue: the availability of damages for a constitutional injury that is difficult or impossible to prove or quantify. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) (awarding nominal damages for procedural due process violation where quantity of damages due to deprivation could not be proven); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308-09 (1986) (holding compensatory damages inappropriate to remedy "abstract" value of a constitutional right); *Hobson v. Brennan*, 646 F. Supp. 884, 891 (D.D.C. 1986) (awarding only nominal damages for loss of supporters for political activity because damages difficult to quantify). The relevant case law actually states that the mere allegation of a constitutional injury is ***not*** itself sufficient to confer standing. *See Valley Forge Christian College v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (holding mere allegation that government action violated plaintiffs' rights under Establishment Clause insufficient to confer standing without allegations of actual

injury suffered as a result of the allegedly unconstitutional act); *Johnson v. U.S. Office of Personnel Mgmt.*, 783 F.3d 655, 665 (7th Cir. 2015) ("The mere allegation of unequal treatment [under the equal protection clause], absent some kind of actual injury, is insufficient to create standing.").

Plaintiffs Matthews and Hamilton (and Mpulubusi-El) next argue that they have suffered individual harm. As a matter of law, however, the vast majority of this alleged harm is not cognizable as harm to a legally-protected interest necessary to establish injury in fact. For example, the "loss of social networks and one's neighborhood ecosystem," Opp. at 14, is not harm to a legally-protected interest.[4] *Cf. Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) ("[A] parent does not have a constitutionally-protected liberty interest in the companionship of a child who is past minority and independent."). Goodwill or reputation in the community, Opp. at 15, also does not qualify as a legally protected interest. *See Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citing *Paul v. Davis*, 424 U.S. 693, 709-10 (1976) (finding that reputation by itself is not a legally protected interest)).

Regardless of whether the Barry Farm Plaintiffs have sufficiently alleged injury in fact, their alleged injuries are not fairly traceable to DCHA. For example, they still fail to specify how DCHA's purported negligence in maintaining Barry Farm has affected their health. *See* Opp. at

---

[4]    Plaintiffs cite *Barry Farm Tenants and Allies Association v. Zoning Commission*, 182 A.3d 1214, 1227 (D.C. 2018) and *Friends of McMillan v. Zoning Commission*, 149 A.3d 1027, 1036-38 n.21 (D.C. 2016), for the proposition that disruption of social networks may have adverse impacts on tenants. *See* Opp. at 14. However, what qualifies as an "adverse impact" under zoning regulations bears no relationship to what qualifies as harm to a legally protected interest sufficient to confer Article III standing for a constitutional violation. The two are not the same thing. *Doe v. Chao*, 540 U.S. 614, 624-25 (2004), and *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998), are equally unhelpful to Plaintiffs. *Doe* did not involve an alleged constitutional violation requiring the court to ascertain legally protected interests, and *Clinton* involved a long-held protected interest, economic injury. Neither supports Plaintiffs' contention that maintenance of social networks or a neighborhood ecosystem is a legally protected interest sufficient to confer Article III standing.

13-14. Similarly, while they allege they felt "pressure to move out of their units," they fail to state how DCHA was the source of that alleged pressure. *See id. Lujan* requires such alleged injuries to be "fairly traceable" to DCHA's conduct; an attenuated connection does not suffice. *Robbins v. U.S. Dep't of Hous. & Urban Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014). The failure of the Barry Farm Plaintiffs to provide even an attenuated connection between DCHA conduct and tangible injuries to legally protected interests warrants dismissal of their claims against DCHA.

Additionally, any "injury" to the Barry Farm Plaintiffs' social networks and community culture necessarily rests on DCHA barring tenants from returning to Barry Farm once redevelopment is completed. As explained above, the Quadel Report and the first-stage Barry Farm PUD make clear that DCHA intends to fully comply with the one-for-one right to return policy. *See* Am. Compl., Ex. H at 727; Ex. K at 981-82. Thus, the Barry Farm Plaintiffs will suffer injury to their social networks and community culture only if they choose not to return. Because the Barry Farm Plaintiffs control whether they will return following redevelopment, the alleged harm to their social networks and community culture is too speculative to establish standing. *See Robbins*, 72 F. Supp. 3d at 7 (citing *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663-64 (D.C. Cir. 1996) ("The presence of third-party links in a causal chain can independently corroborate that [Plaintiffs'] claim of causation is entirely speculative and insufficient for standing.").[5]

---

[5] On this point, Plaintiffs also fail to show that the loss of their social networks would be redressable by this Court. Even if the Court had to order DCHA to comply with the right to return policy, it cannot force tenants to return to Barry Farm. Thus, the injunctive relief the Barry Farm Plaintiffs seek is not likely to alleviate their alleged injury. *See Robbins*, 72 F. Supp. at 7 ("The redressability requirement for federal standing examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.") (quoting *Florida Audubon Soc.*, 94 F.3d at 663-64).

III.    **Plaintiffs' Claims Challenging Policy Statements Are Non-Justiciable Political Questions.**

Each Count against DCHA—Counts 11, 15, and 16—chiefly complains of policies encouraging "investment in luxury studio condominiums over family homes," Opp. at 26, including the Creative Class Agenda and related policies. *See* Opp. at 76 (challenging "discriminatory intention and assumptions underlying the Creative Class Agenda"); Opp. at 85 (challenging "the District of Columbia's overt and covert [Creative Class] policy"). Apart from the fact that DCHA has no role in or authority over these District policies, the policy pronouncements themselves are non-justiciable because they raise classic political questions, as the District explained in its opening brief. *See* District's Opening Br. at 16-20. DCHA incorporates those arguments here. The Plaintiffs who bring claims against DCHA make no viable argument to survive dismissal of their claims to the extent they challenge policy pronouncements like the Creative Class Agenda, the Creative Economy Strategy and the New Communities Initiative.

IV.    **Plaintiffs' Claims Against DCHA Are Barred by the Statute of Limitations.**

The Plaintiffs who bring claims against DCHA have failed to show that those claims fall within the statute of limitations. These Plaintiffs assert that, "[w]hile the DCHA has noted that the Amended Complaint states that the city's gentrification plans began over 10 years before the plaintiffs filed a complaint, *the discriminatory transactions were the decisions by the Zoning Commission*." Opp. at 83 (emphasis added). But none of these decisions is attributable to DCHA, as the Zoning Commission is a District agency. And the only decision that is even remotely connected to DCHA—the Zoning Commission's final approval of the Barry Farm PUD—falls well outside both the one- and two-year statute of limitations that potentially apply. *See* Opening Br. at 27-29. That is because, as Plaintiffs concede, this action was commenced on April 13, 2018, nearly three years after the final order for the Barry Farm PUD was issued. *See* Opp. at 83-84.

Plaintiffs attempt to circumvent the statute of limitations by alleging that the Barry Farm PUD decision was part of a "continuing violation" of law. That is not so.

To determine whether Plaintiffs have properly asserted a continuing violation, the Court should use a two-step test. *Lempres v. CBS Inc.*, 916 F. Supp. 2d 15 (D.D.C. 1996) (citing *Palmer v. Kelly*, 17 F.3d 1490, 1496 (D.C. Cir. 1994)). First, it must determine whether an actual violation of law occurred during the statutory period. *Id.* Then it must determine whether the act "either was part of a series of related . . . acts or was caused by a . . . system in effect both before and during the limitations period." *Id.*

In asserting a continuing violation as to DCHA, the Plaintiffs who bring claims against DCHA attempt to string together a series of attenuated, discrete events attributable to a different defendant. In particular, these Plaintiffs point to other decisions of the Zoning Commission—a District agency—that fall within the statute of limitations. But even if the Zoning Commission's Barry Farm PUD decision could be attributed to DCHA—and it cannot—the other challenged Zoning Commission decisions have nothing at all to do with DCHA; they involved non-DCHA properties. As to DCHA, the Zoning Commission's Barry Farm PUD decision is a discrete, stand-alone event. It is not "related to" any Zoning Commission decision that falls within the limitations period or "caused by [a DCHA] system in effect both before and during the limitations period." *Id.* Therefore, the continuing violations doctrine cannot rescue the asserted claims against DCHA from the statute of limitations.

There is yet another reason the continuing violation doctrine provides Plaintiffs no refuge: the doctrine does not apply unless the violation is "one that could not reasonably have been expected to be made the subject of the lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period . . . typically

because it is only its cumulative impact . . . that reveals its illegality." *Taylor v. Fed. Deposit Ins. Corp.*, 132 F.3d 753, 765 (D.C. Cir. 1997). Here, Plaintiffs easily could have made the Zoning Commission's approval of the Barry Farms PUD the subject of a lawsuit. In fact, other parties did so, challenging the Barry Farm PUD approval in the proper forum, the D.C. Court of Appeals, which vacated and remanded the matter to the Zoning Commission for reconsideration. There is nothing to show why, on its own, the Barry Farm PUD decision was insufficient to form the basis of a complaint.

## CONCLUSION

For all of the foregoing reasons, as well as the reasons given in the opening brief, the amended complaint should be dismissed with prejudice as to DCHA.

Date: October 17, 2018

Respectfully submitted,

 */s/* Seth Rosenthal
Seth A. Rosenthal (D.C. Bar 482586)
Moxila A. Upadhyaya (D.C. Bar 494373)
VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, D.C.  20001
T: 202.344.4000
F: 202.344.8300
sarosenthal@venable.com
maupadhyaya@venable.com

*Counsel for Defendant District of Columbia Housing Authority*