**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CURRENT AREA RESIDENTS EAST OF THE RIVER**, *et al.*, | ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) **Case No. 18-cv-0872 (EGS/GMH)** |
| **DISTRICT OF COLUMBIA**, *et al.*, | ) ) |
| **Defendants.** | ) ) ) |

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

In this putative class action, the named Plaintiffs—two community-based nonprofit advocacy organizations and ten individuals who currently live or formerly lived in certain specified areas of the District of Columbia—have sued the District of Columbia (the "District") and the District of Columbia Housing Authority (the "Housing Authority"), asserting that Defendants have violated the District's laws governing zoning and land use in order to gentrify certain historically African-American neighborhoods in the city, thereby effecting a pattern and practice of racial discrimination against African-Americans.  Plaintiffs advance a total of sixteen counts, such as violation of Plaintiff's rights to procedural due process and equal protection under the Fifth Amendment to the U.S. Constitution, racial discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604 *et seq.*, and discrimination based on race, age, and source of income in violation of the D.C. Human Rights Act of 1977 ("D.C. Human Rights Act"), D.C. Code § 2-1401.01 *et seq.*  Defendants have each filed a motion to dismiss on various grounds, including non-justiciability, lack of standing, and failure to state a claim.[1]

---

[1] The following docket entries are particularly relevant to this Report and Recommendation: (1) the first amended

Plaintiffs make some troubling claims, asserting a pattern of discrimination by the District of Columbia Zoning Commission based on municipal land-use policy in favor of the so-called "Creative Class," a group that is allegedly disproportionately young and white, as well as an intentional scheme by the Housing Authority to constructively evict low-income African-American residents from the Barry Farm public housing project so that Creative Class members can move into the area. However, the operative complaint fails to establish standing for many of the alleged constitutional violations and much of the relief sought and fails to state a claim for any of the constitutional or statutory claims pleaded. Therefore, both the District's motion to dismiss and the Housing Authority's motion to dismiss should be granted.

## I.      BACKGROUND

Plaintiffs' overarching theory of this case is that, in order to advance an agenda to attract the Creative Class to the District, the Housing Authority,[2] as well as various agencies of the District, including the Zoning Commission,[3] have engaged in arbitrary and capricious decision-

---

complaint (ECF No. 34); (2) the Housing Authority's motion to dismiss, including exhibits (ECF No. 26); (3) the District's motion to dismiss, including exhibits (ECF No. 27); (4) Plaintiffs' opposition to both motions to dismiss (ECF No. 39); (5) the Housing Authority's reply to Plaintiffs' opposition (ECF No. 46); and (6) the District's reply to Plaintiff's opposition, including exhibits (ECF No. 47). The undersigned has also considered the arguments included in two *amicus curiae* briefs—one from Dr. Mindy Fullilive, a professor of urban policy and health at The New School (ECF No. 42), and one from Empower DC, an organization that focuses on issues of public housing, displacement of residents, and environmental justice (ECF No. 45).

Although Plaintiffs have brought this lawsuit as a putative class action, briefing on class certification has been stayed pending a decision on the motions to dismiss. Minute Order dated July 9, 2018. This Report and Recommendation does not, therefore, address the allegations related to class certification claims.

[2] The Housing Authority is "an independent authority of the District government" with "a legal existence separate from the District government." D.C. Code § 6-202(a). It "govern[s] public housing and implement[s] the [federal] Housing Act of 1937 in the District," D.C. Code § 6-202(b), and can sue and be sued in its own name, D.C. Code § 6-203(11). Because the Housing Authority is "a legal entity distinct from the District government," the District of Columbia is not liable for harm caused by the Housing Authority. *Epps v. Gray*, 62 F. Supp. 3d 77, 81 n.1 (D.D.C. 2014).

[3] The Zoning Commission "is vested with the exclusive authority to enact zoning regulations in the District of Columbia, and must ensure that the regulations it enacts are not inconsistent with the Comprehensive Plan." *Barry Farm Tenants & Allies Ass'n v. D.C. Zoning Comm'n*, 182 A.3d 1214, 1218 (D.C. 2018). "The Comprehensive Plan is 'a broad framework intended to guide the future land use planning decisions of the District.'" *Id.* (quoting *Wisc.*

making and violated governing rules and regulations with the intent to harm the residents of historically African-American neighborhoods by "steamroll[ing] controversial neighborhood-wide [luxury] redevelopment."  ECF No. 34 at 3.  The allegations in the operative complaint[4] focus on practices that affect neighborhoods or housing projects known as Barry Farm, Buzzard Point, Poplar Point, and Union Market, each of which is located in the Southeastern or Northeastern quadrants of the city.

The operative complaint runs to 86 pages and the record contains over 1,500 pages of appendices that Plaintiffs filed in connection with their original complaint and another approximately 100 pages in exhibits filed with the District's motion to dismiss.  *See* ECF Nos. 4 through 7, 34, 45-3 through 45-8, 47-1 through 47-3.  These submissions include considerable background allegations regarding the formulation and implementation of various urban planning documents and policies in the District, such as 2006's  New Communities Initiative, a "District program aimed at transforming select public and low-income housing developments into mixed-income, mixed-use communities," *Barry Farm Tenants & Allies Ass'n*, 182 A.3d at 1219 n.6; 2010's Creative Action Agenda (ECF No. 5-1 at 33–110), a report commissioned by the District of Columbia Office of Planning and the Washington, DC Economic Partnership to "provide a blueprint" for "revitalization of underserved neighborhoods through arts and creative uses that generate new business creation, employment for residents, and income for communities," among other things (*id.* at 37–38); 2014's Creative Economy Strategy (ECF No. 4-3 at 42–76; ECF No.

---

*Newark Neighborhood Coal Dist. v. D.C. Zoning Comm'n*, 33 A.3d 382, 394 (D.C. 2011)).

[4] The initial complaint was filed on April 13, 2018.  ECF No. 1.  After the original defendants filed motions to dismiss (ECF Nos. 16–17), Plaintiffs exercised their right to amend their complaint pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure and filed the first amended complaint on August 1, 2018 (ECF Nos. 20, 25).  After the current motions to dismiss were filed, Defendants filed a consent motion to amend the caption of the first amended complaint, which was granted.  ECF No. 31; Minute Order dated Sept. 4, 2018.  The operative complaint is thus the first amended complaint with the proper caption, which was filed on September 4, 2018.  ECF No. 34.

4-4 at 1–65), a policy document intended to provide a "roadmap for sustained growth that leverages the District's creative industries," that is, industries "that have as their goal the creation, production and distribution of creative goods and services," such as "the arts, broadcast media, culture, digital technology, design, social media, and culinary arts" (ECF No. 4-3 at 44, 53–54); and 2016's Five Year Consolidated Plan ("2016 Consolidated Plan") regarding housing and community development, which served as the District's application to the U.S. Department of Housing and Urban Development ("HUD") for various funding programs (ECF No. 27-3 at 5).  ECF No. 34, ¶¶ 19–69.

In a nutshell, Plaintiffs allege that the District, following the theories of Richard Florida, an urban planner "who has promoted human creativity as an engine of economic growth" (*id.*, ¶ 27), embarked on a planning strategy to attract the "Creative Class," defined (rather loosely) as "high-quality talent within creative industries" (ECF No. 4-3 at 55), a population that skews young, white, and highly educated.  *Id.*, ¶¶ 26–52.  Plaintiffs call this the "Creative Class Agenda."  *Id.*, ¶ 28.  Among the tools to be considered to draw such workers was modification of zoning regulations to increase space for "creative uses, including make/live space," by "changing zoning regulations in industrial areas and allowing residential use."  *Id.*, ¶ 36 (quoting the "Creative Economy Strategy" (ECF No. 4-4 at 17)).

That planning strategy allegedly created "hyper-segregated" African-American neighborhoods and "resegregated" previously integrated neighborhoods with predominantly white residents.  ECF No. 34, ¶¶ 53–54.  Moreover, Plaintiffs assert that the District's plans targeted low-income African-American communities for elimination to repopulate them with younger, more affluent whites.  *Id.*, ¶¶ 65–67.  These strategies were implemented in part through "patterns and practices of discrimination at the Zoning Commission," such as "routinely undermin[ing] the

4

process by which historic DC residents have voiced their concerns about redevelopment policies," making arbitrary decisions that ignore the adverse impacts of redevelopment projects, and ignoring its statutory duties by failing to make certain findings and produce required reports. *Id.*, ¶¶ 67, 70–83. According to Plaintiffs, Defendants knew of the adverse impact on low-income African–Americans and non-millennials through various means, including the D.C. Department of Housing and Community Development's Analysis of Impediments to Fair Housing Choice 2006–2011 ("Analysis of Impediments"), produced in 2012, which documented areas of extreme segregation and displacement of African-American populations (*id.*, ¶¶ 53–55, 59; ECF No. 4-4 at 74–104; ECF No. 4-5 at 1–45; ECF No. 5-1 at 1–30); a November 2016 letter from HUD's Office of Fair Housing and Equal Opportunity (the "2016 HUD Letter") expressing concerns with the 2016 Consolidated Plan for failing to address the impediments to fair housing identified in the Analysis of Impediments, such as the "entrenched dual housing market" (ECF No. 34, ¶ 56 (quoting the 2016 HUD Letter (ECF No. 27-7 at 3))); and further research and commentary on the effects of planning policies focusing on the attraction of the Creative Class, including some by Professor Florida showing "a direct correlation between segregation and concentrations of the Creative Class" (ECF No. 34, ¶¶ 45–46 & nn.9–10).

Plaintiffs comprise two organizations and ten individuals. According to the operative complaint, Near Buzzard Point Resilient Action Committee ("NeRAC") is an advocacy group—active since 2016 and formally organized in 2018—that focuses on the environmental health and safe housing of residents in and around the neighborhood of Buzzard Point. ECF No. 34, ¶ 112. More specifically, it seeks to protect its members and other area residents from environmental damage caused by redevelopment, such as "toxic air resulting from construction dust and diesel fumes emitted by construction vehicles." *Id.*, ¶ 113. To fulfill its advocacy mission, NeRAC

engages in grassroots organizing, leadership development, community organization, and providing resident testimony at Zoning Commission hearings. *Id.*, ¶ 114. Plaintiffs allege that NeRAC's "interests have been thwarted by Defendants' redevelopment decisions that have negatively affected the health of its members and area residents" and that it has "expended resources in response to, and to counteract, the negative effects of [D]efendants' actions." *Id.*, ¶¶ 115–116.

Plaintiff Current Area Residents East of the River ("CARE") is a member organization of NeRAC whose members—African-American individuals living east of the Anacostia River—advocate for preservation of affordable housing and improvement of the quality of life in the area. ECF No. 34, ¶¶ 117–118. Similar to NeRAC, CARE engages in grassroots community organizing and education, such as by "gather[ing] on neighborhood streets to raise awareness among community members unable or uninclined to attend civil meetings"; the group also engages in leadership development, and provides testimony at governmental meetings, often about "the effects of gentrification." *Id.*, ¶¶ 119–120. Plaintiffs allege that CARE's interests, like those of NeRAC, "have been thwarted by Defendants' development decisions that have negatively affected the housing of [its] members" and that it has "expended resources in response to, and to counteract, the negative effects of [D]efendants' actions." *Id.*, ¶ 121.

As to the individual Plaintiffs, three are current or former residents of Barry Farm,[5] three are current residents of Buzzard Point,[6] one each is connected with Poplar Point and Union

---

[5] According to the amended complaint, Paulette Matthews is a current Barry Farm resident, Tendani Mpulubusi-El is a former Barry Farm resident who is now homeless, and Michelle Hamilton is a former Barry Farm resident. ECF No. 34, ¶¶ 7–9.

[6] According to the amended complaint, Geraldine McClain, Sylvia Carroll, and Rhonda Hamilton are all Buzzard Point residents. ECF No. 34, ¶¶ 10–12. Ms. Hamilton is an "Area Neighborhood Commissioner" for her neighborhood. *Id.*, ¶ 12. Throughout the operative complaint, Plaintiffs use the acronym "ANC" to denote such a position, which may result in some confusion. To explain: "in the District's distinctively structured government, the city is divided into wards, the wards into Advisory Neighborhood Commissions." *Smith v. Henderson*, 944 F. Supp. 2d 89, 97 (D.D.C. 2013). These Advisory Neighborhood Commissions are themselves generally known as "ANCs." *See id.* Each Advisory Neighborhood Commission is further divided into "single-member districts," which are each

Market,[7] and two are designated as "housing insecure" because they "cannot find safe, affordable housing."[8]  *Id.*, ¶¶ 7–16.

Plaintiffs assert fifteen substantive causes of action.[9]  The majority of the counts—Counts 1–14—are against the District; only Counts 11 and 15 are pleaded against the Housing Authority. The fifteen causes of action are summarized as follows:

| | |
|---|---|
| Count 1 | Violation of procedural due process rights under the Fifth Amendment[10] against the District in connection with the Zoning Commission's actions in Zoning Commission ("ZC") No. 14-02, "for approval of a first-stage planned unit development ('PUD')[11] and a PUD-related zoning map amendment to rezone" certain plot |

_____

represented by a Commissioner.  *Id.*  That is the position that Plaintiff R. Hamilton (and, as noted *infra* n.7, Plaintiff Greta Fuller) apparently occupy.  For clarity, the undersigned will refer to those Plaintiffs as "ANC Commissioners."

[7] According to the amended complaint, Greta Fuller is the "ANC [Commissioner] for the area in which a Poplar Point development is being built" and Shaninne Ball is a resident of the Union Market neighborhood.  ECF No. 34, ¶¶ 13–14.

[8] The two housing insecure Plaintiffs are Tamia Wells and Ariyon Wells.  ECF No 34, ¶¶ 15–16.

[9] There are sixteen numbered causes of action in the complaint, the last of which includes allegations that Defendants acted under color of state law when engaging in actions that violated Plaintiffs' rights under the Constitution and the Fair Housing Act.  ECF No. 34, ¶¶ 403–407.  As such—and as Plaintiffs recognize (ECF No. 39 at 92)—it is not an additional substantive count, but rather contains allegations directed to stating claims against the state-actor Defendants pursuant to 42 U.S.C. § 1983 for these alleged constitutional and statutory violations.  *See, e.g.*, *Albright v. Oliver*, 510 U.S. 266, 271 (1994) ("Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979))).  Thus, there are fifteen substantive causes of action in the complaint.

[10] Although denials of due process are usually analyzed under the Fourteenth Amendment, which provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. Const., amend. XIV, because the District of Columbia is not a state, it is subject to the due process clause of the Fifth Amendment, which states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law, U.S. Const. amend. V.  *See, e.g.*, *Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001).

[11] A "planned unit development" or "PUD" is "[a] plan for the development of residential, institutional, and commercial developments, industrial parks, urban renewal projects, or a combination of these, on land of a minimum area in one (1) or more zones irrespective of restrictions imposed by the general provisions of the Zoning Regulations." D.C. Office of Zoning, Zoning Handbook, *available at* http://handbook.dcoz.dc.gov/definitionsglossary/p-r/#PUD (last visited Apr. 22, 2020).  The PUD process is designed to "provide for higher quality development through flexibility in building controls, including building height and density."  11-X D.C. Mun. Regs. 300.01.  A PUD application may be granted where it (1) "[r]esults in a project superior to what would result from the matter-of-right standards"; (2) "[o]ffers a commendable number or quality of meaningful benefits"; and (3) "[p]rotects and advances the public health, safety, welfare, and convenience and is not inconsistent with the Comprehensive Plan."  11-X D.C. Mun. Regs. 300.1; *see also Friends of McMillan Park v. D.C. Zoning Comm'n*, 149 A.3d 1027, 1032 (D.C. 2016) (explaining that the PUD process "allows the [Zoning Commission] to grant exceptions to otherwise applicable zoning regulations if the PUD offers a 'commendable number or quality of public benefits' and 'protects and advances the public health, safety, welfare, and convenience" (quoting 11 D.C. Mun. Regs. § 2400.2 (repealed as of Sept. 6, 2016)).

of land in the Barry Farm area.  ECF No. 34, ¶¶ 195–202; ECF No. 6-1 at 10 (Zoning Comm'n Order No. 14-02).  This claim is brought by Plaintiffs Matthews and M. Hamilton, who are current or former Barry Farm residents.  ECF No. 34, ¶¶ 7, 9.

Count 2        Violation of procedural due process rights under the Fifth Amendment against the District in connection with the Zoning Commission's actions in ZC No. 16-02, for approval of a PUD application to "construct and operate a stadium [in the Buzzard Point area] that would principally be used by the DC United professional soccer team." ECF No. 34, ¶¶ 203–207; ECF No. 6-1 at 335 (Zoning Comm'n Order No. 16-02).  This claim is brought by NeRAC and individual Plaintiffs Carroll, McClain, and R. Hamilton, who are Buzzard Point residents.  ECF No. 34, ¶¶ 10–12.

Count 3        Violation of procedural due process rights under the Fifth Amendment against the District in connection with the Zoning Commission's actions in ZC No. 15-28, for approval of a PUD and related zoning map amendment in the Union Market neighborhood. ECF No. 34, ¶¶ 208–220; ECF No. 6-1 at 259 (Zoning Comm'n Order No. 15-28).  This claim is brought by Plaintiff Ball, a Union Market resident.  ECF No. 34, ¶ 14.

Count 4        Violation of procedural due process rights under the Fifth Amendment against the District in connection with the Zoning Commission's actions in ZC No. 16-29, for approval of a PUD and related zoning map amendment in the Poplar Point area.  ECF No. 34, ¶¶ 221–235; Zoning Comm'n Order No. 16-29, DC Office of Zoning, https://app.dcoz.dc.gov/Search/SearchOrders.aspx (enter "16-29" in Search box; click "View"; click "View Full Log"; navigate to Exhibit No. 66; click "View").  This claim is brought by CARE and individual Plaintiff Fuller, who is the ANC Commissioner for the affected area, and Plaintiff Mpulubusi-El, who is homeless.  ECF No. 34, ¶¶ 8, 13.

Count 5        Violation of procedural due process rights under the Fifth Amendment against the District for "failing to put in place pre-deprivation procedures and by failing to execute post-deprivation procedures" in zoning.  ECF No. 34, ¶¶ 236–259.  This claim is brought by all Plaintiffs.

Count 6   Violation of the right to equal protection under the Fifth Amendment against the District for disparate treatment on the basis of race in connection with "housing policies adopted in pursuit of the Creative Class Agenda, in the manner in which it carried out land use and zoning decision-making." *Id.*, ¶¶ 260–264. This claim is brought by all Plaintiffs.

Count 7   Discrimination on the basis of age and source of income in the terms and conditions of a real estate transaction in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.21(a)(2), against the District in connection with its alleged "policy expressing a preference for allocation of public and private resources based on age (millennial) and source of income (creative, innovative, and non-traditional jobs)." *Id.*, ¶¶ 265–277. This claim is brought by all Plaintiffs.

Count 8   Discrimination on the basis of source of income in violation of the D.C. Human Rights Act of 1977, D.C. Code § 2-1402.21(a)(5), against the District in connection with Zoning Commission's actions in ZC No. 15-28, which allegedly contains as an express condition of a real property transaction a preference for so-called "'maker' uses." ECF No. 34, ¶¶ 278–292; ECF No. 6-1 at 266, 269, 277, 281, 286 (Zoning Comm'n Order No. 15-28). This claim is brought by all Plaintiffs.

Count 9   Discrimination in violation of the D.C. Human Rights Act. D.C. Code § 2-1402.21(b), against the District in connection with the District's alleged use of the Creative Class Agenda as a "subterfuge" for unlawful discrimination on the basis of age and source of income. ECF No. 34, ¶¶ 293–307. This claim is brought by all Plaintiffs.

Count 10   Discrimination through "blockbusting" and "steering" in violation of the D.C. Human Rights Act, D.C. Code § 2-1402.22,[12] against the District in connection with the Zoning Commission's alleged "implement[ation] [of] land use changes to industrial zones city-wide by following District of Columbia policy documents that ha[ve] the intent of providing housing to millennials and people who earn their income within certain professions." ECF No. 34, ¶¶ 308–329. This claim is brought by all Plaintiffs.

---

[12] The amended complaint refers to D.C. Code § 2-1402.23, which prohibits real estate brokers or salespeople from engaging in discrimination. ECF No. 34, ¶ 309. In its motion to dismiss, the District points out that Plaintiffs likely meant to cite D.C. Code 2-1402.22 (ECF No. 27-1 at 47 n.18), which prohibits "the practices of 'blockbusting' and 'steering.'" D.C. Code 2-1402.22. Inexplicably, Plaintiffs repeat this error in their opposition to the motions to dismiss. ECF No. 39 at 89.

Count 11    Discrimination in violation of the D.C. Human Rights Act. D.C. Code § 2-1402.21(b), against the District and the Housing Authority in connection with policies and practices regarding the Barry Farm Public Housing project, including leaving the establishment in such gross disrepair as to constructively evict tenants, which allegedly function as subterfuge for unlawful discrimination based on race. ECF No. 34, ¶¶ 330–347.  This claim is brought by Plaintiffs Matthews and M. Hamilton.

Count 12    Discrimination in violation of the D.C. Human Rights Act. D.C. Code § 2-1402.21(b), against the District in connection with the Creative Class Agenda, which allegedly functions as subterfuge for discrimination based on disparate impact against African-American residents in the neighborhoods of Anacostia.  ECF No. 34, ¶¶ 348–356.  This claim is brought by Plaintiffs T. Wells and A. Wells, who are identified as "housing insecure."  *Id.*, ¶¶ 15–16.

Count 13    Discrimination in violation of the Fair Housing Act, 42 U.S.C. § 3604(a)–(b), against the District in connection with its "adoption and enforcement of the Creative Class Agenda," which allegedly makes housing unavailable based on race and discriminates based on race "in the terms, conditions and/or privileges of the housing, as well as in the provision of services in connection with the housing." ECF No. 34, ¶¶ 357–365.  This claim is brought by all Plaintiffs.

Count 14    Illegally perpetuating race-based segregation in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), against the District in connection with "arbitrary barriers to housing," including "both the Creative Class Agenda as a policy and the specific Zoning Commission and other actions taken in pursuit of enacting the Agenda." ECF No. 34, ¶¶ 366–386.  This claim is brought by all Plaintiffs.

Count 15    Violation of substantive due process rights under the Fifth Amendment against the Housing Authority in connection with its actions regarding the Barry Farm Public Housing project, including practices allegedly intended to constructively evict its tenants, who are almost exclusively African-American.  ECF No. 34, ¶¶ 387–402. This claim is brought by Plaintiffs Matthews and M. Hamilton.[13]

Plaintiffs seek a declaratory judgment as well as injunctive relief "enjoining [the Zoning

---

[13] As noted, Count 16 is not an additional substantive count, but rather contains allegations directed to stating claims against Defendants pursuant to 42 U.S.C. § 1983.

Commission] from further activity regarding phase one PUD approvals,"[14] ordering Defendants to "consider the effects of gentrification and the segregative effects in approving all future developments," prohibiting amendment of the Comprehensive Plan, requiring that "all outstanding Requests for Proposals be halted and investigated for Creative Class preferences," and establishing a "fully staffed independent People's Counsel before the Zoning Commission and the DC Court of Appeals." ECF No. 34 at 83–84. They further seek damages in an "amount to be determined by the Court" and attorney's fees and costs. *Id.* at 84  Finally, the operative complaint asks for specific relief against the Housing Authority for the Barry Farm Plaintiffs, including an order requiring it to "develop in place so residents do not have to leave the neighborhood," to "cease all pre-construction activity at Barry Farm," and to "restore and maintain the conditions of the property," among other things.[15]  *Id.* at 83–84.

The District and the Housing Authority have each filed a motion to dismiss. ECF Nos. 26–27. The District contends that (1) neither the organizational nor the individual Plaintiffs have standing to bring their claims, (2) the claims included in the operative complaint are not justiciable under the political question doctrine, (3) Plaintiffs have failed to plead facts sufficient to state a claim for municipal liability for violations of constitutional and federal law under section 1983, and (4) that each of the counts alleged against it in the operative complaint—that is, all the counts

---

[14] "[T]he two-stage PUD process is most often seen in cases where the PUD is especially large or complicated, or when the site is in an area that is undeveloped or undergoing a planning process." D.C. Office of Zoning, *Zoning Handbook, available at* http://handbook.dcoz.dc.gov/zoning-rules/general-procedures/planned-unit-developments/ (last visited Apr. 22, 2020). The first stage application "involves a general review of the site's suitability, including appropriateness of the proposed mix of uses and bulk and height, and the compatibility of the proposed development with the Comprehensive Plan." *Id.* The second stage application "[i]ncludes a detailed site plan review that looks at transportation management and mitigations, final building and landscape design and materials, and compliance with the first-stage approval and the PUD provisions." *Id.*

[15] The operative complaint asserts that it seeks this injunctive and monetary relief "in the alternative" to an order "[d]etermin[ing] that Plaintiffs prevail on all counts of the Complaint." ECF No. 34 at 83. As it seems unlikely that Plaintiffs want *either* (and first) a declaration that their rights have been violated *or* (and as an alternative) the specific injunctive and damages remedies listed, the undersigned assumes that the "in the alternative" language is a scrivener's error.

other than Count 15—fails to plead facts sufficient to state a claim on which relief can be granted. ECF No. 27. For its part, the Housing Authority also argues that Plaintiffs lack standing, that the claims are non-justiciable political questions, and that the counts alleged against it—Counts 11 and 15—fail to state a claim. DCHS further argues that Plaintiffs' claim for intentional discrimination under D.C. Code § 2-1402.21(b)—Count 11—is barred by the statute of limitations, and it adopts by reference the arguments made by the District in its motion to dismiss.[16] ECF No. 26.

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

A motion under Rule 12(b)(1) "presents a threshold challenge to the court's [subject-matter] jurisdiction" over the case before it. *Thomas v. Wash. Metro. Area Transit Auth.*, 305 F. Supp. 3d 77, 81 (D.D.C. 2018) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)). "The D.C. Circuit has explained that a motion to dismiss for lack of standing constitutes a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure because 'the defect of standing is a defect in subject matter jurisdiction.'" *Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 153 F. Supp. 3d 319, 330 (D.D.C. 2016) (quoting *Haase*, 835 F.2d at 906), *aff'd*, 851 F.3d 1 (D.C. Cir. 2017). Similarly, dismissal because the complaint presents a non-justiciable political question "constitutes a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." *Jograj v. Enter. Servs., LLC*, 270 F. Supp. 3d 10, 19 (D.D.C. 2017).

Where its power to hear a case is at issue, a court will subject a plaintiff's complaint to

---

[16] The undersigned ultimately finds that Count 11 should be dismissed on the merits (or based on a denial to exercise pendent jurisdiction over the D.C. Human Rights Act claims), so it is unnecessary to address the statute of limitations argument, which would require a determination of whether the claim "on its face is conclusively time-barred," *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014), a question made somewhat more complicated because it would require determining whether, as Plaintiffs assert (ECF No. 39 at 90–91), the District of Columbia's "continuing violation" doctrine applies.

"closer scrutiny" than on a motion to dismiss for failure to state a claim; moreover, the court is not limited to consideration of the allegations contained in the complaint. *See, e.g.*, *Walsh v. Comey*, 118 F. Supp. 3d 22, 25 (D.D.C. 2015). And, "unlike with a motion to dismiss under Rule 12(b)(6), the Court 'may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.'" *Id.* (quoting *Jerome Stevens Pharms. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005)). Indeed, where a party mounts a factual challenge—that is, it attacks the "underlying facts contained in the complaint" rather than merely the allegations included on the face of the complaint—the court "*must* weight the allegations of the complaint and evidence outside the pleadings in order to 'satisfy itself as to the existence of its power to hear the case.'" *Flynn v. Ohio Bldg. Restoration, Inc.*, 260 F. Supp. 2d 156, 162 (D.D.C. 2003) (emphasis added) (quoting *Loughlin v. United States*, 230 F. Supp. 2d 26, 35 (D.D.C. 2002)); *see also Robinson v. Gov't of Malaysia*, 269 F.3d 133, 141 n.6 (2d Cir. 2001) ("A district court 'may' consult evidence to decide a Rule 12(b)(1) motion in contrast with a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, where it may not. It 'must' do so if resolution of a proffered factual issue may result in the dismissal of the complaint for want of jurisdiction.").

### B.     Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint on the basis that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A court reviewing a 12(b)(6) motion must accept as true the well-pleaded factual allegations contained in the complaint, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), and construe those allegations "in the light most favorable to the plaintiff[]," *Vick v. Brennan*, 172 F. Supp. 3d 285, 295 (D.D.C. 2016). While the plaintiff need not make "detailed factual allegations" to avoid dismissal, he or she must provide "more than labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007).  Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  To meet this standard, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In addition to the allegations of the complaint, a court evaluating a motion under Rule 12(b)(6) may also consider "any documents either attached to or incorporated in the complaint[] and matters of which [the court] may take judicial notice," *Vasaturo v. Peterka*, 177 F. Supp. 3d 509, 511 (D.D.C. 2016) (second alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)), including the court's own records and records from other judicial proceedings, *see Alford v. Providence Hosp.*, 60 F. Supp. 3d 118, 123 (D.D.C. 2014).

## III.    DISCUSSION

### A.    Standing

"To establish standing, [p]laintiffs 'must state a plausible claim that [they have] suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (second alteration in original) (quoting *Humane Soc'y of the U.S. v. Vilsack,* 797 F.3d 4, 8 (D.C. Cir. 2015)).  That is, plaintiffs "must show (i) they have 'suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of [a] defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision.'" *Id.* at 914 (quoting *Osborn v. Visa,* 797 F.3d 1057, 1063 (D.C. Cir. 2015)).  Where, as here, an

organization sues on its own behalf,[17] it must make the same showing, *see, e.g.*, *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (stating that where an organization asserts "organizational standing," it must "like an individual plaintiff, [ ] show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision'" (some internal quotation marks omitted) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011))), although, as will be seen, the nuances of the inquiry differ somewhat.

In determining whether a plaintiff has standing, "a federal court must assume *arguendo* the merits of his or her legal claim," so that the court "does not resolve the merits while analyzing the standing question." *Smith v. Henderson*, 944 F. Supp. 2d 89, 97 (D.D.C. 2013) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007)). Additionally, in ruling on a motion

---

[17] This kind of standing is known as "organizational standing" or *Havens* standing, from the Supreme Court case *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). An organization may also have standing to sue on behalf of its members. *See, e.g.*, *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) ("An organization . . . can assert standing on its own behalf, on behalf of its members[,] or both."). Such "associational standing" requires "(1) that the plaintiff has at least one member who 'would otherwise have standing to sue in [her] own right;' (2) that 'the interests' the association 'seeks to protect are germane to [its] purpose;' and (3) that 'neither the claim asserted nor the relief requested requires the participation of [the] individual members in the lawsuit.'" *Pub. Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 17–18 (D.D.C. 2018) (alterations in original) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). Here, as their opposition to the motions to dismiss makes clear, Plaintiffs CARE and NeRAC assert only organizational standing. ECF No. 39 at 14. Therefore, this Report and Recommendation does not address Defendants' arguments directed to associational standing. ECF No. 26-1 at 29–30, 32; ECF No. 27-1 at 20. Those arguments include the Housing Authority's contention that, because CARE and NeRAC "have not alleged specifics of how they are [ ] 'traditional membership organization[s]'"—a questionable assertion given that the operative complaint quite plainly alleges that each entity is made up of members (ECF No. 34, ¶¶ 112–113, 118–119) and the Housing Authority has not explained what more is needed—they must make an additional showing to establish standing, including that they "represent individuals that have all the 'indicia of membership'" (ECF No. 26-1 at 32 (quoting *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002))). As the cases the Housing Authority cites establish, that further showing applies to entities without members that seek to assert associational standing, rather than entities that seek to assert organizational standing. *See Fund Democracy*, 278 F.3d at 25–27 (addressing additional factors in analyzing associational standing for an entity that apparently had no members); *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 207–09 (D.D.C. Mar. 19, 2007) (same); *see also, e.g.*, *Hunt*, 432 U.S. at 342–45 (outlining additional requirements for a "state agency, rather than a traditional voluntary membership organization" to sufficiently allege associational standing); *Fair Employment Counsel of Greater Wash., Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (analyzing organizational standing without addressing those additional factors even where the entity was not a traditional membership organization).

to dismiss challenging the plaintiffs' standing, the court should "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Food & Water Watch*, 808 F.3d at 913 (quoting *Bennett v. Spear,* 520 U.S. 154, 168 (1997). On the other hand, courts, "do not assume the truth of legal conclusions, . . . accept inferences that are unsupported by the facts set out in the complaint," *Food & Water Watch*, 808 F.3d at 913 (quoting *Arpaio v. Obama,* 797 F.3d 11, 19 (D.C. Cir. 2015)), or "accept[ ] as correct the conclusions [a] plaintiff would draw from such facts," *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Moreover, "nondescript and conclusory allegations of injury are not the type of general factual allegations from which the Court may presume the specific facts necessary to ensure that the plaintiff has standing, and are insufficient to meet the plaintiff's burden of alleging an injury in fact that is concrete and particularized." *Brown v. FBI*, 793 F. Supp. 2d 368, 374 (D.D.C. 2011) (quoting *Wright v. McPhie*, No. 04-cv-1204, 2005 WL 3273556, at *3 (D.D.C. Sept. 27, 2005)).

"Plaintiffs bear the burden of demonstrating that they have standing to bring suit with respect to each of their claims." *Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 225 (D.D.C. 2009). Similarly, they must establish that they have "standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). However, where multiple parties seek the same relief on a claim, as long as one party has standing, the court need not consider whether the other parties also have standing. *Am. Anti-Vivisection Soc. v. U.S. Dep't of Agric.*, 946 F.3d 615, 619–20 (D.C. Cir. 2020).

The following first discussion addresses Plaintiffs' argument that they have standing to press their constitutional claims pursuant to the Supreme Court's decision in *Carey v. Piphus*, 435 U.S. 247 (1978). It then considers issues of organizational standing for NeRAC and CARE, and, finally, issues of standing for the individual Plaintiffs. Ultimately, the undersigned finds that the

operative complaint fails to establish that the organizational entities have standing to pursue any of the causes of action.   However, the complaint has alleged facts sufficient to find that the individual Plaintiffs have established standing for damages and certain prospective relief against the Housing Authority on their substantive due process claim (Count 15); the individual Plaintiffs have also established standing to seek damages from the District on their equal protection claim (Count 6) and their statutory claims under the D.C. Human Rights Act and Fair Housing Act (Counts 7–14).

        1.     Standing Pursuant to *Carey v. Piphus*

Plaintiffs first argue that they "have standing because they allege violations of their constitutional rights.   The violation of a constitutional right is itself an injury that confers standing."   ECF No. 39 at 13.   The argument (which concludes briskly in three sentences other than the one just quoted) relies on the Supreme Court's decision in *Carey*:

> Courts have traditionally recognized "the importance to organized society that [certain absolute] rights be scrupulously observed" even in the absence of proof of actual injury by "making the deprivation of such rights actionable." *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *see also Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986); *Hobson v Brennan*, 646 F. Supp. 884, 886 (D.D.C. 1986). In *Carey*, the Supreme Court held:
>
>> Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, . . . the denial of procedural due process should be actionable . . . without proof of actual injury.
>
> 435 U.S. at 266. Accordingly, regardless of the actual, concrete injuries discussed below this case cannot be dismissed for lack of standing.

ECF No. 39 at 13–14 (alterations in original) (internal cross-reference omitted).   The argument is underdeveloped and appears to rely on an overreading of the precedent.

In *Carey*, the Supreme Court "consider[ed] the elements and prerequisites for recovery of

damages [under 42 U.S.C. § 1983] by students who were suspended from public elementary and secondary schools without procedural due process."  435 U.S. at 248.  The Seventh Circuit had held that the students would not be entitled to recover damages "representing the value of the missed school time" if it were shown "that there was just cause for the suspension[s] and that therefore [the students] would have been suspended even if a proper hearing had been held."  *Id.* at 252 (first alteration in original) (quoting *Piphus v. Carey*, 545 F.2d 30, 32 (7th Cir. 1976)).  It had further held, however, that even if the suspensions were justified, the students "would be entitled to recover substantial 'nonpunitive' damages simply because they had been denied procedural due process."  *Carey*, 435 U.S. at 252 (quoting *Piphus*, 545 F.2d at 31).  The Supreme Court agreed with the first holding, stating that "an award of damages for injuries caused by [justified] suspensions would constitute a windfall, rather than compensation" to the students.  *Carey*, 435 U.S. at 260.  As to injuries derived from the denial of due process itself, the Court held that in order to recover compensatory damages for such an injury, the plaintiff must "produc[e] evidence that mental and emotional distress was caused by that denial," rather than caused by the "justified" suspensions.  *Id.* at 263–64.  Finally, as relevant here, the Court noted that "[e]ven if [the students'] suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process."  *Id.* at 266.  It continued with the sentence Plaintiffs quote, here reproduced without omissions:

> Because the right to procedural due process is "absolute" in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Id.*  It is on that sentence that Plaintiffs base the assertion that the mere "alleg[ation] [of] violations of their constitutional rights" confers standing regardless of whether they suffered any "actual,

concrete injuries."  ECF No. 39 at 13–14.

On its face, *Carey* holds no such thing.  The case addresses the proof required for an award of damages for a constitutional injury.[18]  *See, e.g.*, *Aref v. Lynch*, 833 F.3d 242, 264 (D.C. Cir. 2016) ("[I]n *Carey v. Piphus*, the Court held that a plaintiff is eligible to recover damages under Section 1983 if he can demonstrate 'some actual, if intangible, injury' caused by a constitutional violation." (quoting *Carey*, 435 U.S. at 264)); *PETA. v. Gittens*, 396 F.3d 416, 421 (D.C. Cir. 2005) (citing *Carey*, among other cases, for "the principle that when a court finds a constitutional violation in an action seeking monetary relief under 42 U.S.C. § 1983, the court (or jury) must at least award nominal damages"); *Tri Cty. Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997) (citing *Carey* for the proposition that, while a plaintiff may recover nominal damages when a violation of procedural due process is proved, the same is not true of a violation of substantive due process); *Daskalea v. Wash. Humane Soc'y*, 710 F. Supp. 2d 32, 44 (D.D.C. 2010) ("[W]hile a plaintiff may be entitled to nominal damages for a violation of his procedural due process rights, even absent proof of an injury, a plaintiff is not entitled to nominal damages [ ] absent proof that his procedural due process rights were in fact violated.").  Plaintiffs have cited no case from the Supreme Court, the D.C. Circuit, or this Court holding that any allegation of a violation of constitutional rights obviates the need for a court to analyze whether the Plaintiffs have shown the "irreducible constitutional minimum of standing," that is, a "demonstrat[ion] that [the plaintiff] has suffered an injury in fact, that there is a causal connection between the injury and the conduct complained of, and that it is likely that the injury will be redressed by a favorable

---

[18] More specifically, *Carey* focuses on proof of injury when there has been a violation of procedural due process. However, the D.C. Circuit has since held that "the Court [in *Carey*] meant to extend the basic 'compensation principle' to *all* constitutional rights, substantive as well as procedural." *Doe v. District of Columbia*, 697 F.2d 1115, 1122–23 (D.C. Cir. 1983) (citing *Carey*, 435 U.S. at 258–59, 264–65).

decision." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1101 (D.C. Cir. 2005) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also, e.g.*, *Freedom from Religion Found. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 488 (3d Cir. 2016) (Smith, J., concurring *dubitante*) ("*Carey* was not a case about justiciability and was more about the availability of nominal damages where other damages claims were ultimately not susceptible of proof.").  Indeed, when *Carey* is cited in this Circuit in connection with questions of standing, it is generally merely for the proposition that in order to establish standing for a claim alleging violation of the right to procedural due process, a plaintiff need not demonstrate that "he would prevail if accorded appropriate process." [19]  *See, e.g.*, *Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1503 (D.C. Cir. 1988) (citing *Carey*, 435 U.S. at 266).

To be sure, allegations of certain constitutional injuries affect the contours of the standing inquiry.  For example, plaintiffs alleging a violation of procedural due process (as Plaintiffs do in

---

[19] One case from this District (not cited by Plaintiffs) could be read to support their position, at least for procedural due process claims.  In *McManus v. District of Columbia*, Judge Kollar-Kotelly cited *Carey* for the proposition that the "failure to indicate specific injuries as a result of the [an] alleged denial of procedural due process would not, in and of itself, deprive [a plaintiff] of Article III standing." 530 F. Supp. 2d 46, 73 n.24 (D.D.C. 2007).  The statement, however, is merely dicta.  Judge Bates later cited *McManus*, again in dicta, to support the notion that "courts applying the 'standing framework' to procedural due process claims have accorded some flexibility to such claims."  *English v. District of Columbia*, 815 F. Supp. 2d 254, 267 n.14 (D.D.C. 2011), *aff'd*, 717 F.3d 968 (D.C. Cir. 2013).

In *Irish Lesbian and Gay Org. v. Giuliani*, the Second Circuit seemed to adopt an expansive interpretation of *Carey*, asserting that the plaintiff had "standing to assert a claim for nominal damages" because "[n]ominal damages are available in actions alleging a violation of constitutionally protected rights, even without proof of any actual injury."  143 F.3d 638, 651 (2d Cir. 1998) (citing *Carey*, 435 U.S. at 266); *see also Island Online, Inc. v. Network Sols., Inc.*, 119 F. Supp. 2d 289, 299 (E.D.N.Y. 2000) ("In *Irish Lesbian and Gay Org.*, the Second Circuit made it clear that a party can get standing without proving that a defendant's unconstitutional conduct caused any actual damage to it.").  However, it is difficult to harmonize that position with later pronouncements by the Second Circuit.  For example, in *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, the plaintiff argued that the Supreme Court had "eliminated the 'injury-in-fact' requirement in discrimination cases" when it stated (in words reminiscent of those in *Carey*), "[L]ike the right to procedural due process, the right to equal treatment guaranteed by the Constitution is not co–extensive with any substantive rights to the benefits denied the party discriminated against" because "discrimination itself . . . can cause serious non-economic damages to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."  861 F.3d 40, 50 (2d Cir. 2017), *as amended* (Aug. 2, 2017) (first alteration in original) (quoting *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984)).  The Second Circuit rejected the argument, noting that the holding in *Matthews* that recognized the harm inherent in discrimination itself "did not eliminate the need to show an 'injury in fact' incorporating the dual requirement of concreteness and imminence; it simply expanded the definition of what constitutes such an injury to include emotional as well as tangible harms."  *MGM Resorts*, 861 F.3d at 50.

a number of the claims here) must show that they have "been accorded a procedural right to protect [their] concrete interests"; if that is accomplished "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff[s], but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc) (quoting *Lujan*, 504 U.S. at 572 n.7); *see also Summers*, 555 U.S. at 496 ("Only a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy.'" (quoting *Lujan*, 504 U.S. at 572 n.17)); *Rector v. City and Cty. of Denver*, 348 F.3d 935, 943 (10th Cir. 2003) (noting that "[c]ourts must be cautious in applying Article III standing requirements in procedural due process cases"); *English*, 815 F. Supp. 2d at 267 n.14 ("[C]ourts applying the 'standing framework' to procedural due process claims have accorded some flexibility to such claims."). But, as Judge Bates explained in *City of Dover v. EPA*:

> [A] bare assertion of a procedural due process violation is not an Article III injury. Under settled precedent, plaintiffs do not have standing based simply on allegations that their due process rights have been violated. The reason is straightforward: the Fifth and Fourteenth Amendments together guarantee that neither the federal government nor any state government will "deprive any person of life, liberty, or property, without due process of law . . . ." Thus, unless a plaintiff is deprived of one of those interests without due process, that plaintiff has no claim.

36 F. Supp. 3d 103, 118–19 (D.D.C. 2014) (internal citations omitted) (quoting U.S. Const. amends. V, XIV) (citing *Gen. Elec. Co. v. Jackson*, 640 F.3d 110, 117 (D.C. Cir. 2010)); *see also Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Multistar Indus., Inc. v. U.S. Dep't of Transp.*, 707 F.3d 1045, 1054 (9th Cir. 2013) ("Where, as here, a plaintiff alleges injury based on the government's failure to abide by a

procedural requirement, it must show that the procedures 'protect[] a concrete threatened interest.'" (quoting *Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1229 (9th Cir. 2008))); *Rector*, 348 F.3d at 943 ("[T]he Constitution does not protect procedure for procedure's sake."); *United Transp. Union v. Interstate Commerce Comm'n*, 891 F.2d 908, 918 (D.C. Cir. 1989) ("[B]efore [a court will] find standing in procedural injury cases, [it] must ensure that there is some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing.  Without such a nexus, the procedural injury doctrine could swallow Article III standing requirements."); *Rangel v. Boehner*, 20 F. Supp. 3d 148, 165 (D.D.C. 2013) ("[A]llegations that defendants violated [a plaintiff's] due process rights, standing alone, are not cognizable as injuries-in-fact.  Rather, [the plaintiff] must allege a deprivation of some liberty or property interest to satisfy Article III.").  When the claim is for a violation of equal protection (which Plaintiffs also allege here),

> [t]he mere allegation of unequal treatment, absent some kind of actual injury, is insufficient to create standing. . . .  At the very least, plaintiffs have had to show that the challenged classification creates a "barrier that makes it more difficult for members of one group to obtain a benefit," or causes "non-economic injuries" such as "stigmatizing members of the disfavored group."

*Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 665–66 (7th Cir. 2015) (first quoting *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666 (1993), then quoting *Mathews,* 465 U.S. at 739).  Thus, "the particular nature of the case does not—and cannot—eliminate any of the 'irreducible' elements of standing," although it may "compel the court to pay particular attention" to certain "components of standing."  *Fla. Audubon Soc'y*, 94 F.3d at 664.  Nor does the fact that a case alleges constitutional violations elide the requirement that a plaintiff demonstrate standing for each claim and for each type of relief sought, neither of which Plaintiffs have attempted in connection with this argument.  It is necessary

therefore to proceed with a standard analysis of Plaintiffs' standing.[20]

## 2. Organizational Standing

To establish organizational standing, an entity (like an individual) must allege a concrete and particularized injury traceable to the defendant's actions.[21]  *See, e.g.*, *PETA*, 797 F.3d at 1093 ("The key issue is whether [the plaintiff] has suffered a 'concrete and demonstrable injury to [its] activities . . . .'" (second alteration in original) (quoting *Equal Rights Ctr.*, 633 F.3d at 1138)). Evaluating whether an organization has accomplished that task can be a tricky business.  *See, e.g.*, *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 254 (D.D.C. 2016) [hereinafter *International Academy* or *Int'l Acad.*] ("[I]dentifying what counts as a cognizable injury to an organization is no easy feat . . . ."). Under D.C. Circuit precedent, there is "'a two-part test to determine whether an organization has alleged a cognizable injury' when asserting a claim against the government."[22]  *Id.* (quoting *Food & Water Watch*, 808 F.3d at 924).  The court asks, "first, whether the [defendant's] action or omission to act injured the [organization's] interest, and, second, whether the organization used its resources to counteract the harm."  *Food & Water*

---

[20] Even if Plaintiffs were correct that the mere assertion of a constitutional violation without further harm conferred standing, that assertion would do so only for claims for nominal damages, not declaratory relief, injunctive relief, or compensatory damages.  *See Carey*, 435 U.S. at 266.

[21] Courts regularly use the conventional tests to inquire into organizational and associational standing in cases in which the plaintiff alleges a violation of constitutional rights.  *See, e.g.*, *Metro. Wash. Chapter, Assoc. Builders and Contractors, Inc. v. District of Columbia*, 57 F. Supp. 3d 1, 18–20 (D.D.C. 2014) (Sullivan, J.); *see also, e.g.*, *Cmty. Fin. Servs. Assoc. of Am. V. FDIC*, No. 14-cv-953 (GK), 2016 WL 7376847, at *11–12 (D.D.C. Dec. 19, 2016); *Nat'l Veterans Legal Servs. Program v. DOD*, No 14-cv-1915 (APM), 2016 WL 4435175, at *6–7, 14 (D.D.C. Aug. 19, 2016); *Kingman Park Civic Assoc. v. Gray*, 27 F. Supp. 3d 142, 155–58, 167–68 (D.D.C. 2014).

[22] Although, as noted above, the Housing Authority has "a legal existence separate from the District government," *supra* n.2, it is still a part of the D.C. government.  D.C. Code § 6-202(a) (designating the Housing Authority as "an independent authority of the District government"); *see also Long v. D.C. Hous. Auth.*, 166 F. Supp. 3d 16, 20 (D.D.C. 2016) (calling the Housing Authority "an agency of the District of Columbia government").  Thus, even if the organizational standing analysis might differ slightly when the defendant is a private party, *see Food & Water Watch*, 808 F.3d at 926 (suggesting that the details of the analysis might differ depending on whether the defendant is a government agency or a private party), there is no need to discuss that here and, indeed, no party has suggested that the Court do so.

*Watch*, 808 F.3d at 924 (second alteration in original) (quoting *PETA*, 797 F.3d at 1094).

        a.      NeRAC

      The first prong of the organizational standing test asks whether the challenged action (or inaction) "injured the [organization's] interest." *Food & Water Watch*, 808 F.3d at 924. As Judge Boasberg has noted, the question "appears deceptively simple" in light of Circuit precedent making a somewhat "haz[y]" distinction between "a 'concrete and demonstrable injury to [the organization's] activities'—which suffices for standing purposes—and 'a mere setback to its abstract social interests'—which does not." *Int'l Acad.*, 195 F. Supp. 3d at 254 (second alteration in original) (quoting *Equal Rights Ctr.*, 633 F.3d at 1138); *see also Ctr. for Responsible Science v. Gottlieb*, 311 F. Supp. 3d 5, 9 (D.D.C. 2018) ("Caselaw for organizational standing is not a model of clarity . . . .").

      The D.C. Circuit has held that "the presence of a direct conflict between the defendant's conduct and the organization's mission is necessary—though not alone sufficient—to establish standing." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430 (emphasis omitted). .Nor is it enough to allege merely that "an agency's conduct makes an organization's activities more difficult," *Food & Water Watch v. Vilsack*, 79 F. Supp. 3d 174, 200 (D.D.C.) (emphasis omitted), *aff'd* 808 F.3d 905 (D.C. Cir. 2015), or that the organization's objectives have been frustrated; those are "the type[s] of abstract concern[s] that do[ ] not impart standing," *Nat'l Treasury Emps. Union*, 101 F.3d at 1430; *see also Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) ("[J]ust as an individual lacks standing to assert '"generalized grievances" about the conduct of Government,' so an 'organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III.'" (internal citations omitted) (first quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 217 (1974), then quoting *Simon*

*v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976))).  Instead, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services," which occurs "when the defendant's conduct causes an 'inhibition of [the organization's] daily operations."  *Food & Water Watch*, 808 F.3d at 919 (alteration in original) (first quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015), then quoting *PETA*, 797 F.3d at 1094)); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 22 (D.D.C. 2014) ("Specifically, the "'organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action.'" (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995))).

While case law in this area fails to yield a "bright-line test," one of the "key factors" in the analysis "is whether the injury relates to the organization's mere advocacy objectives or if, instead, it undermines the organization's direct, non-advocacy services."  *Int'l Acad.*, 195 F. Supp. 3d at 256; *U.S. Women's Chamber of Commerce v. U.S. Small Bus. Admin.*, No. 04-cv-1889 (RBW), 2005 WL 3244182, at *6 (D.D.C. Nov. 30, 2005) (noting that the Supreme Court has found an injury sufficient to satisfy the requirements of organizational standing where the organization "suffered concrete injury due to [its] inability to provide a service to [its] members").  For example, in *Havens Realty Corp. v. Coleman*, the plaintiffs—which included an organization whose "purpose was 'to make equal opportunity in housing a reality'" and whose "activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination"—brought an action under the Fair Housing Act alleging that a realty company and one of its employees had engaged in "racial steering" by "steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups and away from buildings and neighborhoods inhabited primarily by members of other races

25

or groups." 455 U.S. 363, 367 n.1, 368 (1982) (citations to record omitted).  The Supreme Court found that the organization had alleged an injury-in-fact by asserting that the defendants' "steering practices ha[d] perceptibly impaired [the organization's] ability to provide counseling and referral services."  *Id.* at 379.  Similarly, in *League of Women Voters of the U.S. v. Newby*, various voting rights groups sued the Executive Director of the Election Assistance Commission, seeking to enjoin enforcement of his decision to allow the states of Alabama, Georgia, and Kansas to modify the instructions to the federally-prescribed national mail voter registration form to include a proof-of-citizenship requirement.  838 F.3d 1, 4–6 (D.C. Cir. 2016).  The D.C. Circuit noted that proof-of-citizenship instructions

> substantially limited the ability of [one of the organizations] to successfully register voters because (1) often potential voters didn't have citizenship documents with them, (2) even if they did, the [plaintiff] didn't have equipment to copy those documents, and (3) some potential voters balked at the idea of allowing the [plaintiff's] volunteers to copy their sensitive citizenship documents.

*Id.* at 8.  Because the organization had alleged that the proof-of-citizenship requirement impaired its ability to provide its primary service to individuals—registering them to vote—it had established injury in fact sufficient to support standing.  *Id.* at 9.  Finally, in *Haitian Refugee Ctr. v. Gracey*, the D.C. Circuit held that an organization whose "purpose . . . [was] to promote the well-being of Haitian refugees through appropriate programs and activities, including legal representation . . . , education regarding legal and civil rights, orientation, acculturation, and social and referral services" had sufficiently alleged standing to challenge a program to interdict Haitian refugees on the high seas and return them to Haiti, which would obviously prevent the group from providing services to its target population.  809 F.2d 794, 799 (D.C. Cir. 1987).

Here, neither the operative complaint's allegations regarding NeRAC nor Plaintiffs' arguments in opposition to Defendants' motions to dismiss are sufficient to surmount the "high

bar for organizational standing." *Better Markets, Inc. v. DOJ*, 83 F. Supp. 3d 250, 254 (D.D.C. 2015) (Howell, C.J.).   As noted above, Plaintiffs allege that NeRAC "is a community-based nonprofit organization that advocates for D.C. residents' environmental health and safe housing, with a particular focus on residents of Buzzard Point."   ECF No. 34, ¶ 112.   It "advances that interest through grassroots organizing, leadership development, community education, and providing resident testimony at Zoning Commission hearings."  *Id.*, ¶ 114.   NeRAC asserts that its "interests have been thwarted by Defendants' redevelopment decisions that have negatively affected the health of its members and area residents."  *Id.*, ¶ 115.   For example, it argues that "redevelopment construction has resulted in poor air quality for residents of Buzzard Point" because "[f]ugitive and toxic dust from the site coats the surfaces in residents' homes and otherwise suffocates members with unclean air."   ECF No. 39 at 16.   Such an injury is "not abstract," according to Plaintiffs, because "NeRAC has been prevented from fulfilling its mission of protecting residents from environmental damage."  *Id.* at 18.

On the contrary, those alleged injuries are precisely the sort of "abstract concern[s] that do[ ] not impart standing" to an organization.  *Nat'l Treasury Emps. Union*, 101 F.3d at 1429.   For example, in *Chesapeake Climate Action Network v. Export-Import Bank of the U.S.*, a group called Pacific Environment challenged the Export-Import Bank's $90 million loan guarantee, which supported a $100 million loan from a bank to a coal exporter.   78 F. Supp. 3d 208, 212 (D.D.C. 2015).   Pacific Environment, whose mission was "to strengthen democracy, support grassroots activism, empower local communities, and redefine international policies in order to protect the living environment of the Pacific Rim," claimed that the guarantee would allow the coal exporter to export $1 billion in U.S. coal to the detriment of "human health and the environment"; such an export would allegedly harm the group by "impeding its objectives of requiring financial

institutions to increase their accountability and improve their environmental policies." *Id.* at 212, 230 (emphasis omitted) (internal citations to the record omitted). The court held that such allegations merely described "the kind of 'setback to the organization's abstract social interests,' that does not constitute a 'concrete and demonstrable injury to the organization's activities.'" *Id.* at 230 (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1428). Similarly, in *International Academy*, an organization (known as the International Academy of Oral Medicine and Toxicology, or IAOMT), which opposed the use of mercury in dental fillings, challenged a rule promulgated by the FDA that, in the group's opinion, did not regulate the use of amalgam fillings (which include mercury as a component) strictly enough. 195 F. Supp. 3d at 252, 256. The court held that the organization did not have standing based on its "mission to promote the health of the public, including the reduction of the devastating effects of mercury exposure on patients, dentists, and staff." *Id.* at 256–57. Rather, the conflict was merely with the organization's mission, which "alone does not confer standing." *Id.* at 257. Here, the bulk of NeRAC's allegations of harm merely indicate that Defendants' conduct has interfered with its "advocacy objectives." *Id.* at 256. Plaintiffs fail to sufficiently "allege that [NeRAC's] discrete programmatic concerns are being directly and adversely affected by [Defendants'] actions." *Food & Water Watch*, 79 F. Supp. 3d at 201–02 (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)).

Nor do NeRAC's bare-bones contentions regarding diversion of resources suffice to establish injury. The complaint alleges merely that "NeRAC has expended its resources in response to, and to counteract, the negative effects of [D]efendants' actions." ECF No. 34, ¶ 116. The opposition to the motions to dismiss adds that NeRAC has incurred "the costs of creating and distributing information with tools like flyers and brochures, and redirecting the organization's human resources efforts to build public awareness." ECF No. 39 at 18. Again, such allegations

have been held not to "'perceptibly impair[ ]' a non-abstract interest." *Nat'l Assoc. of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).  Rather, "an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 920 (alteration in original) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434); *see also Food & Water Watch*, 808 F.3d at 925 (Henderson, J. concurring) ("[A]n organizations 'expend[iture of] resources to educate its members and others regarding' government action or inaction 'does not present an injury in fact.'  Instead, an organizational plaintiff must 'allege impairment of its ability to provide services, [not] only impairment of its advocacy.'  [The organization's] sole allegation that it has made expenditures based on the challenged . . . regime is tied to educating its members and the public. . . .  This is 'pure issue-advocacy.'" (second and third alterations in original) (footnote omitted) (first quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434, then quoting *Turlock Irrigation Dist.*, 786 F.3d at 25, then quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2015))); *Int'l Acad.*, 195 F. Supp. 3d at 256 (listing as a "key factor" in the organizational standing inquiry, whether "the challenged agency action cause[d] it to incur 'operational costs beyond those normally expended' to carry out its day-to-day mission of educating the public or advancing its advocacy mission" (quoting *Food & Water Watch*, 808 F.3d at 920)).

So, for example, *Better Markets* found that a complaint alleging that the defendants "interfere[d] with [the plaintiff organization's] ability to pursue its advocacy activities . . . by forcing it to devote resources to counteracting the harmful effects of the [defendant's] unlawful . . . process" was insufficient to allege an injury in fact based on the expenditure of resources.  83 F. Supp. 3d at 255 (quoting the complaint).  The court noted that "[t]he plaintiff ha[d] utterly failed

to point to a single programmatic concern impacted by the defendants' actions." *Id.*   In *International Academy*, IAOMT made two diversion-of-resources arguments.   First, it claimed that, "[a]s a direct result" of the FDA Rule regarding use of amalgam fillings, the group "was forced to deviate a substantial portion of its resources to identify and dispute the FDA's errors [in that Rule]." *Int'l Acad.*, 195 F. Supp. 3d at 257 (alterations in original) (quoting the organization's opposition to the motion to dismiss).   Second, it asserted that the FDA Rule "forced it to spend $10,000 on a pamphlet designed to educate its members on how to 'communicat[e] about mercury fillings with the public, with their patients, and with the various dental boards.'" (alteration in original) (quoting the organization's opposition to the motion to dismiss).   *Id.* at 259.   Judge Boasberg found that the first "pertained directly and exclusively to [the organization's] issue-advocacy services." *Id.* at 257.   He explained that the group's "situation is quite unlike others in which organizations engaged in both advocacy and direct services provision, as the latter may provide the basis for standing while the former does not." *Id.* at 258.   Moreover, it "ha[d] not identified any specific projects that [it] had to put on hold or otherwise curtail in order to respond" to the allegedly illegal conduct of the defendant. *Id.* at 257 (second alteration in original) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)).   In sum, there was no "'diversion' of expenditures at all; on the contrary, [the] recent spending pattern [fell] neatly within the core of services [the organization] ha[d] long performed"; thus, the activities were a "continuation of" its normal enterprise. *Id.* at 258–59.   The second injury fared no better, and for similar reasons.   The pamphlet merely expressed IAOMT's "long supported efforts to educate" and thus did not "fall[] outside the ambit of its normal activities." *Id.* at 260.   Like IAOMT,  NeRAC has failed to point to any direct services it was unable to provide or projects it put on hold as a result of its activities in response to the District's conduct; the allegations that it created and distributed flyers and

brochures about the asserted harms of the Buzzard Point redevelopment and used its members to build public awareness are merely continuations of its normal enterprise.

NeRAC urges that the D.C. Circuit in *ASPCA v. Feld Entertainment, Inc.*, 659 F.3d 13 (D.C. Cir. 2011), held that "expending resources on 'advocacy' does not defeat standing." ECF No. 39 at 19. NeRAC overreads the case. *ASPCA* certainly questioned whether an injury to an organization's advocacy activities could support *Havens* standing, but it ultimately left that question for another day. *ASPCA*, 659 F.3d at 25–27 ("Ultimately, whether injury to an organization's advocacy supports *Havens* standing remains an open question that we have no need to resolve here."). Since Judge Tatel's opinion in *ASPCA*, the D.C. Circuit has reiterated that injury to an organization's advocacy objectives and expense on advocacy does not support organizational standing. *See, e.g.*, *Food & Water Watch*, 808 F.3d at 919–20 ("Our precedent makes clear that an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury. Furthermore, an organization does not suffer an injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" (second alteration in original) (internal citations omitted) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434)); *id.* at 924–25 (Henderson, J., concurring) ("[A]n organization's 'expend[iture of] resources to educate its members and others regarding' government action or inaction 'does not present an injury in fact.' Instead, an organizational plaintiff must 'allege impairment of its ability to provide services, [not] only impairment of its advocacy.'" (second and third alterations in original) (internal citations omitted) (first quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434, then quoting *Turlock Irrigation Dist.*, 786 F.3d at 24); *Turlock Irrigation Dist.*, 786 F.3d at 24 (D.C. Cir. 2015) (reaffirming that "the expenditure of resources on advocacy is not a cognizable Article III injury" and further holding

31

that, where an organization "does not allege impairment of its ability to provide services, [but] only impairment of its advocacy," it has not established standing); *see also Elec. Privacy Info. Ctr.*, 48 F. Supp. 3d at 23 ("[T]he D.C. Circuit has not found standing when 'the only "service" impaired is pure issue-advocacy'" (quoting *Ctr. for Law & Educ.*, 396 F.3d at 1162).

In any event, NeRAC has not plausibly alleged that "Defendant's redevelopment decisions" (ECF No. 39, ¶ 115) have made its advocacy activities impossible or even more difficult. *See Int'l Acad.*, 195 F. Supp. 3d at 257 (indicating that *Havens* standing might be supported by a showing that there was an injury to "'the organizations advocacy activities' themselves." (quoting *ASPCA*, 659 F.3d at 27)). NeRAC "advocates for D.C. residents' environmental health and safe housing, with a particular focus on residents of Buzzards Point" and "advances that interest through grassroots organizing, leadership development, community education, and providing resident testimony at Zoning Commission hearings." ECF No. 34, ¶¶ 112, 114. Seen through the proper lens, NeRAC's "purported need for increased expenditures for advocacy and outreach proves precisely the *opposite* of the point that [NeRAC] is attempting to make." *Food & Water Watch*, 79 F. Supp. 3d at 202. Indeed, NeRAC "presumably fulfills its very purpose when it undertakes to marshal its resources to fight the good fight against [municipal and] agency action that it feels is improper and unwise." *Food & Water Watch*, 79 F. Supp. 3d at 202; *see also Elec. Privacy Info. Ctr.*, 48 F. Supp. 3d at 23 (finding that a federal regulation allowing certain student information to be released without prior consent did not "impede[] . . . the programmatic concerns and activities" of an organizational plaintiff established to focus attention on preserving privacy safeguards, but in fact "fueled them" by "contribut[ing] to its pursuit of its purpose"). And Plaintiffs have pointed to no allegation or evidence that Defendants' conduct in connection with the Creative Class Agenda has had any 'impact whatsoever on [its] *ability*" to, for

example, advocate for environmental health, organize, educate, or testify. *Int'l Acad.*, 195 F. Supp. 3d at 258. Indeed, the allegations indicate that NeRAC continues to do just that.

One issue that Plaintiffs do not press in their arguments on organizational standing deserves some more discussion. Courts have found that an organization can establish standing based on so-called "informational injury," such as when the government fails to disclose information that is essential to the organization's activities. *See, e.g.*, *Food & Water Watch*, 79 F. Supp. 3d at 203. The allegations supporting Count 2—a procedural due process claim brought by NeRAC (as well as three individual plaintiffs) regarding ZC No. 16-02, the PUD application related to a professional soccer stadium in Buzzard Point—assert, among other things, that the Department of Housing and Community Development neglected to produce a statutorily-required impact assessment prior to the hearing on the application. ECF No. 34, ¶¶ 57, 82, 204.f. Such a failure could arguably constitute an informational injury. However, "to sustain informational standing, organizations must point to concrete ways in which their programmatic activities have been harmed." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 123 (D.C. Cir. 1990). In *PETA*, for example, the animal rights group challenged the government's decision not to enforce statutory protections for the humane treatment of birds, including licensure and inspection provisions. 797 F.3d at 1091. The court held that the organization had adequately alleged injury for standing purposes by asserting that it was denied "access to bird-related [ ] information" that would have been available had the government engaged in investigations of avian abuse, thus requiring the group to expend resources to gather such information itself to fulfill its mission to educate the public. *Id.* at 1095. NeRAC has failed identify any concrete injury from the lack of an impact assessment (such as an expenditure of funds to commission or produce an impact assessment), asserting only that the failure (together with other wrongs) "limited [its] right

33

to participate in proceedings that comply with D.C. law." ECF No. 34, ¶ 205. But it is well established that "an asserted right to have the Government act in accordance with the law is not sufficient" to confer standing. *Allen v. Wright*, 468 U.S. 737, 754 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see also Lujan*, 504 U.S. at 575–76 ("[A]n injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable because 'assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.'" (quoting *Allen*, 468 U.S. at 754)). Moreover, Plaintiffs' submissions demonstrate that the alleged withholding of information did not impact NeRAC's ability to educate, organize, or testify. For example, it admits both in the operative complaint and in its opposition to the motion to dismiss that NeRAC provided testimony in connection with ZC No. 16-02, so there can be no suggestion that the lack of an impact assessment impinged on that process. ECF No. 34, ¶ 204.c; ECF No. 39 at 55; *see Food & Water Watch*, 79 F. Supp. 3d at 204 (finding no cognizable injury notwithstanding an asserted failure to disseminate information on the part of the government where the organization continued to mount a public education campaign and its only alleged injury was that it would "have to spend more money to inform the public" about the allegedly illegal conduct).

Finally, a foundational tenet of Plaintiffs' argument on standing is that they need not allege any more than they have because "the court 'presumes that general allegations embrace those specific facts that are necessary to support the claim.'" ECF No. 39 at 17 (quoting *Lujan*, 504 U.S. at 561). That may be true as a general proposition. However, as noted above, courts will not accept "nondescript and conclusory allegations of injury," *Brown*, 793 F. Supp. 2d at 374, "inferences that are unsupported by the facts set out in the complaint," *Food & Water Watch*, 808

F.3d at 913, or "the conclusions [a] plaintiff would draw from such facts," *Nat'l Treasury Emps.*

*Union*, 101 F.3d at 1430.  Moreover, an organizational plaintiff's "asserted injury must be clearly

identified and then assessed under the D.C. Circuit's two-prong analysis for determining whether

an organizational plaintiff has established a cognizable injury."  *Nat'l Fair Hous. Alliance v.*

*Carson*, 330 F. Supp. 3d 14, 44 (D.D.C. 2018).  Here, NeRAC's assertions of harm, whether

general or specific, do not establish injury-in-fact for the purposes of organizational standing.

NeRAC alleges that "Defendants' redevelopment decisions [ ] have negatively affected the health

of its members and area residents" because "redevelopment construction has resulted in poor air

quality for residents of Buzzard Point."  ECF No. 34, ¶ 115; ECF No. 39 at 16.  As discussed,

those types of harms are not sufficient to establish organizational standing, whether they are set

out explicitly or presumed from more general terms.  It further alleges that it "has expended its

resources in response to, and to counteract, the negative effects of [D]efendants' actions,"

incurring "the costs of creating and distributing information with tools like flyers and brochures,

and redirecting the organization's human resources efforts to build public awareness" and that

Defendant's actions have "limited [its] right to participate in proceedings that comply with D.C.

law."  ECF No. 34, ¶¶ 116, 205; ECF No. 39 at 18.  Again, those types of harms are insufficient

here, whether set out explicitly or presumed.  In short, Plaintiff has failed to allege that NeRAC

has organizational standing, and the undersigned recommends that the motions to dismiss be

granted as they relate to that issue.

b.   CARE

The allegations regarding CARE's organizational standing are almost identically flawed.

Plaintiffs assert that CARE "is a community-based nonprofit organization that advocates for the

preservation of affordable housing and seeks to improve quality of life for area residents" and

"advances its interests through grassroots organizing, leadership development, community education, and testifying at various governmental meetings." ECF No. 34, ¶¶ 117, 120. It, too, asserts that its interests have been "thwarted by Defendants' development decisions," which have "negatively affected the housing of CARE members" (*id.*, ¶ 121) and "undermined their quality of life" (ECF No. 39 at 18). In response to the "negative effect of [D]efendants' actions," it has incurred "the costs of creating and distributing information with tools like flyers and brochures, and redirecting the organization's human resources efforts to build public awareness." ECF No. 34, ¶ 121; ECF No. 39 at 19. It is unnecessary to detail the infirmities in these allegations, as doing so would merely parrot the discussion above relating to NeRAC's almost identical organizational standing allegations.

Similar to the allegations in Count 2 as to NeRAC's participation in ZC No. 16-02 outlined above, the operative complaint includes specific allegations in Count 4 regarding CARE's participation in ZC No. 16-29, a PUD and zoning map amendment application for the Poplar Point area. Count 4 asserts that the Zoning Commission denied NeRAC's request for a written impact assessment from the Department of Housing and Community Development, failed to allow more than one of its members to speak on its behalf, and failed to make findings of fact regarding three contested issues brought to the Zoning Commission's attention by CARE, among other things. ECF No. 34, ¶ 231. These acts allegedly deprived CARE of its "right to participate in proceedings that comply with D.C. Law." *Id.*, ¶ 232. To the extent that CARE intends to assert an informational injury regarding the missing impact assessment, its claim to organizational standing has the same defects as NeRAC's claim, because it has not identified that it suffered a concrete injury traceable to the lack of that impact assessment. To be sure, CARE asserts that it was not able to participate fully in the Zoning Commission hearing on ZC No. 16-02 because the Zoning

Commission allowed only one of its members to speak on its behalf. *Id.*, ¶ 231.e. However, there is no suggestion that such harm was caused by the fact that the Zoning Commission had denied CARE's request for the impact assessment. And, as detailed in the discussion above regarding potential procedural injury to NeRAC, CARE, too, has failed to show a particularized injury to its interests. The undersigned therefore recommends that the motions to dismiss be granted to the extent that they contend that CARE lacks standing to bring its claims.

### 3.    Individual Standing

To review, in order to establish individual standing, "a complaint must state a plausible claim that the plaintiff has suffered an injury in fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable decision on the merits." *Humane Soc'y*, 797 F.3d at 8. To do so, the plaintiff must have "(i) . . . suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of [a] defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision." *Osborn*, 797 F.3d at 1063. "Determining a claim's plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Humane Soc'y*, 797 F.3d at 8 (quoting *Iqbal*, 556 U.S. at 679).

Plaintiffs must establish standing for each claim asserted and type of relief requested. *See Summers*, 555 U.S. at 493; *Citizens for Responsibility & Ethics in Washington*, 593 F. Supp. 2d at 225. Where multiple parties seek the same relief on a claim, the court need only satisfy itself that one party has standing. *Am. Anti-Vivisection Soc'y*, 946 F.3d at 619–20. Therefore, unlike the parties, who evaluate individual standing on a plaintiff-by-plaintiff basis, the undersigned will do so on a claim-by-claim basis.

a.      Procedural Due Process Claims

As noted above, "[u]nder settled precedent, plaintiffs do not have standing based simply on allegations that their due process rights have been violated." *City of Dover*, 36 F. Supp. 3d at 118.  Rather, "[i]t is the deprivation of a liberty or property interest . . . that triggers procedural due process requirements, and that deprivation is the Article III injury." *Rangel*, 20 F. Supp. 3d at 166.  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted).   Constitutionally cognizable property rights are created not by the Constitution itself, but "by existing rules or understandings that stem from an independent source," such as local laws or regulations.  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).   "A governmental authority 'creates a [protected property] interest . . . by establishing "substantive predicates" to govern official decision-making and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met.'"  *Robles v. Kerry*, 74 F. Supp. 3d 254, 262–63 (D.D.C. 2014) (alterations in original) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989)).  Plaintiffs that have alleged the deprivation of a protected interest must still establish the "other two elements of standing . . . [,] causation and redressability," although the requirement of redressability is "'loosen[ed]' in the procedural due process context."  *Del. Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 151 (D.D.C. 2017) (final alteration in original) (quoting *Summers*, 555 U.S. at 497).

1.      *Count 1—ZC No. 14-02 (Barry Farm)*

Count 1 is brought against the District by Plaintiff Matthews, a "current Barry Farm resident," and Plaintiff M. Hamilton, a "former Barry Farm resident."  ECF No. 34, ¶¶ 7, 9, 196–

199.  It focuses on an application for a PUD and zoning map adjustment for the redevelopment of

the Barry Farm area, which received first-stage approval in ZC No. 14-02, issued on December 8,

2014.  *Id.*, ¶¶ 195–202; ECF No. 6-1 at 10.  As relevant here, the complaint alleges that both of

these Plaintiffs were "prejudiced by initial denial" of the request of an organization that they both

helped found—the Barry Farm Tenants and Allies Association—to be accorded party status for

the purposes of a hearing on the application before the Zoning Commission, on the basis that they

were not "'uniquely' impacted despite being Barry Farm residents."  ECF No. 34, ¶¶ 74 & n.22,

96–97 & n.28, 122–123, 132.  In addition, in connection with that application, the Department of

Housing and Community Development and the Department of Energy and the Environment each

allegedly failed to produce "a statutorily-required agency report," which are "due 10 days before

the [public] hearing [on a PUD] so the [ANC Commissioners] may have a chance to review them

and bring issues before the Zoning Commission."  *Id.*, ¶ 82 & n.27.  These Plaintiffs also complain

about "Defendants' development decisions . . . , including their failure to maintain Barry Farm—

allowing it to fall into a gross state of disrepair—and pressuring tenants to move out and keeping

those units vacant."  *Id.*, ¶ 124.  Indeed, Plaintiff M. Hamilton asserts that she was forced to move

because of "mold and other health issues."  ECF No. 39 at 21.  They have allegedly suffered loss

of their social network due to the displacement of neighbors caused by the redevelopment.  ECF

No. 34, ¶¶ 126, 137; ECF No. 39 at 28.

Plaintiffs Matthews and M. Hamilton contend that Defendants' conduct affected a number

of their property and liberty interests.  They assert that they "have constitutionally protected

property interests" in (1) "their public housing at Barry Farms" and (2) "participation in the zoning

process," as well as liberty interests in (3) "accessing the basic processes of government" and  (4)

the "social networks and bonds that provide a network of safety in their community."  ECF No. 39

at 45, 49–50.  According to them, Defendants' conduct has deprived them of these interests.  *Id.* at 50.  Neither Plaintiff, however, has established that she has standing to pursue this claim.

Taking those interests in the order set out above, it appears that tenants of public housing do have a property interest in their tenancy.  *See, e.g.*, *Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 184 (6th Cir. 1984) (stating that "participation in a public housing program is a property interest protected by due process" and collecting cases from multiple federal courts of appeals and district courts); *Swann v. Gastonia Hous. Auth.*, 675 F.2d 1342, 1346 (4th Cir. 1982) ("It is now beyond question that such statutory entitlements [to continued occupancy in public housing absent good cause for eviction] are protected by the due process clause."); *Long v. D.C. Hous. Auth.*, 166 F. Supp. 3d 16, 32 (D.D.C. 2016) (noting that "some courts, including courts in this district, have found that, once an individual becomes a participant in the [Section 8 Housing Choice Voucher] Program, the person maintains a property interest in continuing to receive assistance that is subject to constitutional due process protections.").  But Plaintiff Matthews has not been deprived of her tenancy or her participation in the public housing program; the complaint recites that she is "a current Barry Farm resident."  ECF No. 34, ¶ 7.  However, she also alleges that Barry Farm had fallen into such "a gross state of disrepair," that the conditions were dire enough to support a claim for constructive eviction.  *Id.*, ¶¶ 124, 338, 342.  Indeed, Plaintiff M. Hamilton asserts that she was constructively evicted because she was "forced to move out due to mold and other health issues."  ECF No. 39 at 21.  At least one court has indicated that constitutionally cognizable property interests are infringed when public housing is maintained in "conditions that do not meet minimum standards of habitability."  *See Davis v. N.Y. City Hous. Auth.*, 379 F. Supp. 3d 237, 243, 253–55 (S.D.N.Y. 2019) (finding that a complaint that the New York City Housing Authority inadequately heated the plaintiff's home such that the temperature rarely exceeded 50 degrees Fahrenheit and

often reached freezing sufficiently alleged that a constitutionally protected property right had been

infringed).  That property interest does not arise out of a constitutional right to "access to dwellings

of a particular quality," which has generally been held not to exist; rather, it arises from the contract

through which an apartment is leased to a tenant by a housing authority, which, pursuant to federal

law governing so-called Section 8 housing, must include a term "obligat[ing] the public housing

agency to maintain the project in a decent, safe, and sanitary condition."  *Id.* at 253–54 (alteration

in original) (first quoting *Lindsey v. Normet*, 405 U.S. 56, 74 (1972), then quoting 42 U.S.C. §

1437d(*l*)(3)).  Although Plaintiffs here do not point specifically to their leases as the source of their

property rights, such leases are required by law, so Plaintiff Matthews must currently have one and

Plaintiff M. Hamilton must have had one when she occupied a residence at Barry Farm.  *See, e.g.*,

42 U.S.C. § 1432d(*l*)(3) ("Each public housing agency shall utilize leases which . . . obligate the

public housing authority to maintain the project in a decent, safe, and sanitary condition.").  The

undersigned therefore finds that, in light of the well-recognized property right public housing

tenants have in continued occupancy in public housing and the allegations that the Barry Farm

housing project was allowed to deteriorate to the extent that it became uninhabitable in violation

of a promise included in their leases pursuant to federal law, these Plaintiffs have sufficiently

alleged a deprivation of a constitutionally protected property interest.[23]  *See, e.g.*, *Toxco, Inc. v.*

_____

[23] The undersigned recognizes the tension between the principle that an individual does not have a property interest in
public housing at a specific residence, *see, e.g.*, *Fincher v. S. Bend Heritage Found.*, 606 F.3d 331, 333 (7th Cir.
2010), and the principle, which is implicit in *Davis*, that there is some property interest in remaining at a particular
public housing residence, *see also Aponte-Rosario v. Acevedo-Vila*, 617 F.3d 1, 9 (1st Cir. 2010) (assuming without
deciding individuals had "a protected property interest in the form of an expectation to remain in their public housing
units").  Although *Davis* did not address this tension, the court located the property interest specifically in the lease
that the plaintiff had with the New York City Housing Authority, rather than in a statutorily-created expectation of
continued residence in a particular dwelling.

Moreover, recognizing a protected property interest in these circumstances does not run the risk of
"constitutionalizing all public contract rights."  *See Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 382 (S.D.N.Y, 2014)
(quoting *S&D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988)).  Rather, the bases of the protected right are
well-established and related to the "entitlements to welfare benefits conferred by statute upon our poorest citizens to
provide for their immediate well-being, if not survival," which the Supreme Court has recognized.  *S&D Maint.*, 844

*Chu*, 801 F. Supp. 2d 1, 9 (D.D.C. 2011) ("In due process cases that arise out of contracts with the government, courts require that a claimant show a 'legitimate claim of entitlement' to some benefit that is protected by independent state-law rules, relevant contractual language and applicable federal regulations."); *Ervin & Assocs., Inc. v. Dunlap*, 33 F Supp. 2d 1, 9 (D.D.C. 1997) ("It is well-established that property interests can reside in contracts with the government."); *cf. Green v. District of Columbia*, No. 90-cv-793 (TFH), 1991 WL 251936, at *7 (D.D.C. Nov. 12, 1991) (declining to find that prisoners had a constitutionally protected property interest in access to educational and vocational programs where there was no statutory or regulatory requirement that those prisoners be provided access to such programs); *but see Perry v. Hous. Auth. of Charleston*, 486 F. Supp. 498, 503 (D.S.C. 1980) (finding that "a claim that it is unfair for [the housing authority] to allow George Legare Homes to deteriorate into indecent housing" did not allege deprivation of a constitutionally protected interest based on the reasoning of *Lindsey*), *aff'd*, 664 F.2d 1210 (4th Cir. 1981).

Plaintiffs' problem is causation.  Recall that they have brought this claim against the District alone and not against the Housing Authority.  ECF No. 34 at 50–51.  But the operative complaint makes clear that the Housing Authority was responsible for the alleged conditions at Barry Farm.  *See id.*, ¶¶ 133 ("Michelle Hamilton was a resident of Barry Farm who moved out of Barry Farm because her unit was filled with mold, which DCHA failed to adequately [remedy] despite her request."), 338 ("DCHA caused resident hardship by leaving the Barry Farm site in gross disrepair so as to constructively evict Barry Farm residents."), 343 ("DCHA refused to make repairs at the Barry Farm site since it was a part of a real property transaction that if laws were

---

F.2d at 966.  As such, the agreement from which the protected right derives is not "an ordinary commercial contract with a state" that is unlikely to receive constitutional protection.  *Id.*

followed would have kept relatively intact a community inimical to the sorts of communities the District of Columbia Government has been seeking to grow pursuant to Creative Class policies."), 345 ("[B]y refusing to make repairs on Barry Farm residents' properties, wholly or partially, for discriminatory purposes, the DCHA has been engaged in Subterfuge against the residents of Barry Farm and has acted contrary to the DCHRA."), 398 ("DCHA refused to make repairs at the Barry Farm site since it was a part of a real property transaction that if laws were followed would have kept relatively intact a community inimical to the sorts of communities the District of Columbia Government has been seeking to grow pursuant to Creative Class policies."), 400 (noting a "DCHA policy to constructively evict Barry Farm residents").  Moreover, as noted, federal law makes the Housing Authority responsible for the upkeep of the public housing project.  *See* 42 U.S.C. § 1437d(*l*)(3) ("Each public housing agency shall utilize leases which . . . obligate that public housing agency to maintain the project in a decent, safe, and sanitary condition."), and the District is not liable for harm caused by the Housing Authority.  D.C. Code §§ 6-202(a) & (b), 6-203(11); *Epps*, 62 F. Supp. 3d at 81 n.1.  Thus, as the District argues (ECF No. 47 at 21), they have not shown that the District—the only Defendant named in Count 1—caused any deprivation of their cognizable property rights in their public-housing tenancy.

Second, Plaintiffs Matthews and M. Hamilton claim a property right in participation in the zoning process.  As with many of Plaintiffs' allegations and arguments, the submissions are vague as to both the source of this alleged right and the details of its infringement.  At times they seem to argue that their due process rights were violated because the Zoning Commission (or other agencies of the District) failed to follow procedures required by local law.  ECF No. 39 at 43–45 (listing many procedural requirements in the District's statutes and zoning regulations and concluding that "[w]hen the District fails to follow its own procedures, it nullifies the only

procedural protections standing between vulnerable parties and the loss of valuable liberty and property interests" and that Defendants have "engaged in a pattern of arbitrary denials of basic procedures"). However, such a failure does not violate the Constitution, which "does not require state and local governments to adhere to their procedural promises. Failure to implement state law violates that state law, not the Constitution." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166–67 (7th Cir. 1994); *see also, e.g., Snowdon v. Hughes*, 321 U.S. 1, 11 (1944) ("Mere violation of a state statute does not infringe the federal Constitution."); *S. Cty. Sand & Gravel Co. v. Town of S. Kingston*, 160 F.3d 834, 839 (1st Cir. 1998) ("A municipality's violation of state law, without more, is insufficient to pass as a violation of the federal Constitution.").

Insofar as Plaintiffs allege a more particular violation, they appear to base the claim on a "right to be heard," asserting that "the Zoning Commission arbitrarily denied party status to the Barry Farm Tenants and Allies Association [ ], the community organization Paulette Matthews and Michelle Hamilton are part of." ECF No. 39 at 45, 51, 60. There are several problems with that theory. First, a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Here, Plaintiffs Matthews and M. Hamilton seek to assert the right of the Barry Farm Tenants and Allies Association to be heard as a party at the Zoning Commission hearing on first-stage PUD approval in ZC No. 14-02. ECF No. 39 at 51. But these Plaintiffs have not shown that they should be allowed to pursue a claim on behalf of the association. In order to establish third-party standing—that is, standing to assert the rights of party not before the court—a litigant

> must satisfy three requirements: "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests."

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 19 (D.D.C. 2008) (quoting

*Powers v. Ohio,* 499 U.S. 400, 411 (1991)), *aff'd*, 358 F. App'x 179 (D.C. Cir. 2009). "The first of these requirements is constitutional, while the latter two are prudential." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) (citing *Caplan & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989)). Plaintiffs have not addressed any of these requirements, notwithstanding the fact that it is their responsibility "clearly to allege facts demonstrating that [they are] proper part[ies] to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (internal quotation marks omitted) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)). The undersigned finds that Plaintiffs have failed to establish third-party standing. Assuming without deciding that their status as members of the Barry Farm Tenants and Allies Association satisfied the requirement of a "close relationship," Plaintiffs Matthews and M. Hamilton have not satisfied the first and third requirements. There is no allegation that they themselves sought party status for the purposes of the hearing and were denied, and thus they have not shown that they suffered an injury-in-fact. *See, e.g.*, *Aaron Private Clinic Mgmt., LLC v. Berry*, 912 F.3d 1330, 1334, 1339 (11th Cir. 2019) (affirming the district court's holding that the plaintiff did not establish an injury-in-fact for the purposes of direct or third-party standing where he did not allege that he had applied for a benefit and been denied, that he would be prevented from applying for the benefit in the future, or that such a future application would be unsuccessful); *Messer v. City of Douglasville*, 975 F.2d 1505, 1514 (11th Cir. 1992) (holding that an individual did not have standing to challenge a city board's power to issue variances where the individual had not applied for and been denied such a variance); *Rainbow Push Coalition v. AmSouth Bank*, No. 3:03-1059, 2005 WL 637834, at *2 (W.D. Mich. Mar. 15, 2005) (where the plaintiff did not itself apply for a benefit, it did not have standing in its own right to pursue an action on behalf of those who did apply and were denied). Moreover, there

is nothing to indicate that any "obvious barrier exists that would prevent" the Barry Farm Tenants and Allies Association "from asserting [its] own rights."[24]  *Renne*, 501 U.S. at 320; *see also Al-Aulaqi*, 727 F. Supp. 2d at 31 (noting that the "hindrance requirement for third-party standing" requires demonstration of "some impediment to the real party in interest's ability to assert his own legal rights," such as a "financial disincentive to litigate," a "desire to protect [ ] personal privacy," or "the 'imminent mootness' of a party's claims" (quoting *Singleton v. Wulff*, 428 U.S.106, 117 (1976))).  Therefore, Plaintiffs Matthews and M. Hamilton do not have standing to litigate any putative denial of due process based on the Zoning Commission's alleged arbitrary denial of the Barry Farm Tenants and Allies Association's request for party status.

Even if these Plaintiffs had been able to overcome the third-party standing obstacle, they would still lack standing because they have not alleged a property interest in receiving party status during the PUD proceedings at issue.  As noted, an ordinance or regulation creates a property interest when it both "establish[es] 'substantive predicates' to govern official decision-making" and also "mandate[s] the outcome to be reached upon a finding that the relevant criteria have been met.'"  *Robles*, 74 F. Supp. 3d at 262–63 (quoting *Ky. Dep't of Corr.*, 490 U.S. at 462).  It is not enough, as Plaintiffs seem to indicate, that official discretion is somehow limited.  ECF No. 39 at 42.  Generally, the requirement for "discretion-limiting substantive predicates," *Robles*, 74 F. Supp. 3d at 263, is satisfied when  "substantial limits" are placed on the exercise of discretion, *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 207 (D.C. Cir. 2003) (quoting

---

[24] As Judge Bates discussed in *Al-Aulaqi*, the Supreme Court's jurisprudence on third-party standing sometimes has been "'quite forgiving' in its application" of the hindrance factor.  727 F. Supp. 2d at 29 (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)).  The D.C. Circuit, however, has stated that "when the '*Powers* test' is applied, all three requirements must be met."  *Al-Aulaqi*, 727 F. Supp. 2d at 29–30 (internal quotation marks omitted) (quoting *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000)).  The D.C. Circuit has also recognized a second test for third-party standing, by which a litigant must "show that the challenged government action specifically targeted a protected 'relationship' between the litigant and the third party."  *Al-Aulaqi*, 727 F. Supp. 2d at 30 (citing *Am. Immigration Lawyers Ass'n*, 199 F.3d at 1362).  That is not the case here.

*Bituminous Materials, Inc. v. Rice Cty.*, 126 F.3d 1068, 1070 (8th Cir. 1997)).  Moreover, "in addition to discretion-limiting substantive predicates, the applicable statutes or regulations must contain 'explicitly mandatory language, *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow.'" *Robles*, 74 F. Supp. 3d at 263 (quoting *Ky. Dep't of Corr.*, 490 U.S. at 463); *see also, e.g.*, *Mallette v. Arlington Cty. Emps. Supp. Retirement Syst. II*, 91 F.3d 630, 635 (4th Cir. 1996).  Such language will typically be expressed with words like "shall" or "will" or "must." *See, e.g.*, *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983); *Freeze v. City of Decherd*, 753 F.3d 661, 666–67 (6th Cir. 2014); *Price v. Barry*, 53 F.3d 369, 370 (D.C. Cir. 1995) (per curiam); *Doe I v. District of Columbia*, 206 F. Supp. 3d 583, 621 (D.D.C. 2016).

Turning to the first requirement, there is some question as to whether the substantive predicates in the regulations governing party status at Zoning Commission hearings sufficiently cabin the Zoning Commission's discretion.  Those regulations provide that party status is conferred automatically on (1) the applicant and (2) the ANC (or ANCs) for the area in which the property that is the subject of the application is located.  D.C. Mun. Regs. § 403.5.[25]  When an individual or entity not automatically accorded party status requests such status (for clarity, the "requester"), that requester must provide a written statement setting forth certain information, such as the property owned or occupied by the requester that will be affected by the proposed substantive zoning action, the distance between the property of the requester and the property that is the subject of the substantive application before the Zoning Commission, the "environmental, economic,

---

[25] The Zoning Commission's decision in ZC No. 14-02 was issued in December 2014.  At that time, the prior version of the District's zoning regulations governed Zoning Commission proceedings.  *See* 11-A D.C. Mun. Regs. §§ 100.1, 100.3.  This Report and Recommendation nevertheless cites the current regulations because the relevant provisions are materially identical to the prior regulations.  *Compare* 11-Z D.C. Mun. Regs. § 403.5, 404.1, 404.13, 404.14 (2016) *with* 11 D.C. Mun. Regs. §§ 3022.3, 3022.4 (1958, as amended), *available at* http://dcrules.elaws.us/dcmr/11-3022 (last visited Apr. 26, 2020).

social, or other impacts likely to affect" the requester if the substantive application is approved, and an explanation as to how the requester's identified interests would be "more significantly, distinctively, or uniquely affected in character or kind by the proposed zoning action than those of other persons in the general public." 11-Z D.C. Mun. Regs. § 404.1. The determination of "who will be recognized as a party" is reserved to the Zoning Commission, which "shall consider . . . whether the specific information presented qualifies the person as a party." 11-Z D.C. Mun. Regs. § 404.13. Thus, the regulations provide some guidance to the Zoning Commission as to how to evaluate a request for party status: there must be a showing that the requester is "more significantly, distinctively, or uniquely affected in character or kind by the proposed zoning action than those of other persons in the general public." 11-Z D.C. Mun. Regs. § 404.1(h)(5). However, the Zoning Commission retains the discretion to determine how to interpret that rather vague standard. *See, e.g.*, *Ohio Head Start Ass'n, Inc. v. U.S. Dep't of Health & Human Servs.*, 873 F. Supp. 2d 335, 349–50 (D.D.C. 2012) (finding that a statute that restricted the agency's "discretion to deny grants once the grantee show[ed] it provides 'high quality and comprehensive' services" did not impose "sufficient limitations on the [agency's] discretion to determine *who* provides 'high quality and comprehensive services'" (quoting 42 U.S.C. § 9836(c)(1))), *aff'd*, 510 F. App'x 1 (D.C. Cir. 2013); *see also Ohio Head Start Ass'n, Inc. v. U.S. Dep't of Health & Human Servs.*, 902 F. Supp. 2d 61, 66 (D.D.C. 2012) (describing the terms "high quality and comprehensive" as too vague to be "a *specific* substantive predicate"); *see also George Wash. Univ.*, 318 F.3d at 213 (Henderson, J., concurring) ("I find it impossible to conclude the zoning regulations under which the [Board of Zoning Adjustment] 'ordinarily must' approve a special exception for a campus plan only if it determines that the proposed plan is 'not likely to become *objectionable* to the neighboring property' substantially limit the exercise of discretion." (internal citations omitted) (first quoting

48

*Stewart v. D.C. Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973), then quoting 11 D.C. Mun. Regs. § 210.2 (1958))); *but see George Wash. Univ.*, 318 F.3d at 205–06 (indicating that the standard based on whether a use was likely to be "objectionable" sufficiently bounded the Board of Zoning Adjustment's discretion).

However, it is not necessary to determine whether that substantive predicate sufficiently controls the Zoning Commission's discretion, because the regulations do not include the requisite mandatory language directing the Zoning Commission "that if the regulations' substantive predicates are present, a particular outcome must follow." *Robles*, 74 F. Supp. 3d at 263 (internal quotation marks omitted) (quoting *Ky. Dep't of Corr.*, 490 U.S. at 463). The regulations state that the Zoning Commission "shall grant party status *only if* the person requesting party status has clearly demonstrated that the person's interest would likely be more significantly, distinctively, or uniquely affected in character or kind by the proposed zoning action than those of other persons in the general public." 11-Z D.C. Mun. Regs. § 404.14 (emphasis added). To be sure, the provision states that the Zoning Commission "shall grant party status," but the seeming imperative is diluted by the succeeding phrase beginning with "only if." As numerous courts, including the Supreme Court, have recognized, the phrase "only if" introduces "a *necessary*, but not a *sufficient*, condition." *California v. Hodari D.*, 499 U.S. 621, 628 (1991); *see also, e.g.*, *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015) (holding that a statute stating that a court "'shall order relief' . . . 'only if' the debtor is not paying its debts" means that "a debtor not paying his debts is a necessary but not sufficient condition for ordering relief" and contrasting the use of an "'if' or 'if and only if' clause" (quoting 11 U.S.C. § 303(h)(1))); *Carver v. Lehman*, 558 F.3d 869, 876 n.12 (9th Cir. 2009) ("The distinction between 'if' and 'only if [ ] is not a mere quibble over vocabulary—it goes right to the heart of whether the criteria . . . are necessary or sufficient

49

conditions for transfer, and therefore whether transfer is mandatory or entirely discretionary."); *In re Marinari*, 610 B.R. 87, 93 (E.D. Pa. 2019) ("By using 'shall' and 'if'—rather than 'only if'— Congress made dismissal mandatory unless the case has been converted.").  The Third Circuit provides a helpful (and sporting) illustration:

> For example, making the playoffs is a necessary condition for winning the Major League Baseball World Series because a team cannot win the World Series if it does not make the playoffs. Using the "only if" form: a team may win the World Series *only if* it makes the playoffs. But, a team's meeting the necessary condition of making the playoffs does not guarantee that the team will win the World Series.
>
> The word "if" describes a sufficient condition.  A sufficient condition is a guarantee.  For example, winning the division is a sufficient condition for making the playoffs because a team that wins the division is ensured a spot in the playoffs. Using the "if" form: a team makes the playoffs *if* it wins its division.

*Twp. of Tinicum v. U.S. Dep't of Transp.*, 582 F.3d 482, 488–89 (3d Cir. 2009) (internal citations omitted).

Here, then, according to the plain language of the regulation, the fact that a person requesting party status "clearly demonstrate[s] that the person's interests would likely be more significantly, distinctively, or uniquely affected in character or kind by the proposed zoning action than those of other persons in the general public," 11-Z D.C. Mun. Regs. § 404.14, although a necessary precondition to granting the request, does not *require* the Zoning Commission to grant it.  Thus, the regulation does not contain the "explicit mandatory language" necessary to create a property interest.[26]  *Ky. Dep't of Corr.*, 490 U.S. at 463 (quoting *Hewitt v. Helms*, 459 U.S. 460, 871 (1983)).

---

[26] In *States v. District of Columbia*, the court found that a plaintiff had alleged injury-in-fact when he alleged that his "legally protected interest in participating in [a] zoning hearing as fully as possible" was infringed by flawed notice from the Board of Zoning Appeals that failed to set forth the deadline for applications for party status.  No. 18-cv-1652 (ABJ), 2019 WL 295472, at *3, 8 (D.D.C. Jan. 23, 2019).  That case is easily distinguishable, however, as the court there identified the injury as a lack of notice rather than a failure to grant party status.  *Id.* at *8.  Moreover, the court failed to engage in any inquiry as to whether there is a legally protected interest in participating in a zoning hearing or, if so, the basis of that interest.

Elsewhere in their opposition to the motions to dismiss, Plaintiffs point to a regulation that requires the Zoning Commission, prior to a public hearing on a PUD application, to "prepare an impact assessment of the project, which shall include reports in writing from the relevant District of Columbia departments and agencies, including, but not limited to, the Departments of Transportation and Housing and Community Development."  11-X D.C. Mun. Regs. § 308.4; ECF No. 39 at 43, 61.  Those reports are due before the hearing so that "[ANC Commissioners] may have the chance to review them and bring issues before the Zoning Commission."  ECF No. 34, ¶ 82; 11-Z D.C. Mun. Regs. § 405.3, 405.4.[27]  It is not clear if Plaintiffs contend that this regulation is the source of a cognizable property interest in the right to participate in the zoning process; to the extent they do, they fail.

The complaint specifically asserts that the reports are to be created in order to allow *ANC Commissioners* to review them.  ECF No. 34, ¶ 82.  Plaintiffs are therefore suing on the theory that their ANC Commissioner did not have the opportunity to review the agency reports and thereafter bring concerns to the Zoning Commission, which is allowed under D.C. Court of Appeals precedent.  *See Kopff v. D.C. Alcoholic Beverage Control Bd.*, 381 A.2d 1372, 1377 (D.C. 1977) ("ANC area residents (including ANC Commissioners as individual citizens) have standing to initiate legal action to assert the rights of the ANC itself.");[28] *see also  Smith v. Henderson*, 982 F. Supp. 2d 32, 43 (D.D.C. 2013) ("[A] resident of one of the Commissioners' districts could [ ] sue based on the fact that her Commissioner had no opportunity to comment on the proposal

---

[27] As above, the regulations in force at the time of the Zoning Commission's action in ZC No. 14-02 are materially identical to those currently in force.  *Compare* 11-X D.C. Mun. Regs. § 308.4 *and* 11-Z D.C. Mun. Regs. 405.3, 405.4 *with* 11 D.C. Mun. Regs. 2407.3, *available at* http://dcrules.elaws.us/dcmr/11-2407 (last visited Apr. 26, 2020), *and* D.C. Mun. Regs. § 3012.2, 3012.3, *available at* http://dcrules.elaws.us/dcmr/11-3012 (last visited Apr. 26, 2020).

[28] The D.C. Court of Appeals explained that an ANC area resident is a "person aggrieved" by a challenged agency action and therefore is within the "'zone of interests' sought to be protected or regulated" by the D.C. Administrative Procedures Act.  *Kopff*, 381 A.2d at 1377 & n.10.

[because the ANC Commissioner did not receive notice of a government proposal to close certain public schools in the area], but that resident would also need to allege some injury based on the lack of notice."). But the mere fact that an ANC area resident may sue on behalf of the ANC where the ANC's rights have been violated does not address the issue of whether the ANC here has been injured by the invasion of an interest protected by the Constitution—that is, it does not answer the question of whether the regulations create a protectible interest in the availability of the agency reports.

It does not appear that any federal or local court in the District of Columbia has addressed that precise question.  However, courts have addressed whether a statutory right to information pursuant to state and federal public disclosure statutes creates a constitutionally-protectible interest in the provision of that information and have generally found that it does not.  *See, e.g.*, *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236–37 (10th Cir. 2007) (holding that a government agency's failure to produce documents did not violate the plaintiff's due process rights because the Freedom of Information Act, 5 U.S.C. § 552, did not create "a life, liberty, or property interest in the materials at issue"); *Hulshof v. Jurkas*, No. 4:05-CV-152, 2006 WL 2943302, at *6 (W.D. Mich. Oct. 13, 2006) (same); *see also Miramontes v. Zellerbach*, No. EDCV 13-0027, 2014 WL 793143, at *7 (C.D. Cal. Feb. 26, 2014) (holding that violation of California's public disclosure law did not constitute a constitutional violation and collecting similar cases from the Ninth Circuit, Eastern District of Louisiana, Western District of Michigan, and Southern District of New York).  If statutes that, as a general matter, require that an agency "shall make records promptly available to any person" who follows the procedures to request them, *see* 5 U.S.C. § 552(a)(3)(A), do not create a property interest in those records, it is not clear why regulations that provide that certain agency reports shall be produced and included in the public record should do so.

Plaintiffs third and fourth arguments noted above claim that they have liberty interests "in accessing the basic processes of government" and in the "social networks and bonds that provide a network of safety in their community."  ECF No. 39 at 50.  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."  *Wilkinson*, 545 U.S. at 221.  The question is whether the specific interests Plaintiffs assert fall within that domain.

Plaintiffs fail to explain how their liberty interest in access to government differs from their property interest in participation in the zoning process.  Indeed, each of their due process claims against the District focuses on alleged procedural deficiencies in zoning proceedings.  Determining the existence of a liberty interest created by the District's laws or policies would thus mirror the analysis above regarding a property interest.  *See, e.g.*, *Doe I*, 206 F. Supp. 3d at 621 ("[S]tate laws can ground a constitutionally protected liberty interest when they 'contain substantive limitations on official discretion, embodied in mandatory statutory . . . language.'" (second alteration in original) (quoting *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009))).  Plaintiffs seek to link their alleged liberty interest in accessing Zoning Commission proceedings to the protected interest in the right to vote, citing Supreme Court cases discussing that fundamental right.  ECF No. 39 at 46 (citing *Reynolds v. Sims*, 377 U.S. 533 (1964), and *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966).  They argue that "[t]he Supreme Court chose to protect the right to vote because of the role it plays in upholding *other* political and civil democratic rights for citizens.  Access to the zoning process, an administrative system designed for public participation created by elected members of the District, is one example of the civil and political rights the right to vote protect[s]."  ECF No. 39 at 46.  But the fact that the Due Process Clause protects the fundamental right to vote, which in turn helps to support other rights and privileges, does not mean

that there is a cognizable liberty interest in those other supported rights.  Indeed, as Plaintiffs note, the right to vote is protected because it helps "preserve other basic civil and political rights."  *Id.* at 42 (citing *Harper*, 383 U.S. at 667).  They do not explain how participation in administrative zoning proceedings does so.  *See, e.g.*, *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 354 (1st Cir. 2004) ("[The plaintiff's] first charge implodes because there is no fundamental right to participate in administrative adjudications.  Reactor licensing (unlike, say, voting) is not 'preservative of other basic civil and political rights.'" (quoting *Reynolds,* 377 U.S. at 562)).  Therefore, they have not shown that their right to access zoning proceedings is a protected liberty interest.

As to their fourth argument, Plaintiffs have not shown that the Constitution protects their social networks and community bonds.  To be clear, Plaintiffs Matthews and M. Hamilton do not argue that the District has curtailed their right to associate with whomever they please; rather, they assert that their "constructive eviction" from Barry Farm due to "failure to maintain the building rob[bed] residents of the intimate choice of where they may live and who they may associate with."  ECF No. 39 at 50.  The first obvious problem with that contention is that, as discussed above, there is no allegation that the District, as opposed to the Housing Authority, is responsible for the allegedly poor condition of Barry Farm housing.  More fundamentally, this argument—like the one above regarding the right to access government processes—overreaches.  At most, these Plaintiffs have alleged that government action made it more difficult to maintain friendships and other social and neighborhood bonds.  That is a far cry from a violation of the fundamental rights the Constitution protects, such as "the right to marry, the right to have children, the right to marital privacy, the right to contraception, and the right to bodily integrity."  *Sung Park v. Ind. Univ. Sch. of Dentistry,* 692 F.3d 828, 832 (7th Cir. 2012).  The argument that the Constitution protects an

interest in keeping one's social network in one's neighborhood just as it protects "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs," ECF No. 39 at 41 (internal quotation marks omitted) (quoting *Obergefell v. Hodges*, __, U.S. __, __, 135 S. Ct. 2584, 2597 (2015)), is not well-taken.[29]  The Second Circuit has stated that "[t]he 'liberty' protected by the [Constitution] extends beyond freedom from bodily restraint and includes the opportunity to make a range of personal decisions concerning one's life, family, and private pursuits.  However, it does not include the maintenance of transient levels of the quality of neighborhood life."[30]  *BAM Historic Dist. Ass'n v. Koch*, 723 F.2d 233, 237 (2d Cir. 1983) (internal citations omitted).

The undersigned thus finds that Plaintiff Matthews and Plaintiff M. Hamilton have not established that they have standing to pursue Count 1 and therefore recommends dismissing the

---

[29] None of the three cases Plaintiffs cite in support of their substantive due process claim (ECF No. 39 at 91–92) suggests that an individual's social network is deserving of protection under the substantive component of the Due Process Clause.  *Wolff v. McDonnell* addressed the rights of incarcerated individuals to credits for good behavior authorized by state law and thus concerned the liberty interest protected by the Constitution.  418 U.S. 539, 558 (1974) ("We think a person's liberty is . . . protected, even when the liberty itself is a statutory creation of the State.").  *County of Sacramento v. Lewis* held that "the Fourteenth Amendment's guarantee of substantive due process" was not violated when a police officer "caus[ed] death through deliberate or reckless conduct."  523 U.S. 833, 836 (1998).  *Collins v. Harker Heights* addressed a situation in which a municipal employee died while engaged in his work and found that the Constitution's guarantee against the deprivation of life without due process of law did not mandate that a municipality "provide its employees with certain minimal levels of security and safety."  503 U.S. 115, 127 (1992). The interests at issue in those cases are a far cry from the interest Plaintiffs claim here.

[30] Plaintiffs generally reference a provision of the District's Comprehensive Plan affecting Barry Park that directs the District to "[e]ncourage the revitalization of Barry Farm in a manner which [ ] [e]nsures one-for-one replacement of any public housing that is removed, along with measures to assist residents and avoid dislocation and personal hardship."  10-A D.C. Mun. Regs. § 1813 Policy FSS-2.3.1; *see* ECF No. 34, ¶¶ 201, 341, 391; ECF No. 39 at 46, 52. They do not explicitly claim, however, that Policy FSS-2.3.1 creates a liberty or property interest in community bonds, nor would any such argument be successful.  The policy merely "*encourages* the redevelopment of Barry Farm" in a particular manner.  *Barry Farm Tenants & Allies Ass'n*, 182 A.3d at 1219 (emphasis added).  It thus lacks the necessary discretion-limiting substantive predicates and language mandating an outcome discussed above.  Indeed, the Comprehensive Plan as a whole has been found to be a "non-self-executing set of policy guidelines—not binding policy directives," and therefore an inadequate basis for a due process claim.  *Kingman Park Civic Ass'n*, 27 F. Supp. 3d at 169; *see also, e.g.*, *Kraushaar v. Flanigan*, 45 F.3d 1040, 1048–49 (7th Cir. 1995) ("Some statutes and regulations create only guidelines that direct the manner in which state personnel exercise their discretion to perform certain activities.  These types of guidelines do not create substantive rights or legally enforceable expectancies." (internal citation omitted)).

claim on that ground.

### 2.    *Count 2—ZC No. 16-02 (Buzzard Point)*

Count 2 is brought against the District by Plaintiff NeRAC, and Plaintiffs Carroll, McClain, and R. Hamilton, who are all Buzzard Point residents.[31]   ECF No. 34, ¶¶ 10-12, 203–207.   R. Hamilton is also the ANC Commissioner for her area.   *Id.*, ¶ 153.   The claim concerns an application for a PUD to "construct and operate a stadium [in the Buzzard Point area] that would principally be used by the DC United professional soccer team," which was approved in February 2017.   *Id.*, ¶¶ 203–207; ECF No. 6-1 at 335 (Zoning Comm'n Order No. 16-02).   The operative complaint alleges, as above, that the Department of Community Development and the Department of Energy and the Environment failed to produce required reports.   ECF No. 34, ¶¶ 82 & n.27, 204.c.; ECF No. 39 at 55.   In addition, it alleges that Plaintiff McClain has been affected by the redevelopment in the area, which has resulted in polluted air causing health problems, interrupted her power and her gas line, and made her fence collapse.   ECF No. 34, ¶¶ 140–142; ECF No. 39 at 54–55.   Plaintiff Carroll lives near Plaintiff McClain and has experienced similar environmental pollution, as well as health effects from the "harmful dust coating the surface of her house since the construction began."   ECF No. 34, ¶¶ 146–147; ECF No. 39 at 55.   Plaintiff R. Hamilton has suffered from the environmental pollution and from a loss of reputation because she has been unable to protect her neighborhood in her role as ANC Commissioner.   ECF No. 34, ¶¶ 150, 153; ECF No. 39 at 54.   All three individual Plaintiffs have lost their social networks "as individuals leave Buzzard Point."   ECF No. 34, ¶¶ 143, 147, 151.   They claim these constitute injuries to their property interest in participating in the zoning process and their liberty interest in their social networks.   ECF No. 39 at 53–54.   In addition, they mention "a bundle of property rights associated

---

[31] Plaintiff NeRAC's standing is discussed above in section III.A.2.a.

with the homes they own." *Id.* at 53.  Plaintiff R. Hamilton asserts that her liberty interest in her reputation has been infringed. *Id.* at 54.

As discussed above, Plaintiffs have not established that they have a property interest in participation in the zoning process.   Indeed, here, the claim is weaker than that of Plaintiffs Matthews and M. Hamilton, because these Plaintiffs cannot even point to a denial of party status on which to hang this claim.  Rather, Plaintiffs Carroll, McClain, and R. Hamilton seek to derive their property interest from the fact that the District "solicit[s] neighborhood feedback from residents in the PUD process."  ECF No. 39 at 53.  They make no attempt to identify a statute or regulation that establishes substantive predicates to decision-making and mandates an outcome when the relevant criteria have been met.  *See Robles*, 74 F. Supp. 3d at 262–63.  Additionally, the claim to a protectible interest in Plaintiffs' social networks fails for the reasons already explained.

Plaintiffs are correct that a number of rights inhere in the ownership of real property.  The Supreme Court has recognized "the rights 'to possess, use[,] and dispose of it,'" as well as the concomitant right to exclude others from it.  *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)).  Plaintiffs do not explain how the District interfered with any of these rights; rather, as they seem to recognize, it is the construction companies that cause the pollution complained of.  ECF No. 34, ¶¶ 141 ("[C]onstruction trucks idle next to her house for long periods of time, resulting in polluted air that forces her to close her windows."), 142 ("Redevelopment construction has frequent involved digging for underground pipes.  The digging has interrupted Ms. McClain's power on at least three occasions for hours at a time, and once interrupted the gas line. . . .  The construction has also shaken her house and caused her backyard fence to fall down."), 146 (complaining of "air pollution from construction trucks [and] construction dust that coats surfaces

in [Plaintiff Carroll's] house"); ECF No. 39 at 16 ("Construction trucks idle next to residents' houses for long periods of time, forcing them to close their windows to avoid the buildup of diesel fumes.  Toxic soil, of which the Zoning Commission was made aware, is predictably disturbed by heavy construction equipment.").  To be sure, "courts occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct," such as "government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the [g]overnment's action."  *Nat'l Wrestling Coaches v. Dep't of Educ.,* 366 F.3d 930, 941 (D.C. Cir. 2004), *abrogated on other grounds as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).  However, such cases "require 'formidable evidence' of causation," to show that the third party's response to the government action was "never in doubt," *City of Duluth v. Nat'l Indian Gaming Comm'n*, 7 F. Supp. 3d 30, 39 n.3 (D.D.C. 2013) (quoting *Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994)) or, at the very least, that "'the agency action is . . . a substantial factor motivating the third parties' actions' that directly cause the injuries," *Long Term Care Pharmacy All. v. Leavitt*, 530 F. Supp. 2d 173, 181 (D.D.C. 2008) (some internal quotation marks omitted) (quoting *Tozzi v. U.S. Dep't of Health & Human Servs.,* 271 F.3d 301, 308 (D.C. Cir. 2001)).  Plaintiffs have made no such showing here.  Their sole argument as to causation is that the District allowed the redevelopment by setting a policy agenda and issuing the PUD.  ECF No. 39 at 26.  But it is not the redevelopment *per se* that has caused these alleged injuries; rather, it is the manner in which the construction companies have gone about such redevelopment that has done so.  Indeed, the District points out that local regulations require construction companies to protect adjoining properties from damage during construction.  12-A D.C. Mun. Regs. § 3307.1.  Moreover, the Zoning Commission's approval requires the redeveloper to protect nearby residents from potential harmful effects of the

project, such as "fugitive dust" and soil contaminants.  ECF No. 6-1 at 355; ECF No. 6-2 at 4–6.

The fact that the redeveloper has allegedly not complied cannot be laid at the District's feet for the

purposes of the standing analysis.  Moreover, Plaintiffs have not identified what interests protected

by the Due Process Clause have been violated.  For example, this Circuit has found that there is

no liberty interest in the right to a clean or healthy environment and Plaintiffs have pointed to no

source indicating a state-created property right.  *See, e.g.*, *Del. Riverkeeper Network v. FERC*, 895

F.3d 102, 108–09 (D.C. Cir. 2018); *see also SF Chapter of A. Philip Randolph Inst. v. EPA*, No.

C 07-4936, 2008 WL 859985, at *6 (N.D. Cal. Mar. 28, 2008).  Nor does the Constitution protect

the value of real property from diminution.  *See, e.g.*, *SF Chapter*, 2008 WL 859985, at *6–7.

Finally, Plaintiff R. Hamilton claims a liberty interest in her reputation.  The operative

complaint alleges that, as an ANC Commissioner, she "has ma[de] it a priority as a representative

of her constituency to protect the character of her neighborhood" and that "the existing and

imminent construction and redevelopment has undermined [her] standing and reputation in the

community."  ECF No. 34, ¶ 153.  Recognizing that the Supreme Court has held that "reputation

alone [is] not sufficient to find a liberty interest, and that some other tangible interest must be at

issue," she asserts in the opposition to the motions to dismiss that she has also been "depriv[d] of

the powers of her position as an ANC [Commissioner]."  ECF No. 39 at 54 (citing *Paul v. Davis*,

424 U.S. 693, 701 (1976) ("[T]his line of cases does not establish the proposition that reputation

alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property'

by itself sufficient to invoke the procedural protection of the Due Process Clause.")).  The logic

here appears circular: because Plaintiff R. Hamilton is an ANC Commissioner, her inability to

protect her community in zoning proceedings has caused her to lose her reputation, and the added

tangible interest affected is her ability to protect her community in zoning proceedings.  In any

case, she has not demonstrated that the government "has worked some change in [her] status under the law," which is required for such a claim. *Taylor v. Resolution Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir.), *op. amended on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995).  The District has not removed her from her position and there is no plausible factual allegation that she has otherwise been deprived of "the powers of her position as an ANC [Commissioner]."  The only allegation that could be interpreted as referring to Plaintiff R. Hamilton's powers as an ANC Commissioner is that she has testified before the Zoning Commission and had a "negative experience with [the District's] decisions and the planning process," leading to "emotional stress and fear that she and her community are voiceless."  ECF No. 34, ¶ 152.  But the fact that the Zoning Commission did not adopt her views is not a deprivation of her power as an ANC Commissioner (or of a constitutional right).

For these reasons, Plaintiffs Carroll, McClain, and R. Hamilton lack standing to bring this claim, and it should be dismissed.

### 3.    Count 3—ZC No. 15-28 (Union Market)

Count 3 is brought against the District by Plaintiff Ball, a Union Market resident, and concerns an application for a PUD and related zoning map amendment, which was granted in September 2016.  ECF No. 34, ¶¶ 14, 158, 208–220; ECF No. 6-1 at 259 (Zoning Comm'n Order No. 15-28).  She alleges that she was erroneously denied party status by the Zoning Commission and that the Department of Housing and Community Development and the Department of Energy and the Environment failed to produce impact reports. ECF No. 34, ¶¶ 82 & n.27, 216.c, f.  She "lives in reasonable fear of . . . environmental degradation . . . , increased taxes that she will not be able to afford on her home, [ ] the changing character of her neighborhood, the loss of nearby businesses at which she engages in commerce, and [the] break-up of her social network," *id.*, ¶

161, and claims a property interest in her ability to participate in the zoning process and a liberty interest in "maintaining her social network and bonds that are the lifeblood of her community," ECF No. 39 at 56.

The only allegation Plaintiff Ball asserts that has not been dealt with above is that she has a "reasonable fear" that her property taxes will increase, leading to the loss of her home. ECF No. 34, ¶ 161. She does not, however, claim a property or liberty interest in taxes at a certain level or in protection against an increase in the value of her home. Moreover, even if those were cognizable injuries, the "line of causation between the [allegedly] illegal conduct and injury [would be] too attenuated." *Allen*, 468 U.S. at 752. In order for the District to have caused the claimed harm, the denial of Plaintiff Ball's procedural due process rights in connection with ZC No. 15-28 would have to have caused the approval of the PUD application and the approved redevelopment would have to have increased the property values to such a level that the property taxes on Plaintiff Ball's home became too expensive for her to afford, such that she would have to leave her home. That chain of causation is far too speculative to meet the requirements of the standing analysis. Plaintiff Ball does not have standing as to this claim.

### 4. *Count 4—ZC No. 16-29 (Poplar Point)*

Count 4 concerns the application for a PUD and related zoning map amendment in the Poplar Point area, which was approved in April 2018. ECF No. 34, ¶¶ 221–235; Zoning Comm'n Order No. 16-29, DC Office of Zoning, 1 (enter "16-29" in Search box; click "View"; click "View Full Log"; navigate to Exhibit No. 66; click "View"). It is brought against the District by CARE and individual Plaintiffs Fuller, who is the ANC Commissioner for the affected area, and Mpulubusi-El, who is homeless.[32] ECF No. 34, ¶¶ 8, 13. Plaintiff Fuller's allegations largely

---

[32] Plaintiff CARE's standing is discussed above in section III.A.2.b.

mirror those already discussed—two agencies failed to produce written reports in connection with the hearing on ZC No. 16-29; she has a property interest in accessing the basic processes of government and her social networks; and she has "suffered stress and humiliation from her unsuccessful efforts to 'educate through her testimony the D.C. Zoning Commission about the serious negative implications of its decision-making'" and damage to her reputation from her inability to "protect[] the character of her neighborhood." *Id.*, ¶¶ 82 & n.27, 156–157, 231.c.; ECF No. 39 at 58–59. None of those constitutes a constitutionally-protected interest and therefore their infringement cannot be an injury in fact to confer standing.

Plaintiff Mpulubusi-El raises a somewhat different claim. The operative complaint alleges that he is an artist who focuses on documenting the history and culture of Barry Farm and that the District's zoning decisions have "injured his livelihood by scattering residents that compose the art culture—thus interfering [with] the topic of his work." ECF No. 34. ¶ 131. The District has also "injured his livelihood by scattering the people with whom he has earned a professional reputation," which has "undermined his opportunity for business collaboration intrinsic to his livelihood" and "diminished" the "goodwill [that] inhered in his name as an artist, advocate, and mentor in his immediate community." ECF No. 39 at 21–22.

Plaintiff Mpulubusi-El has not identified a property or liberty interest that is infringed. The only one that could possibly be implicated is his "'right to follow a chosen trade or profession' without governmental interference," *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) (quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994)), but he has not actually alleged any interference with his right to practice his occupation.[33] There is no allegation that the

---

[33] Plaintiffs also allege that the destruction of Barry Farm has "made it harder for [Plaintiff Mpulubusi-El] to survive" as a homeless person because "he relie[d] on trusted neighbors . . . to store [his] personal possessions." *Id.* at 22. They cite no legal authority recognizing that such a deprivation would violate a constitutionally-protected interest and the undersigned has found no such authority that might support such a claim.

District has, for example, denied him a required license, *see Schware v. Bd. of Bar Exam of N.M.*, 353 U.S. 238–39 (1957), or "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities," such as by "invok[ing] any regulations to bar" him from similar employment, *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573–74 (1972).  He merely contends that the District's zoning decisions, by causing the redevelopment of Barry Farm, interfered with a preferred subject of his art and a community that supported his work.  That does not implicate a liberty interest.  Moreover, Plaintiff Mpulubusi-El has a causation problem.  There is no explanation as to how the District's conduct in relation to a PUD and zoning map amendment in the Poplar Point neighborhood—which is the claim in which he is named as a Plaintiff (ECF No. 34, ¶¶ 221–235—had any effect on the Barry Farm neighborhood upon which his work is focused, the redevelopment of which is the basis of his claimed harm.[34]

These Plaintiffs do not have standing to bring this claim, and it should therefore be dismissed.

5.    *Count 5—Inadequate Pre- and Post-Deprivation Practices*

Count 5 is brought against the District by all Plaintiffs.  ECF No. 34 at 60–61.  It alleges that the District "fail[ed] to put in place pre-deprivation procedures and [ ] fail[ed] to execute post-deprivation procedures" by such actions as "changing how zoning processes have traditionally operated" and "[d]enying the PUD process unless the mixed-use portion of the project fit the very

---

[34] The opposition to the motions to dismiss discusses Plaintiff Mpulubusi-El's claims in connection with Plaintiffs Matthews and M. Hamilton, who assert claims related to Barry Farm in Count 1.  Plaintiffs cannot amend the operative complaint via its opposition brief to add Plaintiff Mpulubusi-El to Count 1.  *See, e.g.*, *Smith v. Mayor*, 191 F. Supp. 3d 114, 117 (D.D.C. 2016) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting *Arbitraje Casa de Cambio, S.A. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C.2003))), *aff'd sub nom. Smith v. Mayor, D.C.*, No. 16-7109, 2017 WL 2193615 (D.C. Cir. May 19, 2017).  In any case, even if he had been listed as a Plaintiff for Count 1, which concerns Barry Farm, he would still lack standing because he has not alleged a cognizable liberty interest in protecting the focus of his artwork.

specific definition of 'maker-use,'" as well as prioritizing the needs of "residents who meet Defendants' definition of Creative Class . . . to the detriment and exclusion of non-Creative Class residents." *Id.*, ¶ 237. It points to "the examples in Counts I through IV, in which the land use and zoning rules were repeatedly violated" and contends that these wrongs have "severely impacted" the "property, life, and liberty interests" of "District of Columbia residents." *Id.*, ¶¶ 238, 243. It thus appears to be a catch-all count, relying largely on the allegations in the prior four counts.

As discussed above, however, no Plaintiff has established standing to pursue those claims either because they failed to allege a constitutionally-protected interest or failed to establish causation, or both. But the standing of two Plaintiffs has not yet been assessed: the so-called "housing-insecure" litigants, Plaintiffs T. Wells and A. Wells. ECF No. 34, ¶¶ 15–16. Their alleged injury is their inability to "find safe, affordable housing" as a result of the "Zoning Commission's pattern and practice of not conducting comprehensive reviews of projects resulting from the discriminatory Creative Class Agenda on low-income families' racial segregation," which has caused a dearth of "affordable multi-bedroom rental units for families available for low-income African-Americans in racially integrated neighborhoods." *Id.*, ¶¶ 162, 165, 167, 170; ECF No. 39 at 25. As noted above in the section addressing the standing of Plaintiffs Matthews and M. Hamilton, the Supreme Court has indicated that the Constitution does not protect a right to adequate housing. *Lindsey*, 405 U.S. at 73 ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality . . . ."); *Reese v. Miami-Dade Cty.*, 242 F. Supp. 2d 1292, 1301 (S.D. Fla. 2002) (stating that "[c]ourts across the country have consistently held that there is no

constitutional right to housing" and collecting cases), *aff'd*, No. 02-16855, 2003 WL 22025458 (11th Cir. July 14, 2003); *see also Melton v. U.S. Gov't*, Civ. A. No. 92-2604-LFO, 1993 WL 91343, at *1 (D.D.C. Mar. 18, 1983). Having failed to identify an interest protected by the Due Process Clause, Plaintiffs T. Wells and A. Wells, like the other Plaintiffs in this case, lack standing to assert this claim.

b.       Substantive Due Process Claim—Count 15

The undersigned turns now to the substantive due process claim included in the operative complaint as Count 15. This count is brought against the Housing Authority by Plaintiffs Matthews and M. Hamilton and concerns allegations of constructive eviction from Barry Farm. ECF No. 34, ¶¶ 392–393, 398—399. Fairly read, the operative complaint asserts that the Housing Authority's illegal scheme to constructively evict the "almost exclusively black residents" of Barry Farm was motivated by racially discriminatory intent as well as animus against residents who are not members of the largely young, largely white "Creative Class." *Id.*, ¶¶ 390, 393, 397–400.

"As a threshold matter, for a plaintiff to allege a substantive due process violation, he must allegedly have been arbitrarily deprived of a fundamental right or liberty or property interest that is based in the United States Constitution." *Toms v. Office of the Architect of the Capitol*, 650 F. Supp. 2d 11, 25 n.11 (D.D.C. 2009). Plaintiffs Matthews and M. Hamilton identified a "right[] to access housing without discrimination." ECF No. 34, ¶ 401. But, as discussed, there is no constitutional right to housing. *Lindsey*, 405 U.S. at 73; *Reese*, 242 F. Supp. at 1301; *Melton*, 1993 WL 91343, at *1. Moreover, the right to be free from discrimination based on race (or age or source of income) derives from the Equal Protection Clause, and the Supreme Court has held that where there is "an explicit textual source of constitutional protection' against a particular sort of government behavior," that textual source rather than "the more generalized notion of

'substantive due process,' must be the guide for analyzing [those] claims."[35]  *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (internal quotation marks omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989));[36] *see, e.g.*, *Johnson v. California*, 207 F.3d 650, 656 (9th Cir. 2000) (holding that a claim for racial discrimination should be analyzed under the Equal Protection Clause rather than as a substantive due process violation), *rev'd on other grounds*, 543 U.S. 499 (2005); *Gehl Grp. v. Koby*, 63 F.3d 1528, 1535 n.8 (10th Cir. 1995) (stating that claims that the government acted with discriminatory animus "should be analyzed under the [ ] explicit constitutional guarantee[] of the . . . Equal Protection Clause."), *abrogated on other grounds by Crawford-El v. Britton*, 523 U.S. 574 (1998).

There is, perhaps, another protected interest at stake here: Plaintiffs' property interest in their tenancy in habitable public housing, which the undersigned has already found, based on the Southern District of New York's decision in *Davis*, can be a basis for a procedural due process claim.  *See supra* § III.A.3.a.1.  The law, however, is unclear as to whether such a property interest is a sufficient basis for a substantive due process claim.  Justice Powell's concurrence in *Board of Regents of Michigan v. Ewing* made a distinction between property rights protected by procedural due process guarantees and those cognizable when a substantive due process claim is made: "[N]ot every [property] right is entitled to the protection of substantive due process.  While property

---

[35] Plaintiffs' standing to pursue their equal protection claim is discussed *infra* Section III.A.3.c.

[36] The quotation cited comes from the plurality opinion in *Albright* by Chief Justice Rehnquist joined by Justices O'Connor, Scalia, and Ginsburg.  While the dissenting opinion (by Justice Stevens joined by Justice Blackmun) questioned the plurality's reliance on *Graham v. Connor*, 510 U.S. at 303–04, Justice Souter's concurrence in the judgment explicitly agreed with the "rule of reserving due process for otherwise homeless substantial claims," *id.* at 288 (citing *Graham*), and Justice Kennedy (joined by Justice Thomas) also appeared to reaffirm that principle, *id.* at 817 ("I agree with the plurality that an allegation of arrest without probable cause must be analyzed under the Fourth Amendment without reference to more general considerations of due process.").  Thus, it appears that seven Justices agreed with the proposition that substantive due process must not be used to analyze the infringement of a right that is guaranteed elsewhere in the Constitution.

interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." 474 U.S. 214, 229 (Powell, J., concurring) (internal citation omitted).  Thus, for Justice Powell, only property rights that "resemble[e] [ ] the fundamental interests that previously have been viewed as implicitly protected by the Constitution" are worthy of substantive due process protection; "state-law contract right[s]" and the like are not.  *Id.* at 229–30.  Some Circuits have therefore found that, "to state a substantive due process claim, 'a plaintiff must have been deprived of a *particular quality* of property interest," one that is not derived from state law but rather can be characterized as "'fundamental' under the United States Constitution."  *Nicholas v. Penn. State Univ.*, 227 F.3d 133, 140 (3d Cir. 2000) (quoting *DeBlasio v. Bd. of Adjustment*, 53 F.3d 592, 598 (3d Cir. 1995)); *see also Selig v. N. Whitehall Twp. Zoning Hearing Bd.*, 653 F. App'x 155, 156 (6th Cir. 2016) (per curiam).  Applying this theory, both the Third Circuit and the Sixth Circuit have indicated that interests less fundamental than property *ownership* are not protected.  *See Nicholas*, 227 F.3d at 141 ("Heedful of the Supreme Court's admonition that we should exercise 'utmost care whenever we are asked to break new ground in this field,' we have been reluctant to extend substantive due process protection to other, less fundamental property interests [than land ownership]." (internal citation omitted) (quoting *Collins*, 503 U.S. at 124); *Selig*, 653 F. App'x at 157 ("We are not aware of any case in which we have found that something other than full property ownership warrants substantive due process protection.").  Under that line of cases, Plaintiffs Matthews and M. Hamilton would not have alleged a cognizable property interest for the purposes of substantive due process, and therefore would not have standing.

However, the D.C. Circuit does not appear to apply so strict a rule.  Although it has cited Justice Powell's concurrence in *Ewing*—for example, stating in a criminal case regarding a

defendant's entitlement to a downward departure in sentencing for providing substantial assistance that "'substantive due process rights are created only by the Constitution,' not by federal law," *United States v. White*, 71 F.3d 920, 926 (D.C. Cir. 1995) (quoting *Ewing*, 474 U.S. at 229)—in the context of claims for violation of substantive due process rights related to land use, the D.C. Circuit has relied on an inquiry like that outlined above for determining property interests for the purposes of procedural due process.  For example, in *Elkins v. District of Columbia*, the D.C. Circuit addressed a claim that the District's issuance of stop-work orders and an administrative search warrant in connection with the plaintiffs' home renovations violated their substantive due process rights.  690 F.3d 554, 558–59 (D.C. Cir. 2012).  In identifying whether there was an allegation of infringement of a cognizable property right, the court relied on *3883 Connecticut LLC v. District of Columbia*—a procedural due process case in which the D.C. Circuit held that individuals have a property interest in construction permits that have been issued to them based on the limitation on official discretion to revoke the permits, *see* 336 F.3d 1068, 1069, 1072–72 (D.C. Cir. 2003)—and imported that property interest into the substantive due process context: "[The] substantive due process claim rests on [the] allegations that the stop work orders and search of [the] home were made despite valid construction permits.  We have previously held that individuals have a protected property interest in building permits issued by the District." *Elkins*, 690 F.3d at 561 (citing *3883 Connecticut*, 336 F.3d at 1073); *see also George Wash. Univ.*, 318 F.3d at 207–09 (analyzing whether the university had alleged a property interest in connection with its substantive due process claim by evaluating the "degree of discretion to be exercised by state officials in granting or withholding" permission for an exception to the applicable zoning of a particular area).

There is not, of course, a perfect fit between those precedents and the situation here.  This

68

claim is not a land use claim.  Rather, this is a claim that the Housing Authority caused Barry Farm to deteriorate into unlivable conditions, interfering with the tenancies of Plaintiff Matthews and Plaintiff M. Hamilton.  And the source of any property right—at least as recognized in *Davis*—is not a discretion-limiting local law, but contract rights in federally-subsidized housing derived from a lease provision required by federal law.  *See Davis*, 379 F. Supp. 3d at 253–54.  Nevertheless, *Elkins* and *George Washington University* indicate that, in this Circuit, a substantive due process claim can be based on a property interest that has been deemed sufficient to ground a procedural due process claim.  Therefore, the undersigned finds that Plaintiffs Matthews and M. Hamilton have alleged an injury-in-fact.

They have also alleged that the Housing Authority—the Defendant sued in this count—caused the injury.  As outlined above, the operative complaint asserts that the Housing Authority was responsible for the alleged conditions at Barry Farm.  *See* ECF No. 34, ¶¶ 133 ("Michelle Hamilton was a resident of Barry Farm who moved out of Barry Farm because her unit was filled with mold, which DCHA failed to adequately [remedy] despite her request."), 338 ("DCHA caused resident hardship by leaving the Barry Farm site in gross disrepair so as to constructively evict Barry Farm residents."), 343 ("DCHA refused to make repairs at the Barry Farm site since it was a part of a real property transaction that if laws were followed would have kept relatively intact a community inimical to the sorts of communities the District of Columbia Government has been seeking to grow pursuant to Creative Class policies."), 345 ("[B]y refusing to make repairs on Barry Farm residents' properties, wholly or partially, for discriminatory purposes, the DCHA has been engaged in Subterfuge against the residents of Barry Farm and has acted contrary to the DCHRA."), 398 ("DCHA refused to make repairs at the Barry Farm site since it was a part of a real property transaction that if laws were followed would have kept relatively intact a community

69

inimical to the sorts of communities the District of Columbia Government has been seeking to grow pursuant to Creative Class policies."), 400 (noting "DCHA policy to constructively evict Barry Farm residents").

That leaves the redressability requirement of standing. It asks whether "it is 'likely' and not 'merely "speculative"' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008) (some internal quotation marks omitted) (quoting *Lujan*, 50 U.S. 561). Much of the relief listed in the operative complaint would not redress the injuries that these Plaintiffs claim in Count 15— that is, injuries like constructive eviction arising from the alleged failure to maintain Barry Farm. For example, an injunction against the Zoning Commission to halt further activity on phase one PUD approvals or to prohibit amendment of the Comprehensive Plan; or an order requiring Defendants to consider gentrification and segregative effects in approving future developments, halting all requests for proposals, or creating an independent "People's Counsel" to aid District residents appearing before the Zoning Commission or the D.C. Court of Appeals (presumably in connection with appeals of Zoning Commission decisions) will not redress the claimed deterioration of the Barry Farm premises. ECF No. 34 at 83–84. Nor will much of the specific relief in the operative complaint that targets Barry Farm. Requiring the Housing Authority to "develop in place so residents do not have to leave the neighborhood," to "cease all pre-construction activity" at the site, to "make every resident current on their rent and utility bills," or to provide prepaid phones "to permissively track residents if they are required to leave the Barry Farm site" will not, again, redress the claimed injury. *Id.* However, Plaintiff Matthews, as a current resident of Barry Farm, has standing to seek an order, requested in the operative complaint, requiring the Housing Authority to make repairs on the premises and to thereafter maintain the

property.  *See id.*  As stated previously, there are sufficient allegation in the operative complaint to support the contention that the Housing Authority continues to allow Barry Farm to deteriorate. *Id.*, ¶¶ 133, 338, 343, 345, 398, 400; *see Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) ("[W]here the plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing.  Rather, [the plaintiff] must show he is suffering an ongoing injury or faces an immediate threat of injury.").  Similarly, Plaintiffs Matthews and M. Hamilton have standing to seek damages for the alleged substantive due process violations.  ECF No. 34 at 84.

The undersigned recommends finding that Plaintiffs Matthews and M. Hamilton, between the two of them,[37] have standing to assert this substantive due process claim and to seek the relief noted above.

### c.      Equal Protection Claim—Count 6

Count 6 is brought by all Plaintiffs and alleges that the District violated the Equal Protection Clause through its "policies adopted in pursuit of the Creative Class Agenda, in the manner in which it carried out land use and zoning decision-making," which targeted for redevelopment "historically and predominantly black communities."  ECF No. 34, ¶¶ 261–262. Generously read, the claim contends not only that Defendants, through the Creative Class Agenda, treat African-American residents of the District differently from those of other races by redeveloping traditionally African-American neighborhoods in order to attract non-African-American residents, but also that the specific zoning proceedings complained of treated these African-American Plaintiffs differently by arbitrarily approving PUDs and zoning map

---

[37] Because Plaintiff M. Hamilton no longer lives at Barry Farm, she does not appear to have standing to seek such relief.  However, as note above, where multiple parties seek the same relief on a claim, as long as one party has standing, the court need not consider whether the other parties also have standing.  *Am. Anti-Vivisection Soc'y*, 946 F.3d at 619–20.

adjustments that disrupted their neighborhoods and dispersed their inhabitants.

> As the Sixth Circuit has recently explained:
>
>> Because the Equal Protection Clause "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference," an allegation that plaintiffs were subjected to differential treatment in one of these impermissible ways amounts to a cognizable injury in fact, so long as the differential treatment was either ongoing or accompanied by continuing adverse effects at the time the complaint was filed.

*Sullivan v. Benningfield*, 920 F.3d 401, 408 (6th Cir. 2019) (internal citation omitted) (quoting

*Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011)) (citing *O'Shea v.*

*Littleton*, 414 U.S. 488, 495–96 (1974)).  The allegations in the operative complaint clearly satisfy

that standard by asserting that the District in its zoning decisions targeted a suspect class—African-

American residents of the District.  It makes no difference that the redevelopments at issue are

presumably intended to bestow benefits rather than injuries to the District's residents as a whole.

The fact that others would find the challenged government action beneficial does not mean that a

plaintiff complaining of that action has not suffered an injury.  To take an example provided by

the D.C. Circuit:

> When plaintiffs allege that they will suffer "aesthetic injury" from the government's interference with their ability to observe an animal species, we do not resolve the matter by asking whether we—or the government, or most other people—have the same aesthetic sense.

*Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) (citing *Lujan*, 504 U.S. at 562–63).

"Nor [should the Court] do the equivalent here."  *Id.*

"[C]lear precedent" from the Supreme Court "require[s] that [ ] allegations of future injury

be particular and concrete" and exposure to illegal conduct in the past "does not in itself show a

present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing,

present adverse effects."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998) (internal

quotation marks omitted) (ellipses in original) (quoting *O'Shea*, 414 U.S. at 495–96).  Plaintiffs—who appear to seek the same relief in each cause of action, as they do not link any of the "specific relief" to any specific claim—categorize the prospective remedies they seek as "prophylactic," "structural," and "restorative" injunctions.  ECF No. 39 at 31–32.  The "prophylactic injunctions," such as an injunction prohibiting further action on "phase one PUD approvals," an injunction prohibiting amendment of the Comprehensive Plan, and an order halting outstanding requests for proposals so that they can be "reviewed for Creative Class preferences," seek to "maintain the status quo and prevent additional harm."  *Id.* at 31–32.  However, Plaintiffs have provided neither allegations nor argument to suggest that they will be harmed by *any* unidentified phase one PUD approvals—and certainly not that they will be harmed by *every* phase one PUD approval in the District—or by unidentified amendments to the Comprehensive Plan or unidentified requests for proposals.  More simply, although Plaintiffs include vague assertions such as that the "destruction in the name of the Creative Class Agenda has no end in sight" (ECF No. 34, ¶ 109), there are no "particular and concrete" allegations that future PUD approvals, Comprehensive Plan amendments, and requests for proposals will affect Plaintiffs specifically or even, more generally, the neighborhoods in which Plaintiffs reside.  Additionally, Plaintiffs do not explain how their proposed prophylaxis would remedy any of the adverse effects that they allegedly suffer currently.

The structural relief—in the form of requiring the District to consider the gentrifying and segregative effects of future developments as well as to establish an independent body to represent residents potentially affected by zoning decisions—suffers from the same problems.  Again, Plaintiffs fail to specify upcoming developments that will likely cause gentrifying or segregative effects anywhere in the District, let alone in the neighborhoods that are the focus of this action; nor do they suggest how this relief would prevent such harm if it were identified.  As for the

restorative relief, some of it—*i.e.*, the repairs and maintenance of the Barry Farm premises—is directed at the Housing Authority (which is not sued in this count).  The underpinnings for the request for an order requiring "Defendants [to] cease pre-construction activity at Barry Farm," are similarly undeveloped.  It is not clear from the operative complaint what pre-construction activity, if any, the District (the only Defendant sued in this count) is engaging in at the site, or, indeed, what is meant by "pre-construction activity."[38]  Therefore, the undersigned recommends finding that Plaintiffs have standing to seek only damages on this claim.

        d.        D.C. Human Rights Act Claims—Counts 7–12—and Fair Housing
                  Act Claims—Counts 13–14

Counts 7–12 are brought pursuant to the D.C. Human Rights Act.  All those counts are alleged against the District; Count 11 is also alleged against the Housing Authority.  Counts 13–14 are brought pursuant to the Fair Housing Act against the District; neither of those counts is alleged against the Housing Authority.

As to the D.C. Human Rights Act, Count 7, which is brought by all Plaintiffs against the District, asserts that the District's policies in connection with the PUD process and zoning amendments, as well as the District's policy document, 2014's Creative Economy Strategy, include explicit source-of-income and age preferences in violation of such prohibitions in the D.C. Human Rights Act.  ECF No. 34, ¶¶ 266–277.  Count 8, which is brought by all Plaintiffs against the District, asserts that in ZC No. 15-28 (a PUD in the Union Market neighborhood), the Zoning Commission "restricted that development of residential housing based on how the retail tenants in a mixed-use development earned their living"  (*id.*, ¶¶ 279–292) and thus engaged in prohibited

---

[38] Indeed, the Housing Authority points out that the Zoning Commission's order in ZC No. 14-02 was vacated by the District of Columbia Court of Appeals in *Barry Farm Tenants & Allies Ass'n v. D.C. Zoning Comm'n*, 182 A.3d 1214, 1230 (D.C. 2018).  Thereafter, the PUD applications for Barry Farm were withdrawn.  Applicant's Request to Withdraw Application (Approved), DC Office of Zoning, http://app.dcoz.dc.gov/Search/SearchOrders.aspx (enter "14-02" in Search box; click "View"; click "View Full Log"; navigate to Exhibit No. 118, click "View").

discrimination because "an ordinary listener would understand th[ose] preferences for Creative Class businesses as expressing a preference for Creative Class residents in the development" (ECF No. 39 at 87).

Count 9, which is brought by all Plaintiffs against the District, alleges that the implementation of the Creative Class Agenda is a subterfuge for discrimination based on age and source of income and that the Zoning Commission has placed restrictions on the development of housing by following the District's policy with the intent to provide housing to "millennials and people who earn their income within certain professions," thus "engag[ing] in illegal subterfuge." ECF No. 34, ¶¶ 294–307. Plaintiffs bring two other subterfuge counts. In Count 11 Plaintiffs Matthews and M. Hamilton allege that both Defendants have engaged in subterfuge based on race—*i.e.*, the District implementing the Creative Class Agenda in a manner that "actively encourage[es] others to allocate . . . resources in real estate transactions" to the Creative Class "to the detriment of low-income predominantly historic black residents of Anacostia neighborhoods" and the Housing Authority refusing to make repairs on the premises of Barry Farm residents, who are predominantly African-American. *Id.*, ¶¶ 331–347. In Count 12, T, Wells and A. Wells, the two "housing insecure" Plaintiffs, allege that the District engaged in subterfuge based on disparate impact by implementing a land use policy favoring the Creative Class, which "skew[s] white by over 20%" in both the nation and the D.C. metropolitan area, thus "disproportionately impact[ing] black residents" of the District. *Id.*, ¶¶ 349–356.

In Count 10, all Plaintiffs allege that the District engaged in steering by instituting policies and publishing documents that "offer development incentives and zoning relief" in order to attract members of the Creative Class, thus discriminating against others on the basis of age and source of income. ECF No. 34, ¶¶ 309–329.

The Fair Housing Act claims—Counts 13 and 14—are brought by all Plaintiffs against the District.  Count 13 alleges disparate treatment based on race stemming from the manner in which the Creative Class Agenda has been implemented, which purportedly makes housing unavailable based on race; discriminates in the terms, conditions, or privileges of housing and in the provision of services in connection with housing based on race; and perpetuates racial segregation.[39]  ECF No. 34, ¶¶ 358–365.  Count 14 alleges that the implementation of the Creative Class Agenda as well as specific Zoning Commission decisions enacting the policy "have caused or predictably will cause a discriminatory effect in perpetuating racial segregation."  *Id.*, ¶¶ 367–386.It is well-established that standing under the Fair Housing Act extends to the full limits of Article III.  *See, e.g.*, *Bank of Am. Corp. v. City of Miami*, __ U.S. __, __, 137 S. Ct. 1296, 1303–05 (2017); *see also Hargreaves v. Capital City Mortg. Corp.*, 147 F. Supp. 2d 1, 3 (D.D.C. 2001) ("'Prudential limits' on standing do not apply [under the Fair Housing Act], as the Act confers standing to the full extent permitted by Article III.").  Similarly, the D.C. Court of Appeals has held that "standing under the [D.C. Human Rights Act] is co-extensive with standing under Article III."  *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 733 (D.C. 2000) (quoting *Molovinsky v. Fair Emp't Council of Greater Wash.*, 683 A.2d 142, 146 (D.C. 1996)).  The analysis under each statute is, therefore, largely congruent.  *See, e.g.*, *Welsh v. McNeil*, 162 A.3d 135, 144 (D.C. 2017).

It is also significantly simpler than the analyses above addressing the standing of the individual Plaintiffs as to the constitutional claims.  Congress (in the case of the Fair Housing Act) or the D.C. Council (in the case of the D.C. Human Rights Act)—"can create new private rights and authorize private plaintiffs to sue simply based on the violation of those private rights.  A

---

[39] To the extent that Plaintiffs assert a claim here based on the failure to maintain Barry Farm, any such injury cannot be traced to the District for the reasons discussed *supra* section III.A.3.a.1.

plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that right." *Spokeo, Inc. v. Robins*, __ U.S. __, __, 136 S. Ct. 1540, 1553 (2016) (Thomas, J., concurring) (internal citations omitted) (citing, among others, *Warth*, 422 U.S. at 500, and *Havens Realty*, 455 U.S. at 373–74); *see also Havens Realty*, 455 U.S. at 373 ("As we have previously recognized, '[t]he actual or threatened injury required by Art. III may exist solely by virtue of "statutes creating legal rights, the invasion of which creates standing . . . .'"" (quoting *Warth*, 422 U.S. at 500)).   Standing under the two statutes is not limited to the direct target of discrimination but extends to other individuals within the area affected by the defendant's conduct. *See, e.g.*, *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 112–15 (1979) (holding that allegations that "the carefully described neighborhood . . . in which the four individual respondents reside" was "losing its integrated character" were sufficient to plead an injury-in-fact to those who were not direct targets of racial discrimination); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972) (holding that the Fair Housing Act "protect[s] not only those against whom a discrimination is directed" and noting that discriminatory housing practices injure the whole community); *Exec. Sandwich Shoppe*, 749 A.2d at 732 (stating that the argument that the D.C. Human Rights Act "confers standing only to the targets of discrimination finds no support in the language of the statute" and that "[w]e traverse no new epistemological territory when we recognize that discrimination not only inflicts an injury on the individual who is targeted for discrimination but also exacts a social and economic toll from others.").   Thus, to establish the injury-in-fact and causation prongs of the standing inquiry for the purposes of either of these statues, the plaintiff must allege only that a violation of the statute caused her a concrete harm to one of the interests the statute is designed to protect.

The D.C. Human Rights Act provides that "[a]ny person claiming to be aggrieved by an

unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and other such remedies as may be appropriate." D.C. Code § 2-1403.16. That same statute makes it "an unlawful discriminatory practice" to, "wholly or partially for a discriminatory reason based on the actual or perceived[] race, . . . age, . . . [or] source of income . . . of any individual" to "include in the terms or conditions of a transaction in real property, any clause, condition, or restriction" or to "make, print or publish" any "notice, statement or advertisement" with respect to a real estate transaction that indicates any such "preference, limitation, or discrimination.". D.C. Code § 2-1402.21(a)(2), (5). The allegations in Counts 7–8 largely track that statutory text. It is further an "unlawful discriminatory practice" to practice "subterfuge," defined as "do[ing] any of the above said acts for any reason that would not have been asserted but for" discrimination on the basis of, among other things, race, age, or source of income. D.C. Code § 2-1402(b). Plaintiffs allege such subterfuge in Counts 9 and 11–12. Finally, it is also unlawful discrimination to "engage in the practices of 'blockbusting' and 'steering,'" which includes acts of "promot[ing], induc[ing], influenc[ing] or attempt[ing] to promote, induce, or influence" a real estate transaction to "induce a person to discriminate." D.C. Code § 2-1402.22(1). That claim can be found in Count 10.

Finally, the Fair Housing Act prohibits, in relevant part, making housing unavailable or denying housing on the basis of race, as well as discriminating against any person on the basis of race "in the terms, conditions, or privileges of a sale or rental of a dwelling, or in the provision of services or facilities in connection" with a dwelling. 42 U.S.C. § 3604 (a)–(b). As with the D.C. Human Rights Act, "racial steering practices" that create or perpetuate segregation are prohibited. *See, e.g.*, *Havens Realty*, 455 U.S. at 376; *Boykin v. Gray*, 895 F. Supp. 2d 199, 213 (D.D.C. 2012) ("[I]f [conduct] perpetuates segregation and thereby prevents interracial association[,] it will be

considered invidious under the Fair Housing Act independently of the extent to which it produces a disparate effect on different racial groups." (quoting *Graoch Assocs. #33, L.P. v. Louisville/Jefferson Cty. Metro Human Relations Comm'n*, 508 F.3d 366, 378 (6th Cir. 2007))), *aff'd sub nom, Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016).  Claims 13–14 allege violations of those rights.

As should be clear, the allegations in the operative complaint with respect to Counts 7 through 14 satisfy the injury-in-fact and causation requirements for the purposes of the standing analysis and would be redressed by retrospective relief like damages.  However, as with the equal protection claim discussed above, there are insufficient allegations to find that Plaintiffs will be harmed by future PUD applications or approvals such that proceedings should be halted or overhauled or that the injunctive relief targeted at the dilapidation of Barry Farm will remedy the injuries Plaintiffs claim from alleged violations of the Fair Housing Act and the D.C. Human Rights Act.

### B.     The Political Question Doctrine

Both the District and the Housing Authority argue that Plaintiffs' claims are non-justiciable under the political question doctrine.  While the Housing Authority recites the generalized notion that "matters of public policy [are] better left to the legislative and executive arms of the D.C. government" (interspersed with some arguments that concern Plaintiffs' standing and others that appear to address the merits of Plaintiffs' claims) (ECF No. 26-1 at 24–28; ECF No. 46 at 25), the District engages more fully with the case law governing justiciability under the political question doctrine (ECF No. 27-1 at 25–29; ECF No. 47 at 19–20).

"The political question doctrine is 'essentially a function of the separation of powers . . . .'"  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010)

(en banc) (quoting *Baker v. Carr,* 369 U.S. 186, 217 (1962)).  As the Supreme Court recently explained, although it is "the province and duty of the judicial department to say what the law is," sometimes "the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights."  *Rucho v. Common Cause*, __ U.S. __, __, 139 S. Ct. 2484, 2494 (2019) (internal quotation marks omitted) (first quoting *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), then quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion)). When such a "political question" is presented, the claim is "nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction."  *Rucho*, __ U.S. at __, 139 S. Ct. at 2494.  That said, the political question doctrine is a "narrow exception" to the rule that "the Judiciary has a responsibility to decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012).  A claim presents a political question only if it involves one or more of the following:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.

The District asserts that Plaintiffs' claims fit into the first two categories—that Congress explicitly empowered the political branches of the District to formulate its housing policy by establishing the D.C. Zoning Commission and later making the Mayor "the central planning agency for the District" and "delegating legislative authority to the D.C. City Council" (ECF No. 39 at 26 (citing Zoning Act of 1920, Pub. L. 75-153, 41 Stat. 500 (1923) and D.C. Code §§ 1-

204.23, 204.4)), and that there is no manageable standard for resolving the claims because "absent a policy determination about how to choose among housing development strategies, there is no way to determine whether plaintiffs are correct that the District has failed to satisfy its obligations" (ECF No. 39 at 27).

Defendants appear to misapprehend the claims that Plaintiffs are making.  Plaintiffs do not contest that it is the District's "province to set housing policy."  ECF No. 39 at 36.  They do not seek "judicial review" of documents like the 2014 Creative Economy Strategy, the 2016 Creative Plan, or the operative Comprehensive Plan.  ECF No. 27-1 at 26–27.  They are not "ask[ing] the Court to opine on how many 'affordable multi-bedroom rental units' are required in the District." ECF No. 47 at 19 (quoting ECF No. 39 at 25)).  Rather, Plaintiffs challenge specific actions of the Zoning Commission in specific matters and argue that Defendants have implemented land use policy in a manner that violates the Constitution and federal and local statutes.  Ruling on those claims will not require the Court to pass on the wisdom of the District's policy choices, which are domain of the District's legislative and executive branches, but rather presents legal issues regarding whether government conduct violated the law, for example by allegedly improperly denying Plaintiffs the opportunity to participate in Zoning Commission hearings, depriving them of property without due process of law, and implementing land use policy in a discriminatory manner.  *See El-Shifa Pharm. Indus.*, 607 F.3d at 842 (noting that, for the purposes of the political question doctrine, the D.C. Circuit has distinguished between claims requiring a decision as to whether government action was "'wise'—"a 'policy choice[] and value determination'" committed to legislative and executive benches—"and claims '[p]resenting purely legal issues'" (alterations in original) (quoting *Campbell v. Clinton*, 203 F.3d 19, 40 (D.C. Cir. 2000) (Tatel, J., concurring))).  There are clearly articulated standards for determining those issues—indeed,

Defendants lay out those standards clearly when they argue that Plaintiffs have failed to state claim as to each of their causes of action.  As the District admits, Plaintiffs "may challenge specific District actions they contend promote" its land use frameworks and policies.  ECF No. 27-1 at 27. That is precisely the focus of the operative complaint.

> ### C.     *Younger* Abstention

The District argues that this Court "should abstain from considering Plaintiffs' request for 'an immediate injunction against the Zoning Commission enjoining it from further activity regarding phase one PUD approval'" pursuant to *Younger v. Harris*, 401 U.S. 37 (1971).  ECF No. 27-1 at 48–49.

*Younger* abstention precludes federal courts from enjoining certain pending state proceedings.[40]  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013).  In its original form, this abstention doctrine barred a federal court from enjoining state criminal proceedings, but the Supreme Court has since extended it to apply to certain "civil proceedings in which important state interests are involved," *Ohio Civil Rights Comm'n v. Christian Sch., Inc.*, 477 U.S. 619, 627 (1986), such as "state civil proceedings that are akin to criminal prosecutions" or "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Comm'cns*, 571 U.S. at 72–73, 78 (alteration in original) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989)).  The Supreme Court has also stated that some administrative proceedings that are "judicial in nature" and implicate important state interests may "command the respect due court proceedings." *Ohio Civil Rights Comm'n*, 477 U.S. at 627 (internal quotation marks omitted) (first quoting *Gibson v.*

---

[40] The D.C. Circuit has held that the District should be "regard[ed] . . . as a state for the purposes of *Younger* abstention." *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1125 (D.C. Cir. 2004).

*Berryhill*, 411 U.S. 564 576–77 (1973), then quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 433 (1982)).   Importantly, the Supreme Court clarified in *Sprint Communications* that, in order for a court to abstain under *Younger*, the state proceeding at issue must be a criminal prosecution, a civil or administrative proceeding that is akin to a criminal prosecution, or a civil or administrative proceeding that implicates a state forum's interest in enforcing its judgments and orders; other considerations, such as whether a pending state proceeding implicates important state interests, are "additional factors" to be assessed after a court has made that initial determination.[41]   571 U.S. at 81.

It does not appear that *Younger* abstention is appropriate here.   First, the doctrine is an exception to the rule that "federal courts are obliged to decide cases within the scope of federal jurisdiction."   *Sprint Commc'ns*, 571 U.S. at 73.   The District here has not argued that this Court should abstain from exercising jurisdiction over the case , but only that it should "abstain from considering" one of the specific requests for relief Plaintiff has sought—namely, an injunction to prevent the Zoning Commission from approving phase one PUD applications.   Second, *Younger* abstention is required "only when state [ ] proceedings are initiated 'before any proceedings of substance on the merits have taken place in the federal court.'"   *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984) (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)).   The District has not met its burden to identify a zoning proceeding that has been initiated prior to this motion on which to base its request for abstention.   *See, e.g.*, *Trainor v. Hernandez*, 431 U.S. 434, 448 (1977) (Blackmun, J., concurring) (noting that the Supreme Court has required the proponent of *Younger* abstention to show that there is an important interest to vindicate in the state proceedings before a

---

[41] The undersigned assumes that, pursuant to *Ohio Civil Rights Commission*, 477 U.S. at 627, federal courts should abstain from deciding cases that involve orders in furtherance of an administrative agency's ability to enforce its orders as well as cases involving orders in furtherance of a state court's ability to enforce its orders.

federal court is required to abstain); *In re Dairy Mart Convenience Stores*, 411 F.3d 367, 373 (2d Cir. 2005) (noting that it is the non-movant's burden to establish the prerequisites for *Younger* abstention).  Third, "[i]n the typical *Younger* case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings.  Moreover, the basis for the federal relief claimed is generally available to the would-be federal plaintiff as a defense in the state proceedings."  *Devlin v. Kalm*, 594 F.3d 893, 894 (6th Cir. 2010).  *Younger* abstention is generally not warranted where the plaintiff is not seeking to "use the federal court to shield him from state enforcement efforts."  *Id.* at 895.

Most importantly, however, the District has not established the existence of one of "the three 'exceptional circumstances'" the Supreme Court has identified to merit abstention pursuant to *Younger*: "ongoing state criminal prosecutions," "certain 'civil enforcement proceedings,'" or "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions."  *Sprint Commc'ns*, 571 U.S. at 78 (some internal quotation marks omitted) (quoting *New Orleans Pub. Serv.*, 491 U.S. at 368).  Zoning Commission hearings on PUD applications are not criminal prosecutions or civil enforcement proceedings.[42]  Nor do they involve orders "uniquely in furtherance" of the state forum's ability to perform its judicial functions.  To be sure, precedent from the D.C. Court of Appeals indicates that "a proceeding upon an application for preliminary approval" of a PUD is a "'adjudicatory-type' hearing."  *Shneider v. D.C. Zoning Comm'n*, 383 A.2d 324, 327 (D.C. 1978).  But any resulting orders approving or

---

[42] In a case challenging D.C. Zoning regulations applicable to adult video stores, the D.C. Circuit found that a pending enforcement action by the D.C. Department of Consumer and Regulatory Affairs concerning infractions for operating without a proper certificate of occupancy and seeking to revoke a certificate of occupancy justified *Younger* abstention. *JMM Corp.*, 378 F.3d at 162, 169–70.  As the D.C. Circuit recognized, however, that was an enforcement action. *See id.* at 169.  Similarly, in *Bannum, Inc. v. D.C. Board of Zoning Adjustment*, the court found that a pending local enforcement action to revoke a certificate of occupancy for a halfway house justified abstaining from the halfway house's federal action challenging the zoning decisions underlying the enforcement action.  No. 05-cv-858 (JDB), 2005 WL 1076179, at *1 (D.D.C. May 6, 2005).

denying the application are not orders furthering the agency's ability to perform its adjudicatory functions. The Supreme Court made clear in *Sprint Communications* that the orders included in this last category are such things as civil contempt orders and rules requiring a losing litigant to post a bond pending appeal. 571 U.S. at 591–92 (citing *Juidice v. Vail*, 430 U.S. 327, 336 n.12 (1977), and *Pennzoil Co. v. Texac Inc.*, 481 U.S. 1, 13 (1987)); *see also Pennzoil*, 481 U.S. at 13 ("'Contempt in these cases, serves, of course, to vindicate and preserve the private interests of competing litigants, . . . but its purpose is by no means spent upon purely private concerns. It stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory.' . . . There is little difference between the State's interest in forcing persons to transfer property in response to a court's judgment and in forcing persons to respond to the court's process on pain of contempt." (first alteration in original) (quoting *Juidice*, 430 U.S. at 336 n.12)). That is, "[c]ases in this third category generally involve a state court's attempt to effectuate its orders." *Golf Vill. N., LLC v. City of Powell*, 338 F. Supp. 3d 700, 710 (S.D. Ohio 2018). No such concern is implicated here.

In sum, *Younger* abstention is not the proper tool to challenge Plaintiffs' entitlement to the specific injunctive relief discussed above.[43] The District's abstention arguments should be rejected.

### D.    Failure to State a Claim

The undersigned has recommended dismissing a number of Plaintiffs' claims for lack of standing. However, even if Plaintiffs were to have standing to pursue each of their claims, the

---

[43] It is worth noting, too, that the undersigned has already found that Plaintiffs' have not pleaded sufficient facts to show that they would be entitled to the injunction at issue, *see supra* Section III.A.3.c, d, demonstrating that Defendants have other means to challenge the appropriateness of the broad proposed injunction Plaintiffs seek.

claims would fail because they do not state claims on which relief can be granted.[44]

1.   Procedural Due Process Claims (Counts 1–5)

To state a claim for a procedural due process violation, a plaintiff must allege that (1) the government "deprived [him] of a 'liberty or property interest' to which [he] had a 'legitimate claim of entitlement,'" and (2) that "the procedures attendant upon that deprivation were constitutionally insufficient." *Jangjoo v. Broad. Bd. of Governors*, 244 F. Supp. 3d 160, 175 (D.D.C. 2017) (some internal quotation marks omitted) (alterations in original) (quoting *Roberts v. United States*, 741 F.3d 452, 161 (D.C. Cir. 2014)). "Beyond the basic requirements of notice and an opportunity to be heard, the precise requirements of procedural due process are flexible." *English*, 717 F.3d at 972. Generally, to assess what procedural protections are due in a given case, "a court must weigh (1) the importance of the private interest at stake, (2) the risk of an erroneous deprivation of the interest because of the procedures used and the probable value of additional procedural safeguards, and (3) the government's interests, including the cost of additional procedures." *Id.* (citing *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The undersigned has already found in the sections above addressing Plaintiffs' standing to bring their claims, that, for the most part, they have failed to identify a protected interest of which they have been deprived. *See supra* § III.A.3.a. Only in Count 1 (regarding Barry Farm) do

---

[44] The District spends two paragraphs of its 41-page motion to dismiss arguing that Plaintiffs have failed to establish municipal liability for their federal claims under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "In considering whether a plaintiff has stated a claim for municipal liability, the district court must conduct a two-step inquiry. First, the court must determine whether the complaint states a claim for a predicate constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). If such a violation is shown, the court must then analyze whether the plaintiff has shown that a policy or custom of the municipality caused the violation. *Id.* A alleged municipal policy or custom can support liability if it is (1) an express policy, (2) the action of a policy maker in the government, (3) persistent and unchecked conduct by the policy maker's subordinates, or (4) conduct showing a deliberate indifference to a risk of constitutional injury. *Id.* The District argues that Plaintiffs have not stated a claim for a constitutional violation, alleged a policy that discriminates, or shown that any alleged policy caused their asserted injuries. ECF No. 27-1 at 29–30. Because that argument appears to be merely a restatement of the District's position that Plaintiffs have failed to state claims, and is, in any event, perfunctory, it need not be addressed separately.

Plaintiffs allege a protected property interest, which is derived from federally-mandated provisions in the leases of Plaintiff's Matthews and M. Hamilton of their public housing apartments.  That claim, like all of Plaintiffs' procedural due process claims, focuses on the consequences of alleged irregularities in Zoning Commission proceedings.  ECF No. 34, ¶¶ 195–202 (alleging that "[t]he Zoning Commission took several intentional actions against" Plaintiffs Matthews and M. Hamilton that deprived them of "their right to participate in proceedings that comply with D.C. law and their right to access and enjoy their housing").  Specifically, Plaintiffs contend that "a repeated pattern and practice of procedural violations" informed by the Creative Class Agenda "resulted in the redevelopment" of the neighborhood (ECF No. 39 at 26)—although it should be recognized that the connection between the alleged deviation from proper Zoning Commission procedures and the dilapidation of the Barry Farm premises is far from obvious.[45]  In any event, the question here is whether Plaintiffs were afforded appropriate procedures in connection with the zoning proceedings that allegedly led to the deprivation of their property interest in their tenancy in habitable public housing.

 Supreme Court precedent establishes that "[t]he procedures due in zoning cases . . . are not

---

[45] At a later point in their opposition to the motions to dismiss, Plaintiffs assert that

> [t]he decision to let Barry Farm fall into gross disrepair while attempting to entice young Creative Class members with preferential funding and development deals was meant to push out low-income African-American residents and pull in millennial, white Creative Class members. . . . [T]he DCHA gave Creative Class members preferential treatment in commercial and retail real property transactions as part of a strategy to attract more Creative Class millennials to the District.  The DCHA has approved PUD applications for projects that are meant to create a "distinctive, creative enclave," in which only 8% of the residential space will have affordable unites with more than two bedrooms.

ECF No. 39 at 89 (quoting ZC No. 15-28, ECF No. 6-1 at 277).  This passage lays bare Plaintiffs' attempts to elide the distinction between the two Defendants and among the various zoning decisions about which they complain in this Court.  DCHA is responsible for Barry Farm.  But DCHA does not approve PUD applications, nor has it—at least according to the allegations in the operative complaint—given preferential treatment in commercial and retail property transactions to Creative Class members.  That—again, according to the operative complaint—is the province of the District and its Zoning Commission.  Moreover, the "distinctive, creative enclave" to which Plaintiffs refer has nothing to do with the redevelopment of Barry Farm; the phrase comes from the PUD approval for a development in Union Market.  ECF No. 6-1 at 277 (ZC No. 15-28).

extensive." *Tri Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 436 (4th Cir. 2002) (citing *City of Eastlake v. Forest City Enters.*, 426 U.S. 668, 677, 679 (1976)); *see also, e.g.*, *S. Cty. Sand & Gravel Co. v. Town of S. Kingstown*, 160 F.3d 834, 838 (1st Cir. 1998) (stating that Rhode Island's procedural protections in connection with zoning issues "far exceed[ ] the minima required by the Constitution" and citing *City of Eastlake*); *River Park*, 23 F.3d at 166 ("[T]he procedures 'due' in zoning cases are minimal." (discussing *City of Eastlake*). In *City of Eastlake*, the Supreme Court held that zoning decisions may be made through the political process without a hearing of any kind. 426 U.S. at 677, 679. Judge Easterbrook suggests a potential reason "why such scant process is all that is 'due' in zoning cases":

> [S]o far as the Constitution is concerned, state and local governments are not required to respect property owners' rights, and there is therefore no obligation to provide hearings to ascertain a protected core. State and local governments may regulate and even take property; they must *pay* for what they take but are free to use the land as they please.

*River Park*, 23 F.3d at 167.

Leaving aside the question of whether that is a satisfactory explanation of Supreme Court precedent in this context, it is clear that Plaintiffs Matthews and M. Hamilton have not plausibly alleged a deprivation of procedural due process because the procedural protections they received "exceed[ed] the minima required by the Constitution." *S. Cty. Sand & Gravel Co.*, 160 F.3d at 838. Plaintiffs admit that, through the Barry Farm Tenants and Allies Association of which they were members, they had notice of the "PUD proceedings for redevelopment of Barry Farm" that allegedly created a "serious risk of erroneous deprivation of their valid property . . . interests." ECF No. 39 at 51. They further admit that, as individual citizens, they were allowed to "present written testimony" on the PUD if they chose. *Id.* They further admit that they were able to file a motion to reconsider the Zoning Commission's denial of party status to the Barry Farm Tenants

and Allies Association and that on reconsideration, the Zoning Board granted party status to that group. *Id.* at 51–52. Finally, the District points out that they could and, apparently *did* (through the Barry Farm Tenants and Allies Association) appeal the Zoning Commission's decision in ZC No. 14-02 to the D.C. Court of Appeals, and their challenge was successful. ECF No. 27-1 at 33–34; *see also* D.C. Code § 2-510 (allowing appeals of Zoning Commission decisions to the D.C. Court of Appeals); *Barry Farm Tenants & Allies Assoc.*, 182 A.3d at 1217 (vacating the Zoning Commission's order and remanding the case for further proceedings). Thus, Plaintiffs had more than sufficient pre- and post-deprivation procedures available. *See, e.g.. Tri Cty. Paving*, 281 F.3d at 437 ("If, as *Eastlake* teaches, a community can make land-use decisions through a popular referendum with no hearings of any kind and still satisfy the mandates of due process, certainly conducting open community meetings and giving affected parties the opportunity to speak . . . is constitutionally sufficient."); *Hyatt v. Town of Lake Lure*, 314 F. Supp. 2d 562, 579 (W.D.N.C. 2003) (quoting *Tri Cty. Paving*), *aff'd* 114 F. App'x 72 (4th Cir. 2004); *S. Cty Sand & Gravel*, 160 F.3d at 837–38 (holding that there was no violation of procedural due process where the zoning board was governed by regulations guiding its discretion and there was a public hearing). The fact that their ability to question witnesses or present testimony may have been constrained because they had little time to prepare prior to the hearing makes no difference, as the Constitution does not require that kind of procedure in zoning cases. *See Dayalji v. City of Compton*, 176 F.3d 482 (9th Cir. 1999) (holding that the plaintiffs were afforded adequate procedural due process when they had notice of the relevant zoning hearing and were allowed to present argument, even if they could not present new evidence or cross-examine).

Indeed, even if Plaintiffs' other purported liberty or property interests were constitutionally protected (such as an interest in social networks and community bonds, in reputation alone, in

Plaintiff Mpulubusi-El's access to the Barry Farm neighborhood, or even in party status at a zoning hearing), the procedures outlined above were sufficient under the Constitution. Plaintiffs do not allege that they were denied notice of any of the Zoning Commission hearings at issue and that they had the opportunity to be heard through written testimony and to challenge any deprivation—including the denial of party status—in the D.C. Court of Appeals. *See, e.g., States*, 2019 WL 295472, at *7 (noting that the D.C. Court of Appeals has exclusive jurisdiction to review the denial of party status to an individual).

2.     Substantive Due Process Claim (Count 15)

To state a claim for the violation of substantive due process, there must, of course, be a deprivation of a liberty or property interest and an allegation of "grave unfairness." *George Wash. Univ.*, 318 F.3d at 209 (quoting *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988)). As discussed above, the undersigned has recommended finding that Plaintiffs have established standing to pursue this claim against the Housing Authority based on its alleged interference (by creating unlivable conditions) with property interests emanating from the public housing lease agreements between the Housing Authority and Plaintiff Matthews and Plaintiff M. Hamilton. *See supra* Section III.A.3.b.

In *Silverman*, the D.C. Circuit suggested two ways to establish grave unfairness: (1) "a substantial infringement of state law prompted by personal or group animus," or (2) "a deliberate flouting of the law that trammels significant personal or property rights." *Silverman*, 845 F.2d at 1080. However, in 1989, the year after *Silverman* was decided, the Supreme Court "ma[de] explicit" that where the Constitution provides an express "textual source of . . . protection" against specific conduct, that source, and not "the more generalized notion of 'substantive due process,' must be the guide for analyzing" a challenge to that conduct, *Graham*, 490 U.S. at 395, and the

Court reiterated that rule five years later, *Albright*, 510 U.S. at 273.[46]  Subsequently, in *George Washington University*, the D.C. Circuit questioned "what sort of 'group animus' the *Silverman* court had in mind" and cautioned against the "creation of a sort of shadow equal protection doctrine in the name of 'substantive due process.'"  318 F.3d at 209.  Thus, as discussed above in Section III.A.3.b (discussing standing to bring a substantive due process claim), Plaintiffs Matthews and M. Hamilton cannot state a claim for a violation of substantive due process rights based on alleged discrimination; that is an equal protection claim.

These two Plaintiffs must, then, show that the deprivation at issue—the Housing Authority's failure to maintain their Barry Farm residences to the extent that they became unlivable—amounts to "a deliberate flouting of the law that trammels significant personal or property rights."  *Silverman*, 845 F.2d at 1080.  They cannot do so for two related reasons.  First, "'[c]laims that are, in essence, state law claims, cannot be given constitutional "window dressing" in order to circumvent this basic limitation on Section 1983 actions.'  Treating violations of state law as a violation of the Constitution makes the federal government the enforcer of state law." *Medina v. District of Columbia*, 517 F. Supp. 2d 272, 280 (D.D.C. 2007) (Sullivan, J.) (internal citations omitted) (quoting *Beary Landscaping, Inc. v. Ludwig*, 479 F. Supp. 2d 857, 872 (N.D. Ill. 2007)).  A claim that the Housing Authority failed to maintain habitable premises as the lease required is essentially a state law claim.  Indeed, the D.C. Circuit has previously affirmed the dismissal pursuant to Rule 12(b)(6) of a claim that "the District violated its lease agreements with [public housing residents] by failing to maintain the project in a safe, decent, and sanitary condition," pursuant to 42 U.S.C. § 1437d(*l*), "which stipulates that '[e]ach public housing agency shall utilize leases which' require such maintenance," finding that it was not a federal claim and

---

[46] *See supra* n.36.

"belong[ed] in local court." *Edwards v. District of Columbia*, 821 F.2d 651, 653 n.2 (D.C. Cir. 1987). In doing so, it rejected the plaintiffs' argument that actions based on "particularly egregious lease violations" state a claim upon which relief can be granted in federal court. *Id.* And in *Barry Farm Tenants Association v. D.C. Housing Authority*, the Court dismissed similar claims under Rule 12(b)(6) because applicable provisions of the United States Housing Act, 42 U.S.C. § 1437p, did not confer rights enforceable through 42 U.S.C. § 1983. 311 F. Supp. 3d 57, 69–76 (D.D.C. 2018) (Sullivan, J.). In short, "[s]tate courts, not federal courts, are the appropriate bodies to enforce state rules." *Medina*, 517 F. Supp. 2d at 280.

Second, and somewhat relatedly, the D.C. Circuit has held that "a deliberate flouting of the law that trammels significant personal or property rights," *Silverman*, 845 F.2d at 1080, requires plaintiffs to allege facts that show that the relevant actions, "in their totality are genuinely drastic." *Tri Cty. Indus.*, 104 F.3d at 459. "[U]nless the victim of government imposition has pushed its local remedies to the hilt, it ordinarily will not be able to show the necessary substantiality." *Id.* at 460; *see also Am. Towers, Inc. v. Williams*, 50 F. App'x 448, 449 (D.C. Cir. 2002); *Psychas v. Dist. Dep't of Transp.*, No. 18-cv-0081 (ABJ), 2019 WL 4644503, at *16–17 (D.D.C. Sept. 24, 2019), *appeal docketed sub nom. Psychas v. Marcou*, No. 19-7159 (D.C. Cir. Dec. 11, 2019); *3883 Connecticut LLC v. District of Columbia*, 191 F. Supp. 2d 90, 95 (D.D.C. 2002), *aff'd*, 336 F.3d 1068 (D.C. Cir. 2003). Here, there is no indication that Plaintiffs Matthews or M. Hamilton have pursued relief in local courts for a claim based on the Housing Authority's failure to maintain the Barry Farm premises. They have therefore not alleged a substantive due process claim under D.C. Circuit precedent.[47]

---

[47] To be sure, the court in *Davis* found that the plaintiff had stated a substantive due process claim based on the New York City Housing Authority's failure to heat her apartment; however, that New York federal court was not constrained by *Silverman* or *Tri County Industries* and their progeny. *See Davis*, 379 F. Supp. 3d at 254–55 (applying Second Circuit precedent).

3.      Equal Protection Claim (Count 6)

Plaintiffs' Equal Protection Clause claim alleges that the District was motivated, at least in part, by racially discriminatory intent in implementing the Creative Class Agenda, a facially neutral policy.  ECF No. 39 at 63 ("[The District] intentionally discriminated against the District's longtime black residents using the cloaked vehicle of the Creative Class Agenda.").  "To state a claim for intentional discrimination under the Equal Protection Clause, a plaintiff 'must plead and prove that the defendant acted with discriminatory purpose.'" *Burrell v. Shepard*, 321 F. Supp. 3d 1, 15 (D.D.C. 2018) (Sullivan, J.) (quoting *Iqbal*, 556 U.S. at 676).  That requires facts that plausibly allege "more than 'intent as volition or intent as awareness of consequences.' It instead involves a decision maker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Burrell*, 321 F. Supp. 3d at 15 (some internal quotation marks omitted) (alteration in original) (quoting *Iqbal*, 556 U.S. at 676– 77).  Even at the motion to dismiss stage, it is not enough that those facts are "consistent with" a defendant's liability; rather they must "permit the court to infer more than the mere possibility of misconduct." *Ekwen v. Fenty*, 666 F. Supp. 2d 71, 79 (D.D.C. 2009) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678–79).

While disparate impact can be "an important starting point," such impact will be sufficient to show discriminatory intent only in the "rare" case when "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1976).  In all other cases, the court "must look to other evidence." *Id.*  The Supreme Court has suggested some areas for inquiry:

> The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.  The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. . . . .  Departures from the normal

procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege.

*Id.* at 267–68 (footnotes omitted) (internal citations omitted).

Plaintiffs point to the following allegations to support their claim.

- The District sought to attract members of the so-called Creative Class, a group that allegedly includes a larger percentage of white individuals and a smaller percentage of African-American individuals. ECF No. 39 at 65, 60–61.

- Statistics also show that since the implementation of the Creative Class Agenda, 39,000 African-American residents have left the District, while 50,000 white residents have entered. *Id.* at 60.

- The 2012 Analysis of Impediments notes that the "extreme degree of segregation" in the southeastern quadrant of the city "is the District's greatest fair housing challenge." ECF No. 4-4 at 84 (Analysis of Impediments); ECF No. 39 at 66.

- The 2016 HUD Letter states that the District should amend its Consolidated Plan to address impediments identified in the Analysis of Impediments, such as an "entrenched dual housing market," lending discrimination, racial steering, overuse of zoning exemptions, and "the segregation of Black residents and the rapid changes in neighborhoods due to gentrification." ECF No. 27-7 at 3–4 (2016 HUD Letter); ECF No. 39 at 66–67.

- Later work of Professor Florida found a correlation between the Creative Class and inequality and segregation. ECF No. 39 at 65–66 & n.7 (quoting Richard Florida, *The Racial Divide in the Creative Economy*, citylab.com/life/2016/05/creative-class-race-black-white-divide/481749/ (last visited Feb. 14, 2020)).

- There has been a pattern of allegedly arbitrary decision-making and failure to follow proper procedure in Zoning Commission proceedings addressing PUD applications in predominantly African-American neighborhoods of the District. ECF No. 39 at 68; ECF No. 34, ¶¶ 70–100.

- Harriet Tregoning, who helped implement the Creative Class Agenda when she was with the D.C. Office of Planning, has made statements indicating that the purpose

of that agenda is to attract younger "'high value' knowledge workers" and discussing the replacement of a Murray's Meals—according to Plaintiffs, "a bulk item food store known for serving African-American communities"—with a Whole Foods.  ECF No. 39 at 69; ECF No. 5-1 at 117.

These allegations "stop[ ] short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (some internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).  As noted, allegations of disparate impact are insufficient unless the discriminatory pattern is "unexplainable on grounds other than" racial animus.  *Vill. of Arlington Heights*, 429 U.S. at 266.  Here, the operative complaint itself provides evidence of "other inferences that can be drawn from [its] allegations." *Ivey v. Fenty*, 789 F. Supp. 2d 65, 71 (D.D.C. 2011) (dismissing equal protection claim under Rule 12(b)(6)).  A significant portion of the complaint focuses on the work of Professor Florida, who "promoted human creativity as an engine of economic growth" and whose work allegedly inspired the Creative Class Agenda.  ECF No. 34, ¶¶ 27–28, 32.  Plaintiffs allege that the District "used Professor Florida's theories to make District of Columbia neighborhoods, particularly the neighborhoods surrounding the Metro's Green Line"—which is the line closest to Barry Farm, Buzzard Point, and Poplar point—"'vibrant', 'rejuvenated', and places where people 'want to live.'" *Id.*, ¶ 33.  This would attract "high value worker[s]," who were important to the Creative Economy Strategy because they would foster economic growth. *Id.*, ¶ 41; ECF No. 4-3 at 52 (the Creative Economy Strategy).  These allegations and the documents supporting them indicate that economic growth was the motivating factor behind the government's actions. Plaintiffs' allegations tend to show at most an "awareness of consequences," rather than that the District undertook its "course of action 'because of,' not merely 'in spite of' [the action's] adverse effects upon an identifiable group." *Burrell*, 321 F. Supp. 3d at 15.

The claims are not saved by conclusory allegations that "systemic and repeated violations

of federal and D.C. law are evidence of racial animus, as it is not possible to explain the pattern of arbitrary decisions but for the existence of animus against a predominantly black community." ECF No. 34, ¶ 94. Taking as true the assertion that there were procedural irregularities in proceedings on applications for PUDs in African-American neighborhoods, that does not, without more, plausibly allege that the effect on African-American residents was the impetus for the zoning decisions at issue. There are no facts to indicate, for example, that applications for PUDs in neighborhoods with a different racial make-up were handled differently, *see, e.g.*, *Kingman Park Ass'n*, 27 F. Supp. 3d at 159 (dismissing under Rule 12(b)(6) an equal protection claim where the plaintiff "fail[ed] to identify any neighborhood, much less one that is a similarly situated non-African-American neighborhood—that has been treated more favorably than Kingman Park"); *Ekwem*, 666 F. Supp. 2d at 78–79 (dismissing equal protection cause of action under Rule 12(b)(6) where the plaintiff alleged that older employees of "a different national origin" were treated unfairly by being assigned "an inordinate number of cases" but failed to present allegations regarding "the caseloads, national origins, or ages of other" employees), or some evidence that knowledge of the disparate impact on African-American residents triggered the Zoning Commission's allegedly overzealous approach to approving the PUD applications, *see, e.g.*, *Vill. of Arlington Heights*, 429 U.S. at 266 ("For example, if the property involved here always had been zoned R-5 but suddenly was changed to R-3 when the town learned of MHDC's plans to erect integrated housing, we would have a far different case.").

The undersigned therefore finds that the operative complaint does not sufficiently plead a cognizable claim for an equal protection violation and recommends dismissing the claim on that ground.

4.      Fair Housing Act Claims

a.      Count 13—Intentional Discrimination, 42 U.S.C. § 3604(a)–(b)

This Fair Housing Act claim charges the District with intentional discrimination based on its implementation of the Creative Class Agenda and the failure to maintain the Barry Farm premises.

The standard to plead a cause of action for intentional discrimination under the Fair Housing Act is the same as it is under the Equal Protection Clause.  *See, e.g.*, *Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 639 (6th Cir. 2001) ("The standard for finding discriminatory intent is the same under the Fair Housing Act and the Equal Protection Clause."), *rev'd in part, vacated in part on other grounds*, 538 U.S. 188 (2003); *see also, e.g.*, *Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 502 (9th Cir. 2016) ("If a governmental actor engages in [ ] discrimination [under the Fair Housing Act], such conduct also violates the Equal Protection Clause."); *Bonasera v. City of Norcross*, 342 F. App'x 581, 586 (11th Cir. 2009) ("Because we conclude that [the plaintiff] presented no direct of circumstantial evidence of discriminatory intent . . . to support her claims under the FHA, we also conclude that [she] has failed to support her claim under the Equal Protection Clause.").  Therefore, based on the analysis immediately above in Section II.D.3 addressing Plaintiffs' equal protection claim, this claim should also fail.

Additionally, as discussed above in Section III.A.3.a.1, the District is the wrong party to sue regarding Barry Farm maintenance.

b.      Count 14—Segregative Effect, 42 U.S.C. § 3604(a)

Plaintiffs base this Fair Housing Act claim (brought against the District alone) on the segregative effect of the Creative Class Agenda and, more specifically, Zoning Commission

actions "taken in pursuit of the Agenda."  ECF No. 34, ¶ 367–369, 381–384; ECF No. 39 at 75.

The Supreme Court recently confirmed that claims for disparate impact, a category that includes claims for segregative effect, can be brought pursuant to the Fair Housing Act.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, __ U.S. __, __, 135 S. Ct. 2507, 2525 (2015) ("The Court holds that disparate-impact claims are cognizable under the Fair Housing Act upon considering its results-oriented language, the Court's interpretation of similar language in Title VII and the ADEA, Congress' ratification of disparate-impact claims in 1988 against the backdrop of the unanimous view of nine Courts of Appeals, and the statutory purpose.").  In doing so, the Court was particularly concerned about the effect that such litigation would have on defendants, including housing authorities and private developers, and thus outlined certain "safeguards at the prima facie stage."  *Id.* at __, 135 S. Ct. at 2523.  Among these is a "robust causality requirement to ensure[ ] that '[r]acial imbalance . . . does not, without more, establish a case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (second and third alterations in original) (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)).

> Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact and prompt resolution of these cases is important. A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection [between a defendant's policies and the alleged disparate impact] cannot make out a prima facie case of disparate impact.

*Inclusive Cmtys.*, __ U.S. at __, 135 S. Ct. at 2523.

Regulations promulgated pursuant to the "affirmatively furthering fair housing mandate" of the Fair Housing Act, 24 C.F.R. § 5.150 *et seq.*, define segregation as

> a condition, within the . . . geographic area of analysis . . . in which there is a high concentration of persons of a particular race, color, religion, sex, familial status, national origin, or having a disability or a type of disability in a particular geographic area when compared to a broader geographic area.

24 C.F.R. § 5.152.   Conversely, integration is a condition within the relevant geographic area of

analysis "in which there is not a high concentration of persons of a particular race, color, religion,

sex, familial status, national origin, or having a disability or a particular type of disability when

compared to a broader geographic area." *Id.*   As noted, a "segregative effect" or "perpetuation of

segregation" claim focuses on "the effect which the [challenged practice or] decision has on the

community involved; if it perpetuates segregation and thereby prevents interracial association it

will be considered invidious under the Fair Housing Act independently of the extent to which it

produces a disparate effect on different racial groups."   *Boykin*, 895 F. Supp. 2d at 213 (quoting

*Graoch Assocs*, 508 F.3d at 378); *see also Edwards v. Johnson Cty. Health Dep't*, 885 F.2d 1215,

1224 (4th Cir. 1989) (stating that "a disputed policy may still produce a racially discriminatory

impact" for the purposes of a segregative effect claim because "it may contribute to continued

housing segregation or impede integration efforts").   As particularly relevant here, a plaintiff must

allege facts to show that the challenged practice "creates, increases, reinforces, or perpetuates

segregated housing patterns."   24 C.F.R. § 100.500(a).   The pleadings must satisfy the "robust"

causality standard the Supreme Court mandated in *Inclusive Communities*, which will often require

plaintiffs to allege statistical evidence "at the pleading stage."   __ U.S. at __, 135 S. Ct. at 2523;

*see also Nat'l Fair Hous. Alliance v. Bank of Am.*, 401 F. Supp. 3d 619, 637 (D. Md. 2019) (noting

the "necessary investigative depth and statistical sophistication required" to sufficiently plead a

disparate impact claim).[48]

---

[48] Plaintiffs contend that analysis of their claim should be guided by Fair Housing Act regulations effective prior to
the Supreme Court's decision in *Inclusive Communities*.   ECF No. 39 at 75. Those regulations impose a burden-
shifting framework first requiring the plaintiff to show that "a challenged practice caused or predictably will cause a
discriminatory effect," after which the defendant must show that the practice is necessary to achieve a "substantial,
legitimate, nondiscriminatory interest[ ]"; the plaintiff then has the opportunity to show that the interest identified by
the defendant "could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500(c).   It
appears that in *Inclusive Communities* the Supreme Court did approve a burden-shifting framework similar to that
outlined in those regulations.  *See, e.g.*, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 n.4 (4th

The typical segregative effect claim alleges that officials have used zoning regulations to keep minority residents out of predominantly white neighborhoods, often by barring the development of subsidized multi-family dwellings. *See, e.g.*, *MHANY Mgmt.*, 819 F.3d at 588–89, 97–98 (addressing the decision of a town with a less-than-five percent minority population to reject a proposal to zone a particular site for mixed-income multi-family dwellings); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288 (7th Cir. 1977) ("Arlington Heights remains almost totally white in a metropolitan area with a significant percentage of black people. Since [the rejected subsidized housing development] would have to be racially integrated in order to qualify for federal subsidization, the Village's action in preventing the project from being built had the effect of perpetuating segregation in Arlington Heights."); *United States v. City of Black Jack*, 508 F.2d 1179, 1184 (7th Cir. 1974) ("The discretion of local zoning officials . . . must be curbed where the clear result of such discretion is the segregation of low-income Blacks from all White neighborhoods."). Plaintiffs' claim here is different. As elucidated in its opposition to the motions to dismiss, Plaintiffs' theory is that "ongoing gentrification" of "low-income African-American neighborhoods" as a result of the implementation of the Creative Class Agenda "push[es] the current residents out and 'resegregate[s] these gentrifying neighborhoods as virtually all-white.'" ECF No. 39 at 77 (quoting the Analysis of Impediments, ECF No. 5-1 at 8).[49] Put

---

Cir. 2018) ("The HUD regulation is similar to the framework the Supreme Court ultimately adopted in *Inclusive Communities*."); *MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 618 (2d Cir. 2016) ("The Supreme Court implicitly adopted HUD's approach . . . [and] placed the burden of proving a less discriminatory alternative on the plaintiff."). However, it also appended a "robust causality requirement" not found in those regulations. *See, e.g.*, *Inclusive Cmtys. Project v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019 ) (reading the Supreme Court's opinion in *Inclusive Communities* to add a "purposeful and significant" requirement to show robust causation at the pleading stage), *cert. petition docketed*, No. 19-497 (Oct. 17, 2019); *Reyes*, 903 F.3d at 424 ("As one safeguard to ensure that disparate-impact claims would be properly limited, the Supreme Court focused on the plaintiff's need to demonstrate a 'robust causality requirement' under the first step of the framework in order to state a prima facie disparate-impact claim."). As it is dispositive, that causality requirement guides the analysis here.

[49] The Analysis of Impediments did not assert that this re-segregation was occurring or that the Creative Class Agenda was or would cause it. Rather, it flagged such re-segregation as a possible consequence of gentrification and noted that the District's "unique legal and programmatic tools" could be used to preserve the integrative effects that

more succinctly, Plaintiffs claim that "[t]he process of 'revitalization' pushed by the Creative Class Agenda is better characterized as replacement" of African-American residents with white residents.  ECF No. 39 at 78.

Although perhaps novel, *see, e.g.*, Olatunde C.A. Johnson, *Unjust Cities? Gentrification, Integration, and the Fair Housing Act*, 53 U. Rich. L. Rev. 835, 837, 841 (2019) (noting that gentrification "has historically been too rare to be documented, much less generate legal or policy concerns," and that "[i]t is not obvious how to assess gentrification from a fair housing perspective"), neither Defendant has argued that the theory does not fit within the purview of a segregative effect claim under the Fair Housing Act.  Here, Plaintiffs' problem is that none of the data they present focuses on the neighborhoods upon which this action is based.  That is, they present nothing that plausibly alleges that the District's implementation of the Creative Class Agenda, particularly through its zoning decisions, has caused or perpetuated segregation in the neighborhoods at the heart of this litigation—Barry Farm, Buzzard Point, Union Market, and Poplar Point—even as they recognize that a segregative effect claim must plausibly allege that the challenged practice created, increased, reinforced, or perpetuated segregation "in the relevant community" where Plaintiffs live and about which they have standing to challenge such effects.[50]

---

accompanied a "wave of Caucasian in-migration."  ECF No. 5-1 at 8.

[50] That position is well supported by Supreme Court precedent.  In a series of cases, the Supreme Court has made clear that the focus of a segregative effect claim must be the discreet area in which the plaintiff lives.  For example, in *Trafficante*, the Court held that the residents of an apartment complex could sue their landlord for excluding individuals who were members of racial minorities from the complex, thus defining that single apartment complex as the "community" that was damaged by the "loss of important benefits of interracial association."  409 U.S. at 209–11. In *Gladstone*, the Court found that "residents of a relatively compact neighborhood" could challenge the defendants' alleged practice of steering minority home-seekers to that specific neighborhood, thus "transform[ing] [ ] their neighborhood from an integrated to a predominantly Negro community" and "depriving them of 'the social and professional benefits of living in an integrated society.'"  441 U.S. at 111–13.  The Court warned, however, that "[a] 'neighborhood' whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident."  *Id.* at 114.  Finally, in *Havens Realty*, the Court found that the plaintiffs had "failed to demonstrate how the asserted steering practices of [defendants] in Henrico County may have affected the *particular* neighborhoods in which the individual [plaintiffs] resided."  455 U.S. at 377.  The Court noted that it had allowed

ECF No. 39 at 76 (quoting Schwemm, *Segregative-Effect Claims*, 20 N.Y.U. J. of Legis. & Pub. Policy at 747).

Plaintiffs cite census figures showing that in 2000, the District was 30.8 percent white and 60 percent African-American and by 2010, the District was 38.5 percent white and 50.7 percent African-American.   ECF No. 4-4 at 101.   Plaintiffs allege that "[i]n one decade, approximately 39,000 African-Americans left D.C. while 50,000 white residents entered."   ECF No. 34, ¶ 48. The purpose to which Plaintiffs seek to put these figures is unclear.   The raw numbers say little about the overall demographics of the District and the percentages may indicate an integrative tendency.   The percentages could serve as the baseline for Plaintiffs' claim—that is, as the "larger geographic area" against which the concentration of "persons of a particular race" in the smaller "geographic area of analysis"—here, Barry Farm, Buzzard Point, Union Market, and Polar Point— is compared.   24 C.F.R. § 5.152 (defining "segregation" and "integration"); *see also Heights Cmty. Cong. v. Hilltop Realty, Inc.*, 629 F. Supp. 1232, 1242 n.3 (N.D. Ohio 1983) (noting that there is no "agreed-upon definition as to what constitutes integration" and therefore defining an integrated neighborhood as one in which the racial makeup mirrors that of the city of which it is a part), *aff'd in relevant part*,  774 F.2d 135 (6th Cir. 1985), but Plaintiffs nowhere attempt to put them to such a use.   In any case, those statistics do not, themselves, tend to show that the particular neighborhoods in which Plaintiffs live are being segregated because of the implementation of the Creative Class Agenda.

---

plaintiffs to proceed with claims "based on the effects of discrimination only within a 'relatively compact neighborhood.'"   *Id.* (quoting *Bellwood*, 441 U.S. at 114).   According to a law review article that Plaintiffs cite, these cases show that the Supreme Court has determined that "local residents and various other types of plaintiffs are entitled to challenge FHA-prohibited action that is racially manipulating *their neighborhood*."   Robert G. Schwemm, *Segregative-Effect Claims under the Fair Housing Act*, 20 N.Y.U. J. of Legis. & Pub. Policy 709, 747 (2017) [hereinafter, Schwemm, *Segregative-Effect Claims*] (emphasis added).   Thus, in order to state a claim here, Plaintiffs must show that the challenged implementation of the Creative Class Agenda had a segregative effect on Barry Farm, Buzzard Point, Union Market, or Poplar Point, rather than in the District as a whole or in other neighborhoods around the city.

Neither does the other data Plaintiffs offer.  They assert that in the period ending in 2009, the Navy Yard neighborhood contained 625 residents, of which 73.44 percent were African-American and 22.08 percent were white; in the period ending in 2016, the population of the neighborhood was over 4,500, of which 27.7 percent were African-American and 66.1 percent were white.  ECF No. 34, ¶ 69.  Similarly, the Bloomingdale neighborhood went from 67.35 percent African-American and 22 percent white in 2009 to 43 percent African-American and 46 percent white in 2016 and the U St. area went from 34.65 percent African-American and 58.01 percent white to 20.95% African-American and 65.98% white.  *Id.*  Plaintiffs further point to the 2012 Analysis of Impediments, which found that "the District of Columbia consists of hyper-segregated clusters in which African Americans constitute 93 percent to over 98 percent of the population" and warned of the segregative effects of gentrification.  ECF No. 39 at 77; ECF No. 5-1 at 8, 12.

Those allegations do not state a claim because they do not allege sufficient facts to show that the either the Creative Class Agenda or Zoning Commission practice has caused or continued segregation in the neighborhoods at the heart of this litigation.  There is no data, for example, on the racial make-up of Barry Farm, Buzzard Point, Union Market, and Poplar Point before the imposition of the Creative Class Agenda (which began, according to plaintiffs, in 2006 with the New Communities Initiative (ECF No. 34, ¶ 64; ECF No. 39 at 90)) or their racial make-up after that date so that the Court might glean whether the racial makeup of any of those neighborhoods (1) became more segregated; (2) stayed constant, or (3) became more integrated.

Presumably, Plaintiffs want the Court to extrapolate from demographic changes in Navy Yard, Bloomingdale, and U Street the likely future of Barry Farm, Buzzard Point, Union Market, and Poplar Point.  But they have not suggested why that assumption is plausible.  For example, the

operative complaint alleges that "the neighborhoods with the most dense development have undergone the most demographic change," pointing especially to Navy Yard, which went from a neighborhood of 625 residents in 2005–2009 to one of 4,664 residents in 2010–2016—reflecting "the most dense development in the city"—and saw a "flip[ ]" in its racial makeup.  ECF No. 34, ¶ 69.  Unfortunately, there is no data to indicate that the communities relevant to this case are comparable to Navy Yard (or Bloomingdale or U Street) such that a similar effect might plausibly occur.  It is Plaintiff's theory, after all, that the segregative effect they posit is an effect of targeting a neighborhood for "dense development."  But there are no allegations, for example, that the four "relevant communit[ies]" are or will be similarly targeted for such dense development and no rational basis on which to conclude that the four PUD applications discussed in the complaint—one each for Barry Farm, Buzzard Point, Union Market, and Poplar Point, at least one of which—suggest such targeting.   Nor are there any allegations that suggest that if those four neighborhoods were to be developed, the result would be increased or continued segregation.

Finally, there are insufficient facts to show that any hypothesized segregative effect would be caused by the Creative Class Agenda or allegedly illegal Zoning Commission practices "as opposed to some other factor, *not* attributable to [the District]."  *Inclusive Cmtys.*, 920 F.3d at 907. Plaintiffs have alleged only a temporal coincidence: The Creative Class Agenda began in 2006 and by 2016 the demographics of certain neighborhoods had changed so that they hosted a smaller proportion of African-American residents than they had previously.  But those neighborhoods are not the ones at issue here and the operative complaint as written does not plausibly suggest that the District's conduct in implementing the Creative Class Agenda caused a segregative effect in Barry Farm, Buzzard Point, Union Market, or Polar Point.[51]

---

[51] The allegations that Plaintiffs T. Wells and A. Wells are "low-income tenant[s] who cannot find safe, affordable housing" in an integrated neighborhood (ECF No. 34, ¶¶ 162–163, 167–168) cannot save this claim.  The allegations

For these reasons, the undersigned finds that the operative complaint fails to state a claim for disparate impact under the Fair Housing Act.

        5.        D.C. Human Rights Act Claims

The undersigned's recommendation, so far, has been that each of Plaintiffs' federal claims should be dismissed for lack of standing, failure to state a claim, or both.  If a federal court dismisses all of a plaintiff's federal claims, the court may, in its discretion, decline to retain jurisdiction over pendent state claims.  *See, e.g. Barry Farm Tenants & Allies Ass'n*, 311 F. Supp. 3d at 77.  "[I]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C. Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)).  Here, because this litigation has not progressed beyond the motion to dismiss stage and the complaint raises a few somewhat complex questions under state law, judicial economy, fairness, and comity counsel in favor of dismissing the D.C. Human Rights Act claims so that they can be addressed by a D.C. local court. The undersigned will nevertheless address the claims under the D.C. Human Rights Act on their merits for the Court's convenience.

To review, Plaintiffs have alleged violations of that statute's prohibition on discrimination in the terms and conditions of a real estate transaction (Count 7), discrimination in statements made in connection with a real estate transaction (Count 8), subterfuge for discrimination (Counts 9, 11, and 12), and discrimination through "steering" (Count 10).

---

are vague and conclusory and make no attempt to meet the "robust causality requirement" of *Inclusive Communities*.

a.      Count 7—Discrimination in the Terms and Conditions of a Real Estate Transaction, D.C. Code § 2-1402.21(a)(2)

This claim alleges that the District, in promulgating the Creative Economy Strategy, explicitly discriminated against Plaintiffs based on age and source of income in a "transaction in real estate."   D.C. Code § 2-1402.21(a)(2); ECF No. 34, ¶¶ 266–277.   Because the Creative Economy Strategy seeks to attract the Creative Class, the membership of which depends in part on an individual's source of income and also skews young, Plaintiffs contend that the strategy and the zoning decisions implementing it are discriminatory.   *Id.*, ¶¶ 273-276.   In their opposition to the motions to dismiss, Plaintiffs point to ZC No. 15-28, a proceeding for a PUD and zoning map amendment for a mixed-use development in Union Market, in which the Zoning Commission required the developer to "set aside at least 10 percent of [the] project's retail space for 'maker space.'"   ECF No. 39 at 85, ECF No. 6-1 at 266, 286.   This action was allegedly discriminatory because mixed-use developments "inevitably" contain housing designed to attract those who will support the retail establishments in and around the development.   ECF No. 39 at 85.   Plaintiffs argue that  the "[r]equired 'maker-use' . . .  limit[s] the potential for low-income family housing because such tenants will not patronize" the sorts of retail establishments that are consistent with the maker-use restriction, like "a craft beer bar with artisanal jam offerings."

D.C. Code § 2-1402.21(a)(2), a provision of the D.C. Human Rights Act, prohibits "inclu[sion] in the terms or conditions of a transaction in real property, any clause, condition or restriction" that discriminates on a prohibited basis, such as age or source of income.   The District first argues that Plaintiffs have not identified a "transaction in real estate" such that section 2-1402.21(a)(2) cannot apply here.   ECF No. 27-1 at 43; ECF No. 47 at 29.   The D.C. Human Rights Act provides a definition of a "transaction in real property": "the exhibiting, listing, advertising,

negotiating, agreeing to transfer or transferring, whether by sale, lease, sublease, rent, assignment or other agreement, any interest in real property or improvements thereon, including, but not limited to, leaseholds and other real chattels." D.C. Code § 2-1401.02(30). If the Court were writing on a blank slate, Defendants would have a good argument. A zoning decision would not seem to fit that definition. *Cf. Frazier v. City of Grand Ledge*, 135 F. Supp. 2d 845, 849–50 (W.D. Mich. 2001) (finding that a zoning decision made by the defendant did not constitute a real estate transaction pursuant to a Michigan law that prohibited discrimination on the basis of disability "in the terms, condition, or privileges of a real estate transaction" (quoting Mich. Comp. Law § 37.1502(1))). However, in *George Wash. Univ. v. D.C. Bd. of Zoning Adjustment*, 831 A.2d 921 (D.C. 2003), the D.C. Court of Appeals expansively interpreted the D.C. Human Rights Act to apply to zoning decisions. That case addressed the objections of George Washington University ("GWU") to conditions placed by the Board of Zoning Appeals on the long-range plan for continued development of the GWU campus. *Id.* at 926. GWU claimed, among other things, that the Board of Zoning Appeals-imposed condition that the university provide 5,600 beds for undergraduates, "either on campus, or, if not on campus, then in other neighborhoods" than the neighborhood in which the university is situated discriminated against students in violation of the D.C. Human Rights Act's prohibition on discrimination based on matriculation. *Id.* at 938, 941–42. Although recognizing that decisions of the Board of Zoning Appeals did not fit comfortably into any of the categories of prohibited discriminatory conduct related to housing comprising D.C. Code § 2-1402.21 (of which the provision at issue here is a subsection), the court held that the statute nevertheless reached that conduct stating that "the Act may be invoked against any application of zoning regulations which discriminates, in purpose or effect, on grounds prohibited by the Act." *Id.* at 939–41. The court continued: "Parties may disagree as to whether a particular

action by the [Board of Zoning Appeals], or by another District agency, is or is not discriminatory, but while that issue may determine the final result of the case, it does not affect coverage." *Id.* at 941; *see also 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 686 (D.C. Cir. 2006) (stating that "the D.C. Court of Appeals has squarely held" that another subsection of the D.C. Human Rights Act prohibiting discrimination in housing and commercial space—D.C. Code § 2-1402.21(a)(4)—"applies to actions by District agencies, including actions not specifically mentioned in the Act's definition of 'real estate transactions'"). Although the decisions at issue here were not taken by the Board of Zoning Appeals regarding the "application" of a zoning regulation, but rather, were decisions of the Zoning Commission allowing exceptions to the zoning regulations pursuant to PUD applications, in light of the D.C. Court of Appeals' broad application of the statute to zoning decisions, the District's argument that the conduct here is not covered by the statute is unavailing.

In another argument that runs headlong into the D.C. Court of Appeals' decision in *George Washington University*, Defendants contend that allowing such a claim would too-expansively interpret a different provision of the D.C. Human Rights Act. Section 2-1402.73 makes it unlawful for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived . . . age . . . [or] source of income." That provision, according to the District is "the portion of the [D.C. Human Rights Act] applying the Act to District agencies." ECF No. 27-1 at 43. They argue, based on Judge Friedman's decision in *Boykin*, that Plaintiffs' interpretation of the scope of the statute to reach the implementation of zoning policy would subject too many of the District's "routine policy decisions" to litigation and that, therefore, section 2-1402.73 should be read to "focus on the *selective denial of benefits to certain persons*" based on a discriminatory reason. ECF No. 27-

1 at 42–43 (quoting *Boykin*, 895 F. Supp. 2d at 218).  But in *George Washington University* the D.C. Court of Appeals observed that, although the language of section 2-1402.73 provision "appears to be directed at the administration of District of Columbia government programs rather than at the adjudicative responsibilities of the District's agencies," it was "difficult to believe" that the drafters of the D.C. Human Rights Act "intended to countenance any governmental action which would prevent or impede residence in an area of members of a protected class."  831 A.2d at 941 n.16.  The court then asserted that it did not have to decide the issue of the reach of Section 2-1402.73 because it had already held that the discriminatory application of zoning regulations was covered by the D.C. Human Rights Act without recourse to that provision.  *Id.*  Thus, the D.C. Court of Appeals' decision in *George Washington University* seriously undermines the District's argument that the D.C. Human Rights Act cannot be applied to the actions of the Zoning Commission unless those actions fall within the purview of D.C. Code § 2-1402.73.

That zoning decisions that allegedly discriminate on the basis of age and/or source of income are actionable under the D.C. Human Rights Act does not get Plaintiffs very far, however. First, to the extent that Plaintiffs seek to challenge the "Creative Economy Strategy" itself as violating the D.C. Human Rights Act by discriminating in the "terms and conditions of a transaction in real property" (ECF No. 34, ¶¶ 267, 271–275; ECF No. 39 at 85 ("By definition, the Creative Class Agenda expresses a preference for people based on age (millennials, ages 18-34) and source of income (derived from creative, innovative, non-traditional jobs)."), the claim must fail.  The D.C. Court of Appeals does not appear to have addressed whether high-level policy documents such as the Creative Economy Strategy or the New Communities Initiative can themselves violate the D.C. Human Rights Act, but there is no indication in the case law or the language of the statute that they are, even under the broad interpretation of the statute in *George*

*Washington University*.  More, neither the operative complaint nor Plaintiffs' opposition to the motions to dismiss makes any serious attempt either to argue that such documents are themselves "transactions in real estate" and therefore covered by the letter of the law or are akin to decisions of the Board of Zoning Appeals and therefore swept into the purview of the D.C. Human Rights Act's prohibitions on housing discrimination under the logic of *George Washington University*.

Plaintiffs do argue that the "PUD process" is a transaction in real estate, describing it as a "three-way negotiation between the District of Columbia government, residents, and private developers regarding an interest in real property, particularly which improvements will be allowed on real property."  ECF No. 34, ¶ 268–269.  Moreover, as discussed above, the provisions of the D.C. Human Rights Act on housing discrimination likely apply to Zoning Commission decisions like those on PUD applications.  However, Plaintiffs have identified only one part of one zoning decision that allegedly discriminates, and a closer look at their argument compels the conclusion that they have not stated a claim here.

Plaintiffs focus on the requirement that the PUD approved in ZC No. 15-28 (for a development in Union Market) reserve "3000 feet of the Project's retail space (more than 10% of the total retail space) for 'maker' uses."  ECF No. 6-1 at 266.  "Maker-uses" are defined as "[p]roduction, distribution, or repair of goods"; uses "encompassed within the Arts, Design, and Creation Use Category" as defined in the zoning regulations;[52] "production and/or consumption of food or beverages and the accessory sale or on-site consumption of the related food and beverage;" and "design related uses."  *Id.* at 286 (citing 11-B D.C. Mun. Regs. §§ 100.2, 200.2).  That is, the requirement reserves a certain amount of the commercial space in the development for

---

[52] That use category includes space to design, create, and rehearse art; and work space for artists and artisans that may include the sale of items created on the site.  11-B D.C. Mun. Regs. § 200.2.  It excludes "uses which would typically fall within the entertainment, assembly, and performing arts, educational, or sexually-oriented business establishment use categories.  *Id.*

specific kinds of commercial activity.  The condition does not pertain to the residential portion of the development and thus does not involve restrictions on housing, which are the target of Plaintiffs' claims here.  In order to connect this condition to housing, Plaintiffs rely on a series of allegations (none included in the operative complaint): the "maker-use" condition "effects the production of housing" because (1) mixed-use developments "inevitably produce[ ]" studio, one-bedroom, and luxury residences because (2) those are the only housing types that can feasibly be built above retail space because (3) ground floor retail space "is typically supported by the housing above and immediately surrounding it"; thus (4) the "maker use" condition will "limit the potential for low-income family housing" in the development because (5) low-income residential tenants will not patronize the maker-use retail space therefore (6) making provision of low-income housing in the development economically unfeasible.  ECF No. 39 at 85.  That tortured causation argument is rife with unsupported generalizations and unexamined assumptions, and it is too speculative to sufficiently allege that the Zoning Commission's imposition of the maker-use condition for retail space has the intent or effect of discrimination in the provision of housing on the basis of source of income or age.  Plaintiffs have cited no legal authority for the proposition that a zoning decision that might make it less likely that a development will include low-income housing violates the D.C. Human Rights Act's prohibition on source-of-income or age discrimination.  Moreover, as a factual matter, evidence in the record suggests otherwise: the PUD approval at issue actually mandates a certain amount of square footage be dedicated to affordable two-bedroom residences. ECF No. 6-1 at 285.  In any event, there are no plausible allegations that the Zoning Commission had the intent to discriminate in the provision of housing when it set aside a portion of the retail space in the Union Market development for so-called "maker uses."  *Cf. George Wash. Univ.*, 831 A.2d at 941–42 (finding that a zoning decision requiring the university to "provide at least 5600

beds for full-time undergraduates, either on campus or outside [Foggy Bottom–West End]" by a certain date consciously treated students differently "because of their status as students, *i.e.* on account of matriculation," which is a prohibited basis under the D.C Human Rights Act, where "the principal purpose of the [zoning] action[ ] was the 'protection' of [the neighborhood] from the perceived bane of too many students").

Perhaps Plaintiffs mean to argue that a zoning decision that makes it less likely that low-income housing will be created in a development constitutes source-of-income discrimination because it could mean that fewer individuals receiving income from Section 8 vouchers would be able to rent.  If so, they have not made that argument clear; but even if it were clear, it would fail. Indeed, it has been held that charging rents that place apartments out of reach of participants in the Section 8 program is not itself discriminatory under the D.C. Human Rights Act.  *See Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 87 (D.D.C. 2008).  Rather, "as long as it does so in a non-discriminatory fashion, a landlord is free to set the rent for its apartments high enough to make the apartments unavailable" to certain residents.  *Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre*, 936 A.2d 325, 334 n.7 (Md. 2007), *cited in Barbeau*, 549 F. Supp. 2d at 87.  Surely, then, the mere fact that a zoning decision approved or imposed a set-aside of approximately 10 percent of retail space for certain uses would not offend D.C. Code provisions prohibiting discrimination in housing even if it did have the collateral effect of making certain individuals unable to afford residences in the development.  Where, as here, there are no plausible allegations that the decision was taken for a discriminatory reason, such a claim must fail.

      b.    Count 8—Discriminatory Statements in Connection with a Transaction in Real Property—D.C. Code § 2-1402.21(a)(5)

This count alleges that the District violated the D.C. Human Rights Act's prohibition on

making, printing, or publishing any notice, statement, or advertisement in connection with a transaction in real property that indicates a preference, limitation, or discrimination based on, among other characteristics, age or source of income.  D.C. Code § 2-1402.21(a)(5).  The operative complaint states that the District "adopted a policy expressing a preference for allocation of public and private resources based on age (millennial) and source of income (creative, innovative, and non-traditional jobs)."  ECF No. 34, ¶ 280.  It also points to ZC No. 15-28's "maker-use" condition, discussed above.  *Id.*, ¶¶ 281, 285–290.  Plaintiffs argue that the preference expressed by that single PUD approval for Creative Class businesses, in tandem with the District's planning documents, which "state the express intention to create more live and work space for Creative Class members," would be understood by an ordinary listener as "expressing a preference for Creative Class residents in the development."  ECF No. 39 at 87–88.

Presumably because of the dearth of case law interpreting D.C. Code § 2-1402.21(a)(5), Plaintiffs suggest the Court look to interpretations of similar provisions in the Fair Housing Act "as an analogue" for those in the D.C. Human Rights Act.  ECF No. 39 at 87; *see also Benefits Commc'n Corp. v. Kleiforth*, 642 A.2d 1299, 1301–02 (D.C. 1994) (stating that the D.C. Court of Appeals has looked to analogous federal statutes to aid in interpreting the D.C. Human Rights Act).  The Fair Housing Act contains a provision that prohibits making, printing, or publishing any notice, statement, or advertisement in connection the sale or rental of a dwelling that indicates a preference, limitation, or discrimination based on certain characteristics.  42 U.S.C. § 3604(c).  To state a claim for violation of the statute, a plaintiff must allege that the defendant (1) made a statement (2) with respect to the sale or rental of a dwelling that (3) "indicated a preference, limitation, or discrimination against" the plaintiff on the basis of a protected characteristic.  *White v. U.S. Dep't of Hous. And Urban Dev.*, 475 F.3d 898, 904 (7th Cir. 2007).  "In determining

whether an ad or statement 'indicates' impermissible [ ] discrimination," courts ask whether or not the communication "suggests to an ordinary reader [or listener]" that an individual exhibiting or not exhibiting a protected characteristic "is preferred or dispreferred for the housing in question." *Soules v. U.S. Dep't of Hous. and Urban Dev.*, 967 F.2d 817, 824 (2d Cir. 1992) (internal quotation marks omitted) (second alteration in original) (quoting *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 999 (2d Cir. 1990)).  "The ordinary reader 'is neither the most suspicious nor the most insensitive of our citizenry.'"  *Soules*, 967 F.2d at 824 (quoting *Ragin*, 923 F.2d at 102); *see also, e.g.*, *White v. U.S. Dep't of Hous. and Urban Dev.*, 475 F.3d 898, 906 (7th Cir. 2007).  The standard "considers only whether a member of the protected class would be discouraged or steered away from pursuing the housing because of the statement."  *Access Living of Metro. Chi. v. Prewitt*, 111 F. Supp. 3d 890, 898 (N.D. Ill. 2015).  Plaintiffs must allege facts making it plausible, rather than just possible, that such a listener would be so affected.  *See, e.g.*, *Iqbal*, 556 U.S. at 678.

Again, Plaintiffs' allegations fall short of the mark.  Generally, claims under statutes prohibiting discriminatory statements made in connection with the sale or rental of a dwelling are directed at remarks made by individuals involved in the sale or rental of housing, *see, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 364 F. Supp. 3d 635, 653–54 (E.D. La. 2019) (addressing allegedly discriminatory statements made to prospective tenants by the owner/manager of a rental property when the prospective tenants were ready to sign a lease or touring an apartment) or discriminatory material published in the advertising media, *see, e.g.*, *Ragin*, 923 F.2d at 998 (addressing images in real estate advertisements published by the New York Times that allegedly indicated a preference based on race).  *See also* Robert G. Schwemm, *Discriminatory Housing Statements and § 3604(c): A New Look at the Fair Housing Act's Most Intriguing Provision*, 29 Fordham Urb. L.J. 187, 214 (2001) ("[T]wo groups have been the

principal targets of such claims: (1) persons engaged in the sale or rental of housing who make, print, or publish or cause others to make, print, or publish discriminatory notices, statements, or advertising; and (2) newspapers and other advertising media that make, print, or publish the offending material of others.").  The statement complained of here—the Zoning Commission's set-aside of 10 percent of retail space in a Union Market development for "maker uses"—is neither. More importantly, the preference for a certain square footage of maker use is facially nondiscriminatory and, according to Plaintiffs themselves, becomes susceptible to a discriminatory meaning only if read "in concert with the assumptions of the [Creative Class] Agenda itself."  ECF No. 39 at 88.  It is not clear precisely what these "assumptions" are.  Plaintiffs hypothesize in the Creative Class Agenda as a whole a preference for millennials and those who work in "creative" trades that must inflect the interpretation of the maker use set-aside. But Plaintiffs do not point in their opposition to specific language in the planning documents that might, itself, suggest to an ordinary reader a discriminatory preference based on age or source of income.  Indeed, another count of the operative complaint—Count 10, the "steering" count—quotes certain language that purportedly shows that the Creative Economy Strategy is a "publication that has source of income and age preferences," but each of the identified phrases and clauses merely asserts that the strategy seeks to "improve access to space," including residential housing, "and affordable resources" through "changing zoning regulations in industrial areas and allowing residential use."  ECF No. 34, ¶¶ 318–322.  Nor do Plaintiffs allege that this apparently necessary context is one that the ordinary reader would be aware of.

Instead, as support, Plaintiffs cite a Seventh Circuit case addressing the admissibility of a social scientist's testimony "about the way an advertising campaign sends messages to its target market and how an all-White campaign affects African-Americans."  *Tyus v. Urban Search Mgmt.*,

102 F.3d 256, 263–64 (7th Cir. 1996).  According to Plaintiffs, the fact that in *Tyus*, the Seventh Circuit "held that testimony from sociology and psychology experts on the signaling impact of advertisements featuring only white people for an upscale apartment complex could be admissible [under Rule 702 of the Federal Rules of Evidence] to show that that advertising campaign designed to attract young affluent professionals" violated the Fair Housing Act's prohibition on discriminatory statements in connection with the rental of a dwelling means that the Creative Class Agenda's allegedly explicit preference for "residential tenants of certain ages and sources of income" is "sufficient to draw the inference of discriminatory intent."  ECF No. 39 at 88.  First, the fact that such testimony might "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), does not address the question of whether Plaintiffs have pleaded facts sufficient to withstand a Rule 12(b)(6) motion.  *Cf. In re Lipitor Antitrust Litig.*, 868 F.3d 231, 259 n.14 (3d Cir. 2017) (noting that the standard for admissibility under Federal Rule of Evidence 702 is different from the pleading standard to survive a motion to dismiss).

More pertinent are cases that actually address the pleading standard for a claim alleging discriminatory statements in connection with the sale or rental of housing.  For example, in *Ragin*, the court held that a complaint alleging "a long-standing pattern of publishing real estate ads in which models of potential customers are always white while black models largely portray service employees, except for the exclusive use of black models for housing in predominantly black neighborhoods" sufficiently stated a claim under 42 U.S.C. § 3604(c).  923 F.2d at 1001.  In contrast, *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, held that a complaint alleging a single publication of an advertisement including only white models did not do so.  943 F.2d 644, 648 (6th Cir. 1991); *see also Soules*, 967 F.2d at 825 (distinguishing between claims alleging repeated iterations of statements or images subject to a discriminatory

116

interpretation, which violate the Fair Housing Act, with claims of a single allegedly discriminatory statement or image, which do not).   Indeed, at issue in *Tyus* was an "aggressive advertising campaign" designed to attract tenants to a new luxury high rise that, for a period of three years, featured only "White human models" and no racially diverse groups.  102 F.3d at 260.  Here, Plaintiffs' submissions identify only a single facially-neutral statement—the setting aside of 10 percent of retail space for maker uses—and various unidentified "assumptions" in high-level planning documents.  They have not plausibly alleged that such communication would discourage African-Americans from pursuing housing at the development, and therefore have not alleged a violation of D.C. Code § 2-1402.21(a)(5).

        c.        Count 9—Discriminatory Subterfuge, D.C. Code § 2-1402.21(b)

The D.C. Human Rights Act's discriminatory subterfuge provision applicable to housing makes it unlawful to "do any of the . . . acts [prohibited by D.C. Code § 2-1402(a)] for any reason that would not have been asserted but for wholly or partly, a discriminatory reason."  D.C. Code § 2-1402(b).  Subterfuge provisions prohibit the imposition or application of facially neutral policies for a discriminatory purpose.  Such provisions "presuppose[ ] a discriminatory act which is alleged to have been committed by subterfuge," therefore, a subterfuge claim will "necessarily fail[ ]" with the failure of the underlying discrimination claim.  *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 170 (D.D.C. 2012) (internal quotation marks omitted) (quoting *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 956 n.4 (D.C. 2000)).  Plaintiffs here assert that this subterfuge claim is based on the underlying discrimination alleged in Counts 7 and 8, both of which should be dismissed for failure to state a claim.  ECF No. 39 at 88–89.  This count should therefore be dismissed, as well.

d.        Count 10—Steering—D.C. Code § 2-1402.22

Plaintiffs attempt to state a claim that the District engaged in illegal steering based on source of income and age in violation of the D.C. Human Rights Act, but the operative complaint's allegations are confused and seem to focus on (1) whether the Creative Economy Strategy is a "government publication that has source of income and age preferences with respect to real estate transactions" and (2) the personal liability of the current Mayor and former mayors Fenty and Gray, none of whom are defendants here.  ECF No. 34, ¶¶ 311–312, 318–322, 327–328.  The opposition to the motions to dismiss further muddies the water by first focusing on the "decision to let Barry Farm fall into gross disrepair while attempting to entice young Creative Class members with preferential funding and development deals" and then stating that the Housing Authority "gave Creative Class members preferential treatment in commercial and retail real property transactions," including in connection with the PUD application in ZC No. 15-28 in Union Market.  ECF No. 39 at 89.  Plaintiffs then return to Barry Farm by charging "Defendants" with constructively evicting low-income African-American residents of that community in order to build high-rises that they cannot afford.  They wrap up with the assertion that such "disparate treatment permits the inference of discriminatory intent" because it "effectively steer[s] in white residents and steers out African-Americans."  *Id.* at 90.

The textbook example of steering occurs when a realtor "direct[s] prospective home buyers [or tenants] interested in equivalent properties to different areas according to [a protected characteristic]."  *Gladstone*, 441 U.S. at 94.  However, the D.C. Court of Appeals has held that a zoning decision can constitute steering.  In *George Washington University*, a condition imposed on the university's campus plan for student housing "provide[d] that 70% of [ ] undergraduates must reside on campus or, if off-campus, then outside of [the neighborhoods surrounding the

university." 831 A.2d at 941–42.  The D.C. Court of Appeals found that the condition had as a "principal purpose" the "'protection' of [those neighborhoods] from the perceived bane of too many students" and, as such, could constitute "'steering, *i.e.*, directing students to different areas because they are students.'"  *Id.* at 941–42 & n.17.

Plaintiffs' agglomeration of facts does not state a claim for steering under the D.C. Human Rights Act.  Their arguments that the Housing Authority engaged in a prohibited practice fail.  The Housing Authority, which is a separate legal entity from the District, is not sued in this count and there are no factual allegations to support the suggestion that it "attempt[ed] to entice young Creative Class members with preferential funding and development deals" or "gave Creative Class members preferential treatment in commercial and retail real property transactions."  ECF No. 39 at 89.  Rather, the operative complaint repeatedly argues that the *District* implemented policies with such alleged preferences.  *See, e.g.*, ECF No. 34, ¶¶ 26–44.  But it is equally clear from the allegations in the operative complaint that the District did not allegedly constructively evict tenants from Barry Farm.  That alleged conduct is laid at the feet of the *Housing Authority*, which (as noted) is not sued in this count.  ECF No. 34, ¶¶ 133, 337–338, 343, 345.  And there is nothing in the operative complaint to plausibly connect the Housing Authority's management of Barry Farm to the District's allegedly discriminatory zoning decisions.  Indeed, Plaintiffs' reliance on the theory that the constructive eviction of Barry Farm residents in favor of "luxury high-rises" constitutes steering on the basis of age or source of income (ECF No. 39 at 90) must fail because Plaintiffs have not pointed to a zoning decision that allows such construction; as noted above, the approval of the Barry Farm PUD application that Plaintiffs cite (ZC No. 14-02) was vacated.  *See supra* n.38.  Reliance on ZC No. 15-28 as evidence of discrimination on the basis of age and source of income (ECF No. 39 at 89) is unavailing for the reasons discussed above in Section III.D.5.a,

namely, that Plaintiffs have not plausibly alleged that the "maker use" set-aside in that PUD approval would have any effect on the provision of low-income housing. Moreover, ZC No. 15-28 is a Zoning Commission decision connected with a development in Union Market; it has nothing to do with Barry Farm, which is the focus of Plaintiffs' arguments on this steering claim. ECF No. 39 at 89–90; *see also supra* n.45.

To the extent that this claim (as alleged and argued) is comprehensible, it charges that the Creative Class Agenda as a whole evinces a preference for millennials and those who work in "creative" trades and thus the District has engaged in steering based on age and source of income. But that is merely a theory unsupported by any plausibly alleged facts. Plaintiffs have not, for example, pointed to a zoning decision that effectively bans them from an area or a building based on their age or source of income. *Cf. George Wash. Univ.*, 831 A.2d at 941–42 & n.17. Nor have they alleged that similarly-situated individuals were treated differently. *Braxton v. Ga. Dep't of Cmty. Affairs*, 433 F. App'x 839, 840 (5th Cir. 2011) (dismissing "inconsistent complaint" alleging illegal steering under the Fair Housing Act in part because the plaintiff failed to allege that the defendant made different representations about housing or made housing available to a similarly-situated person who did not have the protected characteristic). The claim should be dismissed.

e.     Count 11—Discriminatory Subterfuge—D.C. Code § 2-1402.21(b)

This is a count for subterfuge based on race brought by Plaintiffs Matthews and M. Hamilton—the "Barry Farm Plaintiffs"—against both the District and the Housing Authority. It is, again, confused. The operative complaint focuses on the Housing Authority's alleged failure to comply with Policy FSS-2.3.1, a provision of the Comprehensive Plan that "encourage[s] the revitalization of Barry Farm in a manner" that, among other things, "[e]nsures a one-for-one replacement of any public housing that is removed, along with measures to assist residents and

avoid dislocation or personal hardship."  10-A D.C. Mun. Regs. § 1813 Policy FSS-2.3.1.  It charges the Housing Authority with "fail[ing] to comply with [one-for-one] housing replacement provisions leading to the displacement of tens of thousands of black residents since 2006," failing to follow the policy's "mandate to 'build first' or 'avoid dislocation,'" and "leaving the Barry Farm site in gross disrepair so as to constructively evict [its] residents," in order to disperse "a community inimical to the sorts of communities the District of Columbia Government has been seeking to grow pursuant to Creative Class policies."  ECF No. 34, ¶¶ 334–338, 341–345.  It also states, in a conclusory manner, that "the Zoning Commission has unlawful practices that would not otherwise occur but for . . . discriminatory reasons, as illustrated by its lengthy pattern of arbitrary behavior that cannot be explained but for animus on the basis of race against black residents."  *Id.*, ¶ 346.

In its motion to dismiss, the Housing Authority argues that Plaintiffs have not alleged intentional discrimination in relation to its alleged failure to comply with one-for-one housing replacement or refusal to make repairs.  ECF No. 26-1 at 36–43.  In their opposition, Plaintiffs fail to address the Housing Authority's arguments as to why its conduct in connection with Barry Farm—which is the focus of this count's allegations in the operative complaint—do not state a claim.  The Court should deem that Plaintiffs have conceded the Housing Authority's arguments on the merits of this claim.  *See, e.g.*, *Henneghan v. District of Columbia*, 916 F. Supp. 2d 5, 9 (D.D.C. 2013) (Sullivan, J.) ("[T]he Court may treat as conceded any argument raised in the motion which the opposing parties fail to address."); *see also Ctr. for Biological Diversity v. Everson*, No. 15-cv-477 (EGS), 2020 WL 437289, at *14 (D.D.C. Jan. 28, 2020); *Abdulrazzaq v. Trump*, 422 F. Supp. 3d 281, 290 (D.D.C. 2019) (Sullivan, J.).  Even without that concession, the claim should be dismissed.  As noted, a discriminatory subterfuge claim "presupposes a

discriminatory act which is alleged to have been committed by subterfuge" and will therefore fail with the failure of the underlying discrimination claim. *Young*, 846 F. Supp. 2d at 170. Here, there are no allegations to support a claim of discrimination against the Housing Authority. There is no allegation, for example, that the Housing Authority treated similarly-situated individuals of a different race more favorably than Plaintiffs Matthews and M. Hamilton (or, for that matter, more favorably than any of the other Plaintiffs) by repairing their properties while leaving the properties of African-Americans to fall apart. *See, e.g.*, *Hicks v. Makaha Valley Plantation Homeowners Ass'n*, Civ. No. 14-254, 2015 WL 328311, at *6 (D. Haw. Jan. 26, 2015) ("To state a claim [of racial discrimination based on failure to make repairs to a residence] Plaintiffs would need to allege not only that a particular defendant had a duty to and failed to satisfactorily repair Plaintiffs' unit, but that the defendant satisfactorily repaired the unit or units of non-Black residents."); *see also Inclusive Cmtys.*, 920 F.3d at 910–11 (requiring in a Fair Housing Act case an allegation that similarly-situated individuals were treated differently); *Braxton*, 433 F. App'x at 840 (same); *Hous. Opportunities Project for Excellence, Inc. v. Key Colony No. 4 Condo. Ass'n, Inc.*, 510 F. Supp. 2d 1003, 1011 (S.D. Fla. 2007) (same). Moreover, as the Housing Authority points out, Plaintiffs' theory that it neglected Barry Farm and developed plans to gentrify the area to replace low-income African-American residents with "more affluent millennial Creative Class white residents" (ECF No. 39 at 91; ECF No. 46 at 11)—is significantly undermined because there are no allegations that the Housing Authority implemented or enforced the Creative Class Agenda, the putative prime mover behind the discrimination.

For its part, the District argues that, because Plaintiffs have not stated a claim for racial discrimination against it, this subterfuge claim must also fail. ECF No. 27-1 at 45 (citing *Young*, 846 F. Supp. 2d at 170).

The District is correct.  Plaintiffs' allegations here consist largely of conclusory assertions of discriminatory intent, such as "the Zoning Commission has unlawful practices that would not otherwise occur but for . . . discriminatory reasons, as illustrated by its lengthy pattern of arbitrary behavior that cannot be explained but for animus on the basis of race against black residents." ECF No. 34, ¶ 346.  The Barry Farm Plaintiffs—who are the only two Plaintiffs who bring this claim—do not explain how the Zoning Commission decision in ZC No. 14-02, which approved the PUD application to redevelop Barry Farm but was thereafter vacated, after which the application was withdrawn, *see supra* n.38, caused them a discriminatory injury.  In any case, the undersigned has already recommended dismissing the two counts that Plaintiffs assert underlie this subterfuge claim.  *See supra* §§ III.D.3, III.D.4.a.  This claim should therefore be dismissed also.  *See Young*, 846 F. Supp. 2d at 170 (dismissing subterfuge claim where underlying discrimination claim had been dismissed).

f.      Count 12—Discriminatory Subterfuge—D.C. Code § 2-1402.21(b)

This is a claim for subterfuge against the District based on the some of the same arguments analyzed above in the section addressing Plaintiffs' disparate impact claim under the Fair Housing Act.  ECF No. 39 at 79–81; *See supra* § III.D.4.b.  That is, Plaintiffs allege that the District's land use policies designed to attract members of the Creative Class, which skew white and young, disproportionately impact African-American residents.  ECF No. 34, ¶ 352.  They explicitly recognize that this claim should be analyzed under the same standards as Plaintiff's Fair Housing Act disparate impact claim.  ECF No. 39 at 79 ("Disparate impact claims under the [D.C. Human Rights Act] are interpreted in accordance with similar claims under the [Fair Housing Act].").  Therefore, because Plaintiffs have not shown that their Fair Housing Act disparate impact claim

should go forward, this claim, too, should be dismissed.[53]  *See Young*, 846 F. Supp. 2d at 170 (dismissing subterfuge claim where underlying discrimination claim had been dismissed).

## IV.  CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that the both the District of Columbia Housing Authority's motion to dismiss (ECF No. 26) and the District of Columbia's motion to dismiss (ECF No. 27) be **GRANTED**.

*        *        *        *        *

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  April 30, 2020

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

---

[53] The operative complaint includes conclusory allegations that, "[u]pon information and belief," land use policies to attract members of the Creative Class "disproportionately impact families" and "disproportionately impact the religious persons who live in historically [African-American] communities in Anacostia."  ECF No. 34, ¶¶ 354–355. Those theories are not supported by any other allegations in the complaint.  Moreover, in its opposition to the motions to dismiss, Plaintiffs argue only that this claim alleges race-based disparate impact.  ECF No. 39 at 79–81.